```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   UNITED STATES OF AMERICA,

 5           Plaintiff,

 6   vs.                        Case No. CR-24-146-R

 7   CHONG I PHU,
     MATTHEW ALAN STACY,
 8   CHANH I PHU,

 9           Defendants.

10   ----------------------------

11

12

13

14              TRANSCRIPT OF MOTION HEARING

15          BEFORE THE HONORABLE DAVID L. RUSSELL

16             UNITED STATES DISTRICT JUDGE

17                 JANUARY 28, 2025

18                   9:00 A.M.

19                 VOLUME I OF II

20

21

22

23

24

25   Proceedings reported by mechanical stenography; transcript
     produced by computer-aided transcription.
```

```
 1                              APPEARANCES

 2   FOR THE GOVERNMENT:  Mr. Nicholas M. Coffey and Ms. Elizabeth
     Maeve Bagwell, Assistant United States Attorneys, United States
 3   Attorney's Office, 210 W. Park Ave., Suite 400, Oklahoma City,
     OK 73102
 4

 5   FOR DEFENDANT CHONG I PHU:  Mr. Patrick William Blegen, Blegen
     & Associates, 53 West Jackson Blvd., Suite 1424, Chicago, IL
 6   60604

 7

 8   FOR DEFENDANT MATTHEW ALAN STACY:  Mr. Robert M. Goldstein, Law
     Office of Robert Goldstein, 20 Park Plaza, Suite 1000, Boston,
 9   MA 02116
     Mr. Joshua Todd Welch and Mr. Joseph L. DeGiusti, and
10   Ms. Allison Christian, DeGiusti & Welch, PLLC, 3721 N. Classen
     Blvd., Oklahoma City, OK 73118
11

12   FOR DEFENDANT CHANH I PHU:  Mr. Robert Don Gifford, II, Gifford
     Law, PLLC, PO Box 2682, Oklahoma City, OK 73101
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    EXAMINATION INDEX

2    DEFENDANTS' WITNESSES:

3    DANIEL PETERSON
          DIRECT BY MR. GOLDSTEIN               6
4         CROSS BY MR. COFFEY                   65
          REDIRECT BY MR. GOLDSTEIN            77
5
     JESSICA GOURE
6         DIRECT BY MR. GOLDSTEIN              84
          CROSS BY MR. COFFEY                 135
7         REDIRECT BY MR. GOLDSTEIN           154

8    RAFAEL CARRILLO
          DIRECT BY MR. GOLDSTEIN             156
9         CROSS BY MR. COFFEY                 176
          REDIRECT BY MR. GOLDSTEIN           193
10
     RUSSELL COCHRAN
11        DIRECT BY MR. COFFEY                200
          CROSS BY MR. GOLDSTEIN              214
12        RECROSS BY MR. COFFEY               236

13   CRAIG WILLIAMS
          DIRECT BY MR. COFFEY                237
14        CROSS BY MR. GOLDSTEIN              265
          REDIRECT BY MR. COFFEY              282
15

16

17

18

19

20

21

22

23

24

25
```

```
 1          (Proceedings had on January 28, 2025, with Court, counsel,
 2    and Defendant Stacy present at defense table.)
 3          THE COURT:  All right.  This is United States vs.
 4    Chong Phu, Matthew Stacy, and Chahn Phu, CR-24-146.
 5       Will the parties make their appearance for the record,
 6    please.
 7          MR. COFFEY:  Good morning, Your Honor.  Nick Coffey
 8    and Elizabeth Bagwell for the United States.
 9          MR. GOLDSTEIN:  Good morning, Your Honor.  Robert
10    Goldstein on behalf of Mr. Stacy.
11          MR. WELCH:  Your Honor, Josh Welch and Joseph
12    DeGiusti and Allison Christian on behalf of Mr. Stacy.
13          MR. BLEGAN:  Good morning, Judge.  Pat Blegen on
14    behalf of Chong Phu.  He goes by Alex.  He's seated in the tan
15    jacket in the bench.
16          MR. GIFFORD:  Good morning, Your Honor.  Robert Don
17    Gifford on behalf of Mr. Chahn "Shawn" Phu, he is present and
18    seated at that row, as he indicated.
19          THE COURT:  All right.  The first thing I wanted to
20    take up is there was a motion for interlocutory sale of
21    properties in this case to which I don't believe we've gotten
22    responses from everyone.
23       Is this being opposed by the defendants?
24          MR. BLEGEN:  Judge, if we're talking about the Chong
25    Phu properties, then, no, it is not opposed.
```

```
 1                THE COURT:  All right.

 2                MR. BLEGEN:  And I think those are the ones you're

 3    talking about.

 4                THE COURT:  Is that the only person that would have

 5    an objection to it?

 6                MR. COFFEY:  That's correct, Your Honor.

 7                THE COURT:  All right.  Thank you.

 8         All right.  Defendants ready to proceed?

 9                MR. GOLDSTEIN:  We are, Your Honor.

10                THE COURT:  All right.  Mr. Goldstein, I'll turn it

11    over to you.

12                MR. GOLDSTEIN:  I'll call Agent Daniel Peterson from

13    OBN.

14                THE COURT:  Let me inquire:  Does anyone wish to

15    invoke the rule, and would it be appropriate?

16                MR. GOLDSTEIN:  Yes, Your Honor.

17                THE COURT:  All right.

18                MR. COFFEY:  Your Honor, no objection.  We don't have

19    our witnesses in the courtroom at this moment anyway.

20                THE COURT:  All right.  The rule has been invoked.

21    If there are witnesses in the courtroom, you'll be excused

22    until such time as you testify.  And once you testify, you're

23    not to discuss your testimony with any other witness.

24         All right.  Go ahead.

25                          DANIEL PETERSON,
```

1      called as witness on behalf of the defendants, having been

2 first duly sworn to tell the truth, testified as follows:

3                          DIRECT EXAMINATION

4 BY MR. GOLDSTEIN:

5 Q.   Good morning, Agent Peterson.

6 A.   Good morning, sir.

7 Q.   You are employed by the Oklahoma Bureau of Narcotics and

8 Dangerous Drugs; is that correct?

9 A.   Yes, sir.

10 Q.   And you're currently a senior agent -- otherwise known as

11 OBN, correct?

12 A.   Yes, sir.

13 Q.   And you're a senior agent at OBN?

14 A.   Yes, sir.

15      THE COURT:  I'm sorry.  I don't mean to interrupt.

16 Before you go further, introduce yourself for the record, your

17 name.

18      THE WITNESS:  I am Daniel Lee Peterson.  D-A-N-I-E-L;

19 Lee, L-E-E; Peterson, P-E-T-E-R-S-O-N.

20 Q.   (BY MR. GOLDSTEIN) You're a senior agent with the OBN; is

21 that correct?

22 A.   Yes, sir.

23 Q.   And you are the case agent on the state prosecution of

24 Mr. Stacy, correct?

25 A.   Yes, sir.

1  Q.   In fact, you actually arrested Mr. Stacy in connection

2  with that state prosecution?

3  A.   Yes, sir.

4  Q.   All right.  You've been in law enforcement your entire

5  career?

6  A.   I've got 26 years out of being a police officer, and then

7  I have five with the Oklahoma Bureau of Narcotics.

8  Q.   Okay.  And you've been a law enforcement officer with OBN

9  since September of 2020; is that correct?

10 A.   Yes, sir.

11 Q.   This may sound redundant, but as a law enforcement officer

12 with OBN, your responsibilities are to enforce the law,

13 correct?

14 A.   Yes, sir.

15 Q.   And with that position, you have the authority to and the

16 power to execute arrests, correct?

17 A.   Yes, sir.

18 Q.   To seize contraband?

19 A.   Yes, sir.

20 Q.   To apply for search warrants?

21 A.   Yes, sir.

22 Q.   To file and initiate criminal charges?

23 A.   Yes, sir.

24 Q.   And you have done all of those things in connection with

25 Mr. Stacy, your investigation of Mr. Stacy, in the state; is

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          8

1   that correct?

2   A.   Yes, sir.

3   Q.   All right.  Now, let me direct your attention to medical

4   marijuana.  Okay?  Medical marijuana was legalized in the

5   summer of 2018 in Oklahoma, correct?

6   A.   Yes, sir.

7   Q.   And that was by citizen petition, correct?

8   A.   Yes, sir.

9   Q.   And eventually, a new agency was created, the Oklahoma

10  Medical Marijuana Authority, correct?

11  A.   Yes, sir.

12  Q.   Otherwise known as OMMA?

13  A.   Yes, sir.

14  Q.   Or OMMA, I think you've referred to it as in the past,

15  right?

16  A.   Yes, sir.

17  Q.   Now, in 2020 and 2021, when a business wanted to get into

18  the medical marijuana business, they first needed to apply for

19  a license with OMMA, correct?

20  A.   From what I understand.  I did not start full-time with

21  OBN until September of 2020.

22  Q.   Okay.  So let's focus on after September of 2020.

23  A.   Okay.

24  Q.   If someone wanted to get into the medical marijuana

25  business, the first step, before going to OBN, is to apply for

1  a license with OMMA, correct?

2  A.   Yes, sir.

3  Q.   And then if they're granted that license by OMMA, that's

4  when they can and have to file an application for registration

5  with OBN, correct?

6  A.   Yes, sir.

7  Q.   And when that application comes in to OBN, it's the

8  responsibility of OBN, as an agency, to vet that application,

9  right?

10  A.   It is now, yes, sir.

11  Q.   Okay.  Was that different in September of 2020?

12  A.   We would go ahead and look at background conditions in

13  reference to the persons applying for a registration.

14  Q.   And as part of that process as an OBN agent, after

15  September of 2020, you, yourself, have gone out to conduct

16  inspections of applicants' facilities, correct?

17  A.   Yes, sir.

18  Q.   Looking for things like self-locking doors, right?

19  A.   Yes, sir.

20          THE COURT:  Let me interrupt again and ask a

21  question.  Now, what's the difference between a license and a

22  registration?

23          THE WITNESS:  The license is a part of what OMMA has

24  set up that they have to get a license.  There's things that

25  they have to do to get that license.  With OBN, we are the

1  regulatory side of the registration or the process for

2  marijuana here in the state of Oklahoma.  So we're the law

3  enforcement side of that.  And we handle everything out of 475,

4  which is our administrative code, to do the inspections, et

5  cetera.

6          THE COURT:  I'm still not -- I'm still adrift as to

7  the difference between a license and a registration.

8          THE WITNESS:  The license is what OMMA requires, and

9  the registration's what OBN requires.

10         THE COURT:  All right.  I see.  All right.

11 Q.   (BY MR. GOLDSTEIN)  All right.  Let me just back up a

12 little bit.

13     So just to reiterate, if I wanted to get into the medical

14 marijuana business after September of 2020, when you became

15 employed with OBN, the first thing I have to do is apply for a

16 license from the Oklahoma Medical Marijuana Authority, correct?

17 A.   Yes, sir.

18 Q.   They have their own application process, right?

19 A.   Yes, sir.

20 Q.   Their own team to vet those applications, right?

21 A.   Yes, sir.

22 Q.   And if they go -- after they go through that vetting

23 process, if their discretion -- they want to grant the license,

24 they would issue a license to me, as the applicant, right?

25 A.   Yes, sir.

1  Q.   And I would get a piece of paper from the OMMA that says,

2  "You are licensed, under the OMMA, to whether grow marijuana or

3  process or distribute," those kinds of things, right?

4  A.   Yes, sir.

5  Q.   And then after I receive that license from OMMA, the next

6  step would be to apply for registration with OBN, correct?

7  A.   Yes, sir.

8  Q.   All right.  And then at that point, the application comes

9  in to OBN, right?

10 A.   Yes, sir.

11 Q.   And you have an internal team that receives those

12 applications and reviews those applications, right?

13 A.   That's the registration department.

14 Q.   Okay.  And their job is to vet those applications for the

15 information that's inputted over OBN's application system,

16 right?

17 A.   Yes, sir.

18 Q.   Okay.  And then at a certain point, after they do what

19 they do at the registration department, it can be referred out

20 to people like you, law enforcement officers, to conduct an

21 inspection of the facility, right?

22 A.   Yes, sir.  And to continue the process of vetting that and

23 conducting an investigation.

24 Q.   Right.  Meaning, before you literally give someone a

25 registration to distribute and -- to distribute, possess, and

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        12

1  manufacture a controlled substance, you, as a law enforcement
2  officer, can go out and look at the facility, right?
3  A.   Yes, sir.
4  Q.   Interview the owner of the facility at the location,
5  right?
6  A.   Yes, sir.
7  Q.   All right.  And you did that after September of '20, as
8  part of your responsibilities as a law enforcement officer with
9  OBN, correct?
10 A.   Let me stop you right here.  I was in Diversion until
11 2021, so we formed the Marijuana Enforcement Team in July of
12 '21.  Myself and Agent Jehle were two of the agents that they
13 asked to go ahead and start the Marijuana Enforcement Team.
14 Q.   Okay.
15 A.   So '21 is probably a more accurate aspect of when I
16 started handling marijuana cases.
17 Q.   Okay.  Did you conduct or accompany officers, agents with
18 OBN conducting inspections of facilities, let's say, in October
19 of 2021?
20 A.   Yes, sir.
21 Q.   That's right.  You were physically present in October of
22 2020 -- were you with agents in October of 2020, conducting
23 inspections of facilities?
24 A.   It was part of Diversion at that time, yes, sir.
25 Q.   Okay.

```
 1   A.   And there were times I was with agents and times I
 2   weren't.  So I don't know specifically what you're talking
 3   about.
 4   Q.   Well, the question is:  Did you go on inspections in
 5   October of 2020?
 6   A.   Yes, sir.
 7   Q.   Okay.
 8   A.   I could.
 9   Q.   Well, you did.
10   A.   Okay.
11   Q.   Do you remember Chow King?
12   A.   No, sir, I do not.
13   Q.   Okay.
14        MR. GOLDSTEIN:  Your Honor, I'd like to play an audio
15   recording, if I could.  There's a stipulation, I believe.  This
16   is an inspection of Chow King, an applicant, on October 15 of
17   2020.  This is after Chow King received an OMMA license but
18   before they received an OBN registration.
19        THE COURT:  Chow?
20        MR. GOLDSTEIN:  Chow, C-H-O-W; King, K-I-N-G.
21     So this is a window of time, Your Honor, between after
22   they got their OMMA license but before they have OBN
23   registration.  Okay?
24        THE COURT:  Are you offering it as an exhibit?
25        MR. GOLDSTEIN:  Your Honor, I didn't -- yes.  I'm
```

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          14

1   offering the Chow King recording as an exhibit.

2       Give me one moment, Your Honor.  Exhibit 99.  It's an

3   audio recording of Agent Peterson, with other OBN agents,

4   conducting an inspection of Chow King, which was a client of

5   Mr. Stacy.  And Mr. Stacy can be heard on the recording

6   speaking to Agent Peterson and his fellow agents.

7           THE COURT:  Go ahead.

8           MR. GOLDSTEIN:  Thank you.

9   Q.  (BY MR. GOLDSTEIN) So I'm going to play a clip, Agent

10  Peterson.  Okay?  And it's not playing.

11      (Defendant's Exhibit Number 99 played.)

12      All right.  Do you recognize that first voice as Agent

13  Paulk?

14  A.  Yes, sir.

15      (Audio played.)

16  Q.  Okay.  Do you recognize that as Agent Martinez?

17  A.  Yes, sir.

18      (Audio playing.)

19  Q.  And that's you, right, sir?

20  A.  I didn't hear that very well.

21  Q.  Okay.

22  A.  There was other people talking in it.

23  Q.  Let's play it again.

24  A.  Okay.

25      (Audio played.)

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          15

1   Q.   Did you hear that?

2   A.   I couldn't tell you if that was me or not, sir.

3   Q.   You can't tell if that's you?

4   A.   There are other people talking also.

5   Q.   Let's play it again for you.

6   A.   Okay.

7        (Audio played.)

8   Q.   Can you tell?

9   A.   No, sir.

10  Q.   All right.  Let's try this clip.

11  A.   Somebody is talking also, over me.

12  Q.   Let's try this clip.  You ready?

13  A.   Yes, sir.

14       (Audio played.)

15  Q.   Recognize that voice?

16  A.   That's me.

17  Q.   That's you, right?

18  A.   Yes, sir.

19  Q.   All right.  So now you're present at the Chow King

20  inspection on October 15 of 2020, right?

21  A.   Where was the location?  What's the name of the grow,

22  would be more helpful.

23  Q.   Yeah, it's been stipulated to that it's October 15 of

24  2020, and it's the Chow King facility, sir.

25  A.   Okay.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          16

1   Q.   All right.  Agent Paulk is a law enforcement officer with

2   OBN, right?

3   A.   Yes, sir.

4   Q.   Agent Martinez is a law enforcement officer with OBN,

5   right, sir?

6   A.   Yes, sir.

7   Q.   They have all of the law enforcement powers that you

8   have -- or maybe more -- at that time, the authority to arrest,

9   right?

10  A.   Yes, sir.

11  Q.   The authority to seize contraband, right?

12  A.   Yes, sir.

13  Q.   The authority to initiate criminal charges, right?

14  A.   Yes, sir.

15  Q.   The authority to seek search warrants, right?

16  A.   Yes, sir.

17  Q.   Okay.  Let me play a clip for you, sir.

18       (Audio played.)

19  Q.   Did you hear that?

20  A.   I did.

21  Q.   All right.  That's Agent Paulk, right?

22  A.   Yes, sir.

23  Q.   He's telling the person, the owner of Chow King, that it's

24  activity before registration, right?

25  A.   That's what he said.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        17

1   Q.   Okay.  Let's listen on.  Okay?

2   A.   Okay.

3        (Audio played.)

4   Q.   Did you hear that voice at the end?  It's Mr. Stacy,

5   right?

6   A.   I think.  I don't know.

7   Q.   Okay.  And he says, "Let's just get you the records

8   instead of guessing," right?

9   A.   Yes, sir.

10  Q.   Did you hear that?

11  A.   I heard that.

12  Q.   Okay.  All right.  So there's clearly marijuana at Chow

13  King, right?

14  A.   Yes, sir, it sounds like it.

15  Q.   Right.  And someone is literally growing marijuana in your

16  presence and Agent Paulk's presence and Agent Martinez's

17  presence without an OBN registration, right?

18  A.   That's what I understand, yes, sir.

19  Q.   Right.  And Agent Paulk says, "It's growth before

20  registration; that's fine," right?

21  A.   Yes, sir.

22  Q.   Says, "It's just an admin thing," right?

23  A.   That's what he said.

24  Q.   No one's arrested, right?

25  A.   No, sir, not that I know of.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          18

1    Q.    No plants are seized, right?

2    A.    No.

3    Q.    No search warrants are secured, correct?

4    A.    No, sir.

5    Q.    No criminal charges are initiated against the person

6    standing with you, with marijuana plants all around him?

7    A.    No, sir.

8    Q.    Instead, Agent Paulk and you and Agent Martinez tell him,

9    Everything's fine.  Matt just needs to get him some information

10   regarding proper fencing or proper security controls, those

11   kinds of things, right?

12   A.    That, I don't know.

13   Q.    Okay.

14   A.    They didn't say that.

15   Q.    All right.

16         (Audio played.)

17         Who did he call him?  What name did he use?

18   A.    He said, "Matt."

19   Q.    Matt?

20   A.    Yes, sir.

21         (Audio played.)

22   Q.    Mr. Stacy says, "Yeah, I've given it to them before,"

23   right?

24   A.    Yes, sir.

25   Q.    "I'll give it to them again," right?

1  A.   Yes, sir.

2  Q.   And he's talking about things like proper fencing, right?

3  A.   Well, I'm not sure what was in Chapter 20 that he was

4  referring to, but I would say --

5  Q.   Fencing is in Chapter 20?

6  A.   Yes, sir.

7  Q.   Proper security measures, right?

8  A.   Yes, sir.  Things to prevent diversion.

9  Q.   Self-locking doors, right?  And this wasn't some kind of

10  isolated instance, was it, sir?

11  A.   No, sir.

12  Q.   Meaning, many times, you and agents, before June 30th of

13  2021, went on inspections and found marijuana growing before

14  OBN registration, right?

15  A.   There were times.  And then we started enforcing the laws,

16  as per our administration, there at the first part of '21.

17  Q.   Yeah, we'll get to that.

18  A.   Okay.

19  Q.   But there are other examples.  Take, for instance, Earth

20  Angel.  You conducted an inspection of Earth Angel in February

21  of 2021, correct?

22  A.   Yes, sir.

23  Q.   All right.  The owner of Earth Angel is -- well, the

24  person you encountered there was a man named Jeremy Grable,

25  correct?

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          20

```
 1   A.   Yes, sir.

 2   Q.   He's one of the owners of Earth Angel, right?

 3   A.   Uh-huh.

 4   Q.   And he told you when you went in -- there were marijuana

 5   plants in the facility when you went to inspect Earth Angel,

 6   right?

 7   A.   Yes, sir.

 8   Q.   And, again, we're talking about the window of time after

 9   OMMA licensing, right?  They had their OMMA licensing, but they

10   were still an applicant for OBN registration, right?

11   A.   Right.

12   Q.   We're talking about that window of time, right?

13   A.   Yeah.

14   Q.   All right.  You go into Earth Angel, right?

15   A.   Yes, sir.

16   Q.   And there are marijuana plants everywhere, right?

17   A.   I wouldn't say "everywhere," but he had marijuana plants.

18   Q.   Okay.

19   A.   About 300 of them, if I remember correctly.

20   Q.   Yeah.  And he told you he'd been growing marijuana for

21   three months, right?

22   A.   Yes, sir.

23   Q.   And so once again, there's an individual growing

24   marijuana, February 23, 2021, in your presence, right?

25   A.   Yes, sir.
```

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        21

```
 1   Q.   In the presence of your colleagues at OBN, right?
 2   A.   Yes, sir.
 3   Q.   Another client of Mr. Stacy, right?
 4   A.   Yes, sir.
 5   Q.   And you don't arrest Mr. Gable?
 6   A.   No, sir.
 7   Q.   You don't take a single plant?
 8   A.   No, sir.
 9   Q.   You don't seek a search warrant?
10   A.   No, sir.
11   Q.   Don't initiate any administrative action at that time
12   against Earth Angel, right?
13   A.   No, sir.
14   Q.   In fact, you and your agent, your colleagues at OBN, did
15   the exact opposite.  You actually told him that you would point
16   out anything not compliant during that visit.  Do you recall
17   that?
18   A.   Yes, sir.
19           MR. GOLDSTEIN:  I'm moving to admit the Earth Angel
20   audio, 120.
21       (Defendant's Exhibit 120 played.)
22   Q.   (BY MR. GOLDSTEIN) Who's that, sir?
23   A.   Sounds like Agent Paulk.
24   Q.   Agent Paulk.
25           THE COURT:  Let me ask:  Who is recording?
```

1    MR. GOLDSTEIN:  The agents are.

2    THE COURT:  Is that correct?

3    THE WITNESS:  I didn't record it, but somebody did.

4  Q.  (BY MR. GOLDSTEIN) When you guys went to the grow, someone

5  would have recording devices on them, right?

6  A.    That, I don't know.

7  Q.    Okay.

8  A.    We have our cell phones, and maybe they recorded it off of

9  a cell phone, but I did not.

10    MR. GOLDSTEIN:  Just so the record's clear, I

11  received this tape from the government.

12    THE COURT:  I'm not doubting its authenticity.  I

13  just was curious.

14    MR. GOLDSTEIN:  Yeah.

15    (Audio played.)

16  Q.  (BY MR. GOLDSTEIN) Do you hear him say, "We'll point out

17  anything that's not compliant," right?

18  A.    Yes, sir.

19    (Audio played.)

20  Q.  "Not going to fine you or anything like that."  That's

21  what he says, right?

22  A.    Yes, sir.

23    (Audio played.)

24  Q.  "Tell him what needs to be fixed, tell him you'll come

25  back in 30 days," right?

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        23

```
 1   A.   Yes, sir.
 2        (Audio played.)
 3   Q.   You actually tell him -- there's a guy growing marijuana
 4   in your presence, you tell him you'll give him all the guidance
 5   he needs, right?
 6   A.   Yes, sir.
 7        (Audio played.)
 8   Q.   (BY MR. GOLDSTEIN) "That way, everything is above board,"
 9   right?
10   A.   Yes, sir.
11   Q.   All right.  But yet again, during this entire inspection,
12   you never once tell Mr. Grable, Mr. Stacy's client, that
13   growing marijuana before OBN registration is illegal?
14   A.   Sir, did you play the whole aspect of this?  Because he
15   cut those plants.
16   Q.   No, he cut those plants in the summer of 2021, sir.
17   A.   Yes, sir.
18   Q.   Yeah, not --
19   A.   So that he would not be in trouble.
20   Q.   Correct.  Let's focus on February.  Okay?  Let's focus on
21   your visit in February.
22   A.   Okay.
23   Q.   Did you once tell Mr. Grable, on February 23, 2021,
24   "Growing marijuana before OBN registration is illegal"?
25   A.   That, I don't know.  I didn't hear the whole clip of what
```

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        24

1  you have there.  You're just playing snippets of it.

2  Q.   Okay.  Right.  Do you think you did?

3  A.   I didn't tell him.

4  Q.   Okay.

5  A.   Agent Paulk was the one running that inspection at that

6  time.

7  Q.   Don't recall anyone telling him it was improper to grow?

8  A.   No, sir.

9  Q.   Don't recall anyone telling him it was illegal to grow,

10  right?

11  A.   No.

12  Q.   Let me play the next clip, sir.

13       (Audio played.)

14       He literally tells you, asks you, said he's invested

15  heavily.  If he's not compliant, he wants to know, right?

16  A.   Yes, sir.

17  Q.   He says he's invested heavily so he doesn't have to look

18  over his shoulders, right?

19  A.   Yes, sir.

20  Q.   And, again, you have no memory -- your memory, as you sit

21  here today, never once, after him telling you, asking you -- he

22  wants to know if he's compliant -- never once told him it was

23  illegal to grow marijuana before OBN registration, right?

24  A.   I did not tell him.  Like I said, it was Agent Paulk's

25  inspection.

1  Q.   Let me ask you:  Do you think it's fair to say that on

2  those two days, October 15, 2020 and February 23, 2021, that

3  you and your fellow colleagues at OBN actually promoted the

4  growth of marijuana before OBN registration?

5  A.   No, sir.

6  Q.   Well, can you tell me what you did to discourage the

7  growth of marijuana on those dates?

8  A.   Told Mr. Grable that he needed to cut those plants.

9  Q.   You told him that in February?

10  A.   He cut them later on.

11  Q.   No, no, no.  Did you tell him that in February?

12  A.   Sir, I've been with Mr. Grable a couple of times, talking

13  to him about what he has and didn't have and what he dealt with

14  with registration with Mr. Stacy.

15  Q.   I'm asking you to focus on February 23, 2021.  What did

16  you tell Jeremy Grable on that date to discourage him from

17  growing marijuana before OBN registration?

18  A.   I personally did not tell him anything.

19  Q.   Okay.  Tell me something another agent told him on

20  February 23 to discourage him from growing marijuana before OBN

21  registration?

22  A.   I can't tell you that.  That, I don't know.

23  Q.   Okay.  You can't remember anything, right?

24  A.   No, sir.

25  Q.   Okay.  And these, again, aren't isolated instances, Agent

1  Peterson, right?  Many other times in the fall of 2020 and in

2  2021, agents from OBN inspected a facility, found marijuana,

3  and took no law enforcement action, right?

4  A.   I can -- yes, sir.

5            MR. GOLDSTEIN:  Could I get the ELMO, please.

6       Just so we can maybe proceed with some efficiency here,

7  Mr. Coffey, I'm going to move to admit Exhibits 92, 121, 70,

8  67, 71, and 62.  I'll go through them one at a time.

9            MR. COFFEY:  No objection.

10           THE COURT:  92, 121, 70, 67, 71 and 62 will all be

11 admitted.

12           MR. GOLDSTEIN:  Thank you, Your Honor.

13 Q.   (BY MR. GOLDSTEIN) Agent Peterson, I'm showing you what's

14 been admitted as Exhibit 92, sir.  You recognize the form of

15 this report, right?

16 A.   Yes, sir, I do.

17 Q.   All right.  And this report is -- the reporting date is

18 September 21 of 2020, correct?

19 A.   Yes, sir.

20 Q.   It's a -- reporting agent is Justin Williams, right?

21 A.   Yes, sir.

22 Q.   A law enforcement officer at OBN, correct?

23 A.   Yes, sir.

24 Q.   And he's -- he reports that on September 17, 2020, he

25 received a request from OBN Agent Martinez regarding a recent

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        27

1  application submitted for a particular address, 20367 North

2  County Road, 3210, Pauls Valley.  Do you see that, sir?

3  A.   Yes, sir.

4  Q.   Are you familiar that that's the facility Golden Tree?

5  A.   No, sir, I'm not.

6  Q.   Okay.  I can clean that up later.  The report says he

7  noticed a greenhouse full of what appeared to be marijuana

8  plants, right?

9  A.   Yes, sir.

10 Q.   The plants were approximately 5 to 6 feet tall and bushy,

11 right?

12 A.   Yes, sir.

13 Q.   Are you aware that they -- this facility did not have an

14 OBN registration at this point in time?

15 A.   No, sir, I'm not.

16 Q.   Okay.  Let me show you what's been marked as Exhibit 121.

17 So this is -- you recognize the form, correct?

18 A.   Yes, sir.

19 Q.   This is a medical marijuana background, right?

20 A.   Yes, sir.

21 Q.   And this is a report that you and your colleagues at OBN

22 would prepare after you went out to vet or inspect a facility

23 that's seeking application to OBN for registration, right?

24 A.   That's what Alicia Martinez did.

25 Q.   Okay.

1   A.    I do mine differently.

2   Q.    Okay.  And you've seen her reports, right?

3   A.    Yes, sir.

4   Q.    All right.  And this is one of them, right?

5   A.    It appears to be.

6   Q.    This is an example of that window in time that we've been

7   talking about after someone gets an OMMA license and has

8   applied for OBN registration, right?

9   A.    Yes, sir.

10  Q.    Application goes into OBN, background team looks at the

11  application, and sends out someone like Agent Martinez to

12  conduct an on-site inspection, right?

13  A.    Yes, sir.

14  Q.    And this particular inspection is October 27 of 2020,

15  right?

16  A.    Yes, sir.

17  Q.    And it's a facility called Nana Zhang.  Do you see that,

18  sir?

19  A.    I see that.

20  Q.    Okay.  And she went out, and she conducted an inspection,

21  right?  These reports, by the way, they're not shared with --

22  you don't leave a copy of this with the facility, right?

23  A.    No, sir.

24  Q.    Right.  They don't get a copy -- Nana Zhang didn't get a

25  copy of this, right?

1  A.   No.  You'll go back and write the report.

2  Q.   Right.  And even after it's written, you don't go and

3  give it to Nana Zhang, right?

4  A.   No, sir.  Not no more.

5  Q.   And you don't give it to Mr. Stacy, as their lawyer,

6  right?

7  A.   No.

8  Q.   Right?  It's an internal document?

9  A.   Yes, sir.

10  Q.   Okay.  And so if you look here, it says -- now, there's

11  marijuana at this facility during this inspection, right?

12  A.   That, I don't know.  I can read the report for you.

13  Q.   Well, take a look under Administrative Violations, that

14  last -- I've highlighted it for you.  It says Nana Zhang is

15  currently manufacturing marijuana, right?

16  A.   Can we raise it up a little bit.  I can see parts of it.

17  Okay.  All right.

18  Q.   See that part?

19  A.   Which part, sir?

20  Q.   The part that's highlighted that says Nana Zhang is

21  currently manufacturing marijuana prior to the approval and

22  issuance of a certificate of registration?

23  A.   That's what it says.

24  Q.   Okay.  That's indicative that Agent Martinez saw that they

25  were manufacturing marijuana, right?

1  A.    Yes, sir.

2  Q.    All right.  And this is in October of 2020?

3  A.    Yes, sir.

4  Q.    No OBN registration, right?

5  A.    That's what it says.

6  Q.    All right.  And if I look here, the only thing on the

7  report -- it says 1 of 1 at the bottom, right?  You see that?

8  A.    I do.

9  Q.    Okay.  It says "Administrative Violations," right?

10  A.    Yes, sir.

11  Q.    Doesn't say "criminal violations," right?

12  A.    Correct.

13  Q.    All right.  And, in fact, what's of noteworthy here is

14  that it looks -- she writes:  I received an OMMA report that

15  was submitted by Attorney Matt Stacy stating Nana Zhang is

16  operational and has 300 plants on September 1 of 2020.  Do you

17  see that?

18  A.    Yes.

19  Q.    All right.  So after an entity gets licensure from OMMA

20  -- right? -- they're supposed to submit reports to OMMA on a

21  monthly basis for the number of plants at their facility,

22  right?

23  A.    Yes, sir.  That has changed into metric here, as of '21.

24  Q.    Right.  But in 2020, at this time, October of 2020,

25  they're submitting reports -- the facilities are -- have a

1  responsibility to submit reports if they have grow activity,

2  right?

3  A.   Yes, sir.  They have a responsibility.  I don't know if

4  they've submitted.  I can't sit here and say that they have.

5  Q.   Well, Agent Martinez says it --

6  A.   Okay.

7  Q.   -- right?  She says Matt Stacy submitted a report to OMMA

8  that it's operational, 300 plants, right?

9  A.   Yes, sir.

10 Q.   All right.  And OBN agents, law enforcement agents at OBN,

11 had access to these reports filed with OMMA, right?

12 A.   In 2020?  No, sir.

13 Q.   You couldn't call them up and say, "Hey, did you receive

14 any reports about Nana Zang?"

15 A.   No.  Well --

16 Q.   Well, let me just say this:  Obviously, Agent Martinez had

17 access to it, right?

18 A.   Yes, sir.

19 Q.   Right?  She's saying they filed a report?

20 A.   That's what she said.

21 Q.   All right.  So it can happen, right?

22 A.   It could happen, yes, sir.

23 Q.   All right.  And, in fact, it did happen here?

24 A.   That's what the report says.

25 Q.   Okay.  And so I want the Court to understand this.  Okay?

```
 1   This is -- Nana Zhang has no OBN registration, right?

 2   A.   That's what I'm reading here.

 3   Q.   Right.  So -- but they do have OMMA licensing, right?

 4   A.   Yes, sir.

 5   Q.   And Mr. Stacy is filing a report with OMMA that this

 6   particular client is already operational, right?

 7   A.   Yes, sir.

 8   Q.   Okay.  No enforcement action happened this day that you

 9   know of, right?

10   A.   Not that I know of.

11   Q.   Plants weren't seized that you know of, people weren't

12   arrested, right?

13   A.   No.

14   Q.   Okay.  Let me show you what's been marked or admitted as

15   Exhibit 70.  This is, again, Agent Martinez, correct?

16   A.   Yes, sir.

17   Q.   And the date is December 16, 2020, correct?

18   A.   Yes, sir.

19   Q.   And, again, she's out there -- this is that window of time

20   after OMMA licensure but before OBN registration, right?

21   A.   I have to read her report.  I don't know.

22   Q.   Well, it says right at the top:  I received an OMMA

23   marijuana registration background form for the entity Lama

24   Green.

25   A.   Okay.
```

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          33

```
 1  Q.    Do you see that?

 2  A.    I do.

 3  Q.    And if you see the second page, she cites them for

 4  administrative violations, right?  See that highlighted?

 5  A.    Yes, sir.  Yeah, I see it.  It says, "Engaging in activity

 6  prior to registration approval."

 7  Q.    Yep.  Administrative, right?  Not criminal, correct?

 8  A.    Yes, sir.

 9  Q.    You've seen reports that say criminal, right?

10  A.    Not through this process, but --

11  Q.    Okay.  Well, we'll go through that later.

12  A.    I've seen reports that say criminal, but not through this

13  process.

14  Q.    Okay.  And it says:  I asked Ms. Lama how old the

15  marijuana plants found inside the greenhouse.  She told the

16  agent they were two months old.  Do you see that?

17  A.    Yes, sir.

18  Q.    So she had been growing two months, and she's growing that

19  day, without OBN registration, right?

20  A.    Yes, sir.

21  Q.    And if you look at this first page, again, looks like she

22  tried to call her lawyer, Matt Stacy, right?

23  A.    Yes, sir.

24  Q.    So this is a Stacy Legal Group client, correct?

25  A.    Yes, sir.
```

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        34

1  Q.   And it says:  On the property Lama Green -- On the

2  property of Lama Green, agents were told there were 20

3  greenhouses with ten actively growing marijuana.  Do you see

4  that?

5  A.   Yes, sir.

6  Q.   And they estimated there were about 2,000 plants on the

7  property, right?

8  A.   Yes, sir.

9  Q.   So December of 2020, there's a facility without OBN

10 registration that is in possession of 2,000 marijuana plants,

11 right?

12 A.   Yes, sir.  That's what the report says.

13 Q.   Nobody's arrested, right?

14 A.   Not that I know of.

15 Q.   No plants are seized, right?

16 A.   Not that I know of.

17 Q.   No search warrants are executed, right?

18 A.   Sir, not that I know of.

19 Q.   Okay.  And it's another client of Mr. Stacy's, right?

20 A.   Yes, sir.

21 Q.   Let me show you what's been marked as Exhibit -- admitted

22 as Exhibit 67.  This is another report from Agent Martinez,

23 correct?

24 A.   Yes, sir.

25 Q.   January 19, 2021.  You -- see your name, Danny Peterson?

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        35

1  A.   I do.

2  Q.   -- and other agents traveled to the applicants --

3  applicant, Jeff BC Properties.  Do you see that?

4  A.   Yes, sir.

5  Q.   So, again, we're talking about that window of time before

6  OBN registration, right?

7  A.   Yes, sir.

8  Q.   In fact, it says they've applied for an OBN registration,

9  there at the bottom of that first paragraph, right?

10  A.   Yes, sir.

11  Q.   Again, it's cited for administrative violations, right?

12  A.   That's what the report says.

13  Q.   And it says:  Jeff BC Properties is currently

14  manufacturing marijuana prior to the approval and issuance of a

15  certificate of registration, right?

16  A.   That's what it says, yes, sir.

17  Q.   You see nothing in here about any criminal violations, do

18  you?

19  A.   No, sir.

20  Q.   And, again, no one's arrested, nothing's seized or

21  anything like that, right?

22  A.   Right.

23  Q.   You would know that because you were there --

24  A.   Yes, sir.

25  Q.   -- right?

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN       36

1       Exhibit 71.  Again, an audit inspection.  This one's

2  February 23 of 2021.  Do you see that?

3  A.    I do.

4  Q.    This facility is AL 2020, right?

5  A.    That's what the report says.

6  Q.    And, again, we're in that window of time between OMMA

7  licensing and OBN registration, right?

8  A.    Yes, sir.

9  Q.    And it says that Ye Liang took the agents next door to

10 complete the inspection.  Agents saw multiple cardboard boxes

11 with packages of marijuana, right?

12 A.    Yes, sir.

13 Q.    So another facility without OBN registration engaged in

14 marijuana production in agents' presence, right?

15 A.    Yes, sir.

16 Q.    And, once again, just cited for an administrative

17 violation, right?

18 A.    That's what it says.

19 Q.    All right.  Last one of these examples.  Daphne Green.

20 A.    Yes, sir.

21 Q.    February 23, 2021, you were present, right?

22 A.    Yes, sir.

23 Q.    Went to Daphne Green, right?

24 A.    Yes, sir.

25 Q.    Plants on location, correct?  Says:  Approximately 400

1  plants were growing in one room in the indoor grow building,

2  right?

3  A.   Yes, sir.

4       MR. GOLDSTEIN:  I'm going to move to admit an audio,

5  Your Honor.  It's from the Daphne Green inspection.  Exhibit

6  106.

7       (Exhibit 106 played for the Court.)

8  Q.   (BY MR. GOLDSTEIN)  Is that you, sir?

9  A.   No.  That's Agent Paulk.

10  Q.   Agent Paulk, okay.

11       (Audio played.)

12       So if you remember, there was some back-and-forth.  They

13  were on the phone with the owner, and you guys just wanted to

14  know if there were plants on the facility.  Do you recall that

15  or no?

16  A.   I don't recall that, no.

17  Q.   Okay.  But you heard that advice from -- or directive from

18  Agent Paulk to the person, right?  "Not going to touch, not

19  going to do anything, just want to look, observe, understand

20  what's there," and then you were going to leave, right?

21  A.   That's what I heard.

22  Q.   And so, again, that's February 23, 2021, right?

23  A.   Yes, sir.

24  Q.   And there's growth before registration, right?

25  A.   We'd have to put that back up there.  I don't know.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        38

1  Q.   You don't know what?

2  A.   I don't know if there was growth before registration.  I

3  don't know if they had a registration at this point.  Please

4  put the exhibit back up, and let's look at it again.

5  Q.   Sure.  See this?

6  A.   Yes, sir.

7  Q.   Issued an OMMA license and had applied for an OBN license.

8  Do you see that?

9  A.   I see that, yes, sir.

10 Q.   Okay.  So this was during that same window of time, right?

11 A.   Yes, sir.

12 Q.   Before -- and just as Agent Paulk had told Chow King on

13 October 15, 2020 in your presence, they're telling these

14 individuals, in February, just as you told Jeremy Grable in

15 February, that growth before OBN registration was fine, that

16 it's just an admin thing, right?

17 A.   Yes, sir.

18 Q.   Now, let's discuss why this was happening, okay, Agent

19 Peterson?

20 A.   Okay.

21 Q.   It wasn't until July of 2021 that you started

22 understanding it was illegal to grow after OMMA licensure and

23 before OBN registration, right?

24 A.   No, sir.  We started with a couple of different grows that

25 were located in Logan County off of a traffic stop that Agent

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          39

1   Jehle had.

2   Q.   Wasn't there a shift that occurred at OBN in July of 2021

3   as to the legality of growing medical marijuana before OBN

4   registration?

5   A.   No.  The shift took place before that.

6   Q.   That's -- isn't that when the stand at OBN began to alter

7   and change, July of 2021, after you got Travis on board at OBN?

8   A.   No, sir.

9   Q.   Didn't form a new understanding in July 2021 that it was

10  illegal to grow after OMMA licensure and before OBN

11  registration?

12  A.   No, sir.  That was before, when we started with those two

13  grows, 4233 Midwest Boulevard and then 5501 Midwest Boulevard.

14  And I cannot think of the names of the grows off the top of my

15  head.

16  Q.   So that's not how it unfolded internally at OBN in July?

17  A.   No, sir.  It was prior to that.

18          THE COURT:  Do you know when?

19          THE WITNESS:  Off the top of my head, I do not, sir.

20  I know that if I'd have known what we were going to talk about

21  today, I definitely -- we could have brought reports.  I just

22  remember those two addresses, and that's kind of what got us

23  started off on doing things.

24          MR. GOLDSTEIN:  Your Honor, I'm going to play a clip.

25  It's a prior inconsistent statement of Mr. Peterson.  It's not

```
 1  on the exhibit list.
 2          THE COURT:  Go ahead.
 3          MR. GOLDSTEIN:  We good?
 4      (Audio played.)
 5  Q.  (BY MR. GOLDSTEIN) So that's the exact questions I've been
 6  asking you today, right?
 7  A.  Yes, sir.
 8  Q.  All right.
 9      (Audio played.)
10      That's you, right?
11  A.  Yes, sir.
12      (Audio played.)
13  Q.  That's you, right?
14  A.  Yes, sir.
15  Q.  Explaining that you were in a proffer session with a
16  lawyer and his client, right?
17  A.  Yes, sir.
18  Q.  OBN counsel is with you during this.  Individual's name is
19  Jiangao, J-I-A-N-G-A-O.  Josh McGoldrick is there with you,
20  Travis White is there with you, Dane Towery is there with you,
21  correct?
22  A.  Yes, sir.
23  Q.  And this particular attorney is asking you the same
24  questions I'm asking you.  He had a client who -- they came to
25  see him.  There was marijuana plants everywhere, and OBN took
```

1  no action, and you're explaining to him why and when it

2  changed, right?

3  A.   Yes, sir.

4  Q.   Okay.  Let me just back it up a little bit.  Okay?

5       (Audio played.)

6       That's you, right?

7  A.   Yes, sir.

8       (Audio Played.)

9  Q.   Telling that that's exactly what transpired, right?

10 A.   Yes, sir.

11      (Audio Played.)

12 Q.   "The stand began to alter and change" when you got Travis

13 on board, right?

14 A.   Yes, sir.  With Matt Stacy, it did.

15 Q.   Excuse me?

16 A.   I said with Mr. Stacy, it changed.  We began to find that

17 he was setting these up illegally.

18 Q.   Let me play that again.  Okay?

19 A.   Okay.

20      (Audio played.)

21 Q.   What you said is, "The stand began to alter and change"

22 when you got Travis on board, right?

23 A.   Yes, sir.

24 Q.   Those are your words, right?

25 A.   Those are my words, but you have to understand the context

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        42

 1   of those words.
 2   Q.   I heard them.  You said that the shift occurred in July of
 3   2021, right?
 4   A.   Yes, sir.
 5   Q.   Any context I need for that?
 6   A.   The context that you need is is that this involved
 7   Mr. Stacy.
 8   Q.   I understand it involved Mr. Stacy.  My question to you
 9   is, I asked you before:  Did the stand change in 2021?  You
10   said no, right?
11   A.   For Mr. Stacy, it changed.  But prior to that, we were
12   hitting grows, obviously.  There's a couple of them that are
13   exhibits that we have that -- yes, sir, we started hitting
14   these grows.
15   Q.   Right.
16   A.   Early in April, May.  I can't remember the exact date of
17   what we started doing.
18   Q.   Right.  You started executing some warrants before July,
19   right?
20   A.   Yes, sir.
21   Q.   All right.  But what I'm talking about is this recording,
22   where a lawyer is asking you what happened internally at OBN,
23   and you're explaining to him what happened internally at OBN,
24   right?
25   A.   Yes, sir.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          43

1  Q.   And you tell him, "The stand began to alter and change."

2  "There was a shift in July" after you got Travis on board.

3  That's your language.

4  A.   That's my language, but we are also discussing Mr. Stacy.

5  Q.   Okay.  That's what you said, though, right?

6  A.   Yes, sir.

7  Q.   All right.  Let's listen.

8       (Audio Played.)

9       Let me just back up.  Okay?

10      (Audio played.)

11      "Started understanding."  Those are your words, right?

12 A.   They're my words.  But, again, you're taking them out of

13 context.

14           THE COURT:  Let's move on from this.

15           MR. GOLDSTEIN:  You just need to hear the end, Your

16 Honor.

17      (Audio Played.)

18 Q.   (BY MR. GOLDSTEIN) Okay.  So that's you talking to another

19 lawyer, right?

20 A.   I'm talking to somebody.  I don't know if it's a lawyer or

21 not.

22 Q.   Okay.  And you never told Mr. Stacy -- you never went to

23 see Mr. Stacy to tell you (sic) that there was this shift

24 occurring at OBN, right?

25 A.   No, sir.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          44

1  Q.   Didn't issue any publications in June or July or -- March,

2  April, May, June, or July of 2021 about this change in

3  understanding, right?

4  A.   I did not issue any of these.  It was above my purview.

5  Q.   Okay.

6  A.   At that time, I was an Agent II.

7  Q.   Yeah.

8  A.   So, no.

9  Q.   Okay.  Now, you recall interviewing a woman by the name of

10 Lara Seuss?

11 A.   Yes, sir.

12 Q.   December 14 of 2021.  Do you recall that, sir?

13 A.   I talked to her, yes, sir.

14 Q.   Okay.  Now, you've never participated in submitting a

15 fraudulent application to OBN; is that correct, sir?

16 A.   No, sir.

17 Q.   Have you ever recommended someone submit a fraudulent

18 application to OBN?

19 A.   Not that I recall.

20 Q.   Well, that's something you would recall, isn't it?

21 A.   Yes, sir.

22 Q.   Okay.  Ever help someone submit a fraudulent application

23 to OBN?

24 A.   No, sir.

25 Q.   Okay.  You went to see Ms. Seuss.  A little background,

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          45

1  she was listed as an owner on Earth Angel grow facility,

2  correct?

3  A.   Yes, sir.

4  Q.   That's the facility that you had visited back in February

5  when you spoke to Mr. Grable, right?

6  A.   Yes, sir.

7  Q.   And so Earth Angel's original first application, if you

8  recall, was denied on June 30 of 2021?

9  A.   I don't recall, but --

10  Q.   Okay.  And do you recall that there was a second

11  application -- this is why you went to see Ms. Seuss.  There

12  was a second application filed, in August of 2021, that listed

13  Ms. Seuss as the local resident owner of Earth Angel.  Do you

14  remember that was the purpose of your visit?

15  A.   I don't remember that as the purpose.  Again, if I -- I

16  could have reviewed the reports if I'd have known what we were

17  talking about today.

18  Q.   Okay.

19          MR. GOLDSTEIN:  I'm going to admit the Lara Seuss

20  recording.  Exhibit 49, Your Honor.

21  Q.   (BY MR. GOLDSTEIN) Let's see if this refreshes your

22  recollection.  Okay?

23  A.   Okay.

24      (Audio played.)

25          THE COURT:  That would be the 14th, when?

1          MR. GOLDSTEIN:  What's that?

2          THE COURT:  What's the date?  The 14th --

3          MR. GOLDSTEIN:  December 14, 2021.

4     (Audio played.)

5  Q.   (BY MR. GOLDSTEIN) All right.  So does this refresh your

6  recollection that you went to see Ms. Seuss because she was

7  listed on an application to OBN for Earth Angel?

8  A.   Yes, sir.

9  Q.   And you're quite familiar with the Earth Angel facility --

10 right? -- the owners?

11 A.   Yes, sir.

12 Q.   All right.  One owner is Barbara Miuccio?

13 A.   Yes, sir.

14 Q.   The other is Jeremy Grable, correct?

15 A.   Yes, sir.

16 Q.   And they were clients of Mr. Stacy's, right?

17 A.   Yes, sir.

18 Q.   And at this time, in December, they're still clients of

19 Mr. Stacy's, right?

20 A.   That, I don't know, but -- okay.

21 Q.   Okay.  We'll get to that.  And so you're there; you're

22 conducting an investigation of this OBN application for Earth

23 Angel, right?

24 A.   Yes, sir.

25 Q.   And Ms. Seuss was listed as the 75 percent local resident,

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          47

```
 1  right?
 2  A.   That, I don't know.  I'd have to see the registration.
 3  Q.   Well, let's play a clip.  Maybe that'll refresh your
 4  memory.
 5       (Audio Played.)
 6       So she's telling you, if you remember, during this, that
 7  she only has a 2 percent interest in Earth Angel.  Do you
 8  remember that?
 9  A.   Yes, sir.
10  Q.   She told you that repeatedly during that particular
11  interview, right?
12  A.   I don't know about repeatedly, but she did say she was 2
13  percent owner.
14  Q.   Let's play a different clip.
15       (Audio Played.)
16       All right.  So did you hear that?
17  A.   I did.
18  Q.   So you engaged in this back-and-forth with her.  She's at
19  2 percent, right?
20  A.   Yes, sir.
21  Q.   All right.
22       (Audio played.)
23       All right.  So she's explaining to you the ownership
24  structure, right?
25  A.   Yes, sir.
```

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        48

1  Q.   All right.  And you knew Barb and Jeremy were the majority

2  owners of Earth Angel from your investigation of Earth Angel,

3  right?

4  A.   That's what I understood.

5  Q.   And then she told you, if you remember, that she's listed

6  as a 75 percent owner, and she has an active role in the

7  company.  Do you remember that?

8  A.   No, sir, I don't, but --

9  Q.   I'm going to play the tape.

10 A.   And we're gonna play the tape.

11      (Audio played.)

12 Q.   So she tells you that she was going to do some graphic

13 design work for Earth Angel; her husband anticipated doing some

14 sales work for them, correct?

15 A.   Yes, sir.

16 Q.   And then do you remember telling her that you had been

17 sitting on the Earth Angel registration?  Do you remember that,

18 sir?

19 A.   I do not, but I got a feeling you're about to play it.

20 Q.   I am.

21      (Audio played.)

22      Do you hear that?  You want me to play it again?

23 A.   Play it again, please.

24      (Audio played.)

25 Q.   Do you hear that?  "I'm sitting on the registration."

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN          49

1    "I'm trying to figure this part out"?

2    A.    Yes, sir.

3    Q.    Okay.  And then you tell her that the problem you have

4    with this application is that she's sitting there at 2 percent.

5    And I'll play the clip for you.  Okay?

6    A.    Okay.

7         (Audio played.)

8    Q.    So you're telling her that your problem with that

9    application is that she has told you she has a 2 percent

10   interest in the company, but the local resident has to have 75

11   percent interest in the company, right?

12   A.    Yes, sir.

13   Q.    All right.  And so at the end of this interview, you say

14   something remarkable to Ms. Seuss.

15        (Audio Played.)

16        So what you're telling her is even though she's told you

17   repeatedly that she has a 2 percent interest in the company,

18   you ask her will Barbara and Jeremy trust her to be listed as a

19   75 percent owner, right?

20   A.    Yes, sir.

21   Q.    And then you tell her that you just need to draft up a

22   contract that says that, right?

23   A.    That she'll need to draw up a contract -- or Barbara and

24   Jeremy will, yes.

25   Q.    Yeah.  And you also told her, though, during that

1  interview, that you don't really care how they split up --

2  internally -- the ownership percentages.  Do you recall that,

3  sir?

4  A.   I do not.

5       (Audio played.)

6  Q.   So what you tell her is that you don't care how they --

7  you use the word "demographics."

8  A.   Uh-huh.

9  Q.   I think you meant, like, profit distribution or something?

10 A.   However they're going to set it up -- shares, profits --

11 Q.   Right.

12 A.   -- whatever they want to do inside the company.

13 Q.   Right.  So you tell her, you know, will they trust you to

14 list you at 75 percent, right?

15 A.   Yes, sir.

16 Q.   And then you guys can do whatever you want internally, how

17 you split up the ownership shares internally, but Ms. Seuss has

18 to be listed as a 75 percent owner on the application, right?

19 A.   Yes, sir.

20 Q.   All right.  How is that different than anything Mr. Stacy

21 put on the Earth Angel's application that you're investigating

22 at that time, sir?

23 A.   How that's different is this:  He never gave them an

24 application or a registration.  They never got a registration

25 through Mr. Stacy.  So that was a major problem.  Mrs. Seuss

1  was helping them out, working in the company.  There was no

2  problem with her being 75 percent owner.  She was an Oklahoma

3  resident.  If she has a vested interest in this marijuana grow,

4  that's fantastic.  That means that she could very well be 75

5  percent owner, and that's why I would suggest that.

6  Q.   Exactly.  Meaning, the application Mr. Stacy filed in

7  August of 2021 that you are investigating listed Lara Seuss as

8  a 75 percent local resident?

9  A.   That, I don't know.  I couldn't tell you that unless I go

10  back and look at the records of it.

11  Q.   You just heard yourself on the tape say, You're listed as

12  the 75 percent local registrant, but you're sitting at 2

13  percent.  That's what you just told her repeatedly.

14  A.   Okay.

15  Q.   Okay?

16  A.   Yes, sir.

17  Q.   You're investigating the Earth Angel application, right?

18  A.   Right.

19  Q.   You tell her, You're sitting at 2 percent; you got to be

20  75 percent, right?

21  A.   Yes, sir.

22  Q.   You then tell her, Well, look, will they trust you --

23  Grable and Miuccio -- trust you to put you at 75 percent on the

24  application, right?

25  A.   Right.  What's the problem with -- if Matt Stacy already

1  sent it in at 75 percent?  Why would I even be questioning

2  that?

3  Q.   That's my question, sir.  That's my question.

4  A.   I don't know.

5  Q.   Okay.

6  A.   If she's 75 percent owner on this thing, why is there a

7  problem?

8  Q.   Okay.  So if Matt Stacy submitted the Earth Angel

9  application in August of 2021 with Lara Seuss as a 75 percent

10 owner -- okay? -- and Lara Seuss as the local resident and

11 Lara Seuss is going to have an active role, graphic designing,

12 that would not be a fraudulent application?

13 A.   No.

14 Q.   Okay.  The other thing you told Ms. Seuss is that Jeremy

15 and Barb needed to fire Mr. Stacy, right?

16 A.   I probably did, yes, sir.

17 Q.   Okay.  Now, after that visit with Ms. Seuss, you went

18 right over to see Jeremy Grable.  Do you remember that?

19 A.   She did or I did?

20 Q.   You did.

21 A.   I did, yes, sir.

22 Q.   Right.  And you're all kind of exasperated and you're

23 asking him, "What is going on here?"  Do you remember that,

24 sir?

25 A.   No, sir, I don't.

1  Q.   All right.

2          MR. GOLDSTEIN:  Your Honor, I can play some clips.

3  This is not on the exhibit list, but to refresh the witness's

4  memory.

5      (Audio played.)

6  Q.   (BY MR. GOLDSTEIN) Does that refresh your memory at all?

7  A.   Yes, sir.

8  Q.   And so you went to see Mr. Grable.  You're like, "What's

9  the deal here?  Matt Stacy sent in a new application," right?

10 A.   Yes, sir.

11 Q.   Let me just play.

12     (Audio Played.)

13     So you say Lara Seuss is the registrant, right?

14 A.   Yes, sir.

15 Q.   Jeremy Grable says, "What's that," right?

16 A.   Yes, sir.

17     (Audio played.)

18 Q.   "That's the person that's supposed to own 75 percent of

19 the business," right?

20 A.   Yes, sir.

21 Q.   All right.  So you're there now; you tell him.  Now you

22 understand, right?  Questioning -- you're saying, "Matt's

23 application came through for Earth Angel.  It lists Lara Seuss

24 as 75 percent," right?

25 A.   Yes, sir.

1          (Audio played.)

2    Q.    But she's telling you she only owns 2 percent, right?

3    A.    Yes, sir.

4          (Audio played.)

5    Q.    Right?  He says, "That's correct," right?  Lara Seuss is

6    the registrant; she's 75 percent.  He's telling you all of

7    that's correct, right?

8    A.    Yes, sir.

9    Q.    All right.  Then, you tell Mr. Grable that somehow

10   Mr. Stacy has control of the whole company.  I'm going to play

11   the clip for you.  Okay?

12         (Audio played.)

13         How does Mr. Stacy have control of their company by filing

14   an application, sir?

15   A.    He kept the registration, did not give them the passcode

16   to report anything, and that was through Barbara Miuccio that

17   this all occurred.  They never got their registration from

18   Mr. Stacy.  He held on to it until they wanted to go ahead and

19   renew it for another $10,000.  They'd already spent 25,000 and

20   were very frustrated with him because of that.

21   Q.    So that's control of the company?

22   A.    Yes, sir.  Yeah, if they have --

23   Q.    That's controlling profits?

24   A.    -- no -- no way of getting their registration except going

25   through him and he's retaining control of the whole process,

1  yeah, he's got control of their registration.

2  Q.   You said "company," not "registration."  Let's play it.

3  A.   I said "company."

4       (Audio Played.)

5  Q.   You said --

6  A.   Yeah.  He -- his -- their company, their registration --

7  the whole aspect of this is is he's got control of that

8  registration.

9  Q.   You don't say "registration," you say "company."

10 A.   Yes, sir.

11 Q.   And then Jeremy says, Well, we've been duped.  Let's just

12 listen to this one second.

13      (Audio Played.)

14      He's got control of the company?

15 A.   Yes, sir.

16      (Audio Played.)

17      So you tell him he's got control -- he doesn't control the

18 profits, right?  He doesn't control the losses, he doesn't

19 control the day-to-day activities, right?

20 A.   Sir, without that registration, they can't grow marijuana.

21 He does control their company.

22 Q.   Well, let's talk about your control of the company, then,

23 sir, because you're responsible for approving their

24 registration, right?

25 A.   Yes, sir.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN      56

1  Q.   You were sitting on their application, right?

2  A.   Yes, sir.

3  Q.   This is December 14 of 2021, right?

4  A.   I am investigating this registration, yes, sir.

5  Q.   Right.  So who's controlling the registration, you or

6  Mr. Stacy?

7  A.   I am; he is.  So --

8  Q.   Yeah.  You are, sir, right?  You're sitting on it, right?

9  A.   Yeah.

10 Q.   And you know -- we're going to hear it -- how desperate

11 they are --

12 A.   Yes, sir.

13 Q.   -- right?

14      It's been 16 months.  They've been waiting for an OBN

15 registration, right?

16 A.   They have been because it's been sitting with Mr. Stacy,

17 not us.

18 Q.   Sir, the first Earth Angel application was filed in

19 December of 2020.  You visited Earth Angel in February of 2021,

20 right?

21 A.   Yes, sir.

22 Q.   It's not denied until June of 2021.  Are you aware of

23 that?

24 A.   No, sir.

25 Q.   Is that Mr. Stacy's fault, that it took OBN from December

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        57

1  to June of 2021 for OBN to deny the Earth Angel application?

2  A.    Sir, with this, "Helen Carrillo" was the name that was on

3  this registration prior to that.  We found out that she was a

4  straw owner, and that put it in jeopardy.

5  Q.    Okay.  You're the one that took six months to make a

6  decision on the application, not Mr. Stacy, right?

7  A.    I personally am not the one.  But --

8  Q.    OBN collectively makes that decision, correct?

9  A.    Yes, sir.

10 Q.    And they sat on it for six months, right?

11 A.    Yes, sir.

12 Q.    Okay.  I mean, you were there at Earth Angel's February

13 23.  They had marijuana.  You didn't deny their registration,

14 right?

15 A.    Correct.  They had Helen Carrillo as a 75 percent owner at

16 that time.

17 Q.    They had marijuana --

18 A.    Yes, sir.

19 Q.    -- without an OBN registration.  You still didn't deny it,

20 right?

21 A.    Correct.

22 Q.    All right.  Here we are in December.  You're still sitting

23 on their application, right?

24 A.    Yes, sir.  They had resubmitted it with Lara Seuss.

25 Q.    Right.

1   A.   Or Mr. Stacy resubmitted it with Lara Seuss.

2   Q.   You told Barbara Miuccio she should sue Mr. Stacy, right?

3   A.   I did.

4   Q.   And you then tell her that the problem you're having here

5   is that Lara Seuss is on the registration for 75 percent.  Do

6   you remember that?

7   A.   Yes, sir.

8        (Audio Played.)

9   Q.   So you're telling her everything that we've just been

10  talking about:  Lara Seuss is listed as a 75 percent

11  registrant, right?

12  A.   Yes, sir.

13  Q.   She has a 2 percent profit interest in the company, right?

14  A.   Yes, sir.

15  Q.   All right.  And you say that's not what's on the

16  application, right?

17  A.   Yes, sir.

18  Q.   And then Ms. Miuccio tells you that her greatest fear is

19  not getting the registration, right?

20  A.   I guess.  Yes, sir, I would say that because you're about

21  to play it.

22  Q.   Okay.  And you tell her that their use of Mr. Stacy is

23  just pushing them further out, right?

24  A.   Yes, sir.

25  Q.   Okay.  And she says, "I don't understand.  Why is that?"

1  And you say, "Because Matt's still part of the deal."  And then
2  you tell them the application is still fraudulent; do you
3  remember that?
4  A.   No, sir.  But it may very well be --
5       (Audio Played.)
6       What's the fraudulent state, sir, do you know?
7  A.   It started out with Helen Carrillo.  And then after July,
8  when Mr. Stacy received letters that they had to go ahead and
9  change their business model of the 75/25 and him being able to
10 put people's names on the registrations that had no idea they
11 had their names on them, that -- that's what altered it,
12 especially with Helen Carrillo.
13 Q.   Let's try answering my question, sir.  What's fraudulent
14 about this application that Mr. Stacy filed that had Lara Seuss
15 as a 75 percent registrant -- okay? -- and she was going to be
16 an active, local resident, what's fraudulent about that, sir?
17 A.   There's nothing at that point, other than he resubmitted
18 that as Lara Seuss's 75 percent.
19 Q.   Right.  Which is what -- the same thing you just suggested
20 to Lara Seuss in the prior recording, that she be listed as 75
21 percent, right?
22 A.   Yes, sir.
23 Q.   So can you tell me what was fraudulent about Mr. Stacy's
24 August application for Earth Angel?
25 A.   He still was pushing 75 percent people through, whether

1  they had it or not.

2  Q.    Try answering my question.  What was fraudulent about the

3  Earth Angel application filed by Mr. Stacy in August that

4  you're telling Ms. Miuccio in December is fraudulent?

5  A.    I thought I answered that for you, sir.

6  Q.    What's the answer?

7  A.    That, again, Lara Seuss is on this registration that he

8  filed.

9  Q.    And Lara Seuss is the person you're telling them to put as

10  the 75 percent registrant.  That's what you just told Ms. Seuss

11  and what you're telling Barb and Jeremy here.

12  A.    Is that a question or --

13  Q.    Yeah, that's a question.

14  A.    Okay.

15  Q.    What's the difference between what you're telling them to

16  do and what Mr. Stacy put in the application; do you know?  Is

17  there any difference?

18  A.    No, sir.  I don't know the difference.

19  Q.    Okay.  Then you make arrangements for Ms. Miuccio to drive

20  up from Texas, right?  She's going to meet you the next morning

21  at 9:00 a.m., right?

22  A.    Yes, sir.

23  Q.    Right?  You tell them that you're going to take the bull

24  by the horns here, right?  Remember, Ms. Miuccio was all upset?

25  Should she get ahold of Mr. Stacy?  You say, No, I'm going to

1   take the bull by the horns here, right?

2   A.   I don't know, but I got a feeling you're about to play

3   what I said.

4   Q.   I don't need -- yeah, no need to play it.  All right.

5        And then, so this is December 14th that you're talking to

6   them on the phone, right?

7   A.   Again, sir, I -- if I'd have received reports and knew

8   what I was going to testify today, I would be happy to -- I

9   don't know.

10  Q.   Okay.  You didn't --

11  A.   What -- you're telling me a date.  I have no idea.

12  Q.   You didn't know you were testifying about Mr. Stacy's case

13  today?

14  A.   Oh, I knew about that, but what we were testifying about,

15  I would have gone back and read reports on everything and --

16  Q.   Mr. Coffey, Mr. McGoldrick, they didn't tell you that

17  their issue today was Mr. Stacy's compliance with state law?

18  A.   Yes, sir, they did say that.

19  Q.   Okay.  And they didn't ask you to go back and refresh your

20  memory on reports?

21  A.   No.  I was your -- I was subpoenaed by you.

22  Q.   Correct.  Did you have conversations with Mr. Coffey and

23  Mr. McGoldrick about what the subject matter might be of my

24  questioning?

25  A.   We had guesses as to what it might be, but no specifics.

DANIEL PETERSON - DIRECT EXAMINATION BY MR. GOLDSTEIN        62

1   Q.   Okay.  Are you aware that just two weeks later, January

2   3rd, Earth Angel's registration was approved by OBN; meaning,

3   you're visiting with Ms. Seuss December 14th, you're meeting

4   with Ms. Miuccio December 15; and then two weeks later, the

5   Earth Angel's registration was allowed.  Are you aware of that,

6   sir?

7   A.   No, sir, I'm not.

8   Q.   You secured witness statements -- you secured Ms. Miuccio

9   and Mr. Grable as witnesses against Mr. Stacy on that date,

10  December 15, right?  They gave you handwritten statements.  Do

11  you remember that?

12  A.   Yes, sir.

13  Q.   And became witnesses in your investigation of Mr. Stacy,

14  correct?

15  A.   Yes, sir.

16  Q.   Let me conclude with this.  Okay?  So as the state agent

17  in the investigation of Mr. Stacy, you've collected troves of

18  electronic material, correct?

19  A.   Yes, sir.

20  Q.   Cell phones, right?

21  A.   I just collected his cell phone.

22  Q.   What about all the other grows that you went?  You

23  got cell -- you got clients -- you got cell phones of his

24  clients, right?

25  A.   No, sir.

1  Q.  Didn't --

2  A.  I didn't collect anybody else's cell phone but his.

3  Q.  Okay.  Any laptop -- not you, personally, but OBN?

4  A.  Oh, well, that, I don't know.

5  Q.  Okay.  Well, you're the case agent, right?

6  A.  Yes, sir.

7  Q.  All right.  Did you seize anyone's cell phone in

8  connection with the investigation other than Mr. Stacy's?

9  A.  I personally did not.

10  Q.  Not you, personally; people working with you?

11  A.  And as the case agent, I do not know of those being

12  seized.

13  Q.  Okay.  How about copied?  Any electronics copied?

14  A.  Not that I know of.

15  Q.  How many grows did you go in and seize paperwork from?

16  A.  I don't have a number in my head.  I don't know.  There

17  was several.

18  Q.  All right.  Investigating Mr. Stacy since at least March

19  of 2021; is that correct?

20  A.  No, sir.  I started the investigation in November of '21

21  when I was asked to take the case.

22  Q.  Okay.  Can you point to a single piece of paper -- text,

23  email, diary entry -- single piece of paper showing Mr. Stacy

24  knew his business structure violated a single statute?

25  A.  The only thing that I know of is through the investigation

1  out of Rule 11s, and I don't know if I can talk about that at

2  this point.

3  Q.    I'm not asking about people's statements to you.  I'm

4  talking about hard copy papers that you've seized or reviewed

5  as part of your investigation.  Have you seen a single email,

6  text, diary entry, computer entry, anything, Matt Stacy knew

7  his business structure violated a single statute?

8  A.    I have seen a document between him and Russ Cochran that

9  says that his business model was illegal.

10 Q.    And -- meaning, Matt Stacy said it was illegal?

11 A.    No.  Meaning, Russ Cochran said that it was illegal.

12 Q.    And that was in June of 2021, right?

13 A.    I don't know the date on the document.

14 Q.    Okay.  Can you point to a single piece of paper where,

15 after June 30th of 2021, Mr. Stacy told a single client they

16 could grow without OBN registration?

17 A.    No, sir.

18 Q.    Can you point to a single piece of paper where, after June

19 30, 2021, Mr. Stacy told a single client they could sell

20 without an OBN registration?

21 A.    No, sir, not a single paper.

22 Q.    Can you point to a single piece of paper, after June 30th,

23 2021, where Mr. Stacy told a single client it was permissible

24 to use a nonactive, local resident to secure an OBN

25 registration?

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY            65

1  A.   Other than what him and Russ Cochran talked about, no,

2  sir.

3  Q.   And can you point to a single piece of paper showing

4  Mr. Stacy ever told a client they could grow or sell marijuana

5  without an OMMA license?

6  A.   No.

7  Q.   Okay.

8       MR. GOLDSTEIN:  I have no further questions, Your

9  Honor.

10       THE COURT:  Further questions from other defense

11  counsel?

12       MR. BLEGEN:  No.

13       MR. GIFFORD:  No, Your Honor.

14       THE COURT:  The government have questions?

15       MR. COFFEY:  Yes, Your Honor.

16                    CROSS-EXAMINATION

17  BY MR. COFFEY:

18  Q.   Good morning, Agent.

19  A.   Good morning, sir.

20  Q.   Let me make sure I have my timeline correct.  You start at

21  OBN in what month?

22  A.   I started in September of 2020.  September the 8th,

23  exactly, of 2020 as a full-time agent.

24  Q.   And when you began as a full-time agent, what unit were

25  you assigned to at OBN?

1    A.    Diversion.

2    Q.    Okay.  What does the Diversion Unit do?

3    A.    We handle different cases where pills are sold illegally,

4    doctors, nurses, et cetera, that are prescribing illegally.

5    Q.    So was it -- was your task with the -- and

6    responsibilities with the Diversion Unit primarily devoted to

7    doctors, pharmacies, or marijuana farms, both, or how would you

8    characterize it?

9    A.    Doctor, pharmacies was where it was at.  Different agents

10   would go through the different -- they would make an assignment

11   on the application for a registration throughout the Bureau.

12   Q.    Okay.  So as a member of the Diversion unit in October of

13   2020, is part of your job responsibilities executing search

14   warrants on all of these marijuana grows?

15   A.    No, sir.

16   Q.    Okay.  In fact, was OBN having some logistical problems,

17   around that time, executing search warrants?

18   A.    Yes, sir.

19   Q.    Give the Court some context, if you will.  How much

20   manpower does it take to execute a search warrant at a

21   marijuana grow?

22   A.    It depends on the size of the grow.  There are at least 10

23   to 20 agents on a 3,000-, 4,000-plant grow.  It depends on the

24   size of the acreage that's there, the building structures.

25   There's a whole lot of things.  I did one search warrant in

1  Muskogee County where there was 80 of us that executed that

2  search warrant because it was over 40 acres.

3  Q.   So is it fair to say that, starting in and around October

4  2020, OBN started identifying grows operating without

5  registrations?

6  A.   Yes, sir.

7  Q.   Would it have been feasible, at that point, to go execute

8  search warrants on every single one of those grows?

9  A.   No, sir.

10 Q.   Why not?

11 A.   The amount of manpower that it takes to take care of it.

12 Q.   In fact, did OBN have to create a new unit in order to

13 address the serious problem facing our state, i.e., a bunch of

14 unlicensed grows operating?

15 A.   Yes, sir.

16 Q.   Okay.  When did that happen?

17 A.   That was July 1st of 2021.

18 Q.   Okay.  And so prior to that, when you're executing search

19 warrants, how were you able to do that if the new team, the MET

20 team, wasn't around yet?

21 A.   We brought in several agents from other parts of the

22 state, as well as out of Oklahoma City.

23 Q.   Okay.  When you say agents from other parts of the state

24 and Oklahoma City, are these other OBN agents?

25 A.   Yes, sir.

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY                68

1  Q.    Did you have to rely on other agencies?

2  A.    We would use the sheriffs' departments a lot of times and

3  local police departments, PDs.

4  Q.    So is it fair to say that OBN alone, in and around October

5  of 2020, couldn't have even shut all these grows down if they'd

6  wanted to?

7  A.    No, sir.  There was approximately 10,500 of them when this

8  first started out between '18, '19.

9  Q.    Did OBN have any idea what they were dealing with in

10 October of 2020 in terms of the black-market marijuana activity

11 operating in this state?

12 A.    No, sir.  None whatsoever.

13 Q.    How long have you been in law enforcement?

14 A.    I've been in law enforcement for 31 years now.

15 Q.    Did it -- did this problem surprise you?

16 A.    Yes, sir.  Yeah, it was overwhelming.

17 Q.    Now, at some point, you do start executing search warrants

18 more regularly; is that fair?

19 A.    Yes, sir.

20 Q.    You reference a couple grows involving Agent Jehle and

21 Guthrie, didn't you?

22 A.    Yes, sir.

23 Q.    When were those search warrants?

24 A.    April, May.  Again, I'd have to go back and look.

25 Q.    Do you remember what preceded those search warrants?

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY          69

1   A.   There was a traffic stop that Agent Jehle had knowledge of
2   where they had gotten about 60 pounds out of a traffic stop as
3   it was leaving the state.  So we went ahead, and he started
4   investigating it.  We started hitting a few locations that were
5   residences up in about Northwest 151st, in that area.  And then
6   this transferred over to these two grows that were operating
7   illegally.
8   Q.   When you say "operating illegally," was that evidence of
9   black-market activity?
10  A.   Yes, sir.
11  Q.   Okay.  Now, at some point, Mr. Goldstein walked you
12  through these.  You either -- you or other agents of OBN
13  started inspecting a lot of grows that Helen Carrillo was
14  listed on, did you not?
15  A.   Yes, sir.
16  Q.   Okay.  What was the purpose of those inspections?
17  A.   To see if they had plants and what was going on at that
18  time.  We were doing administrative actions on those, if we
19  could.  There were so many of them that we couldn't even handle
20  administrative actions on them.
21  Q.   Were you, in part, trying to see if Helen Carrillo was on
22  site at some of these?
23  A.   Yes, sir.
24  Q.   Now, later on, did you start executing search warrants on
25  these grows that had Helen Carrillo listed as an owner?

1   A.   Yes, sir.

2   Q.   Okay.  And why is that?

3   A.   Because she was discovered as a false owner, a straw owner

4   in these marijuana grows.

5   Q.   And, of course, Mr. Goldstein kind of glossed over this,

6   but who was Helen Carrillo, and how did you identify her?

7   A.   She was on marijuana grows that Mr. Stacy had set up.

8   Q.   Is it a crime to simply be on a marijuana grow?  What do

9   you mean?  She's on site physically or what?

10  A.   Say that again, sir.

11  Q.   Well, when you say she's, quote, "on a marijuana grow,"

12  what do you mean?

13  A.   She's on the registration for this marijuana grow as the

14  75 percent Oklahoma resident.

15  Q.   Okay.  Why was that a problem?

16  A.   She was not actually involved in the grow at all.

17  Q.   Did you -- how many grows did you identify in which Helen

18  Carrillo is listed as an owner on an OMMA license or an OBN

19  registration?

20  A.   There was about 64 of them.

21  Q.   How many of those grows did you or other OBN agents go out

22  to and inspect or do search warrants at?

23  A.   Sir, I couldn't tell you how many we inspected.  We

24  executed search warrants at several of them.

25  Q.   At any point, did you find Ms. Carrillo on those

1  properties?

2  A.    No, sir.

3  Q.    What did that lead you to conclude about her ownership

4  status of these grows?

5  A.    That she had no ownership of it, that she was just set up

6  on paper as the owner.

7          MR. COFFEY:  Can we pull up Defendant's Exhibit

8  Number 59.

9  Q.    (BY MR. COFFEY) All right.  Agent, I'm showing you an OBN

10 report from July 1st of 2020.  Do you see that?

11 A.    Yes, sir.

12 Q.    Okay.

13         THE COURT:  Excuse me.  This has not been offered

14 into evidence, I don't believe.

15      Any objection to 59?  It is a defendant's exhibit, I

16 believe, but any objection to 59?

17         MR. GOLDSTEIN:  No, Your Honor.  It's our exhibit.

18         THE COURT:  All right.  Fifty-nine will be admitted.

19 Q.    (BY MR. COFFEY) So what is the date on this inspection?

20 A.    It's July the 1st of 2020.

21 Q.    Okay.  And where was this inspection at?

22 A.    It says that it was at Ping Two LLC, located at 18451 East

23 Simmons Road in Luther, Oklahoma.

24 Q.    Are you familiar with that grow at all?

25 A.    I'm familiar with it through Agent Paulk, but that's all

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY          72

1   I'm familiar with on it.

2   Q.   Okay.

3            MR. COFFEY:  Now, if we go to page 2, Brandi.

4   Q.   (BY MR. COFFEY) Agent Jehle, can you please read the

5   paragraph that I circled?  Excuse me.  Agent Peterson, not

6   Jehle.

7   A.   That's okay.  Starting at, "At the conclusion"?

8   Q.   Yes, sir.

9   A.   "At the conclusion of the inspection, I informed Huang,

10  that since her application was not yet approved, she did not

11  currently possess a valid OBN registration to cultivate

12  marijuana.  I told her that her current operation was illegal.

13  I told her not to sell any of her product until she obtained a

14  valid registration.  Huang asked my advice on what she should

15  do regarding marijuana that needed to be harvested soon.  I

16  referred her to her attorney to answer that question."

17  Q.   And Huang, prior to this, who had she identified as her

18  attorney?

19  A.   Huang identified Matt Stacy as her attorney.

20  Q.   Okay.  So is this an instance, in July of 2020, where OBN

21  told Mr. Stacy's client that it was illegal to operate without

22  an OBN registration?

23  A.   Yes, sir.

24  Q.   And, in fact, does the report go on to list any criminal

25  violations?  Do you know?

1  A.   I don't know.  I can see the administrative violations

2  there, but I don't know if it lists any criminal.

3           MR. COFFEY:  Let's go to page 5.

4  Q.   (BY MR. COFFEY) What's that, Agent Peterson?

5  A.   It says, Cultivation of marijuana on a criminal violation.

6  Q.   So you would agree with me that it was pretty obvious that

7  OBN thought of this as criminal as far back as July 1st of

8  2020, wouldn't you?

9  A.   Yes, sir.

10 Q.   Agent Peterson, my last topic for you is I want to talk a

11 little bit about the way you conduct investigations, okay?

12 A.   Okay.

13 Q.   No reason to hide the ball here.  When you went out and

14 inspected grows tied to Matt Stacy, what were some of the

15 things you were trying to determine?

16 A.   If they had plants there, what role that the 75 percent

17 owner played.  If they had any involvement in the marijuana

18 grow at all.  Looked at different things administratively.

19 There were a variety of things that we would look at to be able

20 to obtain a search warrant.  It just wasn't off administrative

21 violations or just any particular item.  I would take the

22 totality of all the things that were involved in the -- to put

23 them in a search warrant, everything that was involved in that

24 grow.

25 Q.   When you would go to these grows and interact with the

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY          74

1  growers and/or Mr. Stacy by phone, would you tell him that all
2  of this was part of a criminal investigation?
3  A.   I don't ever recall talking to Mr. Stacy on the phone.  I
4  talked to him a couple of times when I served him a subpoena
5  for the grand jury and then when I arrested him, but there was
6  no extensive interview.
7  Q.   Well, let's put Mr. Stacy aside, then.
8  A.   Okay.
9  Q.   So you go out to a grow.  Were you -- would you -- do you
10 ever go to a grow and found instances of black-market marijuana
11 activity?
12 A.   Yes, sir.
13 Q.   And it's fair to say that you guys didn't always go get a
14 search warrant and shut down the grow?
15 A.   Not instantly, no.  We would have to go get a search
16 warrant, and then you would take the -- everything that you
17 found.
18 Q.   Did you and other agents have concerns about telling all
19 of the growers out there that what they were doing was
20 blatantly illegal?
21 A.   I personally didn't, no.
22 Q.   Well, was the concern ever that these growers could
23 abscond with the marijuana?
24 A.   Yes, sir.
25 Q.   That they could run away?

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY            75

1  A.   Yes, sir.

2  Q.   That they could tip off associates?

3  A.   Yes, sir.

4  Q.   And is that generally something you are cognizant of when

5  you conduct your investigations?

6  A.   Yes, sir.

7  Q.   On that note, let's go to the interview that Mr. Goldstein

8  asked you about with Lara Seuss.

9  A.   Yes, sir.

10 Q.   Again, to give the Court some context, why are you going

11 out to visit Lara Seuss?

12 A.   Because she was put on this registration as the 75 percent

13 owner and I wanted to find out what was going on with that

14 because it involved Mr. Stacy again.  Helen Carrillo was off of

15 it, and now Lara Seuss was on it, especially after the July 1st

16 conversation with him and Russ Cochran.

17 Q.   And prior to Lara Seuss being on this registration, who

18 was listed on it?

19 A.   Helen Carrillo was listed on it as the 75 percent owner.

20 Q.   The previous straw owner you identified?

21 A.   Yes, sir.

22 Q.   And so had Ms. Seuss simply replaced Helen Carrillo?

23 A.   That was a possibility.

24 Q.   Is that one of the things you were investigating?

25 A.   Yes, sir.

DANIEL PETERSON - CROSS-EXAMINATION BY MR. COFFEY          76

1   Q.   Is that one of the reasons that you weren't entirely

2   honest with Ms. Seuss about why you were there?

3   A.   Yes, sir.

4   Q.   What did you think, if anything, that Matt Stacy had done

5   regarding the Carrillo/Seuss names on the registration?

6   A.   I just figured he has found another owner.

7   Q.   So you were investigating Ms. Seuss to see if she was the

8   new straw owner?

9   A.   Yes, sir.

10  Q.   So at the time, were you really concerned with what you

11  told her about how she was listed on the registration?

12  A.   No, sir.

13  Q.   Is that because your primary focus is investigating Matt

14  Stacy?

15  A.   Yes, sir.

16  Q.   Now, Mr. Goldstein didn't play the whole clip, but do you

17  remember any more of the conversation with Ms. Seuss?

18  A.   No, sir.

19  Q.   Do you remember asking her about whether she had visited

20  with Mr. Stacy?

21  A.   Yes, sir.

22  Q.   Did she say that she'd been to Mr. Stacy's office?

23  A.   She had not.

24  Q.   She did not say that?

25  A.   No.  I don't recall her saying that she had been there.

1  Q.   Okay.

2            THE COURT:  Mr. Coffey, will you be much longer with

3  this witness?

4            MR. COFFEY:  No, Your Honor.  Just a couple more

5  minutes.

6       Your Honor, this clip's a little -- I'm worried it's a

7  little long, so I'm just going to rephrase my question.

8  Q.   (BY MR. COFFEY) During your interview with Ms. Seuss, did

9  you recall her making any comments that made you think that

10 Matt Stacy had tried to ensure that she was actually a 75

11 percent owner of this grow?

12 A.   I don't recall any of that, no, sir.

13 Q.   Okay.

14           MR. COFFEY:  Pass the witness.

15           THE COURT:  Anything further, Mr. Goldstein?

16           MR. GOLDSTEIN:  Just relatively brief, Your Honor.

17 Thank you.

18                      REDIRECT EXAMINATION

19 BY MR. GOLDSTEIN:

20 Q.   Agent Peterson, Mr. Coffey just asked you a series of

21 questions kind of focused on manpower, right?

22 A.   Yes, sir.

23 Q.   And asked you whether or not you had the ability in, say,

24 October to shut down Chow King when you went there.  Do you

25 remember that line of questioning?

DANIEL PETERSON - REDIRECT EXAMINATION BY MR. GOLDSTEIN        78

1   A.   Yes, sir.

2   Q.   And you testified that there was a manpower issue with all

3   of these farms, right?

4   A.   Yes, sir.

5   Q.   Okay.  How difficult would it have been for you to just

6   simply put handcuffs on the person at Chow King who was growing

7   marijuana without an OBN registration?  Wouldn't have been

8   difficult, right?

9   A.   At that time, I was not in charge of that inspection or in

10  charge of that.  I would not -- probably wouldn't have done

11  that unless I was advised to.

12  Q.   Anyone there, right?  Wouldn't have taken much effort.

13  You have someone growing marijuana without an OBN registration.

14  Mr. Coffey just insinuated in his questions to you that it was

15  a manpower issue.  You couldn't do anything.  You didn't have

16  the manpower in October.  Do you remember that line of

17  questioning?

18  A.   I do.

19  Q.   So if there was a brick of cocaine, would you have walked

20  out?

21  A.   No, sir.

22  Q.   Right.

23  A.   This is a different set of circumstances.

24  Q.   Exactly.

25  A.   And we're going to have to be able to cultivate or to cut

1    that marijuana down.

2    Q.   Right.

3    A.   So -- and it's going to take an extensive amount of people

4    to be able to take care of that.

5    Q.   What about just arresting someone in possession of a

6    controlled substance in your presence without an OBN

7    registration?  That wouldn't take a lot of manpower, would it?

8    A.   Yes, sir, it still would.  You still have to take care of

9    the product itself that's there.

10   Q.   You couldn't arrest them?

11   A.   Probably wouldn't at that point in time.  We'd come back.

12   Q.   Not "wouldn't."  Could you have placed someone under

13   arrest that day?

14   A.   Yes, sir.

15   Q.   All right.  But you didn't, right?

16   A.   I didn't, no.

17   Q.   Right.  And you told them it was fine -- Agent Paulk said

18   it was fine to grow before registration, right?

19   A.   Yes, sir.

20   Q.   So it wasn't a manpower issue, right?  Agent Paulk told

21   Mr. Stacy, on October 15, "It's fine to grow before OBN

22   registration," right?

23   A.   That's what he said.

24   Q.   That's what he said.  Mr. Coffey showed you --

25              MR. GOLDSTEIN:  Could I have the ELMO, please?

1  Q.   (BY MR. Goldstein) Showed you Exhibit 59, right?

2  A.   Yes, sir.

3  Q.   And showed you that this is one of those reports I was

4  asking you about earlier during my examination that sometimes

5  in these reports, early on -- again, this is July of 2020,

6  right?

7  A.   Yes, sir.

8  Q.   They put "criminal violation" in the report, right?

9  A.   Yes, sir.

10 Q.   And Mr. Coffey asked you questions that this agent

11 apparently told the person in possession of plants at that time

12 it was illegal to have the plants before OBN registration,

13 right?

14 A.   Yes, sir.

15 Q.   Okay.  And the date of this report is July 1st, right?

16 A.   Yes, sir.

17 Q.   Okay.

18          MR. GOLDSTEIN:  Your Honor, I move to admit Exhibit

19 73.

20          THE COURT:  Any objection to 73?

21          MR. COFFEY:  No, Your Honor.

22          THE COURT:  Seventy-three will be admitted.

23 Q.   (BY MR. GOLDSTEIN) So this report's regarding Ping Two,

24 right?

25 A.   Yes, sir.

DANIEL PETERSON - REDIRECT EXAMINATION BY MR. GOLDSTEIN        81

1   Q.   July 1st, 2020, right?

2   A.   Right.

3   Q.   Says, Illegal to have plants, right?

4   A.   Yes, sir.

5   Q.   This is an OBN registration, right?

6   A.   Yes, sir.

7   Q.   For Ping Two, right?

8   A.   Yes, sir.

9   Q.   Issued seven days later.

10  A.   That's what it says.

11  Q.   Right.  So OBN agents go to Ping Two -- right? -- see

12  marijuana, right?

13  A.   Yes, sir.

14  Q.   All right.  Tell the person it's illegal, right?

15  A.   Yes, sir.

16  Q.   Write a report with criminal violations, right?

17  A.   Yes, sir.

18  Q.   And then grants them a registration for their grow, right?

19  A.   Yes, sir.

20  Q.   And that's not the only time this occurred at that point

21  in time.

22          MR. GOLDSTEIN:  Your Honor, I move to admit Exhibits

23  54, 55, and 56.

24          THE COURT:  Any objection to 54 through 56?

25          MR. COFFEY:  No, Your Honor.

1              THE COURT:  They'll be admitted.
2     Q.   (BY MR. GOLDSTEIN) So this is a search warrant return for
3     property located at 2240 County Road 15, Stratford.  Do you see
4     that at the bottom, "Business:  Happy King Farms"?
5     A.   Yes, sir.
6     Q.   Okay.  So apparently, you did have the manpower back in
7     June of 2020 to execute search warrants, right?
8     A.   Yes, sir.
9     Q.   Okay.
10    A.   I don't know what transpired with it.  That's before I got
11    to OBN, but --
12    Q.   Yeah.  Right.  The search warrant's executed June 4th,
13    2020, and they seized 14,776 marijuana plants.  Do you see
14    that?
15    A.   Yes, sir.
16    Q.   King Happy Farms, right?
17    A.   Yes, sir.
18    Q.   Let me show you Exhibit 55.  This is an email.  You know
19    who Gretchen Hall is at OBN?
20    A.   I do.
21    Q.   She vets -- she's at the backgrounds section, right?  She
22    receives the applications?
23    A.   Yes, sir.
24    Q.   According to this, on June 4th, the same day as the search
25    warrant's executed -- see that?  June 4th, right there, June

DANIEL PETERSON - REDIRECT EXAMINATION BY MR. GOLDSTEIN    83

1    4th?

2    A.    Yes, sir.

3    Q.    All right.    Then June 4th, the same day an OBN

4    registration was applied for.    Do you see that, sir?

5    A.    I do.

6    Q.    All right.    And then Exhibit 56, July 14, 2020, OBN issued

7    King Happy Farms an OBN registration, right?

8    A.    Yes, sir.

9    Q.    So they execute a warrant, they seize 14,000-plus plants,

10    right?

11    A.    Yes, sir.

12    Q.    And then, few weeks later, they actually grant that same

13    entity an OBN registration, right?

14    A.    That's what it appears.

15         MR. GOLDSTEIN:    Nothing further, Your Honor.

16         THE COURT:    You may step down.    Let's take a

17    15-minute recess, ladies and gentlemen.    Court will be in

18    recess.

19       (Recess had.)

20         THE COURT:    Call your next witness.

21         MR. GOLDSTEIN:    Jessica Goure.

22         MR. GIFFORD:    Your Honor, I'm sorry.    Robert Gifford

23    on behalf of Mr. Shawn Phu.    While we're not necessarily

24    participatory witnesses, Mr. Phu is present, just because this

25    is a necessary hearing.    Would the Court have any concern if

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN        84

1   Mr. Phu was to be excused, if he should so wish to leave?

2          THE COURT:  It's up to you and to him.

3          MR. GIFFORD:  Thank you, Judge.  I just wanted to

4   make sure that was okay with the Court.  Thank you.

5          THE COURT:  That's fine.  Sure.

6                      JESSICA GOURE,

7     called as a witness on behalf of the defendants, having

8   been first duly sworn to tell the truth, testified as follows:

9                    DIRECT EXAMINATION

10  BY MR. GOLDSTEIN:

11  Q.   Can you please state your name for the record and spell

12  your last name, please?

13  A.   Jessica Goure, G-O-U-R-E.

14          MR. GOLDSTEIN:  See, Your Honor, I'm not used to

15  calling so many witnesses as a defense lawyer.

16  Q.   (BY MR. GOLDSTEIN) Ms. Goure, you were employed for this

17  -- at the Stacy Legal Group; is that correct?

18  A.   Yes, sir.

19  Q.   And could you tell the Court what years you were employed

20  at the Stacy Legal Group for the general time frame?

21  A.   I think it was May or June of 2020 until 2024.

22  Q.   Okay.  So three-plus years or so?

23  A.   Yes, sir.

24  Q.   Okay.  And who worked -- who hired you to work there?

25  A.   Matt and Kristin.

1              THE COURT:  Could you try to -- imagine you're

2   speaking to the people in the back of the room.  I know you've

3   got kind of a quiet voice.  Thank you.

4              THE WITNESS:  Sorry.  Matt and Kristin.

5   Q.   (By Mr. Goldstein) Matt Stacy?

6   A.   Yes, sir.

7   Q.   Okay.  And during your time there, there were other

8   employees?

9   A.   Yes, sir.

10  Q.   And can you just give the Court the names of those

11  individuals?

12  A.   Siyan Liu and Josh Huckleberry.

13  Q.   All right.  Hang on, there.  So can you spell Siyan Liu

14  for the court reporter, please?

15  A.   S-I-Y-A-N, L-I-U.

16  Q.   And her position there?

17  A.   Secretary, same as mine.

18  Q.   Okay.  And did she speak any languages?

19  A.   Mandarin.

20  Q.   Mandarin.  Okay.

21       And Joshua Huckleberry, can you spell his name, if you

22  know how?

23  A.   J-O-S-H-U-A, H-U-C-K- --

24  Q.   -- -L-E-B-E-R-R-Y.  Does that sound about right?

25  A.   -- -B-E-R-R-Y.  Yeah.  Sounds about right.  Yeah.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          86

1    Q.    Okay.

2              THE COURT:  You didn't know you were going to be

3    given a spelling test.

4              THE WITNESS:  Right?

5    Q.   (BY MR. GOLDSTEIN)  Can you spell pituitary?

6    A.    No, sir.

7    Q.    And Josh Huckleberry was a lawyer at the Stacy Legal

8    Group; is that correct?

9    A.    Yes, sir.

10   Q.    And Mr. Stacy was working there as well?

11   A.    Yes, sir.

12   Q.    And was there a woman working remotely while you were

13   there?

14   A.    Yes, sir.

15   Q.    And what was her name?

16   A.    Leann Bateman or Batam and -- something like that.

17   Q.    Okay.  Leanna or Leann?

18   A.    Leanna maybe.

19   Q.    Okay.  All right.  And where was she working from?

20   A.    I think Georgia or -- out somewhere south, I think.

21   Q.    Okay.  All right.  And when you joined, what month did you

22   say it was in 2020 that you joined, March?

23   A.    I think it was May or June.

24   Q.    Okay.  In the middle of COVID?  Does that refresh your

25   memory?

1  A.   Yes, sir.  Yes, sir.

2  Q.   And at that time, did Mr. Stacy have a cannabis-related

3  legal practice?

4  A.   Yes.

5  Q.   Okay.  And you got a role at the Stacy Legal Group from

6  that period of point (sic) until you left; did that revolve

7  around Mr. Stacy's cannabis practice?

8  A.   Yes, sir.

9  Q.   All right.  And can you just briefly explain for the Court

10 what sort of role, responsibilities you had while you were

11 employed there?

12 A.   Sending emails, scheduling his meetings for the day,

13 filing, getting the front office ready.  Anything secretarial,

14 daily things for the office.

15 Q.   Okay.  Well, let me -- are you familiar with an agency

16 called -- acronym OMMA, the Oklahoma Medical Marijuana

17 Authority?

18 A.   Yes, sir.

19 Q.   All right.  And in connection with your work at the Stacy

20 Legal Group, did you file -- make any filings with OMMA?

21 A.   Yes, sir.

22 Q.   And could you tell the Court what kind of filings you

23 would make with the OMMA?

24 A.   I would get the documentation together that they required

25 for the licenses and submit it online.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN        88

1  Q.    Okay.  So OMMA issued what kind of licenses?

2  A.    Medical marijuana.

3  Q.    All right.  And so Mr. Stacy's clients, some of them were

4  interested in getting into the medical marijuana business; is

5  that fair?

6  A.    Yes, sir.

7  Q.    All right.  And so a first step would be to file these

8  applications for licensing with OMMA?

9  A.    Yes, sir.

10  Q.    All right.  And there was a process to doing that, right?

11  A.    Yes, sir.

12  Q.    All right.  And they had an online portal; is that

13  correct?

14  A.    Yes, sir.

15  Q.    All right.  And you would access their portal, and you

16  would need to download certain filings that they required,

17  right?

18  A.    Yes, sir.

19  Q.    And then at a certain point, if accepted, OMMA issued a

20  license, right?

21  A.    Yes, sir.

22  Q.    All right.  And then after getting OMMA licensing, what

23  was the next step in terms of helping clients who were in the

24  medical marijuana business?

25  A.    Get an OBNDD.

1  Q.   Okay.  And by get an -- what you're referring to is a

2  registration from the Oklahoma Bureau of Narcotics and

3  Dangerous Drugs?

4  A.   Yes, sir.

5  Q.   All right.  And they, too, had an online portal; is that

6  correct?

7  A.   Yes, sir.

8  Q.   And they, too, had their own specifications and

9  requirements for people making application for registration,

10 right?

11 A.   Yes, sir.

12 Q.   And so we're clear on terminology, OMMA issues licenses,

13 right?

14 A.   Yes, sir.

15 Q.   And OBN issues registrations?

16 A.   Yes, sir.

17 Q.   Okay.  And your role at Stacy Legal Group was to help

18 Mr. Stacy and the other people there make the applications to

19 OMMA and then OBN, right?

20 A.   Yes, sir.

21 Q.   Okay.  And I want to direct your attention --

22          MR. GOLDSTEIN:  Your Honor, I think we have just an

23 agreement that the exhibits as marked will be admitted for

24 purposes of the hearing and the Court's considerations of the

25 issues?

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          90

```
1              MR. COFFEY:  Yes, Your Honor.
2              THE COURT:  The point being you have no objection to
3    any of the exhibits.
4              MR. COFFEY:  It sounds like vice versa.
5              MR. GOLDSTEIN:  Yeah, I'm going to start rifling
6    through exhibits rather than having to introduce each one.
7              THE COURT:  That's fine.
8              MR. GOLDSTEIN:  Okay.
9    Q.   (BY MR. GOLDSTEIN) Okay.  So, Ms. Goure, I'm just
10   directing your attention to Defendant's Exhibit 22.  You see
11   your email address on the top there?
12   A.   Yes, sir.
13   Q.   And Mr. Huckleberry, right?
14   A.   Yes, sir.
15   Q.   And the email is from July 1st of 2021, correct?
16   A.   Yes, sir.
17   Q.   All right.  And rather than belaboring this, it says, If
18   you are receiving this email, please be made aware that my
19   office received a letter on June 30th, 2021, from the Oklahoma
20   Bureau of Narcotics and Dangerous Drugs that your business
21   registration has been denied or they intend to deny.  You do
22   not have a current license.  Do you see that?
23   A.   Yes, sir.
24   Q.   All right.  And then, directing your attention to Exhibit
25   23, again, that's your email at the top, right?
```

```
 1  A.   Yes, sir.
 2  Q.   And Huckleberry, and that's Siyan, the other employee that
 3  you referenced, right?
 4  A.   Yes, sir.
 5  Q.   And this one is dated July 2nd, right?
 6  A.   Yes, sir.
 7  Q.   All right.  So the first -- 22 references the denial of
 8  June 30th, right?  And then the first email went out July 1st,
 9  correct?
10  A.   Yes.
11  Q.   And the next email went out July 2nd, right?
12  A.   Yes.
13  Q.   All right.  Do you remember this time period at the Stacy
14  Legal Group?
15  A.   Yes, sir.
16  Q.   Do you recall this was a period of big change at the Stacy
17  Legal Group?
18  A.   Yes, sir.
19  Q.   And can you explain that to the Court, please?
20  A.   We got -- I remember getting a phone call, because I was
21  working from home that day, that we needed to start making
22  lists and things to get everything together so that way we can
23  make changes to people's licenses.
24  Q.   Right.  Meaning, Stacy Legal Group is no longer going to
25  be using nonactive, local residents?
```

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          92

```
1  A.   Yes, sir.  We all had a phone conference about it.

2  Q.   Just for the court reporter's purposes, you just have to

3  wait till I finish.

4  A.   Sorry.

5  Q.   It's okay.  Oh, you did it again.  Just wait till I finish

6  my questions so that she can take down the questions and

7  answers.  Okay?

8       All right.  So this was a changing point in the Stacy

9  Legal Group, right?

10 A.   Yes, sir.

11 Q.   All right.  And so, if you recall, these emails went out

12 in early July, the very beginning of July, correct?

13 A.   Yes.

14 Q.   All right.  And the change was that the Stacy Legal Group

15 would no longer use nonactive, local residents in applications

16 to OBN, correct?

17 A.   Yes.

18 Q.   All right.  And if you recall, the office would no longer

19 even provide the names of the local resident, right?

20 A.   Yes.

21 Q.   Meaning, there was a clear change in direction, and

22 Mr. Stacy and you and everyone else there was -- began to alert

23 clients regarding this change, right?

24 A.   Yes.

25 Q.   All right.  And then you spent the summer trying to
```

1   implement -- the summer of 2021 trying to implement that

2   change, right?

3   A.   Yes.

4   Q.   All right.  And I'm directing your attention to

5   Defendant's Exhibit 4.  Okay?  Again, you're on this email,

6   right?

7   A.   Yes.

8   Q.   And this is an email -- this is Leanna Bertram,

9   B-E-R-T-R-A-M, right?

10  A.   Yes.

11  Q.   And she's sending out that Matt needs everyone to put

12  together spreadsheets of all clients.  Do you see that?

13  A.   Yes.

14  Q.   And then down here, it says, We have to send out all the

15  clients new regulations for OBN.  There's paperwork that has to

16  be sent with this.  This process has to be done in the next 60

17  days.  So the faster we get the spreadsheet done, the better,

18  right?

19  A.   Yes.

20  Q.   All right.  So this is sort of the beginning of this work

21  to implement a change at the Stacy Legal Group, right?

22  A.   Yes.

23  Q.   All right.  And if you recall, you had hundreds of

24  clients, right?

25  A.   Yes, sir.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          94

1  Q.   Is it fair to say this was a chaotic time at the office?

2  A.   Yes.

3  Q.   All right.  And were you doing your level best to

4  implement the change?

5  A.   Yes.

6  Q.   And that change came from -- it was at Mr. Stacy's

7  direction, right?

8  A.   Yes.

9  Q.   Meaning, he was giving directions to his employees that

10 they needed to implement a new change, right?

11 A.   Yes.

12 Q.   That OBN had changed their approach to the regulations,

13 right?

14 A.   Yes.

15 Q.   I'm directing your attention to Defendant's Exhibit 27.

16 It's dated July 7th of 2021.  Do you see that?

17 A.   Yes.

18 Q.   And do you recall that Mr. Stacy began to immediately

19 schedule meetings with all of his clients?

20 A.   Yes.

21 Q.   And do you recall that he told them that they needed to

22 come in, you know; there was going to be a change, and they

23 needed to bring a local resident if they wanted to continue to

24 pursue application to OBN?

25 A.   Yes.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          95

1  Q.   And this addendum to the original contract, this is a form

2  that clients were having to sign in the summer of 2021,

3  correct?

4  A.   Yes.

5  Q.   And this particular addendum is signed by a Barbara

6  Miuccio; is that correct?

7  A.   Yes.

8  Q.   Okay.  So directing your attention to Defendant's Exhibit

9  10.  Again, this is an email from you, right?

10 A.   Yes.

11 Q.   To the team at Stacy Legal Group, correct?

12 A.   Yes.

13 Q.   And it says, SLG team, please see the attached follow-up

14 meeting notes.  Please let me know if you have any questions.

15      And this date is August 26 of 2021, right?

16 A.   Yes.

17 Q.   All right.  And if I direct your attention to the meeting

18 notes.  This is a follow-up -- these are -- this is your notes

19 of the meeting that happened on August 26, right?

20 A.   Yes.

21 Q.   And if we just go through the to-do list, this is Siyan.

22 That's the employee, correct?

23 A.   Yes.

24 Q.   She's to reach out to all Kylie clients for a meeting to

25 change LOR.  Do you see that?

1  A.   Yes, sir.

2  Q.   Who's "Kylie" referring to?

3  A.   Kylie Kennedy.

4  Q.   Okay.  And what's "LOR"?

5  A.   Local resident.

6  Q.   And so what does that mean, Reach out to all Kylie clients

7  for a meeting to change LOR?

8  A.   That she needed to contact any license holders that had

9  Kylie's name on there and get them to schedule a meeting with

10 Matt so we could take Kylie's name off of the license.

11 Q.   Okay.  So Kylie Kennedy had been an individual that had

12 been used as a local resident on applications before June 30th,

13 right -- 2021?

14 A.   Yes.

15 Q.   All right.  And in August, there's a meeting, and the

16 clear directive is that Siyan is to reach out to all of those

17 entities to tell them they needed to change the local resident,

18 right?

19 A.   Yes.

20 Q.   And they needed to find a local resident if they were

21 going to pursue that, right?

22 A.   Yes.

23 Q.   Mr. Stacy's office was no longer providing local

24 residents, right?

25 A.   Yes.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          97

1   Q.   And the second one, Huck, that's Joshua Huckleberry,

2   right?

3   A.   Yes, sir.

4   Q.   It says, Reach out to all Bay clients for a meeting to

5   change LOR.  Do you see that?

6   A.   Yes, sir.

7   Q.   All right.  And so the reference to "Bay," what is that?

8   A.   Bay Tran.

9   Q.   Can you spell the last name, if you know?

10  A.   T-R-A-N.

11  Q.   Okay.  And she was related to Mr. Huckleberry?

12  A.   Yes.

13  Q.   How so?

14  A.   Mother-in-law.

15  Q.   Okay.  And she had been used as a local resident on

16  applications?

17  A.   Yes.

18  Q.   Okay.  And so it was Mr. Huckleberry's responsibility

19  here -- in August, he was given the responsibility of reaching

20  out to all of the clients who had used Bay Tran as a local

21  resident to change the local resident, right?

22  A.   Yes.

23  Q.   Meaning, Matt had issued a directive -- right? -- that Bay

24  Tran was not to be used on any applications going forward,

25  correct?  All right.

1          Let me direct your attention to Exhibit 9.  This is a day

2    before, August 25, 2021.  Do you see that?

3    A.   Yes, sir.

4    Q.   And it just says, "Here is the Agenda Please have

5    questions ready for tomorrow's meeting," correct?

6    A.   Yes, sir.

7    Q.   So this is the precursor to what we just saw for the

8    August 26 meeting, right?

9    A.   Yes, sir.

10   Q.   All right.  And so if I go to the agenda, it says:  "Go

11   over new Checklist/OBN new info."  It says, "Termination

12   Checklist and examples."  Do you see that?

13   A.   Yes, sir.

14   Q.   What does that mean, "termination checklist"?

15   A.   That was clients that Matt no longer wanted to represent.

16   Q.   All right.  So Matt, on occasion, fired clients, right?

17   A.   Yes, sir.

18   Q.   When he wasn't happy with them as a client, correct?

19   A.   Yes, sir.

20   Q.   And the next one says, "Surrender checklist."  What's

21   that?

22   A.   When the license holder decided they no longer wanted the

23   license for any number of reasons.

24   Q.   Okay.  And then, "Not renewing 'Checklist'"?

25   A.   It's kind of the same thing as surrendering.  We weren't

1  going to renew their licenses.

2  Q.   Okay.  Maybe that was your decision or their decision.

3  A.   Yes, sir.

4  Q.   Okay.  Directing your attention to Defendant's Exhibit 31.

5  You recognize -- this is -- so let me ask you this:  So after

6  June 30th of 2021, when OBN notified Mr. Stacy of their change

7  in their approach to the regulations, the office began drafting

8  new template documents.  Do you recall that?

9  A.   Yes.

10 Q.   All right.  And those documents were geared towards

11 informing and educating the clientele about the change that OBN

12 had notified Mr. Stacy of, right?

13 A.   Yes.

14 Q.   And is this one example of those sort of new documents

15 that Mr. Stacy was having you and the others make sure that

16 they issue to the clients?

17 A.   Yes.

18 Q.   Okay.  And so this particular document says, "Please be

19 advised every partner will need to be able to answer the

20 following questions if asked:  1.  If OMMA or OBNDD asked you

21 to shut down the business due to diversion (illegal activities)

22 what steps would you take?"

23      And then, "2.  Are you going to be an active participant

24 engaged in the business, not merely a license holder?"  Do you

25 see that?

1  A.   Yes, sir.

2  Q.   And so that's consistent with how Mr. Stacy changed his

3  practice after June 30th, right?

4  A.   Yes, sir.

5  Q.   All right.  And it goes on to say that, We've been advised

6  by the OBN that -- by the Oklahoma Bureau of Narcotics and

7  Dangerous Drugs that will not allow a member of the company to

8  be registered with the agency unless that member is actively

9  involved in the company.  Active has not been legally defined

10  by OBNDD, but generally active means you are involved in

11  company operations and can be held accountable for any failure

12  of the company to properly follow the law.  Do you see that?

13  A.   Yes, sir.

14  Q.   And so that's the communication that Mr. Stacy is having

15  his staff communicate to his clientele, right?

16  A.   Yes.

17  Q.   And this began after the June 30th denial and notice from

18  OBN; correct?

19  A.   Yes.

20  Q.   Directing your attention to Defendant's Exhibit 25.

21  Again, still the summer, August 24, 2021, correct?

22  A.   Yes, sir.

23  Q.   And that's your email.  You're sending an individual to an

24  individual whose email address begins S-A-M.  Do you see that?

25  A.   Yes.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN    101

1   Q.   And Siyan's on there as well, right?

2   A.   Uh-huh.

3   Q.   And the title of this particular email is "New LOR

4   Approved," right?

5   A.   Yes.

6   Q.   All right.  And so it notifies, "We received approval of

7   the new local partner from OMMA on AZ Green."  Do you see that?

8   A.   Yes.

9   Q.   And then, as you testified, after getting an OMMA license,

10  the next step is to apply for an OBN registration, right?

11  A.   Yes, sir.

12  Q.   And so you tell the client here you're resubmitting with

13  the OBN, right?

14  A.   Yes.

15  Q.   And then, in capital letters -- right? -- it says, "This

16  does NOT mean that your OBN license is approved."  Right?

17  A.   Yes.

18  Q.   And then it says, "Our office will provide your company a

19  paper copy of the certificate once fully approved.  Until that

20  time, possession of any plants, plant material or cannabis

21  derivative product is illegal under Oklahoma law.  Currently,

22  you are NOT Fully Licensed."  Caps, bold, and underlined,

23  right?

24  A.   Yes, sir.

25  Q.   All right.  And then, again, it goes on to repeat those

1   questions that we saw in the prior document, right?

2   A.   Yes.

3   Q.   Let me show you Defendant's Exhibit 12.  Again, we're

4   still in the summer of 2021, right?

5   A.   Yes.

6   Q.   And now this one's OBN is submitted, right?

7   A.   Yes.

8   Q.   It says, "Your Paper license for your Medical Marijuana

9   Grow has arrived."  "...submitted an OBN application on your

10  behalf."  Right?

11  A.   Yes.

12  Q.   And that does not mean that your OBN license is approved,

13  right?

14  A.   Yes.

15  Q.   And then, again, it repeats that same language we just

16  saw, possession of marijuana before OBN registration is

17  illegal, and reminding the client they're not fully licensed,

18  right?

19  A.   Yes.

20  Q.   Let me direct your attention to Exhibit 11.  Still in the

21  summer, right?

22  A.   Yes.

23  Q.   And still trying to implement the changes.  Meaning,

24  August 30th, right?

25  A.   Yes.

1   Q.   July has come and gone.  August has come and gone.  Late

2   August, and you're still trying to implement the changes,

3   right?

4   A.   Yes, sir.

5   Q.   There was a -- is it fair to say there was an urgency in

6   the office that summer?

7   A.   Yes, sir.

8   Q.   And what was the urgency?

9   A.   To try and get every local resident we provided off the

10  license.

11  Q.   Okay.  And that directive came from Mr. Stacy, right?

12  A.   Yes, sir.

13  Q.   Okay.  Directing your attention to Defendant's Exhibit 13.

14  Now we're into September of 2021.  Do you see that?

15  A.   Yes, sir.

16  Q.   All right.  And just for the Court's edification, you had

17  an internal system at the Stacy Legal Group called Asana,

18  A-S-A-N-A, correct?

19  A.   Yes.

20          THE COURT:  Could you try to slow down just a bit?

21  She is tearing her hair out right now.  You talk very rapidly.

22          MR. GOLDSTEIN:  So she has practice from Judge

23  Friot's session, but I promised her I would try and slow down,

24  so I will.

25  Q.   (BY MR. GOLDSTEIN)  All right.  You had an internal

1  computer software system called Asana?
2  A.   Yes, sir.
3  Q.   And that's spelled A-S-A-N-A, right?
4  A.   Yes.
5  Q.   All right.  And inside of that network, all the employees
6  at Stacy Legal Group had access to it, right?
7  A.   Yes.
8  Q.   And it was kind of like an internal calendar, tasking
9  system, right?
10  A.   Yes.
11  Q.   Where you, Jessica Goure, could task, say, Josh
12  Huckleberry with making sure that he follows through with a
13  certain task, right?
14  A.   Yes.
15  Q.   And is this an example of that?  This exhibit an example
16  of like an entry in the Asana system?
17  A.   Yes, sir.
18  Q.   Okay.  And if I could direct your attention to August
19  24th.  You send a message to Siyan; is that correct?
20  A.   Yes.
21  Q.   And you said, The ones I'm tagging you in are Kylie.  All
22  I need you to do is contact the client and let them know they
23  need to schedule a meeting with Matt (kind of like we are with
24  Helen).  He will go over everything, all the changes in the
25  law, right?

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          105

```
1   A.   Yes.
2   Q.   So just another example of directions from Mr. Stacy that
3   nonactive, local residents could no longer be utilized and they
4   needed to be removed from all pending applications or licenses,
5   right?
6   A.   Yes.
7            MR. GOLDSTEIN:   One moment, please.
8   Q.   (BY MR. GOLDSTEIN) So I'm directing your attention to
9   Exhibit 48.   Do you see that?
10  A.   Yes, sir.
11  Q.   And at the top, it says, "High Priority," in capital
12  letters, right?
13  A.   Yes.
14  Q.   And it references "BuBu JingXin Grow."  B-U-B-U.  Second
15  word, J-I-N-G-X-I-N, right?
16  A.   Yes, sir.
17  Q.   And the entries here are from -- if you look below
18  "Jessica Goure," there's an entry from "March 28, 2022," right?
19  A.   Yes, sir.
20  Q.   All right.  I want to show you Exhibit 46.
21       All right.  This is an Asana entry from "March 16, 2022,"
22  the same time period, right?
23  A.   Yes.
24  Q.   Okay.  And it's talking about BuBu Jing Grow, right?
25  A.   Yes.
```

1  Q.   And so it's related to Exhibit 48 -- right? -- in terms of

2  the client, BuBu Jing?

3  A.   Yes.

4  Q.   Okay.  And let me back up for a second.  Do you recall

5  BuBu Jing having -- well, let's just look at this.  Okay?

6       There's an entry from December 20 of 2021.  Do you see

7  that?

8  A.   Yes.

9  Q.   And it's Siyan, and she's sending a message to you and to

10 Matt, right?

11 A.   Yes.

12 Q.   And it says, "Bay still on the license, they need a new"

13 local resident.  Do you see that?

14 A.   Yes.

15 Q.   All right.  And then if you turn the page -- okay? -- to

16 March 16, there's a message from you to Siyan that says,

17 "Honestly I have no idea, it looks like Kristin had assigned it

18 to Huck, So this one looks like" -- it -- that fell "through

19 the cracks after he left."  Do you see that?

20 A.   Yes, sir.

21 Q.   All right.  So let's back up here a little bit.  Okay?

22      So you said that Bay, Bay Tran, was related to Josh

23 Huckleberry, right?

24 A.   Yes.

25 Q.   It's his mother-in-law, right?

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          107

```
 1   A.   Yes.
 2   Q.   All right.  Were all of the clients that used Bay Tran as
 3   a local resident, were those considered to be Josh Huckleberry
 4   clients at the Stacy Legal Group?
 5   A.   Yes.
 6   Q.   All right.  And when you say here that "Kristin had
 7   assigned it to Huck," that's a reference to -- that this
 8   assignment had been -- this task had been assigned to Huck,
 9   right?
10   A.   In Asana, yes.
11   Q.   In Asana, right?
12   A.   Yes.
13   Q.   And the task was that someone needed to take Bay Tran off
14   of the BuBu Jing OBN registration, right?
15   A.   Yes.
16   Q.   And you say it looks like it fell through the cracks --
17   A.   Yes.
18   Q.   -- right?
19        All right.  How would you describe, while he was there,
20   Josh Huckleberry's diligence and follow-through on tasks at the
21   Stacy Legal Group?
22   A.   Not very well done.
23   Q.   Right.  You would assign him things, and he wouldn't do
24   it, right?
25   A.   Yes, sir.
```

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          108

1    Q.    Other people would assign him tasks, and he wouldn't

2    follow through, right?

3    A.    Yes, sir.

4    Q.    And in the Asana system, after you tasked someone with a

5    specific assignment, you couldn't then -- you don't get

6    updates, right?  You need to go and look to see if the person

7    had done it, right?

8    A.    Yes, sir.

9    Q.    All right.  Did I explain that properly?

10   A.    Yes, sir.

11   Q.    Okay.  And so this looks like, although it was assigned in

12   December of 2020 -- right?  Bay's still on the license, we need

13   to get a new local resident, right?

14   A.    Yes.

15   Q.    In March, you're explaining it looks like it fell through

16   the cracks, right?

17   A.    Yes.

18   Q.    And so you testified earlier you had hundreds of clients,

19   right?

20   A.    Yes, sir.

21   Q.    July 1st, 2021, all the way through to 2022, a hectic time

22   at the Stacy Legal Group, right?

23   A.    Yes, sir.

24   Q.    Working feverishly to try and get the local residents that

25   had been on licenses and registrations off of licenses and

1   registrations, right?

2   A.   Yes, sir.

3   Q.   And sometimes things fall through the cracks, right?

4   A.   Yes, sir.

5   Q.   And this is an example of that?

6   A.   Yes, sir.

7   Q.   Now, directing your attention to Exhibit 145.  This is

8   April 15th of 2021, right?

9   A.   Yes, sir.

10  Q.   All right.  And this is a client by the name of "CX

11  Green."  Do you see that?

12  A.   Uh-huh.

13  Q.   And this is an email that says -- it's from you to

14  Mr. Stacy, correct?

15  A.   Yes.

16  Q.   It says, CX Green "was rejected for additional proof of

17  residency, I was trying to see what date she had her original

18  Licenses to see if it was part of the unity."

19       Unity is a reference to the original -- how the system was

20  after the citizens passed the medical marijuana initiative,

21  right?  Or was that afterwards?

22  A.   I'm not sure what I'm referencing there.

23  Q.   Okay.

24  A.   Sorry.

25  Q.   But you have a question about CX Green, right?

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          110

1   A.   Yes, sir.

2   Q.   And you direct it to Mr. Stacy, right?

3   A.   Yes.

4   Q.   And he says -- on the bottom there, he says, "I don't

5   think she was."  He doesn't know, right?

6   A.   Correct.

7   Q.   All right.  And then, forwarding to Exhibit 146, again,

8   this is about CX Green and a surrender form, and it's August

9   27th of 2021.  Do you see that?

10  A.   Yes.

11  Q.   All right.  And then 147 is a DocuSign where Crystal Huynh

12  has surrendered the CX Green license.  Do you see that?

13  A.   Yes.

14  Q.   And then 148 is the actual surrender form by Crystal.  Do

15  you remember that?

16  A.   Yes.

17  Q.   All right.  I want to talk to you about CX Green for a

18  second and see what you recall about this.  Okay?

19  A.   Okay.

20  Q.   Do you recall there was an individual by the name of Guan

21  Green who came in to tell you at the office that he was buying

22  the CX Green license from Crystal Huynh?

23  A.   I don't recall the actual meeting.

24  Q.   Okay.

25  A.   I know there was talk of it.

1  Q.   Okay.  And when you said there was talk of Guan Green
2  buying the license from Crystal Huynh, right?
3  A.   Yes, sir.
4  Q.   And then there were -- applications were submitted after
5  Crystal had apparently told the office she didn't want to renew
6  it, right?  Do you remember that?
7  A.   I think so.
8  Q.   Okay.  Well, let me ask you this:  Do you recall -- did
9  you submit a renewal application for Crystal Huynh on purpose,
10 disregarding her instructions, or were you under the impression
11 that Guan Green was purchasing that license?
12 A.   I was under the impression it was getting purchased, yes.
13 Q.   Okay.  And so it was that understanding that the CX Green
14 application was renewed in the early part of 2021, correct?
15 A.   Yes.
16 Q.   All right.  It certainly wasn't done on purpose to try and
17 do it behind Crystal Huynh's back or anything like that, right?
18 A.   No, sir.
19 Q.   Another one of the mistakes that can happen in a busy law
20 office?
21 A.   Yes, sir.
22 Q.   Okay.  And talking about mistakes, I just have an email
23 here.  It's Defendant's Exhibit 1.  It's from March of 2021.
24 This is you emailing with Jessica McGuire who worked at OBN,
25 right?

1  A.   Yes, sir.

2  Q.   We're going to go through a bunch of her emails in a

3  moment.  But this is you where you're apologizing that while

4  you were doing an OBN application, it autocorrected to Matt

5  Stacy.  Do you see that?

6  A.   Yes, sir.

7  Q.   And you were wondering how you could go about doing a name

8  change, right?

9  A.   Yes.

10 Q.   Just another example of accidents or mistakes that can

11 happen, you know, when interacting with an agency, right?

12 A.   Yes, sir.

13 Q.   All right.  And just another example, Defendant's Exhibit

14 18, October 29, 2021, where you tell -- same thing, you to

15 Ms. McGuire, "I just wanted to FYI I accidentally only put one

16 client as 100 percent which is not correct," right?

17 A.   Yes, sir.

18 Q.   Didn't do it on purpose, right?

19 A.   Yes, sir.

20 Q.   It was a mistake?

21 A.   Yes, sir.

22 Q.   Okay.  I want to talk to you about series of emails

23 between you, Mr. Stacy, and OBN about pending applications.  Do

24 you remember that in the fall of 2020 and beginning of 2021

25 there were serial emails from the Stacy Legal Group to OBN

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          113

1   asking about all of these applications that were pending?

2   A.    I don't remember exact time lines; but, yes, I know there

3   was a lot of emails sent.

4   Q.    Okay.  Well, let me show you Defendant's Exhibit 21, an

5   email from December 1st of 2020.  Do you see that?

6   A.    Yes, sir.

7   Q.    And it's an email from you to Ms. McGuire, right?

8   A.    Yes, sir.

9   Q.    And you're asking, Sorry to bother you.  Just curious if

10  you knew who I could speak to about a list of outstanding OBNs,

11  right?

12  A.    Yes, sir.

13  Q.    And then, at 10:38 that same morning, she tells you to

14  email "tmckedy," M-C-K-E-D-Y, right?

15  A.    Yes, sir.

16  Q.    And if we turn to Exhibit 19, same date, December 1st,

17  2020, right?

18  A.    Yes, sir.

19  Q.    See that?  And you're emailing Ms. McKedy at Ms. Goure's

20  suggestion, right?

21  A.    Yes.

22  Q.    And you send her a list of cases that have been pending,

23  and you're asking about when OBN might alert the Stacy Legal

24  Group whether or not these clients were going to get their OBN

25  registration, right?

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          114

```
 1  A.   Yes.
 2  Q.   And you can see the dates on the right-hand side here.
 3  That's how long the applications had been pending with OBN,
 4  right?
 5  A.   I believe so.
 6  Q.   Okay.  All right.  Well, let's go to Exhibit 33.  So if we
 7  just start here, January 29th.  We're in the next month after
 8  December of 2020, right.  Do you see that?
 9  A.   Yes, sir.
10  Q.   All right.  And Mr. Stacy is emailing Ms. McKedy, with
11  copy to you at that time, right?
12  A.   Yes.
13  Q.   And in this email, he says, "Per our phone call... these
14  OBNDD apps have been pending for some time.  Can you assist."
15  A.   Yes.
16  Q.   Do you see that?
17  A.   Yes.
18  Q.   All right.  Sorry.  And this one, a little bit different
19  than the other one, doesn't just have the case number and the
20  date, but it identifies the actual clients, right?
21  A.   Yes.
22  Q.   Do you recognize those entities as clients of the Stacy
23  Legal Group?
24  A.   Yes, sir.
25  Q.   Okay.  Now, let me just go back to that for a second.  So
```

1  at the top there, it looks like Mr. Stacy forwarded that email

2  to Russ Cochran at OBN.  Do you see that?

3  A.    Yes.

4  Q.    And do you know who Russ Cochran was at OBN?

5  A.    I know he's a bigwig.

6  Q.    All right.  Bigwig.

7       Now, Exhibit 32 is a February 7th -- right?  So now we're

8  into February.  Mr. Stacy is emailing Ms. McKedy again, Quick

9  follow-up on the below list.  Do you see that?

10 A.    Yes, sir.

11 Q.    He says, "Clients are very concerned about not having

12 these licenses available to display and they technically cannot

13 sell without the OBNDD granted."  Do you see that?

14 A.    Yes, sir.

15 Q.    That's an email that's sent to Ms. McKedy who works at

16 OBN, right?

17 A.    Yes.

18 Q.    And she responds -- you're copied on the response up top

19 -- and it says, "They are currently with our Legal Department,"

20 right?

21 A.    Yes.

22 Q.    All right.  So March -- Defendant's Exhibit 50, March 4th,

23 Matt's sending, "an updated list of pending cases," to Russ

24 Cochran, right?

25 A.    Yes.

1   Q.   And this one has -- it's an updated list, so it doesn't

2   just have these entities, but it has a whole bunch of other

3   entities.  Do you see that?

4   A.   Yes, sir.

5   Q.   And it has the dates that the OBN applications were

6   submitted, right?

7   A.   Yes.

8   Q.   All right.  And go back to the first page, Nana Zhang,

9   this is now March, and it's been pending since August 14th,

10  right?

11  A.   Yes, sir.

12  Q.   And if you look, "Golden Tree" is on here, right?

13  A.   Yes.

14  Q.   It's been pending since September 3rd, right?

15  A.   Yes.

16  Q.   And "Chow King" is on here, and it's been pending since

17  September 25th, right?

18  A.   Yes.

19  Q.   Then Defendant's Exhibit 3, this is you to Mr. Stacy, and

20  it's now May 10th, right?

21  A.   Yes, sir.

22  Q.   And you say an, "Updated list," right?

23  A.   Yes.

24  Q.   And, again, still, these same companies that you and

25  Mr. Stacy have been emailing OBN since December of 2020,

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          117

1  there's still no action by OBN, right?

2  A.    Correct.

3  Q.    That means there's been no notice provided to your office

4  of whether the OBN was allowed or denied, right?

5  A.    Yes.

6  Q.    "Nana Zhang" is still on there, right?

7  A.    Yes.

8  Q.    "Golden Tree"?

9  A.    Yes.

10 Q.    "Chow King"?

11 A.    Yes.

12 Q.    And a whole bunch of others.  "Earth Angel."  Do you see

13 that?

14 A.    Yes.

15 Q.    All right.  Defendant's Exhibit 42, October 11 of 2021,

16 Mr. Stacy copies you on an email.  He's -- appreciate any

17 clarification he can get on the following OBNDD applications,

18 been pending for some time.  Earth Angel's is on there, correct?

19 A.    Yes.

20 Q.    Let me -- before I get there, let me ask you:  The impetus

21 for all of this, the sending emails to OBNDD, were you

22 receiving inquiries from your clients?

23 A.    Daily.

24 Q.    What did you say?

25 A.    Daily.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          118

1   Q.   Daily.  Was there a sense of urgency from the clients?

2   A.   Yes.

3   Q.   Were they, to be frank, bothering you and inundating you,

4   asking why -- or when their applications might be granted?

5   A.   Yes.

6   Q.   And was that a big problem during this time period?

7   A.   Yes.

8   Q.   Okay.  And that's what these emails reflect?

9   A.   Yes.

10  Q.   All right.  And then Defendant's Exhibit 7 is an email

11  from July 23, 2021.  It's from Matt to you.  Do you see that?

12  A.   Yes.

13  Q.   And it says, "Can you please look into OBNDD... and see

14  the status of their OBN application?"  And the subject line is

15  Chow -- one of the subject lines -- one of the names on the

16  subject line is "Chow King," right?

17  A.   Yes.

18  Q.   And he said, "Frankie's sister says they called yesterday

19  and were told they were denied for growing without a security

20  system."

21  A.   Yes.

22  Q.   All right.  So this looks like, as of July 23, 2021, you

23  and Mr. Stacy still don't know whether or not Chow King's

24  application has been granted or denied, right?

25  A.   Yes.

1  Q.   And he's asking you to go look into OBN because it looks

2  like the client's sister called, right?

3  A.   Yes.

4  Q.   And was told they had been denied for growing without a

5  security system, right?

6  A.   Yes.

7  Q.   And then Defendant's Exhibit 123.  Have you ever seen

8  these before, these internal documents?

9  A.   I can't recall.

10 Q.   All right.  So you didn't get these as part of -- OBN

11 didn't provide these to you at the Stacy Legal Group, right?

12 A.   Not that I'm aware of.

13 Q.   You've never seen something -- this is Defendant's Exhibit

14 123.  You've never seen this document, right?

15 A.   No, sir, not that I remember.

16 Q.   And so when you wanted to know whether a client had been

17 allowed or denied their OBN application, you went onto the

18 portal, right?

19 A.   Yes, sir.

20 Q.   OBN had a computer system you could access with

21 credentials, right?

22 A.   Yes.

23 Q.   And that's where you would find out "allowed" or "denied,"

24 right?

25 A.   Yes.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN        120

1   Q.   And if it was denied, it didn't say a reason on there, did
2   it?
3   A.   No, sir.
4   Q.   Just said "denied," right?
5   A.   It -- yeah, something to that nature.
6   Q.   Okay.
7   A.   I'm not sure of the exact wording.
8   Q.   And these kinds of reports weren't on there, right?
9   A.   No, sir.
10  Q.   You didn't have access to this?
11  A.   No, sir.
12  Q.   And you obviously had never received this as of July,
13  right?
14  A.   Not that I'm aware of.
15  Q.   Okay.  And at the bottom, it says, Growing without a
16  proper security measure, right?
17  A.   Yes, sir.
18  Q.   And that's the reason for the denial, it looks like?
19  A.   Yes, sir.
20  Q.   All right.  And that's "Chow King," right?
21  A.   Yes.
22  Q.   I want to direct your attention to Defendant's Exhibit 45.
23  This is an Asana entry from November 29, 2021.  Do you see
24  that?
25  A.   Yes.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          121

1   Q.   All right.  And if you go down to here, it looks like

2   you've sent a message to Mr. Huckleberry, right?

3   A.   Yes, sir.

4   Q.   And it says, "Please get with Jeff to sign the paperwork

5   to surrender" his license, right?

6   A.   Yes.

7   Q.   And it says, "They do not check emails."  Do you see that?

8   A.   Yes.

9   Q.   All right.  Were clients sometimes difficult to get ahold

10  of?

11  A.   Yes.

12  Q.   Very difficult?

13  A.   Yes.

14  Q.   All right.  Would they not check their emails?

15  A.   No.

16  Q.   Would they not respond to phone calls?

17  A.   Not really, no.

18  Q.   Okay.  And so this is just a single isolated example of a

19  problem at the Stacy Legal Group in terms of getting ahold of

20  people -- right? -- your clients?

21  A.   Yes.

22  Q.   Let me show you Defendant's Exhibit 35.  This is an email

23  from Barb Miuccio to you, correct?

24  A.   Yes.

25  Q.   And she says, "Stacy, Can you help me with any of this,"

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          122

1   right?

2   A.    Yes.

3   Q.    And then if you go down, there's an email to Ms. Miuccio

4   from a Vickie Hensley.  Do you see that?

5   A.    Yes.

6   Q.    All right.  And it says, "Barbara, We received the

7   Application, Certificate" -- well, let me stop there.

8         Ms. Hensley is from First Enterprise Bank, right?

9   A.    Okay.  Uh-huh.

10  Q.    And, again, this is October of 2020, right?

11  A.    Uh-huh.

12  Q.    October 22, right?  And so Ms. Hensley, from the bank,

13  emails Ms. Miuccio and says, We received the application,

14  certificate LLC for Earth Angel, Earth Angel Real Estate

15  Holdings.  Tell me about each business.  Which is the grow, and

16  what is the business doing?  Do you see that?

17  A.    Yes.

18  Q.    And then down here, she says, "Here is the list of items

19  that we didn't receive but are required."  Do you see that?

20  A.    Yes.

21  Q.    And, then, one of the items is an OBN license, right?

22  A.    Yes, sir.

23  Q.    And that's the registration we've been talking about that

24  a company will get from Oklahoma Bureau of Narcotics to get

25  into the medical marijuana business, right?

1  A.   Yes, sir.

2  Q.   And if I direct your attention -- do you see this

3  document, the attachments?

4  A.   Yes, sir.

5  Q.   The second entry at the top?

6  A.   Yes.

7  Q.   What does that say?

8  A.   OBND license.

9  Q.   Okay.  Showing you Defendant's Exhibit 39.  This is a

10 client called "Lucky Dog Green."  Do you see that?

11 A.   Yes.

12 Q.   And the entry in July of 2021, you sent a message to

13 Leanna and Joshua that we have to get this info.  "I do not see

14 the folder in the cabinet... this is a Huck case he will be

15 back Monday," right?

16 A.   Yes.

17 Q.   And so, again, another example of a Bay Tran local being

18 assigned to Mr. Huckleberry, right?

19 A.   That's what it appears, yes.

20 Q.   Okay.  All right.  I just want to change subjects to kind

21 of your interaction with the people at OBN.  Okay?

22 A.   Okay.

23 Q.   Is it fair to say that you would email frequently with the

24 people at the registration department at OBN?

25 A.   Yes.

1  Q.   Jessica McGuire, one of them?

2  A.   Yes.

3  Q.   Gretchen Hall, another one?

4  A.   Yes.

5  Q.   Anyone else?  Tracie McKedy?

6  A.   Maybe at the very beginning.  I just remember Jessica and

7  Gretchen.

8  Q.   Okay.  And you would have questions of them, right?

9  A.   Yes.

10  Q.   And you would email them on a weekly, if not daily, basis,

11  asking questions that came up in your position at the Stacy

12  Legal Group, right?

13  A.   Yes.

14  Q.   All right.  How would you describe your -- and, listen,

15  this is not a place -- you know, this is a courtroom.  I need

16  you to be honest and not be worried about hurting people's

17  feelings.  Okay?

18       How would you describe your experience dealing with the

19  people at OBN on the other side of these emails?

20  A.   Difficult.

21  Q.   All right.  Were they -- was it a challenge?

22  A.   Yes, sir.

23  Q.   Could you get straight answers from them?

24  A.   Not all the time.

25  Q.   Would you come away frustrated by your communications with

1  them?

2  A.   A lot of the time, yes.

3  Q.   Would you describe their system as inefficient?

4  A.   Yes.

5  Q.   Would you describe it as incompetent?

6  A.   Yes.

7  Q.   Let me show you Defendant's Exhibit 5.  So July 7, 2021,

8  right?

9  A.   Yes.

10  Q.   Matt has sent you an email forwarded from the OBN, right?

11  A.   Yes.

12  Q.   Do you see that?  And if you recall, this was -- OBN

13  changed systems quite a bit, right?

14  A.   Yes.

15  Q.   Their online portal where you would submit applications

16  had gone through different iterations of the programs that they

17  used, right?

18  A.   Yes.

19  Q.   Started out kind of rudimentary and then ended up getting

20  more and more sophisticated as time went on?

21  A.   Yes.

22  Q.   All right.  And so this is July of 2021, and it looks like

23  OBN has gone to a -- they say, "We have made some changes to

24  the registration system."  Do you see that?

25  A.   Yes.

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          126

1   Q.   And it says -- the instructions say to navigate the

2   portal, select forgot password, and you'll get an email to

3   activate, and you'll get into the new system, right?

4   A.   Yes.

5   Q.   All right.  So that's July 7, 2021, right?

6   A.   Yes.

7   Q.   And then two days later, you're emailing Ms. Hall and

8   Ms. McGuire, and you're telling them that you have followed the

9   instructions, but you're not getting the email access, right?

10  A.   Yes.

11  Q.   Just one isolated example of kind of the frustrations that

12  you would encounter in trying to manage the OBN system?

13  A.   Yes.

14  Q.   Okay.  July 21 of 2021, Defendant's Exhibit 37, again,

15  you're sending an email.  You're trying to be diplomatic.  You

16  say you'll -- you keep -- sorry to keep bothering -- "hate to

17  keep bothering you... we really need someone to reach out to

18  us," right?

19  A.   Yes.

20  Q.   Sent emails to anyone I could find online.  They keep

21  directing me back to you, Ms. Hall and Ms. McGuire, right?

22  A.   Yes.

23  Q.   Said you are "so far behind on pulling and applying OBN's

24  I just received another stack of approvals for OMMA today and

25  can't apply for their OBN's and clients are on us daily about

United States Court Reporter
U.S. Courthouse, 200 N.W. 4th St.
Oklahoma City, OK 73102 * 405.609.5505

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          127

1   it.  So any help would be greatly appreciated."  Do you see

2   that?

3   A.   Yes.

4   Q.   All right.  So couple of themes here.  One is clients are

5   bothering you incessantly, right?

6   A.   Yes.

7   Q.   Wondering what's happening to their OBN applications,

8   right?

9   A.   Yes.

10  Q.   Couldn't get answers from OBN, right?

11  A.   Yes.

12  Q.   And this is a hectic time period for you, July, the summer

13  of 2021, right?

14  A.   Yes.

15  Q.   And you're encountering difficulties with OBN's system,

16  right?

17  A.   Yes.

18  Q.   April 5, Defendant's Exhibit -- April 5, 2021, Defendant's

19  Exhibit 36, right?

20  A.   Yes.

21  Q.   Another example, you've been putting -- trying to get into

22  your registrations on their system, and it just keeps spinning,

23  right?

24  A.   Yes.

25  Q.   All right.  October 21, still not getting information

1   regarding pending applications, right?

2   A.   Yes.

3   Q.   I don't know if you can see that?

4   A.   No.

5   Q.   Another email, this one from Siyan, copying you.  Again,

6   can't seem to see all the new applications in their program,

7   right?

8   A.   Yes.

9   Q.   Defendant's Exhibit 40, August 5 of 2021, you have a

10  question for Ms. Hall and Ms. McGuire about clients want to

11  surrender some of their OMMA licenses.  "What procedures are in

12  place for us to 'halt' the OBN licenses for those particular

13  LLC's," right?

14  A.   Yes, sir.

15  Q.   And there wasn't some simple button on the system to halt

16  those applications, right?

17  A.   No, sir.

18  Q.   Ms. McGuire is telling you they need to surrender the OBN

19  as well, and they require all owners to sign the surrender

20  form?

21  A.   Yes.

22  Q.   How difficult would it be for you, on occasion, to get a

23  client to come to the office to sign a physical form?

24  A.   Difficult.

25  Q.   Very difficult?

1   A.   Yes, sir.

2   Q.   All right.  Sometimes they're located far away?

3   A.   Yes, sir.

4   Q.   Sometimes they don't speak English?

5   A.   Yes, sir.

6   Q.   Sometimes they don't respond to emails and calls?

7   A.   Yes, sir.

8   Q.   Defendant's Exhibit 26, this is entitled, "Additional

9   Written Declarations of Fact."  This is an OBN form.

10      Do you remember that OBN, over time, started to require

11  additional information from applicants?

12  A.   Yes, sir.

13  Q.   And is this one example of kind of that process they went

14  through in terms of vetting applicants?

15  A.   Yes.

16  Q.   And was it -- is it fair to say it was kind of a moving

17  target sometimes with OBN -- or no?

18  A.   Yes, probably.  Yes.

19  Q.   Yes?

20      All right.  Defendant's Exhibit 47 is an email from

21  October of 2020, do you see that?

22  A.   Yes, sir.

23  Q.   It's an email from you to Ms. Hall, right?

24  A.   Uh-huh.

25  Q.   And you said you had a quick question.  "Some of our

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN    130

1  OBN... that need renewals by October 31st we are still waiting

2  on their Licenses to be approved by OMMA."  Do you see that?

3  A.   Yes, sir.

4  Q.   And so I want to provide the Court with some context here.

5  Okay?  So companies that had an OBN registration, they had to

6  renew that registration every October 31st?

7  A.   By October 31st, yes.

8  Q.   Okay.  And so what you're describing here is that before

9  you could file the renewal with OBNDD, sometimes you had

10  pending documents at OMMA, right?

11  A.   Yes.  Their license wasn't approved.

12  Q.   Their license wasn't approved?

13  A.   Yes.

14  Q.   So first you had to get a license approval from OMMA?

15  A.   Yes.

16  Q.   Then you could renew with OBN?

17  A.   Yes.

18  Q.   All right.  And so as you came up on this October 31st

19  deadline, sometimes you were still waiting on materials from

20  OMMA, right?

21  A.   Yes.

22  Q.   So you couldn't file the license that you needed to with

23  OBNDD, right?

24  A.   Yes.

25  Q.   Sort of like in a pickle situation?

1   A.   Yes, sir.

2   Q.   And that's what this email is talking about?

3   A.   Yes, sir.

4   Q.   Okay.  I don't need to go through 15.

5        Okay.  Last subject matter.  Showing you what's been

6   admitted as Defendant's Exhibit 88.  Do you see that?

7   A.   Yes.

8   Q.   All right.  This is an email between you and Kylie

9   Kennedy?

10  A.   Yes.

11  Q.   It's dated August 31 of 2021, right?

12  A.   Yes.

13  Q.   All right.  Kylie Kennedy was a local resident that had

14  come into the office to participate as a local resident on grow

15  applications, right?

16  A.   Yes.

17  Q.   All right.  And so, here, you're saying, "Kylie, We have

18  been trying to get in contact with you.  Matt needs to have a

19  meeting with you about a few changes made."  Do you see that?

20  A.   Yes.

21  Q.   All right.  And so the changes are, what's happening, OBN

22  had changed their policy in the June 30th denial, right?

23  A.   Yes.

24  Q.   And so now we're in August.  You're trying to schedule

25  Kylie Kennedy to come back into the office to have a meeting

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          132

1   with Matt so he can go over the changes with her, right?

2   A.    Yes.

3   Q.    And you say, in black-and-white, black letters on white

4   paper, "You came to our office to be put on a medical marijuana

5   license with Jeff, we just need you to come sign some

6   paperwork, and have a brief meeting with him."  Do you see

7   that?

8   A.    Yes.

9   Q.    And the reference to Jeff is Jeff --

10  A.    Chen.

11  Q.    Jeff Chen, C-H-E-N, right?

12  A.    Yes.

13  Q.    All right.  And so what you're saying here is

14  memorializing something happened in the past; Kylie had come to

15  the office with Mr. Chen, right?

16  A.    Yes.

17  Q.    Okay.  And if you recall -- showing you Exhibit 143.  Do

18  you recall that she came with a woman by the name of Krystal

19  Blevins?

20  A.    I believe that's who she came with.

21  Q.    Okay.  Your best memory?

22  A.    Yes.

23  Q.    That's all we can ask for.

24  A.    Yes, I believe that's who she came with.

25  Q.    Okay.  Your best memory is that Kylie came to the office,

JESSICA GOURE - DIRECT EXAMINATION BY MR. GOLDSTEIN          133

1  met with Matt with Ms. Blevins, right?

2  A.   Yes.

3  Q.   Okay.  Then we have texts between you and Jeff Chen,

4  February 12, 2021, do you see that?

5  A.   Yes.

6  Q.   And you text Jeff.  You say, "Hey the drivers license

7  picture I have for Kylie Kennedy is not in the correct format,

8  can you see if she can email me a picture of it front and

9  back?"  And you give your email address, right?

10  A.   Yes.

11  Q.   That's your email address?

12  A.   Yes.

13  Q.   And then Jeff texted you a picture of the -- of her

14  license, right?

15  A.   Yes.

16  Q.   And then you responded and said, "I need her to email them

17  to me."  They "do not come in the correct format if they are

18  texted."  Do you see that?

19  A.   Yes.

20  Q.   Okay.  And that sort of chain of messages starts at -- on

21  February 12, 2021 at 11:28 a.m., right?

22  A.   Yes.

23  Q.   And then it looks like he got back to you at 12:37?

24  A.   Yes.

25  Q.   When he texted you the pictures, right?

1   A.   Yes.

2   Q.   And then it looks like you immediately said, hey, "I need

3   her to email them to me," right?

4   A.   Yes.

5   Q.   Showing you Defendant's Exhibit 149.  So that's at

6   12:39 p.m., right?

7   A.   Yes.

8   Q.   And it's an email from Kylie Kennedy, right?

9   A.   Yes.

10  Q.   And says "kkennedy2212," so K-K-E-N-E-D-Y-2-2-1-2,

11  "@icloud.com," right?

12  A.   Yes.

13  Q.   And as far as you know, that's Kylie Kennedy emailing you

14  a picture of her license, right?

15  A.   Yes, sir.

16  Q.   The Kylie Kennedy who had come to the office, right?

17  A.   Yes.

18  Q.   And had given consent to be put on OBN/OMMA applications

19  as a local resident, right?

20  A.   Yes.

21  Q.   Best memory?

22  A.   Yes.

23  Q.   Okay.

24          MR. GOLDSTEIN:  Nothing further, Your Honor.

25          THE COURT:  Questions?  How long do you anticipate

 1  being with the witness?

 2          MR. COFFEY:  At least 30 minutes, probably.

 3          THE COURT:  Well, let's just go ahead and take our

 4  noon recess, then.  Let's recess until ten minutes after one.

 5  Anything else?

 6          MR. COFFEY:  No, Your Honor.  Thank you.

 7          THE COURT:  All right.  Court will be in recess.

 8      (Recess had.)

 9          THE COURT:  Why don't you come up?  I can tell you're

10  cold.  It's cold in here.

11          THE WITNESS:  Yes, sir.

12          THE COURT:  Go ahead, Mr. Coffey.

13          MR. COFFEY:  Thank you, Your Honor.

14                      CROSS-EXAMINATION

15  BY MR. COFFEY:

16  Q.   Hi, Ms. Goure.  Good to see you again.

17  A.   You too.

18  Q.   I want to start with Defendant's Exhibit 8.  This was an

19  email previously that was shown to you on direct.  Okay.

20      And, Ms. Goure, can you remind me of the context of this

21  email?

22  A.   It looks like they were going to email us their 2020 tax

23  returns.

24  Q.   What about the bottom half of the message, the email

25  that's down here?

1  A.   It looks like we were trying to remove Bay and put the

2  gentleman's name above it in instead of Bay, like take Bay off.

3  Q.   Okay.  And why were you trying to remove Bay?

4  A.   She was 75 percent owner of that license, it looks like.

5  Q.   Okay.  And so what would happen with OBN if you hadn't

6  removed Bay Tran from the OBN registration?

7  A.   Honestly, I don't know.  I don't think it would be

8  approved, but I don't know for sure.

9  Q.   Well, I mean, so we looked at a letter previously -- we'll

10  look at it in a sec -- where Mr. Stacy writes his clients that

11  OBN is no longer approving an ownership structure.  Do you

12  remember that?

13  A.   Yes, sir.

14  Q.   Okay.  So based on that, do you think that OBN would have

15  approved this registration if he'd left Bay Tran's name on it?

16  A.   No.

17  Q.   Okay.  And Bay Tran was who?

18  A.   Josh Huckleberry's mother-in-law.

19        THE COURT:  I'm sorry.  He was what?

20        THE WITNESS:  Josh Huckleberry's mother-in-law.

21  Q.   (BY MR. COFFEY) And Josh Huckleberry was a lawyer at the

22  firm?

23  A.   Yes.

24  Q.   Was he Mr. Stacy's law partner?

25  A.   I wouldn't call him a law partner.

1    Q.    How would you describe him?

2    A.    Employee.

3    Q.    Okay.  Well, was Mr. Huckleberry an experienced attorney?

4    A.    Yes, sir.

5    Q.    He was?

6    A.    Well, I don't know.  Honestly, I think.  I don't know.

7    Sorry.

8    Q.    Well, how old is he?

9    A.    No idea.  Young.

10   Q.    Does he look older or younger than me?

11   A.    Young.  Younger.

12   Q.    Okay.  It's true -- right? -- that he was a first-year or

13   second-year associate working for Mr. Stacy, correct?

14   A.    I believe so.

15   Q.    And he simply did whatever Mr. Stacy told him to, did he

16   not?

17   A.    I believe so.

18   Q.    Okay.  And one of the things Mr. Stacy told him to do was

19   go find local residents, didn't he?

20   A.    Not to my knowledge.

21         MR. GOLDSTEIN:  Your Honor, could we just get a time

22   period for the question?

23         THE COURT:  She said she didn't know.

24   Q.    (BY MR. COFFEY) Well, you also testified that at some

25   point, there were other individuals, like Kylie Kennedy and Bay

1   Tran, put on these registrations.  Do you remember?

2   A.    Yes.

3   Q.    Okay.  So time frame for that?

4   A.    I don't -- I was not in a meeting where he instructed Josh

5   to go find a local resident, no.

6   Q.    Okay.  So, then, how did it end up that Bay Tran was on

7   these licenses?

8   A.    I honestly do not know.

9   Q.    So, to be clear, did Bay Tran work at any marijuana grow?

10  A.    Not to my knowledge.

11  Q.    Okay.  Did she know anything about growing marijuana?

12  A.    Not to my knowledge.

13  Q.    She was just a name on a license that got paid, right?

14  A.    As far as I'm aware.

15  Q.    And her connection was her son-in-law, Josh Huckleberry,

16  that worked for Mr. Stacy?

17  A.    Yes, sir.

18  Q.    Okay.  So given the change of position, as Mr. Stacy

19  characterizes it, from OBN, in the summer of 2021, what would

20  have happened if you had not removed Bay Tran from these

21  licenses and registrations?

22  A.    I believe they would not have gotten approved.

23  Q.    Would that have been good for Mr. Stacy's business?

24  A.    I -- I'm not sure how to answer that.  I mean --

25  Q.    Well, so is it fair to say that summer 2021 and after this

JESSICA GOURE - CROSS-EXAMINATION BY MR. COFFEY          139

1  that there were a lot of licenses that the owners had to be
2  changed?
3  A.   Yes, sir.
4  Q.   Would you say it was a large chunk of Mr. Stacy's clients?
5  A.   Yes, sir.
6  Q.   And if Mr. Stacy can no longer provide the appropriate
7  state licensing for these grows, do you think they're going to
8  keep hiring him?
9  A.   I wouldn't think so.
10 Q.   Would it have been good or bad for his business?
11 A.   Bad.
12 Q.   I agree.
13      So was there a concerted effort to replace certain names
14 on licenses apart from Bay Tran?
15 A.   I'm not -- I don't understand what you asked, sorry.
16 Q.   Well, in this email, it looks like Bay Tran's 75 percent
17 ownership is going to be removed in some capacity from the OBN
18 registration, does it not?
19 A.   Yes, sir.
20 Q.   Okay.  So was there a concerted effort around this time,
21 August of 2021, to remove individuals like Bay Tran from
22 licenses?
23 A.   Yes, sir.
24 Q.   Okay.  Who were the other people that were being removed
25 from licenses?

1  A.   Bay Tran, Helen Carrillo, Kylie Kennedy, Annette Yarger,

2  Zac Staton, and Carman Osborne, to my knowledge, were the only

3  ones.

4  Q.   Okay.  Who was Carman Osborne?

5  A.   She's my best friend.

6  Q.   Okay.  How'd she end up on a OBN registration and

7  marijuana license?

8  A.   I asked her if she wanted to be.

9  Q.   Why did you ask her if she wanted to be?

10 A.   Because Matt gave me the opportunity to ask if she wanted

11 to be.

12 Q.   What do you mean "the opportunity"?

13 A.   After Josh had Bay on his, I asked Matt if I could put a

14 couple of people that I know on some as well.  And he said yes.

15 Q.   Okay.  Why did you want to put some people you knew

16 instead of just yourself?

17 A.   Because Matt said it was a conflict of interest.

18 Q.   How would it be a conflict of interest?

19 A.   Because I was his secretary -- or his assistant.

20 Q.   Is it fair so say that while you worked for Mr. Stacy, you

21 did what he asked?

22 A.   Yes, sir.

23 Q.   Is that because he's the lawyer?

24 A.   Yes, sir.

25 Q.   Did he tell you all of this was legal?

1  A.   Yes, sir.

2  Q.   So you said Carman Osborne was one of the -- your friend

3  you put on a license?

4  A.   Yes, sir.

5  Q.   What about Zac Staton?

6  A.   Yes.

7  Q.   Who was that?

8  A.   My brother-in-law.

9  Q.   Okay.  And Annette Yarger, who is that?

10  A.   My sister-in-law.

11  Q.   Okay.  And so what were all of these individuals getting

12  out of being placed on these registrations?

13  A.   Money.

14  Q.   How much money?

15  A.   A thousand-something.  I can't recall the exact number.

16  I'm sorry.

17  Q.   And did they have to do anything apart from being listed

18  on these licenses in order to get $1,000?

19  A.   No, sir.

20  Q.   Okay.  So there were clearly instances -- were there not?

21  -- where clients had paid Mr. Stacy to get OBN registrations

22  that were later denied, weren't there?

23  A.   Yes.

24  Q.   And to your knowledge -- well, let me ask you this:  How

25  much was Mr. Stacy typically charging clients for the -- for

1  the OMMA license and the OBN registration?

2  A.   I don't know exact numbers.  I know he would write them on

3  the front cover sheet, but I can't give exact numbers because I

4  think they were all different.

5  Q.   Can you ballpark it?  I mean, could I do this for 1,000-

6  or $2,000?

7  A.   No, sir.

8  Q.   Could I do this for 15,000?

9  A.   I don't -- no.  No.  No, sir.

10  Q.   So it cost more than 15,000?

11  A.   I think so, yes.

12  Q.   Okay.  And after OBN denies these registrations that the

13  clients had paid Mr. Stacy for, were there any instances where

14  Mr. Stacy paid back the money to the clients?

15  A.   I'm not aware of anything of that nature.  I was not in

16  any meetings --

17         THE COURT:  Could you try to speak up again?

18         THE WITNESS:  I'm sorry.  I was not in any meetings

19  that he had with the clients, so I'm not aware of how that was

20  handled.

21  Q.   (BY MR. COFFEY) Okay.  But -- sure, you weren't in the

22  meetings, and we'll actually get to that.  But were you one of

23  several office managers or the office manager at this time?

24  A.   I would probably say the office manager.

25  Q.   And would facilitating payments between the clients and

1  Mr. Stacy have been something that you ever helped with?

2  A.   I would take payments if clients would come in, and I

3  would stick it in an area and give them a receipt.  That would

4  be the extent of my dealings with money and clients.

5  Q.   Yeah, but as you sit here today under oath, you can't

6  state that there was ever an instance where Mr. Stacy, after an

7  OBN registration had been denied, actually went and paid back

8  the $15,000 or so that the client had paid him?

9  A.   Not to my knowledge, no.

10  Q.   Okay.  Now, you mentioned some meetings that you --

11  between the clients and Mr. Stacy that you weren't a part of,

12  right?

13  A.   Correct.

14  Q.   Okay.  So did you ever -- well, were you ever part of any

15  meeting with these clients?

16  A.   Maybe a couple, but not to an extent of sitting there and

17  listening to something.  It would have more been, "Can you come

18  in and give us paperwork," or, "Can you notarize this?"

19  Q.   So do you know what Mr. Stacy would explain to clients,

20  essentially his pitch, when they'd come in and ask for a

21  license and OBN registration?  Do you know what he would tell

22  them about how this process would work?

23  A.   No.

24  Q.   Do you know if he ever walked through the statutes with

25  clients?

1   A.   I do not know.

2   Q.   Okay.  Who would have been a part of those meetings?

3   A.   Matt and the clients.  And sometimes Siyan, depending on

4   the language.

5   Q.   Okay.  Would Josh Huckleberry have been a part of those?

6   A.   He may have been.

7   Q.   Okay.

8        MR. COFFEY:  I want to go to Defendant's Exhibit 32,

9   please.

10  Q.   (BY MR. COFFEY) This was one of the emails that

11  Mr. Goldstein walked through with you.  Do you recognize this

12  email at all?

13  A.   Yes.

14  Q.   Okay.  Now, was Mr. Stacy aware, on February 7th of 2021,

15  that you could not -- his clients could not grow marijuana

16  without a registration?

17  A.   I would assume so.  I don't --

18        MR. GOLDSTEIN:  Well, I object.  It assumes a fact

19  not in evidence, Your Honor.

20        THE COURT:  Overruled.  If she knows.

21        THE WITNESS:  I -- I'm not aware.  I don't know.

22  Sorry.

23  Q.   (BY MR. COFFEY) Okay.  Well, can you read that for me,

24  please?

25  A.   "Just a quick follow up on the list below.  Clients are

1   very concerned about not having these licenses available to

2   display and they technically cannot sell without the OBNDD

3   granted.  What can our office do to get them approved?"

4   Q.    What does the "OBNDD granted" mean?  What does that mean?

5   A.    That they approved the license.

6   Q.    Okay.  The OBN registration?

7   A.    Yes, sir.

8   Q.    Okay.  And who is this email from?

9   A.    It looks like Tracie McKedy -- oh.  From Matt Stacy to

10  Tracie.

11  Q.    Yeah.  So it's fair, based on this email, that Matt Stacy

12  understands in February 7 of 2021 that his clients can't grow

13  without a registration.  Would you agree with that?

14          MR. GOLDSTEIN:  Well, I object, Your Honor.  Email

15  says "sell," not "grow."

16          THE COURT:  Why don't you rephrase the question.

17  Q.    (BY MR. COFFEY) So is it fair, Ms. Goure, that -- based on

18  the email, that Mr. Stacy understood, in February of 2021, that

19  his clients cannot sell without an OBN registration?

20  A.    Yes.

21  Q.    Okay.  Do you ever remember conversations around the law

22  firm on that topic about whether a marijuana grower could

23  operate without a registration?

24  A.    I mean, he would tell us no, they couldn't, if they call

25  and ask to let that -- to -- you know, no, you cannot.

1  Q.   When did he start doing that?

2  A.   I can't tell you exact time, dates.  I'm sorry.

3  Q.   Okay.

4          MR. COFFEY:  If we go to Defendant's Exhibit 35,

5  please.

6  Q.   (BY MR. COFFEY) Okay.  This was another email that was

7  sent to you.  Do you recall going over this with Mr. Goldstein?

8  A.   Yes, sir.

9  Q.   Okay.  And in the email, who -- I guess, first question:

10 Who is Barbara?

11 A.   She owned Earth Angels LLC.

12 Q.   Okay.  So was she one of Mr. Stacy's clients?

13 A.   Yes, sir.

14 Q.   Okay.  And what is she attempting to do in this email?

15 A.   It looks like open a bank account.

16 Q.   Okay.  And based on the email, is the bank account --

17 excuse me.  Is the bank going to let them open an account yet?

18 A.   Not until they have the appropriate information.

19 Q.   Such as?

20 A.   Articles of organization, operating agreement, OBN

21 license, OMMA license, IRS SS4 Form, identity information for

22 all owners.

23 Q.   And what's the date on this email from Ms. Miuccio?

24 A.   October 22, 2020.

25 Q.   Okay.  So was this an acknowledgement that at least a bank

JESSICA GOURE - CROSS-EXAMINATION BY MR. COFFEY                147

1  is going to require an OBN registration for a marijuana grow to

2  have a bank account?

3  A.   Yes.

4  Q.   Okay.  So is it fair to say that everyone understood, at

5  the Stacy Law Group in October of 2020, that you needed an OBN

6  registration to operate legally in the state of Oklahoma under

7  the medical marijuana initiative?

8  A.   Yes.

9  Q.   You went through some emails, Ms. Goure, where you or

10 other employees at the Stacy Law Firm -- even Mr. Stacy

11 himself -- are emailing OBN about, let's just say, things

12 related to licenses.  Do you recall that?

13 A.   Yes.

14 Q.   Okay.  Is there any email that you can recall, either one

15 you looked at today or one from your -- you remember from your

16 time working there, where Matt Stacy reached out to OBN and

17 said, "I want to list Helen Carrillo on this license as the

18 owner, but she has no role whatsoever in the company"?

19 A.   Are you asking if he wrote that email?

20 Q.   I'm asking if you remember any time he reached out to OBN

21 and said that.

22 A.   Not to my knowledge.

23 Q.   Do you remember any time him reaching out to OBN and

24 saying, "I want to list Bay Tran, Josh Huckleberry's mother-in-

25 law, on this license; is that legal"?

1   A.   Not specific names.  No, sir, not to my knowledge.

2   Q.   So what do you mean "specific names"?

3   A.   I don't think he ever asked, as you said, "Can Bay Tran or

4   Helen Carrillo be on these licenses."

5   Q.   Yeah.  But, nonetheless, the law group submitted a lot of

6   licenses and registrations with those names on it, didn't they?

7   A.   Yes, sir.

8   Q.   And, Ms. Goure, to be fair, that's -- you had a hand in

9   that, right?  You would hit submit, you'd fill out paperwork,

10  right?

11  A.   Yes, sir.

12  Q.   And is that because you're simply following what the

13  lawyer tells you to do?

14  A.   Yes, sir.

15  Q.   What about emails where, during this time frame of summer

16  of 2021, when you all are attempting to remove Helen Carrillo

17  and Bay Tran from these licenses -- do you remember what I'm

18  talking about?

19  A.   Yes, sir.

20  Q.   Do you recall any emails to clients or any time that

21  clients came in and Stacy Legal Group told them, "Okay, we've

22  got to remove Ms. Carrillo, but we need a new person, and they

23  have to have an active role in this company"?

24  A.   Are you -- I'm sorry.  What are you asking?

25  Q.   It's a simple question.  Was the concern, when you took

JESSICA GOURE - CROSS-EXAMINATION BY MR. COFFEY                149

1   Bay Tran and Kylie Kennedy and Helen Carrillo off these
2   licenses, to simply put a new name on there so OBN wouldn't
3   suspect anything?  Or was the concern actually to put people
4   that were 75 percent owners of these companies and residents in
5   Oklahoma?
6   A.   To put 75 percent owners who were residents.
7   Q.   Okay.  So do you ever recall communications with Mr. Stacy
8   and clients where he explained that that was absolutely what
9   needed to occur?
10  A.   He sent out the attestation forms and things of that
11  nature saying that's what needed to occur.
12  Q.   But you understand that was after 2021 when OBN said they
13  weren't going to approve any licenses unless they filled out
14  those forms, right?
15  A.   I believe so.
16  Q.   Okay.
17            THE COURT:  These names that were taken off or
18  substituted, now, who was put on in their stead?
19            THE WITNESS:  Whoever the client provided.  Whoever
20  they knew that was going to be part of their grow or their
21  dispensary or process license.
22            MR. COFFEY:  Can we go to Document 147, Brandi?
23  Sorry, not document, exhibit.
24  Q.   (BY MR. COFFEY) Okay.  Do you remember Mr. Goldstein
25  asking you about this document?

1  A.   Yes, sir.

2  Q.   Okay.  He asked you about Crystal Huynh; is that correct?

3  A.   Yes, sir.

4  Q.   Okay.  Look, I wasn't going to object the way he was

5  asking questions.  But I'd like to hear, in your own words,

6  what you remember about Crystal Huynh -- everything, please.

7  A.   The -- I don't know how to say his name -- was going to

8  buy her license because she didn't want it anymore.  And so we

9  were going to change from -- take her off at renewal, because I

10 believe at the time you couldn't -- I can't remember if you

11 couldn't change it or it had already been changed, and then we

12 were going to put the gentleman on it as owner.

13 Q.   Okay.  And so when was this?

14 A.   I can't remember a time line.  I'm sorry.

15 Q.   Okay.  Were you at the firm whenever she was first put on

16 the license?

17 A.   I don't believe so, no, sir.

18 Q.   Okay.  So you don't know anything about the circumstances

19 that she was put on the license originally?

20 A.   Correct.

21 Q.   Fair to say you just know that at some point, they needed

22 to take her off, and it looks like there was an effort to do

23 that?

24 A.   Yes, sir.

25 Q.   Okay.  So, I mean, would it surprise you to know that

1  Crystal Huynh testified under oath in state court that Stacy
2  Legal Group put her name on the original license without her
3  permission?
4  A.   I did not know that.
5  Q.   You don't have any information about Crystal Huynh and her
6  relationship with Stacy Legal Group, do you?
7  A.   No, sir.
8  Q.   Okay.
9       MR. COFFEY:  Let's go to Defense Exhibit 88, please.
10 Q.   (BY MR. COFFEY) So, Ms. Goure, you said that this email
11 was with Kylie Kennedy; is that right?
12 A.   Yes, sir.
13 Q.   Again, I'm not going to put words in your mouth.  What do
14 you remember about Ms. Kennedy?
15 A.   I don't remember her face.  I remember two women coming
16 into the law firm with Jeff Chen.  I believe it was Krystal and
17 Kylie.  And then they were put on licenses and had a meeting
18 with Matt.
19 Q.   Okay.  But were you in that meeting?
20 A.   No, sir.
21 Q.   Okay.  You know, you said you don't remember what
22 Ms. Kennedy looks like?
23 A.   No.  I can't put a -- like, I could not pick her out in
24 public and put a face to her name.
25 Q.   Do you remember when you met with the U.S. Attorney's

JESSICA GOURE - CROSS-EXAMINATION BY MR. COFFEY                152

1    Office?

2    A.    Yes.  A little bit.

3    Q.    Do you remember us showing you a picture of Kylie Kennedy?

4    A.    You guys showed me a lot of pictures, sorry.

5    Q.    We did, yeah.

6    A.    But, yeah.

7    Q.    But do you have any reason to disagree with me if I tell

8    you we showed you a picture of Kylie Kennedy, and you hadn't

9    seen her before?

10   A.    I don't remember.  I'm sorry.  I may have -- probably.

11   Q.    You never dealt with Kylie Kennedy much, did you, either?

12   A.    No, sir.

13   Q.    You don't have any information -- do you? -- about whether

14   Mr. Stacy put her on licenses without permission, do you?

15   A.    Say that again, I'm sorry.

16   Q.    You don't have any information about whether Mr. Stacy put

17   Ms. Kennedy on licenses and registrations without her

18   permission?

19   A.    No.  I don't have any information.

20   Q.    Okay.

21         MR. COFFEY:  Let's go to Exhibit 27, please.

22   Q.    (BY MR. COFFEY) Okay.  Ms. Goure, do you remember this

23   letter that you went over with Mr. Goldstein?

24   A.    Yes, sir.

25   Q.    Okay.  Do you know who drafted this?

1   A.    I believe it was probably Matt.

2   Q.    Do you know who else would have drafted it if not Matt?

3   A.    Maybe Kristin.  I don't know.

4   Q.    Okay.  All right.  So it was Mr. Stacy or his wife?

5   A.    Yes.

6   Q.    Okay.  You were asked about some specific things in the

7   letters, and so I want to follow up on that.

8   A.    Okay.

9   Q.    About this part, "I am writing to advise that on June 30,

10  2021, OBN officially denied your registration"?

11  A.    Okay.

12  Q.    Do you know at all whether on June 30th, 2021 OBN

13  officially denied registrations?

14  A.    I can't remember exactly.

15  Q.    Do you know that if -- do you know whether the business

16  structure Mr. Stacy was employing was "not unique" and that

17  "hundreds, if not thousands, of companies utilizing the same

18  business structure have been licensed through state entities."

19  Do you know if that's true?

20  A.    I don't know if it's true.  That's what I was told.  I

21  don't know if it's true.

22  Q.    Is it fair to say that anything in this letter about what

23  OBN has done previously, previous positions, you don't have any

24  personal knowledge about?

25  A.    No, sir.

1  Q.   Okay.  And this was an email that was a letter that was

2  sent out to the clients, right?

3  A.   Yes, sir.

4  Q.   Do you agree with me that if Mr. Stacy were to write a

5  letter to all his clients that tells them, "My underlying

6  business structure was fraud," that he could potentially face

7  some criminal and civil liability?

8  A.   I would assume so.

9  Q.   Yeah.  So do you agree with me that there's a reason he's

10 not going to put that in this letter?

11 A.   Say that again, I'm sorry.

12 Q.   Do you agree with me that there's a reason he's not going

13 to admit fault in this letter?

14 A.   I would assume so, yes.

15 Q.   Okay.

16         MR. COFFEY:  That's all I have, Your Honor.

17         THE COURT:  Further questions?

18         MR. GOLDSTEIN:  Very briefly, Your Honor.

19                   REDIRECT EXAMINATION

20 BY MR. GOLDSTEIN:

21 Q.   Ms. Goure, your best memory, which is all we can ask of

22 you, is that Kylie Kennedy came to the office to participate as

23 a local resident, right?

24 A.   Like I said, I can't remember a face, but I believe, yes.

25 Q.   Right.  And you communicated with her in email?

1   A.    In email, yes.

2   Q.    Right.  And you texted Jeff Chen to have her bring -- to

3   email her license, and you got an email from Ms. Kennedy,

4   right?

5   A.    Yes.

6   Q.    Okay.

7   A.    From my knowledge, yes.

8   Q.    Yeah.  And just so the -- well, I want the Court to

9   clearly understand a point:  After June 30th of 2021, there was

10  a new directive at the Stacy Legal Group about local residents,

11  right?

12  A.    Yes, sir.

13  Q.    Okay.  That new directive was that Mr. Stacy or anyone

14  employed at the Stacy Legal Group would no longer help

15  anyone -- provide them with a local resident, right?

16  A.    Yes, sir.

17  Q.    If a client wanted to pursue an OBN application after June

18  30th of 2021, they had to find their own local resident, right?

19  A.    Yes, sir.

20  Q.    Forms were changed at the Stacy Legal Group, right?

21  A.    Yes, sir.

22  Q.    Clients were required to attest that they had a local

23  resident who was going to be active in the business, right?

24  A.    Yes, sir.

25  Q.    We went through that document on direct where Mr. Stacy

1  says OBN hasn't defined what "active" means, but he gave, you

2  know, his general understanding of what an "active local

3  resident" would mean, right?

4  A.   Yes, sir.

5  Q.   All right.  And so from June 30th, 2021, going forward, as

6  long as you worked at Mr. Stacy's legal office, there was no

7  providing of any local residents by Mr. Stacy or anyone

8  employed there, right?

9  A.   As far as I'm aware, yes.

10  Q.   And he required his clients to attest that the local

11  residents that they were supplying were active in the grow,

12  right?

13  A.   Yes, sir.

14  Q.   Okay.

15        MR. GOLDSTEIN:  Thank you.  Nothing further, Your

16  Honor.

17        THE COURT:  You may step down.  You're excused.

18     Call your next witness.

19        MR. GOLDSTEIN:  Your Honor, we call Rafael Carrillo.

20                    RAFAEL CARRILLO,

21     called as a witness on behalf of the defendants, having

22  been first duly sworn to tell the truth, testified as follows:

23                    DIRECT EXAMINATION

24  BY MR. GOLDSTEIN:

25  Q.   Mr. Carrillo, could you say your full name and spell your

1    last name for the record, please?

2    A.    Rafael Alfonso Carrillo, Jr., C-A-R-R-I-L-L-O.

3    Q.    All right.  Mr. Carrillo, you're married, right?

4    A.    Yes.

5    Q.    And your wife's name?

6    A.    Helen Latoria (ph.) Carrillo.

7    Q.    Okay.  And Helen's -- Helen participated in being a local

8    resident on some OBN applications; is that correct?

9    A.    Yes.

10   Q.    All right.  I just want to chat with you about that for a

11   little bit.  Okay?

12   A.    Okay.

13   Q.    You originally got to Mr. Stacy's law practice through

14   friends of yours, correct?

15   A.    Friends of mine, yes.

16   Q.    Okay.  And their names, please?

17   A.    His legal name is An Con (ph.) Nguyen.

18   Q.    How do you spell the last name?

19   A.    N-G-U-Y-E-N.

20   Q.    Okay.  And he's a friend of yours?

21   A.    Yes.

22   Q.    And he was married or had a girlfriend named My Lien.

23   A.    No.  That was a friend of his.  My Lien was a friend of

24   his.  They both come from Vietnam.

25   Q.    Okay.  So Mr. Nguyen and My Lien Green -- or My Lien

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN          158

1  Green?  Is that her name?

2  A.   Yeah.  My Lien.

3  Q.   Or My Lien?  Not Green.  That's probably the name of the

4  company, right?

5  A.   Yeah.

6  Q.   All right.  His friend's name was My Lien, right?

7  A.   Yes.

8  Q.   Okay.  And one of them contacted you to ask if you wanted

9  to be a local resident on an application; is that correct?

10 A.   Kind of.  They contacted Andy, and he asked me.  But My

11 Lien, when she was alive, she only -- she was more comfortable

12 having a female, so that's how she asked my wife.  And then we

13 said yes, and then we met with Mr. Stacy about it.

14 Q.   Okay.  My point is Mr. Stacy didn't ask you or your wife

15 to be a local resident; you came to Mr. Stacy through a friend

16 of yours, right?

17 A.   Yes.

18 Q.   Okay.  And this was roughly the summer of 2020; is that

19 right?

20 A.   Yes.

21 Q.   Yeah?  Okay.  And did you, at that point, go and have a

22 meeting at Mr. Stacy's office?

23 A.   Yes.

24 Q.   And you were present?

25 A.   Yes.

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN    159

1    Q.   Your wife, Helen, was present?

2    A.   Yes.

3    Q.   Mr. Nguyen was present?

4    A.   No.  My Lien and her boyfriend or husband.

5    Q.   All right.  I missed that.  So her boyfriend or husband's

6    name is Andy?

7    A.   No, no, no, no, no.

8    Q.   Okay.

9    A.   I don't remember his name.

10   Q.   All right.  So you, your wife, My Lien and her --

11   A.   Yeah, her other person.

12   Q.   Okay.  And you went to Mr. Stacy's office with the

13   intention of your wife agreeing to be named as a local resident

14   on a medical marijuana application; is that right?

15   A.   We went to get information and clarification first because

16   my wife was -- like, she wanted to know how it worked.

17   Q.   Okay.

18   A.   And then after it was explained how it worked, then she

19   agreed.

20   Q.   Okay.  Had a meeting with Mr. Stacy?

21   A.   Yes.

22   Q.   He answered everyone's questions?

23   A.   Yes.

24   Q.   And the end of the meeting, the net result was that Helen

25   had approved or given her consent -- your wife, Helen -- to be

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN          160

1    put on the application for My Lien Green as a local resident?

2    A.    Yes.

3    Q.    Okay.  And then -- so from that point forward -- so

4    that's, you know, summer-ish of 2020, right?

5    A.    Yes.

6    Q.    I want to focus your -- let's talk first about the summer

7    of 2020 until March 1st of 2021.

8    A.    Okay.

9    Q.    All right.  You recall that's when law enforcement

10   officers came to your house, on March 1st?

11   A.    Yes.

12   Q.    All right.  So we're going to use those as the bookend

13   dates for now.

14   A.    Okay.

15   Q.    Okay.  So between that first meeting at Mr. Stacy's office

16   and March 1st of 2021, you and your wife would communicate with

17   Mr. Stacy via text?

18   A.    Text, telephone, sometimes, like e-DocuSign stuff on the

19   computer.

20   Q.    Okay.  You're in communication with Mr. Stacy, right?

21   A.    Yes.

22   Q.    All right.  And part of that communication is text

23   messaging?

24   A.    Yes.

25   Q.    All right.  And you had your own phone, correct?

```
 1   A.   Yes.
 2   Q.   And your wife had her own phone?
 3   A.   Yes.
 4   Q.   All right.  And so each of you was capable of sending
 5   texts to Mr. Stacy and asking him certain information?
 6   A.   Yes.
 7   Q.   All right.  During that time period, right?
 8   A.   Uh-huh.
 9   Q.   Summer of 2020, March of 2021, all right?
10   A.   Okay.
11   Q.   You were sending texts from your own personal phone?
12   A.   Yes.
13   Q.   As Rafael Carrillo?
14   A.   Yes.
15   Q.   Right.  And you were also typing texts to Mr. Stacy from
16   your wife's phone, with your wife there, but from your wife's
17   phone, right?
18   A.   Yes.
19   Q.   All right.  Mr. Stacy's receiving texts, from his
20   perspective, from you, right?
21   A.   Uh-huh.
22   Q.   But also, when your wife's phone would come in on the text
23   --
24   A.   Yes.
25   Q.   -- right?  You would write it as, "Hi, this is Helen
```

1  Carrillo" --

2  A.   Yes.

3  Q.   -- even though you're writing it, right?

4  A.   Yes.

5  Q.   All right.  And so let me show you Defendant's Exhibit --

6          MR. GOLDSTEIN:  Could we just get the document

7  camera?  Sorry.  Can we just get a clean copy of this, please.

8  Q.   (BY MR. GOLDSTEIN) Okay.  So this is Defendant's Exhibit

9  82, Mr. Carrillo.

10  A.   Yes.

11  Q.   And the telephone number at the top left there, the "580";

12  do you see that up in the top-left corner?

13  A.   Yes.

14  Q.   That's Helen's cell phone?

15  A.   Yeah, that's her old cell phone number.

16  Q.   Okay.  And this is the phone that you were typing the

17  texts as if it was Helen texting?  She was right there.  I'm

18  not saying you were doing anything wrong, but you were typing

19  as if it was Helen, right?

20  A.   Yes.  Yes.

21  Q.   And so is it fair to say that from -- this is July 13 of

22  2020.  Okay?

23  A.   Okay.

24  Q.   From July 13 of 2020 to the end of February of 2021, you

25  and/or your wife, Helen, were sending regular texts to

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN        163

1   Mr. Stacy, asking if there were additional opportunities for

2   Helen to be named as a local resident on an application?

3   A.   Yes.

4   Q.   All right.  And that made sense -- right? -- because you

5   guys were getting money for it, right?

6   A.   Yes.

7   Q.   And it was a profitable endeavor for you and Helen, right?

8   A.   Yes.

9   Q.   All right.  And if you recall, the agreement was roughly

10  $5,000 for the first year that she would receive, if and when

11  the entity received the OBN registration, right?

12  A.   Yes, 5,000 for the first year, 5,000 for the second year.

13  Q.   Okay.  And then the local resident would sort of fall off

14  the application because their partner would have residency

15  status, right?

16  A.   Correct.

17  Q.   Okay.  So -- now, these texts, you know, "Hello Mr. Stacy

18  this is Mrs. Carrillo... I'm... checking up with you to see if

19  you have any updates.  Sorry if I'm bothering you."  Right?

20  A.   Yes.

21  Q.   That's you writing to Mr. Stacy, but for your wife?

22  A.   Yeah, we're together.

23  Q.   Yeah, yeah.  Okay.  So -- and that -- you would constantly

24  be doing that, between -- I mean, we can go through the texts

25  if you want.  But trying to speed this up a little bit.

1    You're constantly asking Mr. Stacy if there's any more
2  opportunities, right?
3  A.    Yeah.  At least once a month.
4  Q.    Yeah.  And sometimes more, right?
5  A.    Yeah.
6  Q.    Because you were -- you and Helen were interested in Helen
7  being used as a local resident, right?
8  A.    Yes.  Yes.
9  Q.    And you weren't requiring Mr. Stacy to send you any
10 contracts before he signed up Mrs. Carrillo on applications,
11 right?
12 A.    Not after that.  Initially, it was -- we signed in the
13 office the first one.
14 Q.    Yeah.
15 A.    And then the next were DocuSigned, and then we had a
16 meeting.  And it was saying if we were okay with the current
17 arrangement.  If we wanted to do more than -- this was after
18 the February date that you explained, but yes.
19 Q.    Okay.  So let's -- for instance, on July 15, there's a
20 text that says, "My husband said he wouldn't be able to get to
21 your office until 3."  You were going to pick up money from
22 Mr. --
23 A.    Yes.  But this instance, I was actually -- had work to
24 spray a Target, and I was going to be close by his office.  But
25 that was my wife telling him I wouldn't be there till after

1  that time.

2  Q.   Okay.  And -- but you're going there to pick up money,

3  right?

4  A.   Yes.

5  Q.   All right.  And the next text says, "I haven't received

6  any emails from you yet."  Mr. Stacy says, "We are behind.

7  I'll give him a list."  Meaning, he'll give you a list, right?

8  A.   Yes.

9  Q.   And so if you look at that -- right? -- like, he's already

10 used Helen on an application, right?

11 A.   Yes.

12 Q.   You haven't received a contract for it, right?

13 A.   No.

14 Q.   Right.  And you're still fine with it, right?

15 A.   Yes.

16 Q.   Right.  And, I mean, we can go through the whole series of

17 texts, but that's basically the discussions that you're having,

18 is you're asking Mr. Stacy, Are there any more?  And he says,

19 Yeah, I have a few.  I'm behind.  You're not demanding to see a

20 contract before every time, right?

21 A.   No.

22 Q.   Meaning, Mr. Stacy had consent from you and your wife to

23 use Helen on the applications that he chose to, and in return

24 you would get $5,000?

25 A.   Yeah.  We had already agreed to that.  We've had personal

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN        166

1   discussions where we agreed that we were okay with that.

2   Q.   Okay.  All right.  And so that goes all the way up until

3   -- let me focus you on February -- mid-February.  Okay?

4        So law enforcement came to see you March 1st -- right? --

5   for the first time?

6   A.   Yes.  Yes.  I believe that's the correct date.

7   Q.   All right.  And so you're texting Mr. Stacy, you and

8   Helen, that -- saying, My husband will be in Oklahoma City

9   Thursday, Friday, Saturday.  Will any of those days work for

10  you, right?

11  A.   Yes.

12  Q.   And the reason you're texting is because you want to come

13  and pick up some money for Helen being put on an application,

14  right?

15  A.   Yes.

16  Q.   And then he says he's got, you know, kids -- he has some

17  kid problems.  Might be another time.  And said, Fine, just

18  trying to make a plan, right?

19  A.   Yes.

20  Q.   And then the next text, from February 22nd, "Good

21  morning... its Helen," right?

22  A.   Yes.

23  Q.   All right.  But that's probably you, right?

24  A.   More than likely.

25  Q.   All right.  "I'm just checking in to see if you have a

1  date for pick up... I can schedule at your convenience."

2  A.   Uh-huh.

3  Q.   And so you're trying to make arrangements to go to the law

4  office, right?

5  A.   Yes.

6  Q.   Pick up some money, right?

7  A.   Yes.

8  Q.   All right.  And so this text string is from February --

9  A.   Twenty-one.

10  Q.   -- 22, it looks like, right?

11  A.   Yeah.

12  Q.   All right.  And then you have -- so you've got the series

13  of more, where you're still trying to make arrangements.  He

14  tells you he has a new office address, right?

15  A.   Yes.

16  Q.   All right.  And then it says, I don't think I have all the

17  contracts yet either, but give me a couple minutes, and I'll

18  let you know, right?

19  A.   Yes.

20  Q.   Meaning, again, more evidence that you weren't demanding

21  to see contracts before Mr. Stacy put your wife's information

22  on the application, right?

23  A.   Exactly.  The only thing that was there was the DocuSign

24  things that, I guess, were emailed and then we signed.  But

25  there was no agreement they had to be sent beforehand.

1  Q.   Right.  Meaning, look, let's just be honest, you were

2  making good money, right?

3  A.   Yes.

4  Q.   All right.  You didn't care if they sent you the document

5  or not.  All you cared about was hopefully your wife is going

6  to get put on some applications, and you're going to get paid

7  for it, right?

8  A.   Pretty much.

9  Q.   And that's the message you gave to Mr. Stacy --

10 A.   Yeah.

11 Q.   -- throughout, from the summer of 2020 until March 1st of

12 2021, right?

13 A.   Yeah, and I had actually thanked him for them.  So --

14 Q.   Right.  Blessings, right?

15 A.   Yeah.  Yeah.

16 Q.   Yeah.  Okay.  And so here, you can see, at the end, still

17 -- this is still February, right?  You say you have 11 DocuSign

18 emails.  He says, "Perfect."  You ask, "Does that match your

19 records?"  He says, "I'll check," right?

20 A.   Yes.

21 Q.   So he doesn't even know how many he sent or not sent,

22 right?

23 A.   Right.

24 Q.   And then you say, I have the emails saved.  He says, I

25 have them too.  I just want to check with you to make sure we

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN          169

1  are aligned, right?

2  A.   Yes.

3  Q.   And then you say, Okay, "makes sense.  I'm not sure I have

4  every document signed for contracts you paid us on.  I just

5  signed the ones your office emailed me."  Right?  Meaning,

6  you're recognizing that he had consent to use Helen's

7  information.  And your records may not have matched up yet, but

8  you understood that he had the consent, right?

9  A.   Yes.

10 Q.   And he understood, from you, that Helen had given the

11 consent, right?

12 A.   Yes.

13 Q.   He thinks he's texting with Helen --

14 A.   Yes.

15 Q.   -- right?

16      You didn't tell him it was you texting, right?

17 A.   No.

18 Q.   He's seeing texts come in, he thinks it's Helen, right?

19 A.   Yes.

20 Q.   Okay.  So this is right before you guys are -- just say

21 you'll -- you'll get aligned, right?

22 A.   Uh-huh.

23 Q.   And then March 1st happens --

24 A.   Yes.

25 Q.   -- right?

1      Take a look at the text.  You can see.

2      So he says he's on the phone.  Then March 1st, the text

3   says, I'm "in a meeting... Feel free."  And you said, "4 narc

4   officers just showed up at my house," right?

5   A.   Yes.

6   Q.   So you probably tried to call him when they got there or

7   something, and then he's texting, right?

8   A.   Yes.  Immediately.

9   Q.   All right.  And you have a meeting with an Agent Martinez

10  and some other agents, right?

11  A.   Yeah.  I believe one Patterson (sic), one Martinez, and

12  then a couple other guys.

13  Q.   Okay.  And they have -- you are interviewed, you have a

14  meeting, and they leave, right?

15  A.   Kind of.

16  Q.   What does that mean?

17  A.   We had a meeting.  We talked.  They basically said that

18  they were looking for -- they thought they were coming to look

19  for, like, the drug kingpin and --

20  Q.   Yeah.

21  A.   -- they come to my neighborhood and realized that wasn't

22  it.  And then we tried to get ahold of Matt and -- to let them

23  know Matt was our attorney.  And then we were basically advised

24  that -- just to tell them, no, Matt was our attorney.  We don't

25  want to deal with them.  They kind of left.  I went to the

1  porch to smoke.  They came back, and they were like, "Well, you

2  know, he's trying to make you guys the fall guy.  We really

3  want copies of these documents and stuff like that."  And then

4  the next time, my wife was really worried about it, so we gave

5  them the copies of the documents.

6  Q.   Okay.  Let me try and unpack that a little bit.  Okay?

7  A.   Okay.

8  Q.   All right.  If you remember, they came to your house March

9  1st and March 2nd?

10  A.   Yes.

11  Q.   They came back a second day, and they really came after

12  you and your wife --

13  A.   Yes.

14  Q.   -- right?  Do you remember that?

15  A.   Yes.

16  Q.   All right.

17       MR. GOLDSTEIN:  Your Honor, this is a clip from a

18  tape the government has noticed as an exhibit.  So it's from

19  March 2nd.  I'm just going to play a clip of that.

20       (Audio played.)

21  Q.   (BY MR. GOLDSTEIN) All right.  That's a state law

22  enforcement officer coming at you particularly hard on that

23  day, March 2nd.  Do you remember that?

24  A.   Yes, sir.

25  Q.   All right.  And you say, "I see what you're doing here,"

1  right?

2  A.   Yes.

3  Q.   He's trying to turn you against Mr. Stacy, right?

4  A.   Uh-huh.

5  Q.   And you had -- that was a long meeting with them on that

6  date, right?

7  A.   Yes.

8  Q.   All right.  And then two days later, March 4th, you and

9  your wife went to see Matt, right?

10 A.   Yes.

11 Q.   At his office, right?

12 A.   His new office, yeah.

13 Q.   Okay.  And part of it was about that meeting that you had

14 had on the 2nd?

15 A.   Yes.

16 Q.   First and 2nd, really, right?

17 A.   Yeah, the bulk of that meeting was -- we had not had the

18 correct number of contracts, because I thought it was like 20

19 or less.  And they came and said -- I think the exact number

20 they gave me was 64.  And I was like, "Well, I don't have 64

21 copies."  But I -- me and Matt got it.  We wrote down, like,

22 how much was owed, how much was paid -- like, how many were

23 paid, how many were owed, whatever.  And then we had the

24 discussion with Matt about stuff like that.

25 Q.   All right.  So let me back that up a little bit.

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN          173

 1      So remember we saw those texts where you and Matt, right

 2  before March 1st --

 3  A.    Yes.

 4  Q.    -- late February, he said, We've got to get aligned?

 5  A.    Yes.

 6  Q.    I don't have all the information with me right now, right?

 7  A.    Yes.

 8  Q.    The agents come.  They tell you that Helen's on X amount

 9  of applications.

10  A.    Yes.

11  Q.    And that's more than you understood at that time, right?

12  A.    Yes.

13  Q.    And so when you went to see Matt on March 4th, one of the

14  subject matters you're talking about is you guys getting

15  aligned --

16  A.    Yes.

17  Q.    -- on how many applications Helen's name had been put on,

18  right?

19  A.    Yes.

20  Q.    Okay.  And then part of the conversation was also about

21  what happened on March 2nd, right?

22  A.    Yes.

23  Q.    And then part of the conversation was also about whether

24  or not you and Helen wanted to be used going forward, right?

25  A.    Yes.  The main concern was whether she was doing something

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN          174

1  illegal or not.  And that was her concern.  But --

2  Q.   Right.  Yeah.  So you had a meeting with Mr. Stacy on

3  March 4th, right?

4  A.   Yes.

5  Q.   And he answered all of your questions and concerns --

6  A.   That I'm aware of.

7  Q.   -- right?

8       Right.  You asked questions; he gave you answers?

9  A.   Yeah.  Yeah, but I mean, I don't know.

10 Q.   Yeah.  All right.  And the net result of that meeting was

11 you approved -- you and Helen approved Mr. Stacy using her name

12 going forward, right?

13 A.   Yes.

14 Q.   And you said to him you're fine with the way it has been

15 done in the past?

16 A.   Yes.  We were okay with the current agreement we had, the

17 way it was set up, yeah.

18 Q.   Right.  Meaning, he could use her name, and you guys would

19 catch up later and align on how many times her name was being

20 used, right?

21 A.   Yes.  Yes.

22 Q.   All right.  And so, you know, whatever -- however, you

23 know -- well, strike that.

24      I mean, that was the result of the March 4th meeting,

25 right?

RAFAEL CARRILLO - DIRECT EXAMINATION BY MR. GOLDSTEIN          175

1   A.   Yes.

2   Q.   All right.  And so, you know, this was your idea for your

3   wife, right?

4   A.   Well -- well, yeah, you can say that, yes.

5   Q.   Yeah.  Right?

6   A.   Yes.

7   Q.   And so, you know, your wife -- you know, you were sort of

8   the driving party for you and Helen as to this venture, right?

9   A.   Yeah.  I was the common denominator between the

10  Vietnamese, my wife, and her.  So -- yeah.

11  Q.   Yeah.  And then -- you know, so going forward, you're the

12  one who communicated with Matt, even if he doesn't know; he

13  thinks it's Helen, right?

14  A.   Well, we are together, making this --

15  Q.   On March 4th, you're together, right?

16  A.   Yeah.  We're there -- in there.

17  Q.   Yeah.

18  A.   And even at the texts, she's always there.  It's just she

19  don't like talking to people at all, so --

20  Q.   Okay.  All right.  And so, just so we leave this clear --

21  okay?

22  A.   Okay.

23  Q.   Mr. Stacy had consent to use Helen's name on applications

24  before March 4th, right?

25  A.   Yes.

1  Q.   Without approving it beforehand with you or Helen, right?

2  A.   Yes.

3  Q.   And he had permission after March 4th --

4  A.   Yes.

5  Q.   -- to use Helen's name on applications -- even after they

6  came after you on the 2nd -- to use her name on applications,

7  right?

8  A.   Yes.

9  Q.   Without checking with you beforehand, right?

10  A.   Yes.

11  Q.   In fact, you guys made arrangements that you would come to

12  his office on the 1st of the month, after March 4th, and kind

13  of get squared up in terms of money, right?

14  A.   Yes.

15  Q.   Okay.

16         MR. GOLDSTEIN:  May I have a moment, Your Honor?

17      Nothing further, Your Honor.

18         THE COURT:  Mr. Coffey, questions?

19                    CROSS-EXAMINATION

20  BY MR. COFFEY:

21  Q.   Mr. Carrillo, I'm Nick Coffey.  We spoke on the phone the

22  other day.

23  A.   Yes.

24  Q.   Put a face to the name.

25      When you got set up with Mr. Stacy, what was your

1  understanding about what would be expected of you and your wife

2  in regards to the management and operation of these marijuana

3  companies?

4  A.   At first, like I said, it was a friend of my friends.

5  Then we went in there to discuss -- we had a contract -- well,

6  he had a contract printed out, and it basically said that she

7  wanted to start a business.  It was explained that we would be

8  -- well, at the time, I was going to do it, but she wanted a

9  female to do it.  So my wife agreed to do it.

10       And then we were going to be the legal Oklahoma resident.

11  And it would be set up in such a way that they'd run the

12  company, we'd be the legal resident, we would show as like a

13  management deal, but all profits and stuff would circle back

14  in.  It's like on our first contract.

15       And we had extensive conversations -- My Lien, my wife,

16  Matt, and myself to -- and my wife was really adamant about

17  asking questions to make sure everything was okay.  And

18  basically told us how it was set up, that we'd basically just

19  be like a management-type thing, where it'd show everything

20  goes back through them.

21  Q.   Let me stop you there.  So a management-type thing where

22  everything goes back through there?

23  A.   Well, so any profits or anything that the My Lien Green

24  showed, it would go, but it would come out as expenses to go

25  back to them.  That way, we showed zero dollar.

1  Q.   So were there two companies?

2  A.   No.  We were just like -- I guess that the legal

3  resident -- we'd show as kind of like a management or

4  something.  The first time, that's how I kind of remember it.

5  Q.   So, Mr. Carrillo, which company was supposed to apply for

6  the OMMA license?

7  A.   My Lien Green.

8  Q.   Okay.  Was My Lien Green, itself, going to operate a

9  marijuana grow?

10 A.   A grow or a store.  I'm not for sure.

11 Q.   Okay.  And did Mr. Stacy ever mention that there'd be a

12 separate company that would be responsible for actually

13 operating the grow that's not My Lien Green LLC?

14 A.   No.  I'm pretty sure everything on our contract was

15 through My Lien Green except for the Oklahoma residents.

16 Q.   Okay.  So he didn't tell you that there'd be actually

17 another company that would be operating the marijuana grow that

18 was under the name of My Lien Green?

19 A.   Not that I'm aware.

20 Q.   Okay.  Did he tell you that that other company would be

21 required to get an OBNDD registration to operate legally?

22 A.   He did explain some of like what was required by My Lien

23 Green to be legal at that time to do stuff, but to say

24 specifically if it was OBN, OMMA, I don't know.

25 Q.   Okay.  So your wife gets $5,000.  What she's supposed to

1  do to receive that $5,000?

2  A.    Just to be the name on the contract that allow -- to be

3  the legal resident of the state of Oklahoma to allow them to

4  apply for a license.

5  Q.    She ever go out to any of these grows?

6  A.    No.

7  Q.    Did you ever go out to any of these grows?

8  A.    No.

9  Q.    Now, were they grows or dispensaries?  I thought you said

10  dispensaries earlier.

11  A.    Well, I don't know what they were.  When the -- I was

12  under the impression that some were grows, some were

13  dispensaries.  But when they came out with the different 64

14  deals, the majority of them were grow facilities.

15  Q.    What do you mean when they came out with the 60/40 (sic)?

16  What are you talking about?

17  A.    The officers that showed up on my house in March, they

18  brought a stack of like envelopes and stuff that each one was

19  supposed to be a grow facility with my wife's name on it.

20  Q.    And you guys were under the impression that Mr. Stacy was

21  using you guys for dispensary licenses, weren't you?

22  A.    Well, we were under the impression it was going to be for

23  a weed store, but we didn't know specifically if it was a grow

24  or dispensary or what it was.

25  Q.    Fair to say you didn't really care, you just wanted the

RAFAEL CARRILLO - CROSS-EXAMINATION BY MR. COFFEY          180

1    $5,000?

2    A.    Pretty much.

3    Q.    Yeah.  So am I understanding correctly that you went to

4    Matt Stacy -- or there was a conversation meeting at some

5    point, and you said, "You have my consent from here on out to

6    list my wife on every single grow license"?

7    A.    Are you talking a meeting we had in March?

8    Q.    Here's the deal, Mr. Carrillo.  I'm just a little

9    confused, right?  Because we had -- this is the first I'm

10   hearing about you having given consent to Mr. Stacy to place

11   your wife on 37, 40, 60, however many grows it was.

12   A.    Yeah, we don't know the number.  But, yes, when we first

13   did it, we signed up, and then we agreed to do -- I think it's

14   called DocuSign.  I'm not sure.  But it's an email sent, and my

15   wife signs it.  We send it back.  Like I said, I asked, I sent

16   texts to say, "Do we have any more?"  And then we would -- you

17   know, we were giving him the permission to do that.  We had

18   conversation.  We agreed to keep going the way we were.  I

19   believe they actually have recordings of both of us agreeing

20   for that, to keep going the way we were going.  And even on the

21   March -- when we met with him, we agreed to keep going the way

22   it was set up before.

23   Q.    So I guess I'm not tracking, Mr. Carrillo.  If no

24   paperwork is needed for Mr. Stacy to keep putting your wife's

25   name on licenses, why are you doing 11 DocuSigns?  Like, why

1  does it matter if there's a DocuSign if he has consent?

2  A.   Well, we have consent to do it, but we keep track -- me

3  and my wife keep track of what we got.  But when we were told a

4  different number than what we believed, we said, "We have this

5  many."  And even after I told -- when I called Matt -- or

6  Mr. Stacy and told him, said, "Hey, cops showed up.  This is

7  what they're doing."  And he was actually on the phone with my

8  wife to kind of help her navigate the situation that first

9  time.

10       And I let him know -- I was like, "Hey, they have 64" --

11  or whatever number it was.  I'm just saying 64.  And then he

12  was -- we were going to get on track and see what -- which ones

13  were done and which ones -- which we did on March 4th.  We went

14  over the list and see which ones I recognized and which ones I

15  didn't recognize or she recognized or didn't recognize.  But we

16  never pulled out like a laptop and was like, "This one, this

17  one, this one, this one."

18  Q.   So, again, not trying to beat you up.  I just --

19  A.   No, that's fine.

20  Q.   I really don't -- I don't understand.  So what is the

21  purpose of the DocuSign?  Is it for you guys to get paid?  Is

22  it for you guys to give consent for the name to be on the

23  license?

24  A.   The DocuSign, I guess, is the legal consent so -- because

25  we've already agreed to do this.  But we were also told --

1  because we were told that there would be something that we'd

2  have to sign every time we did it.

3  Q.   Was the expectation that whenever Mr. Stacy would, I

4  guess, list your wife on a license that she would be paid?

5  A.   Yes.

6  Q.   And so, at some point, you find out that Mr. Stacy has

7  listed your wife on more licenses than I guess you knew at

8  March 1st?

9  A.   Than we knew about at the time, yes.

10 Q.   Okay.  Let me ask you this:  If you'd known that you could

11 open yourself up to criminal charges and liability in this

12 scheme, would you have given this consent to Mr. Stacy?

13 A.   No.  We were under the impression that it was perfectly

14 legal.

15 Q.   Is that because he told you it was perfectly legal?

16 A.   Well, we asked, and we were assured that everything was

17 legal.  And he took time to explain it to us in our first

18 meeting, and we were confident that it was.

19 Q.   And just to be clear, did you go to another attorney and

20 they'd say, "This is legal," or was it just Mr. Stacy?

21 A.   No, just in Mr. Stacy's office.

22 Q.   Okay.  And so is it fair to say that you were pretty upset

23 when you learned that there were 35 or so registrations that

24 you had not been paid on?

25 A.   For that?  No.  Because Mr. Stacy was usually pretty good

1  about letting me know when -- time to pick up money or

2  something like that.  What made me upset was when she got

3  arrested, and then I found out there was a lot more than what

4  we knew about.

5          MR. COFFEY:  Your Honor, with your permission, I'd

6  like to play what's -- part of it's already been played.  It's

7  the clip Mr. Goldstein played, but it's more of the interview

8  with Mr. Carrillo.

9          THE COURT:  Go ahead.

10          MR. COFFEY:  Let's just start at the beginning, 21.

11          THE COURT:  What is this exhibit number?

12          MR. COFFEY:  Exhibit 21, Your Honor, the

13  government's.

14      (Government's Exhibit Number 21 played for the Court.)

15  Q.  (BY MR. COFFEY) When he said that he just talked to your

16  boss -- first off, do you recognize anyone in that recording?

17  A.    Yeah, me.

18  Q.    Okay.  And when you say -- was that you that said that

19  someone had talked to their boss?

20  A.    Yeah.  So they were instructed to leave.  And then, like I

21  said, I was sitting on the porch, and then they came back.  And

22  they wanted to -- because that's when they was like, "Yeah, for

23  you, not you."  And then they came back, and I told them that

24  Matt said he was going to get in contact with them, and they

25  shouldn't make -- reengage or make contact.  But then that's

1  when they were like, "Yeah, for her, not you."

2  Q.   Okay.  So let me back up.  Prior to this recording started

3  (sic), had OBN agents already been to the house?

4  A.   I think this is the second day -- or -- no.  They had been

5  to my house personally three or four times.

6  Q.   Do you recall an instance where -- well, let's just play

7  it, and I'll ask you about it.  Okay?

8  A.   Okay.

9      (Audio played.)

10 Q.   When you say, "She's different from me," and that, "We're

11 both different individuals," what are you talking about?

12 A.   Yeah, so you don't have the whole conversation in that

13 recording.  We talked for 15 minutes before that recording

14 started.  That was basically talking about her being Native

15 American and me not being.  Because we -- when we started this

16 conversation, they asked if we -- or when he started that

17 recording, it was after a conversation we had basically saying

18 that Matt was trying to throw me under the bus -- or us under

19 the bus for being that.

20      And we had looked up some things before the whole McGirt

21 stuff, trying to figure out if there was something that she was

22 getting in trouble for because they were using her solely

23 because she was Native American, which this is a conversation

24 we had with -- damn it.  I can't remember the officer's name,

25 but one of the four that were there.  And then we started this

1   conversation.  And it was basically asking whether I knew the

2   exact amount he was instructing me, like I could get on there

3   and see it because we didn't know; asking me if I was, you

4   know, if I would be upset if there was a substantial amount of

5   money missing.  Yes, obviously.

6   Q.   Let me stop you there.  There was a substantial amount of

7   money missing, wasn't there?

8   A.   Yes.  Yeah, at the time, what we thought we had and what

9   they showed, like I said -- you heard me say it.  It was a

10  hundred -- you know, I did the math pretty damn quick, you

11  know.  And then I was like, "Yeah, you know, that'd be a

12  problem."

13  Q.   Where is your wife during this conversation?

14  A.   In the house.

15  Q.   Why isn't she out there interviewing with OBN agents like

16  you are?

17  A.   Because they were already instructed to leave.

18  Q.   Who instructed them to leave?

19  A.   My wife.

20  Q.   On whose authority?

21  A.   Well, when we had the phone conversation with Matt because

22  Matt is -- well, at that time, Matt was her attorney for this.

23  Or we used him as this.

24  Q.   Let me back up.  So at that time, Matt was her attorney

25  for what?

RAFAEL CARRILLO - CROSS-EXAMINATION BY MR. COFFEY          186

1  A.   Well, we -- that's the only person that we knew to contact
2  when they arrived.  And so, like it showed, we weren't able to
3  get ahold of him the first phone call, but he did call back.
4  And he was like, you know, "Basically, you can let them know
5  that I'm your attorney, and can you tell them, you know, that
6  you don't want to talk to them, and they'd have to leave."
7      And then they left, but then I went outside to smoke, and
8  then that's when they engaged with me.
9  Q.   So let me make sure I'm understanding this correctly.  Was
10 Matt Stacy your wife's criminal attorney at the time, supposed
11 to handle --
12 A.   No.
13 Q.   Then what was he?
14 A.   Well, he was our contact for this situation, so that was
15 the only person we could think of to contact right away when
16 shit went downhill.
17 Q.   If Mr. Stacy is trying to be fully transparent with the
18 OBN agents that are at your house --
19 A.   Uh-huh.
20 Q.   -- don't you think you all would have gotten on a phone
21 call together and talked about it?
22 A.   I don't know.  At that time, I was -- when that happened,
23 I was a little confused myself.
24 Q.   Let me ask you this:  Did Matt Stacy tell your wife not to
25 talk to OBN agents?

 1  A.    Not directly, no.  He made it -- he told her that it was
 2  her choice, but he would recommend that she not.
 3  Q.    Do you know if he reached out to OBN agents and told them
 4  to leave?
 5  A.    I don't know if he told them to leave, but I know he did
 6  make a phone call -- well, that's what we were told, he was
 7  going to make a phone call to them.
 8  Q.    Okay.  But you're talking to the agents, are you not?
 9  A.    Yes.  Outside, on my porch.
10  Q.    Why'd you make the decision to talk to the agents?
11  A.    They just came back.  And we -- like I said, before the
12  recorded part, we were having a different conversation.  And
13  then basically what happened, they were like, "Well, you know,
14  you're -- we thought we were coming to a kingpin or whatever."
15  But -- and they were like, no.  He was like, "Talking to you,"
16  he was like, "You'd be upset."  He was like, "We think you're
17  hardworking people.  We don't want to see you, you know, get
18  caught up in something that you had no idea was going on."
19        And then that's when I calmed down.  I was talking to them
20  and just figuring it out.  Because I was like, you know, like,
21  in the recording, "I understand certain aspects of this, but I
22  don't even pretend to understand the whole thing or how
23  wording's done."  And he was like, "Well, you know, we just
24  don't want to see you go to jail."  And a little bit of that
25  was BS because they had -- apparently, they had a warrant for

1  my wife's arrest eight months before they even came to my house

2  and then decided to use it, like, on their third visit.

3  Q.   So let me ask you a few things you just said.  So, to be

4  clear, is Mr. Stacy your attorney at this -- on March 3rd,

5  2021, is he your attorney?

6  A.   Not my attorney, no.

7  Q.   Okay.  And when you explained to the agents your

8  understanding of what you'd been paid to do --

9  A.   Yes.

10 Q.   With me?

11      -- were you surprised to learn that you were on several

12 more --

13          THE COURT:  I think he's already said he was

14 surprised.  He thought he was on 11, I think.

15          THE WITNESS:  Well, we thought we were on 20-ish, but

16 we could only prove like 11.  But, yeah, I had no idea it was

17 higher than that.

18 Q.   (BY MR. COFFEY) So at any point --

19          MR. COFFEY:  And, Your Honor, I'm not going to play

20 the whole recording.

21 Q.   (BY MR. COFFEY) But at any point during this interview

22 with agents, do you tell them, "Yeah, as a matter of fact, we'd

23 given my (sic) consent to Matt Stacy in order to list my wife

24 on all these licenses moving forward"?

25 A.   At that time, no.

1  Q.   Okay.  So let's go to -- you've seen this before,

2  Mr. Carrillo.  This is Exhibit 80.  Do you recognize this?

3  A.   Yes.

4  Q.   Okay.  What is this?

5  A.   It was the initial contract -- or maybe not the initial

6  one, but a contract that was made up that we signed for the

7  legal residency.

8  Q.   Okay.  And when did you sign this contract?

9  A.   I did not sign it; my wife signed it.

10 Q.   Good catch.  When did your wife sign this contract?

11 A.   March 4th, 2021.

12 Q.   Okay.  And so was this following the recording that we

13 just listened to?

14 A.   That would have been a couple days after, probably.

15 Q.   Okay.  And so let's go to page 2 of Defendant's Exhibit

16 80.

17 A.   I say it's okay.  I gave that piece of paper to you guys,

18 so I know what it is.

19 Q.   Okay.  So, Mr. Carrillo, what is this?  It's part of the

20 second page of Exhibit 80.

21 A.   This is a list that I was given that has my wife's name on

22 it for grows, the dispensaries, or whatever.

23 Q.   Okay.

24 A.   And then the handwriting on the side was what was

25 discussed between my wife, myself, Mr. Stacy of what's paid,

1  what was owed, what's unpaid, how much we got paid that day,

2  how much we'd get paid per month moving forward.  And, then, I

3  guess that's the first date to pick up.

4  Q.    And so are these lists of marijuana licenses that your

5  wife is either going to be listed on or has been listed on?

6  A.    Apparently, she was listed on all of them --

7  Q.    Okay.

8  A.    -- already.  But as you can tell, some of them say

9  "Pending," some "End" (sic) or whatever.  Have no idea what

10  that meant.

11  Q.    And at this -- on March 4th, 2021, how many had you been

12  paid for?

13  A.    Eleven.

14  Q.    Okay.  So $55,000?

15  A.    No.  $5,000 per one, and then we picked up a bigger lump

16  sum March 4th at the office.  And that's when this was wrote

17  out.

18  Q.    Here's my real question:  If Mr. Stacy simply already has

19  your consent to list his (sic) wife on every --

20  A.    My wife?

21  Q.    -- license under the sun -- sorry?

22  A.    You mean my wife?

23  Q.    Yes.  List --

24  A.    You said "his wife."

25  Q.    -- your wife on every license that the opportunity

1   presents --

2   A.    Uh-huh.

3   Q.    -- why come up with this contract?

4   A.    Well, that -- I don't know.

5   Q.    Isn't it true that Mr. Stacy wrote this contract with you

6   because he was trying to cover himself because he had, without

7   your consent and your wife's consent, listed your wife on all

8   of these grows and had not told you at all and maybe didn't

9   have plans to pay you at all?

10  A.    That could be true.  Like I said, we gave consent, but we

11  had no idea that many.

12  Q.    Where is that consent, Mr. Carrillo?  Where is it?  We've

13  looked at exhibits.  I mean, do you have --

14  A.    Well, we have --

15  Q.    Do you have something where you say, "You have my consent

16  to list my wife on every license moving forward"?

17  A.    Not exactly worded that way.  We gave consent to move on

18  the way we were moving.  Initially, we signed a license, the

19  first one, of My Lien Green.  And then we did e-doc stuff.  And

20  then we talked to Matt, and I believe there's a recording of

21  both of us saying, "Yes, we agree to move on the way we were

22  moving on to get these license."  But we also were getting

23  regular emails for the DocuSign stuff.  So I guess it was just

24  our assumption that we would get a DocuSign every time.

25        But we were never told that, "Hey, this is what we were

RAFAEL CARRILLO - CROSS-EXAMINATION BY MR. COFFEY                192

1    going to do.  This is the terms of our agreement."  You know,
2    this -- we just went off, basically, the first contract we
3    signed, and we just thought it was all going to be exactly the
4    same as that.
5    Q.    And the contract that you signed --
6    A.    Well, she signed.
7    Q.    -- gave you -- that she signed gave you a right to do
8    what?
9    A.    Didn't give us a right to hardly do anything, just to be
10   the legal resident.
11   Q.    Well, it's --
12   A.    -- and them to have the management deal.
13   Q.    Well, at some point, there are other documents executed
14   where the license company with your wife's name contracts all
15   of its rights, obligations, and everything to another company?
16   A.    Yeah.  We were made aware of that afterwards, after
17   meeting with the agents.  And it wasn't the --
18   Q.    Is that because Mr. Stacy hadn't explained any of that
19   before you entered into this business with him?
20   A.    Not that way.
21   Q.    Yeah.  Back to the consent question, though.
22   A.    Okay.
23   Q.    Mr. Stacy is -- he's a lawyer, is he not?
24   A.    I assume so, yeah.
25   Q.    He probably keeps notes from his meetings, right?

1  A.   Yeah, I hope so.

2  Q.   Do you have anything in writing that says, "You have my

3  consent from here on out to list my wife on every license"?

4  A.   In writing?  No.

5  Q.   Yeah.  Well, and you'd agree that, as a lawyer, if such

6  meeting actually occurred, there'd probably be a note in

7  Mr. Stacy's file representing that?

8  A.   A note, a recording, a video, something, yeah.

9  Q.   Something, right?

10 A.   Yeah.

11 Q.   Where is it?

12 A.   Couldn't tell you.

13        MR. COFFEY:  Pass the witness.

14        THE COURT:  Further questions?

15        MR. GOLDSTEIN:  Yeah.

16                    REDIRECT EXAMINATION

17 BY MR. GOLDSTEIN:

18 Q.   Mr. Carrillo?

19 A.   Yes, sir.

20 Q.   Couple different ways you could give consent to someone,

21 right?

22 A.   Yes.

23 Q.   Could make it into writing, right?  I hereby consent?

24 A.   Uh-huh.

25 Q.   Or you can have a conversation with someone --

1  A.   Yes.

2  Q.   -- right?

3       You had meetings with Mr. Stacy?

4  A.   Yes.

5  Q.   In those meetings, you gave him consent --

6  A.   Yes.

7  Q.   -- for Helen's name to be used, right?

8  A.   Yes.

9  Q.   Mr. Coffey's, you know, apparently upset that there's

10 nothing in writing about the consent, right?

11 A.   I don't know about upset, but, yes.

12 Q.   All right.  Well, listen, you had meetings with Mr. Stacy?

13 A.   Yeah.

14 Q.   Yeah.

15 A.   Yes.

16 Q.   And you gave him consent?

17 A.   Yes.

18 Q.   All right.

19 A.   We had meetings, both me and my wife.

20 Q.   All right.  I want to -- apparently -- so I want to make

21 sure I have this right.

22      All right.  So state law enforcement come to your home?

23 A.   Yes.

24 Q.   March 1st, right?  And March 2nd, right?

25 A.   Yes.

1  Q.   On one of those days, was it March -- it was March 1st

2  when your wife asked Mr. Stacy if she should have a

3  conversation with them and he told her it's her choice, but she

4  doesn't have to, right?

5  A.   Basically, yes.

6  Q.   Okay.  And so she invokes her right to not speak to them

7  without her lawyer present?

8  A.   Yes.

9  Q.   And then they came back?

10 A.   They left the house.  They were in the street.  I went to

11 the front porch to smoke, and then they came back and talked to

12 me.  And then on that recording, you can hear them say, you

13 know, "They told us not to talk to her, but not you," you know.

14 Q.   Okay.  All right.  Nick -- Nick -- I'm sorry.  I'm sorry.

15 I'm reading my notes.

16      Mr. Coffey said -- asked you a question, "Don't you think

17 you would all get on the phone to talk about it together," when

18 the law enforcement came to your home?  Meaning, he asked you a

19 question, why didn't you all -- you, Helen, Mr. Stacy -- get on

20 the phone with law enforcement when they came to the house and

21 talk about this structure that had been used, right?

22 A.   Yes.

23 Q.   Isn't it a fact that on March 1st, 2021, the first day

24 they came to your house, you put Mr. Stacy on the phone with

25 them, right?

1    A.    Yes.

2    Q.    On speakerphone, right?

3    A.    Yes.

4    Q.    And he explained the whole structure to the agents that

5    were there that day?

6    A.    Yeah.  He -- when we called, like I said, we couldn't

7    initially get ahold of him, but he did call back, and we put

8    him on speakerphone.  And he was talking to the agents and my

9    wife, and I was talking to another agent by the door.  But,

10   yes, they -- I hope they went over that.  But, yeah, they

11   eventually had to leave because she told them to, and that was

12   -- he said -- well, Matt said that, you know, he wasn't going

13   to tell her she had to, but she could tell them to leave.  They

14   didn't have to talk to her.

15   Q.    Did you hear Mr. Stacy talking to Agent Martinez,

16   explaining this whole two-structure -- the whole two-structure

17   event?

18   A.    I didn't hear the entire conversation.

19   Q.    Okay.

20   A.    I just heard parts of him, you know, talking to them and

21   my wife and stating some things and then, you know, them having

22   to leave and that he was going to make a phone call.

23   Q.    All right.  You were the first one -- you called Mr. Stacy

24   on your phone and put him on speakerphone, right?

25   A.    Well, my wife called.  We called on my wife's phone.

1   Q.   Okay.

2   A.   But, yeah, we put them on speakerphone.

3   Q.   But you were the one talking to Mr. Stacy at the beginning

4   of that recording --

5   A.   Yes.

6   Q.   -- on March 1st?

7   A.   Yes.

8   Q.   You told him there were four police officers or there were

9   police officers there, right?

10  A.   Uh-huh.

11  Q.   And if you remember, you and he are having a conversation,

12  and he says, "Okay, I'm glad to talk to them.  Did they leave a

13  card?"  Right?

14  A.   Yeah.  Uh-huh.

15  Q.   And you're like, "No, no, no, they're right here, right

16  now," right?

17  A.   Yep.

18  Q.   And then he went in and had a conversation with Agent

19  Martinez and the other agents, right?

20  A.   Yes.

21  Q.   Okay.  We'll hear that tape in a little bit.

22       I want to get back to your wife was arrested --

23  A.   Yeah.

24  Q.   -- right? -- by state law enforcement in March of 2022,

25  about a year after they came to your house, right?

RAFAEL CARRILLO - REDIRECT EXAMINATION BY MR. GOLDSTEIN        198

 1  A.   Yes.

 2  Q.   All right.  So March 1st, March 2nd, they come to your

 3  house, they're telling you what nice people you are, right?

 4  A.   Yeah, they --

 5  Q.   Want to have chicken and beer with you on the porch --

 6  A.   Yeah.

 7  Q.   -- right?

 8       Sweet-talking you, telling you that you didn't do anything

 9  wrong and Helen didn't do anything wrong, right?

10  A.   Well, initially, it went that way.  But then it was

11  basically saying we were the fall guys.

12  Q.   Yeah, you're the fall guy, and Matt's the bad guy, and you

13  should cooperate against Matt, right?

14  A.   Yes.

15  Q.   All right.  And then, after telling you that you're sweet

16  people, nice people, a year later, those same agents come to

17  the house and arrest your wife, right?

18  A.   Yeah.  Well, they came, and they said they needed to ask

19  her questions.  They asked her three questions.  And then I

20  believe it was Peterson said, "You have the right to remain

21  silent," blah, blah, blah, and arrested my wife.

22  Q.   Put her in jail for the weekend, right?

23  A.   Well, almost a week, yes.

24  Q.   Almost a week, right?

25  A.   Yep.  And they told her initially that she was just going

 1  to be held in Enid, but they transferred her all the way to

 2  Chickasha, and then we had court which apparently was for no

 3  reason because they did something; I wasn't in the courtroom

 4  for that.  And they let her go.

 5  Q.   Okay.  So -- and then you couldn't have contact with her

 6  for that week, almost a week, she's in jail, right?

 7  A.   Right.

 8  Q.   And your wife's a Native American, right?

 9  A.   Yes.

10  Q.   Okay.  And they knew that?  You guys had told them that,

11  right?

12  A.   Oh, yeah.  Yeah, I believe they knew that.  Yeah, we had

13  that conversation.

14  Q.   Okay.  All right.

15          MR. GOLDSTEIN:  No further questions.

16          THE COURT:  You can step down.  You're excused.

17          THE WITNESS:  All right.  Thank you.

18          THE COURT:  Call your next witness.

19          MR. GOLDSTEIN:  Your Honor, other than the exhibits

20  that we've admitted, that's our last witness.

21          THE COURT:  All right.

22     Do other defendants wish to call any witnesses?

23     All right.  Mr. Coffey, do you wish to put on any

24  evidence?

25          MR. COFFEY:  Yes, Your Honor.

RUSSELL COCHRAN - DIRECT EXAMINATION BY MR. COFFEY      200

```
1        United States calls Russ Cochran.
2                        RUSSELL COCHRAN,
3        called as a witness on behalf of the government, having
4    been first duly sworn to tell the truth, testified as follows:
5                        DIRECT EXAMINATION
6    BY MR. COFFEY:
7    Q.    Afternoon.
8    A.    Good afternoon, sir.
9    Q.    Will you please introduce yourself to the Court?
10   A.    Yes.  My name is Russell Cochran.  Russell, R-U-S-S-E-L-L;
11   Cochran, C-O-C-H-R-A-N.
12   Q.    Are you an attorney?
13   A.    I am.
14   Q.    Okay.  And were you, at one point, OBN's general counsel?
15   A.    I was.
16   Q.    Okay.  When were you OBN's general counsel?  For what time
17   frame?
18   A.    I began as deputy general counsel on September 1 of 2016
19   and then took over as general counsel at the beginning of 2018.
20   Q.    Okay.  And, then, when was your last day as general
21   counsel?
22   A.    December 9, 2021.
23   Q.    Okay.  So December -- so 2018 to the end of 2021, you are
24   OBN's general counsel?
25   A.    Correct, yes, sir.
```

1    Q.   Okay.  There's been a lot -- there were a lot of questions
2    this morning, Mr. Cochran, about why didn't OBN agents file
3    charges on this day or that day.  Okay?  Can OBN itself just go
4    file charges?
5    A.   No.  I didn't have the same authority that I did as an
6    assistant DA or first assistant DA.
7    Q.   So if you're going to file criminal charges on somebody,
8    do you need an ADA's sign-off essentially?
9    A.   The agents would have to take a charge packet to the DA's
10   office, wherever that jurisdiction might be, in order to get
11   charges approved.
12   Q.   Now, are you familiar with the defendant in this case,
13   Mr. Matt Stacy?
14   A.   Yes, I am.
15   Q.   Okay.  You've had a few meetings with him; is that fair?
16   A.   Yes.
17   Q.   Okay.  Do you remember the first time you spoke to him by
18   phone?
19   A.   By phone?
20   Q.   By phone, yes, sir.
21   A.   Yes, sir.  To the best of my recollection, it would have
22   been approximately June of 2020.
23   Q.   Do you know what prompted that phone call?
24   A.   It was a call from Mr. Stacy to me.
25   Q.   About what?

1  A.   At that particular time, there was an enforcement action

2  that was -- that OBN agents were conducting search warrant on a

3  marijuana grow in the Stratford, Oklahoma, area.

4  Q.   What was Mr. Stacy's relationship to that grow in the

5  Stratford area?

6  A.   My understanding from him is that he was the attorney for

7  the owners of that grow.

8  Q.   Okay.  And, you know, by way of introduction -- well, let

9  me back up.

10      Do you know what prompted the search warrant at the grow

11 in Stratford?

12 A.   Yes, sir.

13 Q.   Okay.  What prompted that?

14 A.   And bear in mind that this is four years ago -- over four

15 years ago now, almost five.  But my recollection is that this

16 was a grow that had a license with the Oklahoma Medical

17 Marijuana Authority, but they did not have a registration with

18 the Bureau of Narcotics.

19 Q.   Okay.  And by way of introduction, when Mr. Stacy called

20 you, what else did he tell you about himself?

21 A.   At the time that he called, I wasn't well acquainted with

22 him.  I had met him on one brief occasion shortly after the

23 medical marijuana state question was approved.  But he

24 introduced himself.  He told me that he was on the governor's

25 COVID task force.  And then, during the course of our

RUSSELL COCHRAN - DIRECT EXAMINATION BY MR. COFFEY          203

1  conversation, he also told me that the owner of this particular
2  grow had provided the State with -- I want to say a pallet of
3  personal protective equipment related to the COVID pandemic.
4  Q.   Those two points, that Mr. Stacy was on the governor's
5  task force and that the clients had donated a bunch of PPE
6  equipment, how did you take that?
7  A.   I didn't take it exceptionally well.  I mean, it led me to
8  believe that -- and at this time, I didn't know Mr. Stacy at
9  all hardly.  And I thought, you know, trying to persuade me
10  based on relationships, like with the governor or whatever, as
11  opposed to what he was calling about.
12  Q.   Well, was he calling about the fact that the grow didn't
13  have an OBN registration?
14  A.   Correct.
15  Q.   Okay.  What did you tell him, if anything, about whether
16  grows could operate without an OBN registration?
17  A.   Well, it was an illegal grow.  As it pertains to being
18  able to have marijuana plants, that that particular grow could
19  not operate, could not be in possession of any marijuana prior
20  to being fully licensed by OMMA and registered with the Bureau
21  of Narcotics.
22  Q.   Now, I want to make sure that I am perfectly clear on this
23  because there's been a lot of reports shown today about
24  administrative inspections that took place after June 4th of
25  2020.  Okay?

1  A.   Okay.

2  Q.   Is it your testimony today that you told Matt Stacy on the

3  phone, June 4th, 2020, "It is criminal and illegal to grow

4  marijuana without an OBN registration"?

5  A.   That's correct.

6  Q.   And had that always been OBN's position?

7  A.   Yes.

8  Q.   Okay.

9        MR. COFFEY:  Now let's go to exhibit -- Defendant's

10 91, please.

11 Q.   (BY MR. COFFEY) Okay.  Mr. Cochran, I'm showing you what's

12 been marked as Defendant's Exhibit 91.  Have you seen this

13 email before?

14 A.   I have.

15 Q.   Okay.  Who is this email between?

16 A.   Between Mr. Stacy and myself.

17 Q.   Okay.  This portion down here, do you recall what this has

18 to do with or the context of the email at all?

19 A.   The context of the email is related to construction, more

20 than likely, of a marijuana grow, as opposed -- I mean, it

21 could actually be of a dispensary as well.

22 Q.   Okay.  Is it fair -- and what's the date on this email?

23 A.   February 23, 2021.

24 Q.   Okay.  So is it fair to say that between the June 4th,

25 2020 call, when you told Mr. Stacy that growing without a

1  registration is criminal, and this date, February 23, there

2  were email communications between you guys about things related

3  to licensing?

4  A.    I think that's fair.

5  Q.    Okay.  Would Mr. Stacy reach out to you guys on behalf of

6  some of his clients sometimes?

7  A.    Yes.

8  Q.    Okay.  Mr. Stacy had your phone number?

9  A.    Yes.  I'm sure he did.

10  Q.    Certainly had your email, didn't he?

11  A.    He definitely had my OBN extension.

12  Q.    Okay.

13  A.    I don't remember if he had my bureau-issued cell phone

14  number or not.

15  Q.    Later on -- we'll get to this in a sec -- you learn about

16  a woman named Helen Carrillo, don't you?

17  A.    Yes.

18  Q.    Okay.  And who is Helen Carrillo?

19  A.    Helen Carrillo -- and I never met her personally, so if

20  she walked in the courtroom, I wouldn't know who she was.  But

21  I became aware of a lady named Helen Carrillo that, based on

22  what I was told by agents, was an Enid-area resident.  I

23  believe her career field was medical transcriptionist.

24  Q.    What was her relationship to Matt Stacy?

25  A.    I believe she was a client, maybe, but I do know that a

1  number of his clients, his client medical marijuana businesses,

2  had Helen Carrillo as the applicant for an OBN registration.

3  Q.   And did those applications list her as the 75 percent

4  owner of the business?

5  A.   Yes.

6  Q.   Okay.  And based on OBN's investigation, was that

7  accurate?  Was she actually the 75 percent owner of these

8  businesses?

9  A.   No.  She was listed as the 75 percent owner on the

10 application.  And when it was first brought to my attention --

11 and it was brought to my attention, I believe, by Agent Alicia

12 Martinez.  I believe she and Agent Richard Paulk were working

13 together on a lot of those investigations.  But I saw that it

14 was a large list of marijuana businesses -- grows,

15 particularly.

16 Q.   Listing Mrs. Carrillo?

17 A.   Listing her as the 75 percent owner and OBN regulation

18 registrant.

19 Q.   Okay.  Eventually, you have a meeting with Mr. Stacy in

20 which you discuss -- couple meetings, right? -- where you

21 discuss the fact that he's got, you know, tens, if not

22 hundreds, of licenses listing Ms. Carrillo, don't you?

23 A.   Yes.

24 Q.   Prior to that, prior to Mr. Stacy ever submitting the OMMA

25 applications and the OBN registrations, did he ever once reach

1   out to you and ask, "Would this be legal?"

2   A.   Prior to him actually forming the businesses in that way?

3   Q.   Exactly.

4   A.   No.  No.  I have no recollection of that ever happening.

5   Q.   So he never got permission from OBN to structure his

6   companies in this way, did he?

7   A.   No.

8   Q.   Okay.  Now, eventually, OBN learns about the Carrillos and

9   goes and interviews them, don't they?

10  A.   Yes.

11  Q.   Okay.  And that leads to Mr. Stacy coming to your office

12  to have a meeting with you -- well, first you, right?

13  A.   Yes.  The first meeting that we had at OBN was in a

14  conference room with just myself and Mr. Stacy.

15  Q.   Okay.  And what was the purpose of the meeting?

16  A.   The purpose of the meeting, I took it, was to convince me

17  that his structure was legal.

18  Q.   Okay.  And what did you tell him?

19  A.   That it wasn't.

20  Q.   Okay.  And was there later another meeting in May of 2021?

21  A.   There was -- in the middle between the two meetings, I

22  reduced to writing, in a letter to him, tried to, as clearly as

23  I could, to lay out an analysis of why that that wasn't an

24  appropriate business structure for a business that had to

25  comply under the Oklahoma Uniform Controlled Dangerous

RUSSELL COCHRAN - DIRECT EXAMINATION BY MR. COFFEY          208

1  Substances Act.

2  Q.   Well, eventually, there's the second meeting -- right? --

3  on May 21?

4  A.   Yes.

5  Q.   So have you already told Mr. Stacy that his business

6  structure is not permitted after the May 7th meeting?

7  A.   Yes.

8  Q.   Then why have a second meeting?

9  A.   My recollection of that meeting was to try to get some --

10  he tried to convince us that he could rearrange some aspects of

11  the business structure and that it -- that we should then

12  approve the registrations.

13  Q.   Do you remember who was in that meeting?

14  A.   Yeah, I remember some.  I don't -- I think it was all.

15  But I remember that Mr. Stacy came along with another attorney,

16  Seth Day, and I was in the meeting, Chief Agent Craig Williams

17  was in the meeting, and Deputy Director Mel Woodrow was in the

18  meeting.

19  Q.   Now, did you recently learn that that meeting was

20  recorded?

21  A.   I did.

22  Q.   Is that because I sent you an exhibit that defense

23  produced for this hearing?

24  A.   That's correct.  Before then, I had no idea that it'd been

25  recorded.

RUSSELL COCHRAN - DIRECT EXAMINATION BY MR. COFFEY          209

1  Q.   Do you have any idea who recorded that meeting?

2  A.   No.

3  Q.   Would anyone at OBN have recorded that meeting?

4  A.   Not that I'm aware of.

5  Q.   Did you ever give your consent to be recorded in the

6  meeting?

7  A.   No.

8  Q.   So do you think that Matt Stacy surreptitiously recorded

9  this?

10  A.   That would be my guess.

11  Q.   Now, we've listened to the clip.  Defense is welcome to

12  play it if they want.  Excuse me.  We have the clip.  They can

13  play it if they want.

14      But I just want to ask you some questions about the entire

15  meeting and what was said by Mr. Stacy and your responses.

16  Okay?

17  A.   Okay.

18  Q.   Okay.  Why did you tell Mr. Stacy that his business

19  structure was flawed under the law?

20  A.   Because the -- after the medical marijuana statute was

21  passed, the Uniform Controlled Dangerous Substances Act, it

22  covers anyone who manufactures, prescribes, distributes,

23  dispenses, uses for scientific purposes a controlled drug under

24  the schedules.

25          MR. GOLDSTEIN:  I'm sorry to interrupt, Mr. Cochran.

1          Your Honor, I just have an objection.  I certainly don't

2     object to statements that he made to Mr. Stacy, but I do object

3     if he's going to start interpreting law for Your Honor in terms

4     of what's permitted or not permitted.  So I think it's fair

5     game that we have the recording, so I don't know that we need

6     him to say what happened because we did give the government a

7     recording of this meeting.  But I just don't think it's

8     appropriate for this witness to tell you what the law is; only

9     things that he may have said to Mr. Stacy.

10               THE COURT:  Mr. Coffey, your response.

11               MR. COFFEY:  Your Honor, I don't -- again, this is my

12    position.  It's a legal issue.  But it seems that Mr. Stacy's

13    defense throughout this has been some type of confusion.  And

14    so to the extent the Court wants me to ask responses and what

15    Mr. Stacy was trying to propose in order to convince --

16               THE COURT:  Why don't you just ask him what he told

17    him?

18    Q.    (BY MR. COFFEY) Did you tell him that his business

19    structure was flawed?

20    A.    Yes.  By letter and in person.

21    Q.    Okay.  Did he propose other things that would -- that he

22    thought would work?

23    A.    Yes.

24    Q.    Did you explain why those were legally flawed?

25    A.    Yes.

1  Q.   Okay.  At the end of the meeting, do Mr. Stacy or his

2  attorney explain why they have structured their businesses in

3  this fashion?

4  A.   Yes.

5  Q.   Okay.  What do they say?

6  A.   To get around the 75 percent ownership of the business by

7  an Oklahoman and that they believe that it was

8  unconstitutional.

9  Q.   Okay.  So you're an attorney, aren't you?

10 A.   Yes.  I hope so.

11 Q.   Are there ways to test the constitutionality of a statute

12 apart from breaking it first?

13 A.   Yes.

14 Q.   Okay.  Now, I'd also like to show you Defendant's Exhibit

15 27.  I also sent this to you, didn't I, Mr. Cochran?

16 A.   Yes.

17 Q.   Okay.  I want to go through some of the statements made in

18 this letter.  And do you know who this letter was to?

19 A.   It says "Barbara," and I'm -- I apologize.  There's -- I

20 don't think I've ever seen that last name, so I don't want to

21 butcher it, but it's M-I-U-C-C-I-O.  And Earth Angel LLC, along

22 with Jeremy Grable.

23 Q.   Is this one of Mr. Stacy's clients?

24 A.   I don't have an independent recollection of that, but I'm

25 assuming that it was.

1  Q.   Okay.  Well, let's take this first statement, "I am

2  writing to advise that as of June 30th, 2021, OBN officially

3  denied your registration."  True or false?

4  A.   Oh, it's much earlier than that.

5  Q.   Sorry?

6  A.   If it was one of his clients that was in that particular

7  structure, then it would have been earlier than that, April or

8  early May.

9  Q.   Okay.  What about this portion where Mr. Stacy says to his

10  client, "Your business structure is not unique -- hundreds, if

11  not thousands, of companies utilizing the same business

12  structure have been licensed through OBN and are operating

13  within the Oklahoma medical marijuana industry."  Is that true

14  or false?

15  A.   I don't really have any way of knowing that.

16  Q.   Well, was OBN intentionally signing off on all these

17  registrations with the 75/25 percent straw ownership scheme?

18  A.   No.  No, no, no, no.  Let me put it this way.  Let me make

19  myself clear.  Had we known, if it was apparent, if it became

20  known to us that they were operating under the same structure

21  as what we're talking about with the Helen Carrillo grows,

22  then, no, they would not have been operating because that would

23  be an illegal structure for them as well.

24  Q.   Basically, did OBN know, prior to early 2021, that people

25  like Helen Carrillo were being listed on these registrations?

1  A.   No.  I remember when it was first brought to my attention

2  with the list of marijuana grows that had Helen Carrillo listed

3  as the primary registrant on the applications.  And as I told

4  the agents, I responded to them that either Helen Carrillo is

5  an exceptionally wealthy woman, or there's something here that

6  we need to dig deeper in.

7  Q.   And is that what started the criminal investigation?

8  A.   Yes.

9  Q.   Okay.  What about this part of the letter?

10        THE COURT:  Will you be a bit longer with this

11  witness?

12        MR. COFFEY:  No, Your Honor.  Only a few more

13  minutes.

14        THE COURT:  All right.  Go ahead.

15  Q.   (BY MR. COFFEY) You understand this is a policy change of

16  government authorities.  Is that true or false?

17  A.   That's not true, no.

18  Q.   And why is that not true?

19  A.   Because it wasn't a policy change.  It was just that the

20  facts were being uncovered as we -- as agents began

21  investigating this particular situation.

22        MR. COFFEY:  Brandi, let's go to page 2, please.

23  Q.   (BY MR. COFFEY) What about this paragraph in which

24  Mr. Stacy states that, "Our law firm previously advised that

25  until you or your company is licensed by both OBN and OMMA you

1   cannot operate a medical marijuana business in the State of

2   Oklahoma."  It goes on to say, "You must obtain (1) a valid

3   OMMA license and (2) a valid/approved OBN registration prior to

4   possessing any cannabis plants, plant material, or derivative

5   product."  Is that true or false?

6   A.   I can't speak to when he advised them, but I can tell you

7   that that is a change in his -- Mr. Stacy's position on whether

8   or not a grow or a business could have possession of cannabis

9   plants because, referring back to the Stratford issue in 2020,

10  on the telephone, he tried to convince me that the businesses

11  could possess them as long as they didn't harvest and sell

12  them.  And that wasn't true.

13  Q.   And so was this a change of position in Mr. Stacy?

14  A.   I would say so, yes.

15  Q.   Okay.  Because you told him, in June of 2020, that it was

16  criminal to operate without an OBN registration, didn't you?

17  A.   Yes.

18  Q.   Okay.

19          MR. COFFEY:  Pass the witness.

20          THE COURT:  Let's take a 15-minute recess.  Court

21  will be in recess.

22      (Recess had.)

23          THE COURT:  All right.  Mr. Goldstein.

24          MR. GOLDSTEIN:  Thank you, Your Honor.

25                       CROSS-EXAMINATION

1    BY MR. GOLDSTEIN:

2    Q.   Mr. Cochran, Mr. Coffey asked you some questions about

3    Mr. Stacy surreptitiously recording you; do you remember that

4    question?

5    A.   Yes.

6    Q.   Do you remember that language?

7    A.   Yes, sir.

8    Q.   All right.  Oklahoma's a one-party consent state, correct?

9    A.   Yes, sir.

10   Q.   All right.  And sometimes -- right? -- people, like maybe

11   Mr. Coffey, demand things in writing to show something has

12   occurred or a recording as opposed to testimony, right?

13   Recording is a firm record of what happened, right?

14   A.   It would be.

15   Q.   Okay.

16        MR. GOLDSTEIN:  And so, Your Honor, Exhibit 112 is --

17   I'm only going to play the very snippet beginning.  You'll have

18   it.  This is the June 3rd, 2021, meeting at OBN.

19        THE COURT:  That was recorded.

20        MR. GOLDSTEIN:  That was recorded with Mr. Stacy and

21   his lawyer, Seth Day.

22        THE COURT:  Go ahead.

23        (Audio played.)

24   Q.   (BY MR. GOLDSTEIN) All right.  So you've heard the

25   recording, right?

1    A.    Yes, I have.

2    Q.    It's about 55 minutes, and it accurately recounts what

3    happened at that meeting, right?

4    A.    It appears to, yes.

5    Q.    Well, do you have any question about that?

6    A.    No, I don't have any question about it.  I --

7    Q.    Okay.  All right.

8    A.    But it appears to.

9    Q.    Things that were discussed during that meeting; first of

10   all, Mr. Stacy explained to you -- and there were other people

11   at the meeting.  Who else was at the meeting from your side?

12   Supposed to be stakeholders, right?

13   A.    When I referred to "to get you guys up to speed," in the

14   parts you played, that was to get my OBN people that had not

15   been in a previous meeting up to speed.  And I do know that

16   there was Craig Williams.

17   Q.    What was his position at the time?

18   A.    Chief agent.

19   Q.    Chief agent, yeah.

20   A.    And then there was Deputy Director Mel Woodrow.

21   Q.    Okay.

22   A.    I did not remember Mel Woodrow being in the meeting until

23   I reviewed the audio.

24   Q.    Okay.  Good thing we had the audio, then, right?

25   A.    And I don't know if there were any others that were

1  sitting quietly and did not participate.

2  Q.   Okay.  All right.  And on Matt's side, it was Matt and his

3  lawyer, Seth Day, correct?

4  A.   Those were the voices that I recognized, yes, sir.

5  Q.   Okay.  And at that meeting, Matt gave his best explanation

6  to you and your team about why he believed his two-corporate

7  structure fit within the statutory guidelines for OBN

8  registration, right?

9  A.   He did try to explain that, yes.

10  Q.   Right.  People asked him questions, he gave answers to

11  those questions, right?

12  A.   Yes, sir.

13  Q.   Mr. Day, Seth Day, Mr. Stacy's lawyer, asked you about the

14  possibility of a dec action, declaratory enforcement action, to

15  go to a judge and see what some judicial authority said about

16  the statutes, as opposed to Russ Cochran, general counsel at

17  OBN, right?

18  A.   Yes.  He did offer that toward the end of the --

19  Q.   All right.  You said you might consider that, right?

20  A.   Yes.

21  Q.   And the end of the hour, the parties went their different

22  way, right?

23  A.   Yes, sir.

24  Q.   All right.  This meeting on June 3rd was sort of the

25  culmination of a series of interactions between you and

1    Mr. Stacy, right?

2    A.    Yes, sir.

3    Q.    There were emails going back and forth, and I'm not going

4    to go through them.  The Court will have them.  But they're

5    referring to Exhibit -- so this is one of the emails, right?

6    May 11, Mr. Stacy is trying to explain to you his position as

7    to why his corporate structure comports with the statutory

8    paradigm that existed as to medical marijuana at that time,

9    right?

10   A.    Yes, sir.

11   Q.    Right.  From Matt Stacy to Russ Cochran, May 11, right?

12   A.    This would have been after our meeting of that day, I

13   believe.

14   Q.    Right.  And he followed up on that meeting, you'll see.

15   So right here, he says, probably clarifying, in light of our

16   conversation, that he's found no definition of "straw man" in

17   any of the relevant statutory sections, right?

18   A.    Yes.

19   Q.    All right.

20   A.    He does say that.

21   Q.    And that was a follow-up from an email on the same day,

22   right?  That first email's sent 3:54, and he had sent an

23   earlier one at 1:48.  Do you see that?

24   A.    Yes.

25   Q.    And what he did on May 11 is he gave you copies of all of

1  his agreements, right?

2  A.   I don't know if it was that day or a later time, but he

3  did provide me with a basic agreement, yes, sir.

4  Q.   Take a look at the email.  "Attached is the standard

5  management agreement signed by the parties.  As I illustrated

6  on paper I will attempt to illustrate with words."

7  A.   Okay.

8  Q.   "I will use Helen Carrillo as the representative local

9  resident representing the Company below.  Two companies are

10 formed."  He's explaining to you, chapter and verse, his -- the

11 agreements that he uses and why he thinks it comports with the

12 statutes, right?

13 A.   Yes.

14 Q.   And this is May 11th, right?

15 A.   Yes, sir.

16 Q.   Okay.  And that's just one in a series of emails between

17 you and Mr. Stacy in May of 2021 on the subject matter, right?

18 A.   I don't know how many -- I'm going to say yes, but I don't

19 know how many emails were because I don't have access to those.

20 Q.   Okay.

21 A.   Since I no longer work there.

22 Q.   There was a series of emails going back and forth; is that

23 fair?

24 A.   Yes, sir.

25 Q.   Okay.  Showing you Document 53.  This is that email we

1  just looked at, May 11.  Do you see it?

2  A.    Yes, sir.

3  Q.    Okay.  But in this version of the document, there are

4  notes on the margins.  Are those your notes?

5  A.    Yes.  That looks like my handwriting.

6  Q.    Okay.  So what appears to have happened is Mr. Stacy gave

7  you copies of the -- his corporate documents that he used in

8  his practice in applications for medical marijuana entities.

9  And you, as you should, reviewed them, and made notes that are

10 your relevant -- some relevant observations of yours as to the

11 document, right?

12 A.    Yes.  That's what that appears.

13 Q.    Okay.  And then you have the meeting on June 3rd that's

14 recorded, right?

15 A.    There was an intermediate meeting.

16 Q.    Yep.  Couple meetings and then that sort of penultimate

17 meeting, right?  And do you remember at that meeting Seth Day

18 specifically asking you, "Now, is this your official

19 declination, do we -- is the clock running?  Do we have to

20 appeal in a certain time period, or will you give us sort of an

21 official declination so that the clock will be running?"  Do

22 you remember that?

23 A.    I do.

24 Q.    Okay.  And you told him, "No, no, no, I'll give you a

25 letter that I'll -- if I'm going to deny" -- because you didn't

1   tell there -- you didn't tell them that day, "I reject your
2   position," right?
3   A.   I don't recall saying that on the recording, no.
4   Q.   Right.  "I got more things than I can swing a stick at or
5   something.  Let me take a look at this, and we'll get back to
6   you," right?
7   A.   But as far as writing him a letter -- now, I believe what
8   I was really referring to was when the clock starts for him to
9   be able to file a request for an administrative action.
10  Q.   Right.  And that would be the official denial, right?
11  A.   No.  I had already told them that -- I said -- if I recall
12  correctly, I told them, based on my previous letter, that that
13  was going to suffice as the denial, but I was not going to push
14  them toward the administrative action at the end of --
15           THE COURT:  I'm sorry, denial of what?
16           THE WITNESS:  I'm sorry.  Denial of the OBN
17  registration.
18  Q.   (BY MR. GOLDSTEIN)  You had meetings in May, right?
19  A.   Correct.  And at the end of my --
20  Q.   You wrote letters --
21  A.   -- May 20th letter --
22  Q.   Yeah.  You wrote letters to Mr. Stacy in response to those
23  May meetings, right?
24  A.   Yes.
25  Q.   But then there was an additional meeting scheduled in

RUSSELL COCHRAN - CROSS-EXAMINATION BY MR. GOLDSTEIN          222

```
 1   June, right?

 2   A.   The date, I'm not sure --

 3   Q.   Okay.

 4   A.   -- when that -- when that recorded meeting actually

 5   occurred.  I'll take your word for it.

 6   Q.   Okay.  And in that meeting, Mr. Day explicitly asked you,

 7   "Have you officially denied?  Is the clock running on appeals?"

 8   And you said, "No, let me think about it, and I will get back

 9   to you."  That's how the meeting ended?

10   A.   I believe that I was referring to I will get back to him

11   about the idea of going forward with a declaratory action.

12   Q.   Okay.  This is the letter you sent to Mr. Stacy on June

13   30th, right?

14   A.   Okay.

15   Q.   Exhibit 105.  Do you see that?

16   A.   Yes.

17   Q.   What's the date on it?

18   A.   June 30.

19   Q.   And what does it say?  "I'm writing to inform you the

20   attached list of registration applicants have been denied,"

21   right?

22   A.   Okay.

23   Q.   This is notice of a denial, right?

24   A.   Okay.

25   Q.   Is that true?
```

1    A.    Yes.

2    Q.    All right.  Well, Mr. Coffey just asked you if a statement

3    in Mr. Stacy's documents saying that, "Your license has been

4    officially denied June 30th, 2021" -- could Mr. Stacy have

5    interpreted this letter as an official denial that would have

6    triggered their right to file an administrative hearing?

7    A.    Sir, I was basing my answer on the list of OBN

8    registrations that were pending that indicated that they had

9    been denied, and they were prior to the May 11th meeting.

10   Q.    This is dated June 30th, right?

11   A.    That's correct.

12   Q.    All right.  Do you see the AI -- or AL 2020?  Do you see

13   that, sir?

14   A.    Yes.

15   Q.    So that's the date that that application was denied, June

16   30th, right?

17   A.    Yes.

18   Q.    And Nana Zhang, denied June 30th, 2021?

19   A.    These are attachments to that letter?

20   Q.    Yes.

21   A.    Okay.

22   Q.    Yes.

23   A.    Okay.

24   Q.    Okay.  Nana Zhang, denied June 30th, 2021?

25   A.    Okay.

1  Q.   Lama Green, June 30th, 2021.  Do you see that?

2  A.   Yes, sir.

3  Q.   Daphne Green, June 30th, 2021, right?

4  A.   Yes, sir.

5  Q.   Okay.  Mr. Coffey asked you a series of questions about an

6  event in June of 2020?

7  A.   Yes, sir.

8  Q.   And your communications with Mr. Stacy about that event?

9  A.   Yes, sir.

10  Q.   Do you recall the name of that particular business at 2240

11  County Road 1500, Stratford, Oklahoma, as being King Happy

12  Farms?

13  A.   No, sir, I do not.

14  Q.   You do not?  Okay.  But that is the address that you

15  testified to on direct examination about this event, this

16  conversation you had with Mr. Stacy, right?

17  A.   The general area, yes, Stratford.  I didn't have the

18  specific address, no, sir.

19  Q.   Okay.  Well, there was a search warrant executed at that

20  particular location in June, right?

21  A.   Yes, sir.

22  Q.   Okay.  And this is the facility that you were having

23  conversations with Mr. Stacy about, right?

24  A.   Yes, sir.  I'm assuming, yes, sir.

25  Q.   Okay.  June 4, 2020.  Do you see it?

1    A.    Yes, sir.

2    Q.    Okay.  And this is the series of questions Mr. Coffey

3    asked you about a conversation you had with Mr. Stacy, right?

4    A.    Yes.

5    Q.    Where you testified that you told Mr. Stacy,

6    unequivocally, that it was illegal, criminal, to have an

7    operation with just an OMMA license without an OBN

8    registration, right?

9    A.    That's correct.

10   Q.    Okay.

11   A.    And I do recall that -- well, I'll let you ask the

12   question.

13   Q.    Sure.  Why did OBN give an OBN registration to this

14   illegal, criminal enterprise a few weeks later, on July 14,

15   2020?

16   A.    I don't know.  The registration division is a different

17   division, and those registration ministerial acts by the

18   registration division don't all come through the legal

19   division.

20   Q.    You're general counsel at OBN at this time, right?

21   A.    Yes.

22   Q.    There's a search warrant executed where 14,000 plants are

23   seized, right?

24   A.    That's correct.

25   Q.    He asked you questions about it's hard for you to initiate

1  charges, and you have to go through the DA, right?

2  A.    That's correct.

3  Q.    All right.  And agents go out there, and they seize 14,000

4  plants?

5  A.    Correct.

6  Q.    And I guess what you're telling me that there was some

7  miscommunication within OBN that this entity got their

8  registration a couple weeks later?

9  A.    I can't speak to that, sir, because I don't know how that

10  occurred.  I do know that while the agents were at that

11  particular grow, that, at the request of one of the agents, I

12  made a phone call directly to the elected DA for that county

13  and asked him if he would accept a packet from the lead agent

14  on that to consider criminal charges.

15  Q.    And no criminal charges were brought, right?

16  A.    I don't know if they were or not.

17  Q.    Well, did you initiate any criminal charges?  Did you push

18  to have criminal charges?

19  A.    That was the extent of my involvement in that.

20  Q.    Okay.

21  A.    Because I knew the district attorney at that time, and I

22  asked him what his thoughts were on that.

23  Q.    Okay.  But there's no quarreling that OBN issued them a

24  registration a few weeks later, a month later, and they became

25  an OBN registrant to grow marijuana with an OBN registration,

1   right?

2   A.   I don't see the -- oh, well, I see the expiration date on

3   it.  So that was for '21, yes, sir.  Okay.  All right.

4   Q.   Issued July 14, 2020, right?

5   A.   Yes.

6   Q.   Okay.  Now, you -- Mr. Coffey, "You're a lawyer?"  You

7   said, "Yeah, I'm a lawyer," right?  You're a lawyer?

8   A.   Yes, sir.

9   Q.   All right.  Lawyers give clients advice.  Are you in

10  private practice now?

11  A.   I am.

12  Q.   All right.  Lawyers give clients advice, right?

13  A.   Yes.

14  Q.   All right.  And so just because -- whether something is

15  legal or illegal -- right? -- in your opinion, whatever that

16  opinion is -- okay?  There's also attached to that

17  consequences.  What's the consequence for doing something that

18  might be illegal, right?

19  A.   Yes.  There typically are consequences.

20  Q.   Right.  And so a client can ask a lawyer, you know, "Hey,

21  if I grow without an OBNDD, what's the penalty?"  Right?

22  A.   I never had those conversations with a medical marijuana

23  client, but I would imagine those would be the --

24  Q.   But you understand there's a difference between whether

25  something's legal or illegal and whether -- what the

1  consequence of that illegality is, right?

2  A.    Yes.

3  Q.    Let me play something for you.  Okay?

4  A.    Okay.

5  Q.    This is a recording from October 15, 2020 -- okay? --

6  where your agents -- now, your agents, Agent Martinez, Agent

7  Paulk, Agent Peterson, when you were there -- right? -- they're

8  law enforcement officers, right?

9  A.    Yes.  They're commissioned law enforcement officers, yes.

10 Q.    They have the power to arrest?

11 A.    Correct.

12 Q.    They have the power to seize contraband, right?

13 A.    Yes.

14 Q.    So when you testify, when Mr. Coffey was asking you

15 questions, about the difficulty initiating -- you don't have

16 the power to initiate charges, the law enforcement officers on

17 the scene have the power to arrest people who are committing

18 crimes in their presence, right?

19 A.    Yes.  Absolutely.

20 Q.    Right?  Like if an OBN agent walked into a house and there

21 was 50 bricks of cocaine, they wouldn't say, "It's fine.  Don't

22 worry about it.  We're going to walk out."  I assume they'd

23 exercise their authority to arrest people, right?

24 A.    They should, yes.

25 Q.    And that's what you would want, as OBN general counsel,

1    right?

2    A.    Correct.

3    Q.    All right.  And so when the agents walked into King Happy

4    Farms on June 4th of 2020 and saw 14,000 plants, whatever the

5    eventual filing of charges, those agents had the authority to

6    arrest someone on the spot for what you say is a crime?

7    A.    Yes.  Or they could prefer (sic) that to the district

8    attorney and ask for an arrest warrant to be issued.

9    Q.    But if it's so clear, if it's so clear that it's criminal,

10   why would they go to the district attorney instead of arresting

11   someone on the spot for the crime committed in their presence?

12   A.    Well, and I can answer that.  And that is that at the

13   Bureau of Narcotics, it's not the same in all situations as it

14   might be for a patrol officer that finds someone in possession

15   of a controlled drug and arrests them on the spot.

16       OBN's preference is to work the case because, oftentimes,

17   the investigations they get involved in turn into more complex

18   conspiracy cases that have significant tentacles, maybe even

19   leading into cartel activity or out-of-state activity whereby

20   they would want to bring in federal partners.  It wasn't just

21   the same as, you know, like I say, a patrol officer might --

22   where I make this arrest; I'm done.

23   Q.    Well, do you think that when an OBN agent goes onto a farm

24   and sees that a person, a citizen, is growing plants and they

25   have plants all over the farm, do you think it's appropriate,

1  fair, for that agent to tell the person that growth before

2  registration is fine?  That's not an undercover investigation.

3  That's giving affirmative advice to an individual that growth

4  before registration is fine.  Is that fair?

5  A.   There, again, I think it might be -- there might be

6  circumstances whereby it might not be clear, like, "I can't get

7  the registration people on the phone," or, "I don't know

8  whether or not the" --

9  Q.   Let's say they know on the spot.  They're there.  I can

10  show you the reports.  Agent Martinez -- we're going to listen

11  to the recording.  October --

12        MR. COFFEY:  Your Honor, he's asked this about five

13  times now.

14        THE COURT:  Go ahead.

15  Q.   (BY MR. GOLDSTEIN) Agent Martinez, is that Chow King,

16  October 15, 2020, with Agent Peterson, with Agent Paulk?  Okay?

17  There's plants everywhere.  They know they don't have an OBN

18  registration.  Okay?  That's the -- I can show you the reports.

19  That's the state of affairs.  All right?

20  A.   Okay.

21  Q.   And they tell that person that growth before registration

22  is fine.  Let me play it for you.  Okay?

23  A.   You can if you want.  Yes, sir.

24        (Audio played.)

25  Q.   It's growth -- you want to hear it again?  "Growth before

1  licensing.  It's an admin thing; it's fine."

2  A.    I'm sorry, sir.  I can't speak to why they said that --

3  Q.    Well --

4  A.    -- at that particular time.

5  Q.    -- can you speak to why your agents -- if the illegality

6  is so clear, why, from June and July and August and September

7  of 2020, all the way through to the end of February, are going

8  to facilities, are seeing people growing marijuana in their

9  presence without an OBN and are taking no law enforcement

10 action and telling them that what they're doing is fine and

11 they're being compliant?  Can you explain that?

12 A.    No, I can't.

13 Q.    Do you think it would be reasonable for someone listening

14 to that recording -- as a lawyer, do you think it'd be

15 reasonable for that lawyer when the client asks him what's --

16 you know, "Can I grow before OBN," would it be reasonable for

17 that lawyer to say, "It's an admin thing"?

18 A.    I would think it'd be more reasonable for a lawyer to

19 contact the lawyers that are actively engaged in that

20 particular matter.

21 Q.    What does that mean?

22 A.    Well, that means --

23 Q.    He's supposed to call you?

24 A.    Like he did later, yes.

25 Q.    Right.  He eventually did, right?

1   A.   Correct.

2   Q.   Mr. Cochran, I want to show you Exhibit 52.  Defendant's

3   Exhibit 52 is an email from you to a Shannon Tarpley.  Do you

4   see that?

5   A.   Yes.

6   Q.   At the top, May 7th?

7   A.   Yes.

8   Q.   And it looks like you're forwarding an April 8th email

9   from Tracie McKedy to yourself, right?

10  A.   Yes.

11  Q.   And Tracie worked at OBN with you, correct?

12  A.   Yes.  She led the registration division.

13  Q.   And who's Shannon Tarpley?

14  A.   She was my secretary.

15  Q.   Okay.  And so you forward -- you see, "Per your request,

16  attached is our spreadsheet of current MS applications that are

17  pending.  All those highlighted in Yellow are ones" -- it's a

18  little out of focus, right?

19  A.   Sorry.  I can't -- okay.  That's better.

20  Q.   "All those highlighted in Yellow are the ones that Agent

21  Martinez told us she was recommending denial and she either

22  provided us with an ACISS case number" -- what's that acronym,

23  sir?  Do you know?

24  A.   I know that that's the case management system for the law

25  enforcement side.

1  Q.  Okay.  Which is listed on the spreadsheet, or she told us
2  her report was forthcoming.  All of those highlighted in green
3  are applications that have Helen Carrillo listed as an owner
4  that Agent Martinez advised us she was awaiting word from Legal
5  on how we should proceed with those.  Do you see that?
6  A.  Yes.
7  Q.  All right.  Let me show you this table.  Okay.  So the
8  ones in yellow are the ones Agent Martinez told us she was
9  recommending denial.  Okay?  Do you see that?
10  A.  The focus is coming in and out, and I -- all right.
11  Q.  How about now?  Is that good?
12  A.  It's better now.
13  Q.  Okay.  So you have -- we'll just start at the top, "AI
14  2020."  Do you see that?
15  A.  Yes.
16  Q.  Well, let's just go to ones that we've -- look at "Golden
17  Tree" down below.  Do you see it?  It's underlined.
18  A.  Yes, sir.
19  Q.  Okay.  The application was submitted in September --
20  September 3rd of 2020, right?
21  A.  Yes.
22  Q.  It says that Martinez has denied it internally -- right?
23  -- but she's awaiting instruction on how to notify them of the
24  denial, right?
25  A.  Yes.

1  Q.   So this is May of 2021 that this table is forwarded,

2  right?

3  A.   Yes.

4  Q.   So since September -- okay? -- Agent Martinez went out to

5  conduct inspections, has denied it or has recommended denial,

6  but there's still no notice to the entity that's investing

7  their money in this operation.  That's what the table shows,

8  right?

9  A.   Yes.

10  Q.   Okay.  Same thing with "Jeff BC Properties," right?

11  Application's submitted in November.  And in May, they still

12  have not been notified that the application is going to be

13  denied, right?

14  A.   Yes.

15  Q.   "Lama Green," same thing; November?  Do you recall I went

16  through with you before; that was on your June 30, 2021 denial

17  letter.  So their application will be pending for more than six

18  months, even though it's been denied internally, right?

19  A.   Yes, sir.

20  Q.   Is that fair to the people who are investing in these

21  businesses?

22  A.   I don't know whether I could speak to it being fair or

23  not.  I know that this was a list of several thousand that OBN

24  agents were dealing with at the time.  So --

25  Q.   The agent went out, conducted an inspection, saw

1  marijuana, recommended denial, recommended an administrative

2  proceeding.  They're never told of it; they think they're okay;

3  they're told they can grow.  And it's sitting at OBN.  Is that

4  fair?

5  A.   I don't know how to answer that, whether it's fair or not,

6  sir.  It's -- it is what it is.

7  Q.   Okay.  Let me point you to Earth Angel's, the bottom one,

8  last one on this page.  All right.  Application was submitted

9  December 8, 2020.  And this is May, and it says, "OUT WITH

10 MARTINEZ/she is awaiting clarification from legal."  Do you see

11 that?

12 A.   Yes.

13 Q.   All right.  Now, are you aware that in February of 2021,

14 February 23, 2021, agents went out to Earth Angel, saw plants,

15 spoke to Jeremy Grable, told him -- told the agency he'd been

16 growing for two to three months without an OBN?  Okay?  Did you

17 get that report?  Do you get those reports?

18 A.   I don't have an independent recollection of any of that,

19 sir.

20 Q.   And what does it mean awaiting -- why are they -- if

21 someone's growing marijuana without a registration and it's so

22 blatantly illegal, why do they need clarification from legal

23 about what to do with it?

24 A.   I don't know specifically, on that specific instance, what

25 that -- what the legal issue would have been.  That was

1  four-plus years ago.

2          MR. GOLDSTEIN:  May I have one moment, Your Honor?

3      Nothing further, Your Honor.

4          THE COURT:  Further questions, Mr. Coffey?

5                      RECROSS-EXAMINATION

6  BY MR. COFFEY:

7  Q.   The recorded meeting that, I guess, Mr. Stacy's admitting

8  that he did without your knowledge, you listened to the

9  recording again before today's hearing, did you not?

10  A.   Last night, yes, sir.

11  Q.   Okay.  And at that time, you were discussing in the

12  meeting the Helen Carrillo grows, and her name specifically

13  came up, did it not?

14  A.   Correct.

15  Q.   Did Mr. Stacy, who apparently was coming open files to the

16  table, also tell you in that meeting that he'd listed people

17  like Kylie Kennedy, Bay Tran, Annette Yarger, Zac Staton?  Did

18  he tell you during that meeting he listed all those other

19  people as straw owners also?

20  A.   No.

21          MR. COFFEY:  That's all I have, Your Honor.

22          THE COURT:  You may step down.

23          THE WITNESS:  Thank you.

24          THE COURT:  You're excused.  Thank you.

25      Call your next witness.

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY          237

1                MR. COFFEY:  United States calls Craig Williams.

2                MR. COFFEY:  Your Honor, he is excused, correct?

3                THE COURT:  Yes.

4                MR. COFFEY:  Thank you.

5                      CRAIG WILLIAMS,

6       called as a witness on behalf of the government, having

7    been first duly sworn to tell the truth, testified as follows:

8                      DIRECT EXAMINATION

9    BY MR. COFFEY:

10   Q.   Afternoon, Agent.  Will you please introduce yourself?

11   A.   Yes, sir.  My name is Craig Williams.

12   Q.   Okay.  And what's your official title?

13   A.   I'm a lieutenant colonel with the Oklahoma Bureau of

14   Narcotics.

15   Q.   How long have you been with OBN?

16   A.   I've been with OBN since 2007, and I was prior law

17   enforcement before that.

18   Q.   Okay.  What'd you do prior to OBN?

19   A.   I worked for the Ardmore Police Department for ten

20   years -- or approximately ten years.

21   Q.   And as far as positions with OBN, let's pick up around

22   2018.  What was your title?

23   A.   2018 was the year I promoted.  Our terminology for rank

24   was a little different at that point.  I was an agent in charge

25   over training and operations and professional standards and

1    then promoted to chief agent over the Diversion Division.

2    Chief agent is the equivalent of a lieutenant colonel now.

3    Q.    When did that promotion to chief agent take place?

4    A.    April of '18.

5    Q.    Okay.  Okay.  There have been questions today about OBN's

6    criminal track and administrative track.  Are you aware of both

7    of these tracks, if you will?

8    A.    Yes, sir.

9    Q.    Okay.  What's the difference?

10   A.    Over Diversion, perhaps if I can elaborate a little bit of

11   what Diversion was, that section.

12   Q.    Please.

13   A.    OBN has administrative authority and also criminal

14   investigative authority.  Anybody that manufactures,

15   distributes, dispenses, or prescribes a controlled substance in

16   the state of Oklahoma has to have a corresponding professional

17   license and an OBN registration.  So there are administrative

18   rules that are corresponding to those registrations.  That's

19   Administrative Code 475 --

20        (Court reporter interrupts to slow the witness down.)

21   A.    Certainly.

22        Administrative Code 457 is the administrative code for

23   OBN.  And then there's the criminal side of investigations

24   which would be violations of the Uniform Controlled Dangerous

25   Substance Act.

1  Q.   And as far as the criminal side, is there a statute that
2  requires certain individuals to have an OBN registration?
3  A.   Yeah.  Within the UCDS, or the Uniform Controlled
4  Dangerous Substance Act, in Title 63 in Oklahoma, it does
5  require that registration.
6  Q.   Okay.  And has that statute always been on the books, the
7  requirement of an OBN registration?
8  A.   To my knowledge, best I can tell it -- it started existing
9  when OBN started existing.
10  Q.   When was that?
11  A.   1975.
12  Q.   Okay.  So let's just jump into the meat of this thing.
13  Mr. Stacy's arguing that OBN had some big position change in
14  the last several years regarding administrative investigations,
15  violations, and criminal violations.  Do you agree with that?
16  A.   No.
17  Q.   Okay.  How does the administrative side and the criminal
18  side work hand in hand?
19  A.   They, at times, interact with one another, but they're not
20  dependent upon one another.
21  Q.   What do you mean "they're not dependent upon one another"?
22  A.   You don't have to have an administrative violation to work
23  a criminal case or a criminal violation to work an
24  administrative case.
25  Q.   So if you have an administrative violation, is it

 1  necessarily going criminal?

 2  A.   No.

 3  Q.   If you have a criminal case, is it necessarily going

 4  administrative?

 5  A.   No.

 6  Q.   Can you have violations that are both administrative and

 7  criminal?

 8  A.   Absolutely.

 9  Q.   Okay.  And is OBN always going to file charges any time

10  they find an administrative violation or even a criminal

11  violation?

12  A.   No.  I mean, it's just like any other law enforcement

13  agency.  We attempt to use discretion and certainly look at

14  intent.

15  Q.   So let's jump to 2018.  You're the chief agent in the

16  Diversion Squad, correct?

17  A.   Yes, sir.

18  Q.   And so with the Diversion Squad, what are you primarily

19  doing day to day?  Are you going out to marijuana grows?

20  A.   No.  Marijuana grows didn't even exist when that first

21  started.

22  Q.   Okay.

23  A.   And that was -- or a quasi legal marijuana grow didn't

24  exist when that first started.  That started with State

25  Question 788.  A traditional registrant with OBN is going to be

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY                241

1   a doctor or pharmacy -- somebody manufactures, distributes,

2   dispenses, or prescribes the controlled substance.  So we would

3   have regulatory inspections but also conduct criminal

4   investigations on people that met those categories.

5   Q.    Okay.  And so when does the Diversion Squad start doing

6   any investigations that are related to marijuana grows?

7   A.    So perhaps a snapshot in time is good too.  2018, when

8   that first happens, we start to deal -- or late 2018, we're

9   starting to deal with some challenges from COVID.  We have a

10  registration system, Oklahoma Interactive was the contractor

11  for the initial system.  The registration staff or customer

12  service representatives, those customer service

13  representatives -- I think there were two at the time -- start

14  to have to try to work through the registration applications

15  for medical marijuana.

16       And at one point, that maxed out at -- I believe we were

17  having almost 300 a week come in.  So we don't and did not and

18  still don't always inspect prior to issuing a registration.

19  But we always have the ability to go inspect and check records,

20  readily retrievable records, those sorts of things, to make

21  sure the information we have is correct.  As this is going on,

22  because of the volume, we had a very cursory check because,

23  prior to getting to an OBN to apply for an OBN registration,

24  that -- they would already have an OMMA license.

25       You'll oftentimes hear an OBN registration referred to as

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY                242

1   a license.  We internally refer to it as a registration.  But
2   just for sake of conversation, that's pretty common to hear it
3   referred to as a license.
4       But we started doing the criminal history checks
5   consistent with State Question 788 to make sure there was no
6   prior conviction within -- any felony within the previous two
7   years or violent felony within the previous five.  And that
8   actually entailed all agents at OBN getting assigned those to
9   just be able to even remotely keep up with the volume that was
10  coming in.
11  Q.    Okay.  Was it fair to say that when the registration
12  applications -- 300 a week --
13  A.    Yes.
14  Q.    -- OBN was not equipped to handle that many?
15  A.    We were nowhere near equipped to hand that volume.
16  Q.    And later, did OBN make some changes to better equip
17  itself to handle this problem?
18  A.    Certainly.  We went through a different registration
19  computer system.  Actually, we're on the third system now.
20  Started Oklahoma Interactive, then transitioned to Granicus,
21  and now we're on the system called Thentia.  So that involved
22  computer builds, working with vendors, working through the
23  State purchasing processes to get that going.
24      We hired additional registration staff in that customer
25  service section to be able to help provide -- to help process

1   applications.  And then as we started to notice criminal

2   activity in the medical marijuana field, the Diversion

3   investigators at that time were also very taxed with diversion

4   cases -- overdoses.  It was when we were very much in the

5   middle of an opioid epidemic.  And so the same investigators

6   were working both.  So we were able to -- Director Anderson was

7   committed to improving those -- the capabilities.  And then we

8   started hiring people but really kind of came operational with

9   the marijuana enforcement teams in 2021.

10  Q.   Okay.  So we're at 2021.  Let's put a pin in that for a

11  sec.  Okay?

12  A.   Okay.

13  Q.   Do you remember the first marijuana grow that you executed

14  a search warrant at -- OBN?

15  A.   One of the first sizable -- well, post-medical marijuana

16  legalization, post 788, would have been a grow in Stratford.

17  Q.   Okay.  Do you remember when that grow in Stratford -- when

18  the search warrant was?

19  A.   I believe it was June 4th of 2020.

20  Q.   Okay.  So at the time, you are the -- your title is chief

21  agent, right?

22  A.   Chief agent, yes, sir.

23  Q.   Okay.  You get out to the grow.  Do you encounter the

24  occupants?

25  A.   We encountered multiple people at the grow.

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY                244

1    Q.   Okay.  Can you describe the grow?

2    A.   Yes.  It was a rural property.  Had a gate at the end of

3    a -- I'm going to -- eighth-mile, a quarter-mile driveway; had

4    multiple -- we call hoop houses, metal frames with vinyl or

5    visqueen covering over it; a structure that was probably a

6    house that had been there for some time; and a couple of RVs

7    around it.

8    Q.   Okay.  Now, was the grow licensed with OMMA and also

9    registered with OBN?

10   A.   No.  It was not.

11   Q.   Okay.  What was it lacking?

12   A.   At the time -- we'd initially started planning the

13   operation with OMMA.  And at the time, OMMA had inspectors.

14   They didn't have any criminal enforcement agents.  They did not

15   have an OMMA license or an OBN registration.  At the time of

16   the search warrant, they had been issued an OMMA license but

17   still had no OBN registration.

18   Q.   Okay.  So is it clear that they'd been operating for a

19   while without an OBN registration?

20   A.   Absolutely.

21   Q.   And there were live plants when you got out there?

22   A.   Live plants in multiple stages of growth.

23   Q.   About how many plants?

24   A.   If I recall, I believe it was 12,000 or 14,000 plants.  It

25   was sizable.

1  Q.    How many agents does it take to execute a search warrant

2  on a grow of that size?

3  A.    This was the start of a learning curve for us.  A grow of

4  that size takes a multitude of people.  Just to secure that

5  property, to do it safely for the occupants and safely for the

6  agents -- talking multiple acres, multiple structures, 30

7  agents is pretty close to a minimum to try to do that

8  correctly.  Now would be what we would say; we had less then.

9  We still had our Ardmore district office, our McAlester

10  district office, agents from Oklahoma City, and help from local

11  law enforcement to be able to complete that process.  We

12  encountered multiple other challenges we weren't used to at the

13  time.

14  Q.    Such as?

15  A.    Heat -- significant heat.  Inside the hoop houses, the

16  temperatures were running 115 degrees or more.  Even after we'd

17  ventilated the hoop houses, we still got the temperature down

18  to about 100 degrees, but that was about as cool as we could

19  get it.  The manual labor involved in eradication is

20  tremendous, depending if there's -- and sometimes it's easier

21  than other times.  Depends on netting and those type of things.

22  We did not have any heavy equipment at the time.

23       We were solely dependent upon county commissioners coming

24  in and agreeing to help us by bringing skid steers and dump

25  trucks to be able to move the eradicated marijuana to an

1  off-location site to burn.

2       We've now had to start a skid steer program.  OBN has

3  three skid steers and agents that are trained to operate the

4  skid steers now.  But this was very early on, and it was a

5  learning curve.  So it was a very challenging operation.  We

6  didn't bring enough water for the operation.  We didn't bring

7  food for the agents at lunch.  It was -- logistics are very

8  challenging at times.

9  Q.   And speaking of the agents, Danny Peterson testified

10 earlier.  You know Danny?

11 A.   I do know Danny Peterson, yes, sir.

12 Q.   Okay.  And he was asked questions about, you know, OBN's

13 policy, what's an administrative, what's criminal.  Let's be

14 clear.  Are you Danny's boss?

15 A.   I'm --

16 Q.   Or do you outrank him?

17 A.   At the time, I was Danny's boss's boss.

18 Q.   Okay.  Danny's boss's boss.  Okay.

19      But back to the grow.  So it's fair to say lot of

20 manpower, lot of tools, lot of time and resources needed to

21 eradicate these grows?

22 A.   Yes, sir.

23 Q.   Would OBN, even if they'd wanted to, been able to execute

24 search warrants on every grow they found operating without a

25 registration?

1  A.   Absolutely not.

2  Q.   Okay.  But let's take a little bit with the grow.  You

3  said there were hoop houses, and they were very hot, correct?

4  A.   Yes.

5  Q.   Were there workers on site that you encountered?

6  A.   There were.

7  Q.   Okay.  How many workers were on site?

8  A.   I don't recall.  I would estimate ten-plus.

9  Q.   Okay.  Where were they living on site?

10  A.   Communal living in a -- in the original house structure,

11  what I would call the original house structure.

12  Q.   What does "communal living" mean?  Are they all living in

13  the same house?  Are they sharing rooms?  Are they sharing

14  beds?

15  A.   Not a traditional bedroom-type arrangement, not a

16  traditional dormitory-type arrangement.  Pallets on the floor,

17  maybe a mattress on the floor.  The food was in a shared food

18  environment.  There was some -- we became very concerned at one

19  point -- one of the other supervisors on the scene and I both

20  worked human trafficking together for some time -- became very

21  concerned about the living conditions and also some of the body

22  language exhibited by some of the workers.

23  Q.   And the workers, did they speak English?

24  A.   I don't -- there may have been one or two that spoke a

25  little bit of English, but for the most part, no.

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY          248

1  Q.   You say you were concerned about the body language?

2  A.   There was one -- yes, sir.  There was one individual that

3  was -- and he stands out to me because he was heavily tattooed.

4  No stance against tattoos; just that was the thing that stood

5  out.  And he lived -- his living quarters were the only place

6  that had -- he had his own window unit.  He had

7  air-conditioning in the place he was staying.  As I recall, the

8  others did not.  He had his own food access; the others were

9  dependent upon communal food.

10 Q.   Were they all putting their mattresses in the same room on

11 the floor?

12 A.   It was in several rooms, but yes.  It was -- one room

13 would be maxed out, and there might be some others in the

14 next -- in an adjoining room.

15 Q.   And was there air-conditioning in the rooms that housed

16 the growers, not the other individual boss that you've

17 described?

18 A.   I don't recall there being air-conditioning in there.

19 Q.   Okay.  And was this consistent with your experience with

20 human trafficking?

21 A.   In its entirety, yes, because you had a vulnerable

22 population, limited English.  They're in a very rural part of

23 Oklahoma.  One of the concerns we had -- that we had then is --

24 actually, we would have now, and we look for regularly -- is

25 even if a cry for help was made, who would receive the cry for

1  help, and how would they interpret it?  There was a -- there

2  was a lack of pay.  We were told -- did get from several of

3  them -- and I don't recall whether it was interpreted or how it

4  was -- that they were told they would be paid at the end of the

5  harvest.  So you've got --

6  Q.   Why did that suggest labor trafficking?

7  A.   Labor with no pay, poor living conditions, limited access

8  to food.  And then the one person I referenced earlier -- I

9  believe I neglected to finish my answer.  I apologize.  The

10 body language was, when an agent or an officer was talking to

11 one of the other workers, they would look very much

12 permissively towards that person, like there was a palpable

13 fear of -- we interpret it as potential reprisals if they

14 talked to the law enforcement.

15      And as a matter of fact, Agent Phillips and I both decided

16 that there was enough indicators there that I made a phone call

17 to -- AIC Snowden, at the time, was over our human trafficking

18 section, and had them respond as well.

19 Q.   Okay.  Bluntly put, this was not a great place, was it?

20 A.   No, sir.

21 Q.   Now, at some point, a woman in a van arrives, does she

22 not?

23 A.   Yes.

24 Q.   Did you know who this woman was?

25 A.   I don't recall who that person was and didn't know them at

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY          250

1   the time.

2   Q.   And when the woman arrived, what are you and the other

3   agents doing?

4   A.   I'm all over the place, trying to figure out where -- make

5   sure that agents aren't overheating, trying to look at

6   logistics for the entire operation.  But at some point, I go

7   over there and have a conversation with her.  I believe an

8   agent called me over and said that somebody was on the phone,

9   wanting to speak to a supervisor.

10  Q.   Are you a supervisor?

11  A.   I am indeed.

12  Q.   Did you take the phone?

13  A.   I don't remember if I held the phone, but I talked to

14  someone on the phone.

15  Q.   Okay.  Who was that someone you talked to on the phone?

16  A.   They identified themselves as Matt Stacy.

17  Q.   Okay.  Did Matt Stacy explain his relationship to the grow

18  that you were at?

19  A.   I don't remember all of the details of that, but that he

20  represented the lady that I was talking to was the impression I

21  had.

22  Q.   Okay.  Do you remember anything else about that

23  conversation that stuck out?

24  A.   I do.

25  Q.   What do you remember?

1  A.   I remember the conversation being very unusual, in that he

2  told me that the people were very good people.  The person I

3  was talking to -- it became, like, about that person's

4  character; that they had provided COVID masks to the State and

5  that they were running a perfect grow; they were -- they were

6  basically models and models for how to run a grow; and that he

7  was going to bring the governor of Oklahoma down there for a

8  tour.

9  Q.   Let me get this straight.  He said he was going to bring

10 the governor of Oklahoma to a marijuana grow where you found

11 elements of human trafficking?

12 A.   Yes.

13 Q.   What did you think Matt Stacy was trying to do in that

14 moment?

15 A.   I've been in law enforcement a long time.  I've been

16 around people.  I -- we call it -- typically call it

17 name-dropping.  I felt like he was trying to exert some

18 influence or pressure by saying that.

19 Q.   Did anyone ever name-drop Governor Stitt around you?

20 A.   That's why it stands out.  I've had a lot of names

21 dropped, but I've never had the governor dropped before.

22 Q.   Now, do you guys go on to talk about some of the grow's

23 problems, what you're seeing?

24 A.   Yes.

25 Q.   What do you tell him?

1   A.   Probably very similar rundown to what we just had here.

2   Q.   In terms of the --

3   A.   If he's representing them, about the lack of a

4   registration, the plants in multiple stages of growth, et

5   cetera.

6   Q.   Do you talk about the fact that the grow lacked an OBN

7   registration?

8   A.   Yes.

9   Q.   Okay.  Well, what does he say about that?

10  A.   There was -- I don't remember if it was this call.  I

11  remember several calls that day that I talked to Mr. Stacy.

12  Q.   So let me pause you right there.  So later, there's

13  another call with Mr. Stacy?

14  A.   There is.

15  Q.   Is that call also facilitated by the woman that had

16  arrived in the van?

17  A.   I believe so.

18  Q.   Okay.  So in other words, Mr. Stacy's not calling you

19  directly, is he?

20  A.   No.  And I'd actually referred him to Russ Cochran.

21  Q.   Okay.  But you guys do, on June 4th, have a conversation

22  about the grow and its lack of registration, do you not?

23  A.   Yes.

24  Q.   Okay.  And what did Mr. Stacy say about the grow lacking a

25  registration?

1   A.   Well, at one point, the conversation transitioned to the

2   plants themselves and that it didn't need a registration

3   because the plants weren't mature and, therefore, didn't have

4   THC in it.

5   Q.   Okay.  Is that -- is that at least how you've been

6   instructed on the law as an OBN agent?

7   A.   No, sir, it's not.

8   Q.   Okay.  So what did you tell him about whether a grow

9   needed a registration to operate legally?

10  A.   I would have said, "You have to have an OMMA license and

11  an OBN registration."

12  Q.   Okay.  So, again, I want to make it clear:  June 4th,

13  2020, your testimony is you told Matt Stacy that every grow

14  needed both a license and a registration?

15  A.   We had a discussion on that, yes, sir.

16  Q.   Okay.  Now --

17  A.   And that's -- I'm sorry.  That's consistent with our other

18  registrants as well, the other more traditional type of

19  registrants.

20  Q.   What do you mean?

21  A.   Take a pharmacy or an ambulance service, they have to have

22  their licensing through the pharmacy board and the OBN

23  registration.  A doctor, to be able to administer, has to have

24  their medical license and their DEA and OBN registrations.

25  Q.   And so this operation that you're doing out at the grow in

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY          254

1  Stratford, June 4th, 2020, is it a criminal, civil,
2  administrative, or some other type of action?
3  A.    It's criminal.
4  Q.    Okay.  And were you taking actions there consistent with
5  criminal enforcement?
6  A.    Yes, sir, we were.
7  Q.    Such as?
8  A.    It was a criminal search warrant, and we seized and
9  eradicated the plants.  That's not a decision that's made
10 lightly.
11 Q.    Why not?
12 A.    There's a tremendous value attached to the marijuana
13 plants.
14 Q.    And is the concern that OBN could potentially face legal
15 consequences for that?
16 A.    Yes, sir.  As supervisor, my concerns are the safety of
17 the public, the safety of the agents and other law enforcement,
18 and then ensuring that -- doing everything I can to ensure that
19 we're doing the right thing.  And as the marijuana enforcement
20 teams' protocols have evolved, there is actually a stage that
21 we have on search warrants now to where the supervisor on scene
22 and the case agent confer after the site is secured to make
23 sure that they both believe that it is indeed appropriate to
24 eradicate.  You can't uncut plants.
25 Q.    So did OBN then begin identifying other grows that, like

1  the one in Stratford, lacked an OBN registration?

2  A.   We began identifying many more things that were

3  problematic with multiple registrations --

4  Q.   Such as?

5  A.   -- applications and grows.  Eventually, we became aware of

6  a straw ownership structure.  We became aware of false

7  ownership.  We became aware of address changes.  We've had to

8  look at things like -- some people were able to establish

9  addresses by calling and setting up a 911 address that's not

10  the true address.  They would get an additional address if one

11  location's denied.  We jokingly call that a shotgun approach.

12  You'll get three different applications, three different people

13  on one parcel.  So it's been a very evolving process to try to

14  understand.  We also became aware of people that were helping

15  provide straw owners and helping people that didn't qualify for

16  licenses and registrations to submit paperwork and get that.

17  Q.   Like Matt Stacy?

18  A.   One of them, yes.

19  Q.   Okay.  June of 2020, it's probably evident there are some

20  grows that aren't operating according to law.  And so after

21  that, what steps did you take to get OBN equipped to start

22  handling this problem?

23  A.   We didn't have the resources to deal with it.  It's very

24  resource-challenging.  We began looking at the registration

25  process, hiring more people.  We began looking at the

1  enforcement needs, hiring more people.  We eventually assigned

2  over two agents full-time to start doing marijuana.  And then

3  eventually, we transitioned to where I was no longer over

4  Diversion, and we'd established marijuana enforcement teams,

5  and that was what I was over.

6  Q.  So about when did the marijuana enforcement team get set

7  up or established?

8  A.  It's more of a process than a hard-and-fast date, but I

9  would say February to April-ish of '21, and started really

10  running.  We established another office in Ada and put that

11  agent in charge in place in July of '21.  And, then, keep in

12  mind too, we're having to find buildings.  We have to find a

13  building for Ada.  We have to hire people.  We do an extensive

14  background on people that we hire.  So that was -- those are

15  all different things.  You have to equip agents.  You have to

16  get the budget approved to bring agents onboard.  So there's

17  multiple -- multiple things were at play to try to basically

18  spin up operational capabilities.

19  Q.  Let's just call it what it is.  You ramped up to aid in

20  your operational abilities, did you not?

21  A.  Yes.

22  Q.  Now, Mr. Stacy characterizes that as an OBN shift in

23  policy; do you think that's fair?

24  A.  No.

25  Q.  Why not?

1  A.   Our resources were already maxed out, and we were doing

2  everything we could.  And in hindsight, could we have maybe

3  made some different moves to try to head some things off

4  sooner?  Maybe.  But you don't know what you don't know at the

5  time.

6       I have benefit of having helped listen to the -- or see

7  the results of two wiretap investigations.  I have benefit of

8  having seen and been debriefed on hundreds of marijuana

9  enforcement team operations at this point.  I have benefit of

10 having been able to see multiple search warrants that resulted

11 in phone downloads and the content of those conversations.  So

12 we have a far better understanding, at this point, of how many

13 of those criminal organizations worked than we did in 2020.

14 Q.   As you guys got ramped up to start eradicating these grows

15 in Oklahoma, can you talk a little bit about whether the

16 problems you were seeing were unique to what OBN had dealt with

17 in the past?

18 A.   They were absolutely unique.  And I actually called other

19 states, trying to figure out if there was a model.  If there

20 was a way to not reinvent the wheel, I'm all about it.  But,

21 unfortunately, nobody had seen anything on the scope and scale

22 that we were at.

23 Q.   And one of the -- when you say "the scale," that included

24 a lot of registration applications, did it not?

25 A.   Yes.  At one time, there were over -- right around 8,400

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY          258

1  OBN registrations for medical marijuana grows.  As a point of

2  reference, the last time I checked Arkansas, which is roughly

3  comparable to Oklahoma, it has eight medical marijuana grows.

4  Q.   And we have how many?

5  A.   At one point, over 8,400 -- or approximately 8,400 in

6  Oklahoma.  The OMMA number will be different than the OBN

7  number as well.  I think they were over 10,000.

8  Q.   Basically, has OBN determined that our state is a hotbed

9  of black-market marijuana activity?

10 A.   We've got a multitude of cases that would illustrate that.

11        MR. COFFEY:  Brandi, could we pull up Defendant's

12 Exhibit 59 and 73 side by side, please.

13 Q.   (BY MR. COFFEY) Okay.  Agent, this has been introduced

14 already.  Defendant's Exhibit 59 is an OBN report of an

15 inspection that OBN conducted July 1st of 2020 on Ping Two, a

16 grow in Luther, Oklahoma, okay?

17 A.   Okay.

18 Q.   Later on, it became -- well, will you take my word for it

19 or would you like me to flip through the report that this grow

20 was operating without a registration?

21 A.   I'll take your word for it.

22 Q.   Okay.  Post this inspection, OBN nonetheless issued a

23 registration for that same grow, even though they'd previously

24 been growing without marijuana (sic).  And I think Mr. Stacy's

25 argument is essentially, well, because they -- you all went and

1  granted a registration and it previously had not had one but

2  had grown marijuana, that you guys must have looked at this as

3  no big deal?

4  A.    That's incorrect.

5  Q.    Okay.  Why is that incorrect?

6  A.    The systems -- well, that's actually a workflow that we

7  always strive to make better, but those two systems don't talk.

8  You've got over 300 applications coming in a week.  We used

9  to -- and I actually, part of the things we did was we

10 facilitated meetings between registration -- and registration,

11 it's important to understand, is customer service

12 representative trained --

13 Q.    Let me stop you there.  Customer service -- are these

14 agents that are out there investigating?

15 A.    In the field investigating, yes, but the registration

16 personnel, absolutely not.  They are customer service

17 representatives that answer phone calls and help process

18 applications.

19 Q.    All right.  So the person in the registration division

20 that is looking at the Ping Two, LLC application registration,

21 are they going to go out in the field and start surveilling

22 Ping Two and seeing if it's a legit grow or not?

23 A.    No.

24 Q.    Okay.  So are those sides always talking?

25 A.    We facilitated much better communications, but it's not

1   surprising that that would have happened.

2   Q.   Okay.  So --

3   A.   Certainly not an endorsement of allowing criminal

4   activity.  It's just -- you can still have a registration and

5   commit criminal activities.  And we can issue registrations and

6   then just continue to go about and inspect and go, "Hey, they

7   don't meet requirements.  We shouldn't have issued that."

8   Q.   Are you aware of an instance where Richard Paulk, an OBN

9   agent, tells some growers at a grow that it's just an admin

10  thing, no big deal; it's fine?

11  A.   I don't know the specifics of that, but I'm aware of --

12  somewhat aware of what you're talking about.

13  Q.   Okay.  Let me be very frank.  Does -- where does OBN Agent

14  Richard Paulk rank in relation to you and the management

15  structure at OBN?

16  A.   Richard Paulk is a senior agent, which means he's not a

17  new hire agent.  He's gone through probationary period,

18  completed it, completed all training successfully and gone

19  through what we call an Agent II for at least two years and

20  then promoted to senior agent.  That's fully functional.

21  That's a journeyman agent, not a supervisor.  First supervisory

22  rank is going to be an -- was called an agent in charge, is now

23  called a captain.  And so Richard wouldn't -- is not a

24  supervisor.

25  Q.   Does Agent Paulk speak for OBN's official policy?

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY          261

1   A.   No.

2   Q.   Okay.  Would there be instances where you might tell

3   growers that it is just an admin violation in order to aid your

4   investigation?

5   A.   Yes.

6   Q.   Okay.  Why would you do that?

7   A.   Multitude of reasons.  It may be that we're -- search

8   warrant operations are very logistically heavy.  You have to

9   get help from other agencies to just secure it.  You have to

10  line up eradication protocols and equipment and those sorts of

11  things.  It may be done as a ruse to try to get a better look

12  at what you're going to be facing whenever you go to actually

13  secure the property.

14       It may be that while they were there on the administrative

15  inspection that they saw something that was criminal but

16  there's only two agents there at the time, so they don't want

17  to tip their hat that, "Hey, I've seen something criminal," and

18  just to back off and then come back at it later when it's

19  safer.  There's a multitude of reasons that could happen.  And

20  they could very well still take administrative action.  There's

21  an administrative process if they observe administrative

22  violations.  That's not mutually exclusive of criminal

23  investigation.

24  Q.   So at some point, do agents start investigating Mr. Stacy?

25  A.   At some point, yes.

1    Q.   Okay.  And why do they start investigating him?  What did

2    it appear he was doing?

3    A.   The name came up multiple times because the registration

4    personnel, again, who are not investigators, started noticing

5    same addresses showing up multiple times, which seems

6    suspicious to them.

7    Q.   Why would the same addresses be showing up?

8    A.   Well, the same -- it's -- necessarily shouldn't be.

9    Q.   The addresses of what?  I guess I'm just not following.

10   Addresses of what are showing up multiple times?

11   A.   Oh, I'm sorry.  The address on a registration application.

12   It would be like the business address with -- you have multiple

13   entities showing at the same location.

14   Q.   So was Mr. Stacy submitting false information on these

15   registrations about where they were operating?

16   A.   Yes.

17   Q.   Okay.  And so your registration division starts seeing

18   that, and then what do you do?

19   A.   Start looking at that and then -- start looking, and once

20   you start looking at one thing, you just keep peeling the onion

21   back and start looking at others.

22   Q.   And ultimately, what did OBN determine Mr. Stacy was

23   doing?

24   A.   There was several things.  The investigations appeared to

25   show that he was engaging with people to participate as what we

CRAIG WILLIAMS - DIRECT EXAMINATION BY MR. COFFEY                263

1  call a straw owner to meet registration requirements for the
2  State of Oklahoma.
3  Q.   So did anyone from OBN ever tell Mr. Stacy that his
4  business structure scheme was just an administrative problem?
5  A.   No.  Certainly not that I'm aware of.
6  Q.   Did anyone ever tell him that -- personally, ever tell him
7  personally that operating without a registration is just an
8  administrative problem?
9  A.   No.
10 Q.   And, to be clear, is there a state criminal statute that
11 requires a marijuana grow to have an OBN registration?
12 A.   Yes.
13 Q.   Did OBN ever intend to treat Matt Stacy's licensing scheme
14 as merely an administrative problem?
15 A.   No.
16 Q.   Okay.  And last question:  Has Matt Stacy made OBN's job
17 and your job a lot more difficult?
18 A.   Absolutely.
19 Q.   Could you elaborate on that?
20 A.   The volume of grows that were structured that way and
21 trying to unwind that damage that's been done has been an
22 incredible amount of work for our agents.
23 Q.   What kind of damage has been done?  I mean, what is so bad
24 about a farm?
25 A.   Well, if you're starting structured illegally, your

1    intent's probably not to participate in the legal market.  If

2    you don't have a legal license and registration, you can't even

3    sell into the legal market.  So once it starts outside -- if

4    you start growing marijuana without a license and registration,

5    that marijuana can't be brought into the legal marijuana

6    system, so it's going somewhere other than the legal system to

7    start with.  Then you've got the straw ownership, where we've

8    had to figure out who the straw owners were.  We have had some

9    of those grows -- multitude of those grows that have been

10    structured poorly -- illegally.

11         I'm going to say I've got experience working in human

12    trafficking.  I don't go out on all the search warrants, never

13    did go out on all of them, but I went on enough to see what was

14    going on and get a feel for it.  The substandard living

15    conditions, the forced criminality of some of the poor workers

16    that were there is very disturbing.

17         Then you've got, again, potential environmental damage

18    that we won't understand for some time.  You've got illegal

19    chemicals and pesticides coming in from overseas being utilized

20    on some of the grows in Oklahoma right now.  So there's just a

21    whole bunch of problems that go along with it.

22    Q.  And it's your testimony today that Matt Stacy contributed

23    to those problems?

24    A.    Yes, sir.

25              MR. COFFEY:  Pass the witness.

1      THE COURT:  Questions?

2      MR. GOLDSTEIN:  Yes.  Thank you.

3                    CROSS-EXAMINATION

4  BY MR. GOLDSTEIN:

5  Q.   Agent Williams, you just testified --

6      MR. GOLDSTEIN:  Can I get the volume, please.

7  Q.   (BY MR. GOLDSTEIN) -- that no one from your agency ever

8  told Mr. Stacy personally that it was just an admin thing to

9  grow without an OBN registration.  You just answered that

10 question a few movements ago.  Do you remember that?

11 A.   I do.  And I believe I followed it with, "to my knowledge,

12 no."

13      (Audio played.)

14 Q.   Recognize that voice?

15 A.   Sounds like Richard Paulk.

16 Q.   Yeah, it's Richard Paulk, right?  Do you know that at that

17 very moment, October 15, 2020, he is telling Mr. Stacy --

18      (Audio played.)

19      Activity before a license, an OBN registration.  That's an

20 admin thing, it's fine.  So you didn't know about that before

21 you testified?

22 A.   At best, that's incorrect information.  I didn't know

23 about that.

24 Q.   Well, did you ever go to Mr. Stacy, this huge contributor

25 to your problems, and tell him that Agent Paulk misinformed him

CRAIG WILLIAMS - CROSS-EXAMINATION BY MR. GOLDSTEIN          266

1   and that it's not just an admin thing?

2   A.   Mr. Stacy, to my knowledge, was in communication with our

3   general counsel who can speak for the legal stances of OBN.

4   Q.   We'll talk about that, and we already have.

5        My question is:  Did you go to Mr. Stacy and tell him the

6   advice he got, the direction he got from your agent, was

7   incorrect?

8   A.   I don't have the rest of the context of that conversation,

9   but I did not go talk to Mr. Stacy.

10  Q.   Do you know of anyone that went to Mr. Stacy, between

11  October 15 of 2020 and until his conversations with Russ, that

12  personally went to him and said, "Mr. Stacy, we apologize.

13  Agent Paulk gave you incorrect advice.  It's not just an admin

14  thing.  It's not fine to grow before OBN registration"?  Can

15  you name a single person who told him that on October,

16  November, December, January, February of that time period?

17  A.   I can't.  But that statement would be overriding state

18  statute which clearly states that you have to have an OBN

19  registration.

20  Q.   I'm not -- listen, I'd like you to answer my questions.

21  Okay?  You can -- you've answered Mr. Coffey's questions.  I'm

22  asking you a very direct, simple question.

23  A.   Yes, sir.

24  Q.   Okay.  I'm not asking you to editorialize and add things,

25  what he could have done.  Okay?

1    Do you know of a single person, a single agent, who ever

2  informed Mr. Stacy that Agent Paulk gave him incorrect advice?

3  A.    No.

4  Q.    Okay.  You just said Mr. Stacy contributed to all of these

5  problems, right?

6  A.    He's a piece of the puzzle, yes, sir.

7  Q.    Okay.  Isn't it fair to say that your agency is the

8  biggest contributor to this problem?

9  A.    Our agency didn't commit any frauds to try to get

10  registrations out.

11  Q.    Your agency went to King Happy Farms.  Mr. Coffey just

12  questioned you at length about King Happy Farms.

13          MR. GOLDSTEIN:  Could I just get the camera, please.

14  Q.    (BY MR. GOLDSTEIN) Your agency went to King Happy Farms.

15  You were there, I think you just testified, right?  This is the

16  facility that you saw all of this evidence of human

17  trafficking, right?  June 4th, 2020?

18  A.    Yes.  I'm trying to remember -- I didn't remember the name

19  of it, so I was looking at the address.

20  Q.    Okay.  Right?

21  A.    Yes, sir, I was down there on that operation.

22  Q.    You just testified you went to this facility in June, June

23  4th, 2020.  You saw all this evidence of human trafficking,

24  right?

25  A.    Uh-huh.

1  Q.   Had conversations with Mr. Stacy, right?

2  A.   Yes.

3  Q.   Multiple conversations, I think you testified to, right?

4  A.   Yes.

5  Q.   And he was telling you on the phone his view that they

6  were lawful because they had an OMMA license, correct?

7  A.   He said that he thought it was lawful because the plants

8  didn't have THC at one point as well, sir.

9  Q.   Okay.  And also because they had a license from OMMA,

10 right?

11 A.   The discussion would have always been that you have to

12 have an OBN registration.

13 Q.   That's your point of view, is what you told him, your

14 belief it had to have an OBN registration, right?

15 A.   That's State statute, yes, sir.

16 Q.   Right.  And that's what you were communicating to him,

17 right?

18 A.   Yes, sir.

19 Q.   And he was staking out a different position, right?

20 A.   There were several positions staked out.

21 Q.   Okay.  And you saw all of this horrific evidence of human

22 trafficking, right?

23 A.   I saw what I consider evidence of human trafficking, yes,

24 sir.

25 Q.   You just testified to it.  Mr. Coffey was, you know, upset

CRAIG WILLIAMS - CROSS-EXAMINATION BY MR. GOLDSTEIN          269

1  because you saw all this evidence of human trafficking, right?

2  A.   Yes, sir.

3  Q.   Okay.  And so you rewarded King Happy Farms with an OBN

4  registration a few weeks later?

5  A.   It appears they got a registration several weeks later,

6  yes, sir.

7  Q.   Can you explain that?

8  A.   The administrative process is run separately from the

9  criminal processes.

10  Q.   So you failed?

11  A.   It wouldn't have been our best moment, no.

12  Q.   Well, you found evidence of human trafficking, and OBN

13  gave them a registration.  Is that Mr. Stacy's fault?

14  A.   We didn't make a case on human trafficking.  I said we

15  found evidence of human trafficking, offered assistance to the

16  people that were there as victims of human trafficking.  In my

17  experience, the victims of labor trafficking rarely self-

18  identify, and it's very challenging to get them to seek help,

19  much less cooperate with prosecution.  So to that end, I'd like

20  to elaborate on the human trafficking side of it.

21      But there was a search warrant served there.  And then we

22  can and probably did -- I don't know the disposition on this --

23  run an administrative action on that registration.

24  Q.   Not criminal, right?

25  A.   Two separate processes.

CRAIG WILLIAMS - CROSS-EXAMINATION BY MR. GOLDSTEIN          270

1   Q.   Was there criminal prosecution of anyone from that place?

2   A.   I don't know.

3   Q.   Well, there wasn't.  Do you know that?

4   A.   I haven't followed up on that.

5   Q.   You saw evidence of human trafficking; you didn't follow

6   up on it?

7   A.   We have done hundreds of cases.  And so, no, I do not

8   supervise every case directly.

9   Q.   So you ignored the evidence of human trafficking?

10  A.   No.  I called our human trafficking specialist to the

11  scene, and we did talk about that, and they didn't have anybody

12  that would disclose or receive help, which is not unusual in

13  the labor trafficking environment at all.

14  Q.   It's -- you'd agree with me at least it's not Mr. Stacy's

15  fault that the people at OBN issued them a registration, right?

16  A.   Absolutely.

17  Q.   It's a failure of OBN, right?

18  A.   The registration doesn't mean that there wasn't criminal

19  activity occurring.

20  Q.   Should criminals get an OBN registration to control and

21  distribute marijuana?

22  A.   No.

23  Q.   Right.  So should they have got a registration, then, if

24  it was illegal?

25  A.   There's a due process that's required to revoke that

CRAIG WILLIAMS - CROSS-EXAMINATION BY MR. GOLDSTEIN          271

1   registration, unless it's surrendered.

2   Q.   You don't have to give the license, do you?  It's a

3   privilege, not a right.  Right?  In fact, OBN denied

4   applications all the time for lack of proper fencing, lack of

5   security, not self-locking doors.  Every day OBN denies

6   applications.

7   A.   Or work with applicants to try to get them to correct

8   those problems so they can get the application.

9   Q.   Right.  But OBN gave this human trafficking

10  organization -- apparently -- an OBN?

11  A.   Yes, sir.

12  Q.   Okay.  Ping Two; same thing, right?  You're there on July

13  1st, 2020?  Found evidence of marijuana, right?

14  A.   From the part of the report I can see, looks like it.

15  Q.   Okay.  So that's July 1st of 2020, right?  Right there;

16  see it?

17  A.   Uh-huh.

18  Q.   See that, July 1st, 2020?

19  A.   Yes, sir.

20  Q.   Okay.  And then once again, seven days later, OBN issues

21  them an OBN registration?

22  A.   Yes, sir.

23  Q.   Now, all of this sort of inside baseball stuff you just

24  went through with Mr. Coffey -- overwhelmed, diversion,

25  administrative, discretion.  You know, we were taxed.  We

1  didn't have food for lunch.  We couldn't go and do search

2  warrants.  We didn't have enough people.  Where was that

3  publicized on OBN's website, if I, Robert Goldstein, in the

4  fall of 2020 wanted to know OBN didn't have the capacity to

5  enforce the laws?  Was that publicized somewhere?

6  A.    Not that I know of.

7  Q.    Okay.  And so all of this sort of inside stuff -- inside,

8  you not having the resources and the heavy equipment to execute

9  search warrants, that wasn't publicized to Mr. Stacy, right?

10 A.    It would have been in some of the budget hearings of some

11 of the other matters that we were involved in, yes.

12 Q.    Not on your website?

13 A.    In conversations with the Health Department.

14 Q.    Do you know -- was it published -- was all this published

15 on your website, all these problems you were having?

16 A.    Not on the website, but you asked if it was communicated.

17 I'm saying it was communicated to the Health Department who

18 oversaw OMMA at that time.

19 Q.    Yeah.  You said that OBN has 8,400 registrations and

20 Arkansas has eight grows, right?

21 A.    That's the last I heard, yes.

22 Q.    Okay.  All right.  Do you think maybe that's because OBN

23 failed at the implementation of medical marijuana, that that's

24 why there was an influx here in Oklahoma?

25 A.    I think there was a perfect storm in Oklahoma that set up

1  an environment to where criminals could come in and thrive.

2  Q.   And that perfect environment was no enforcement by OBN?

3  A.   Cheap land, cheap licensing, cheap registrations.

4  Q.   And no enforcement by OBN?

5  A.   So you'll hear lax enforcement, yes.

6  Q.   Right.

7  A.   And it's become one of those things.  It's a constantly

8  evolving process.  We're much better now than we were then.

9  Q.   Right.  Look, I'm not being critical.  It's just that in

10 the beginning --

11 A.   Oh, it's just what it is.

12 Q.   -- you testified you were -- you did cursory checks.  You

13 didn't have the resources.  You were overtaxed.  There was a

14 learning curve.  You had no heavy equipment.  Challenges with

15 heat.  I mean, you weren't prepared for what happened?

16 A.   Absolutely not prepared for what happened.

17 Q.   Okay.  And because of that, because you were ill-prepared

18 for the moment -- not your fault, okay?  First of all, the

19 legislation was written a certain way, right?  No cap on

20 licenses, right?

21 A.   Yes.

22 Q.   Right.  So there was no limit to how many licenses OMMA

23 was issuing to applicants, right?

24 A.   Correct.

25 Q.   All right.  So anyone -- there was no cap -- could come

 1  in, get a hundred licenses if I wanted to, Robert Goldstein,
 2  right?
 3  A.   Yes.
 4  Q.   Okay.  And as you said, the licenses don't cost a lot --
 5  right? -- compared to other states?
 6  A.   Correct.
 7  Q.   All right.  And so -- and then you have an agency that
 8  doesn't have the resources to enforce the law in the way they
 9  want to, right?
10  A.   Correct.
11  Q.   All right.  And so you said, you know, "We couldn't
12  execute warrants every site without registrations," meaning,
13  there's just too many, right?
14  A.   Yes.
15  Q.   All right.  But you could when your agents went, for
16  instance, to Chow King on October 15, 2020.  Even if you didn't
17  have the resources to execute search warrants, you could just
18  tell them, "Hey, it's illegal to grow without a registration.
19  Stop it."  Right?
20  A.   Certainly could.
21  Q.   Right.  And then when Agent Peterson and his team went to
22  Earth Angel's in February of 2023 and saw plants everywhere,
23  you know, instead of telling Mr. Grable that he was good to go,
24  they could have said, "Hey, you can't have these plants here.
25  You don't have an OBN registration," right?

CRAIG WILLIAMS - CROSS-EXAMINATION BY MR. GOLDSTEIN          275

 1  A.   Yes.
 2  Q.   All right.  And it may take a lot of resources to marshal,
 3  to execute search warrants, and cut down plants, and all that,
 4  but your agents have law enforcement authority -- right? --
 5  power to arrest, right?
 6  A.   Yes.
 7  Q.   They can go into any place, see a crime with their eyes,
 8  and arrest someone -- probable cause -- to execute the arrest,
 9  right?
10  A.   Yes, sir.
11  Q.   Okay.  You testified -- Mr. Coffey showed you Defense
12  Exhibits 59 and 73, put them up side by side, and you said the
13  systems don't talk.  You're getting 300 applications a week,
14  registration's customer service, sides are not always talking
15  to each other, right?  Remember that testimony?
16  A.   Yes, sir.
17  Q.   All right.  That's not Mr. Stacy's fault, right?
18  A.   No.  And that's a snapshot in.  Time, we've improved those
19  processes.
20  Q.   Right.  But this time period that we're talking about,
21  let's say, June of 2020 until June of 2021 -- okay? -- still
22  going through a learning curve, right?
23  A.   We're on a learning curve still.
24  Q.   Right.  And still overtaxed during that period of time,
25  right?

1  A.   Yes, sir.

2  Q.   Yeah.  And perhaps the -- what -- you refer to them as

3  customer service people in the registrations, right?

4  A.   Yes, sir.

5  Q.   All right.  Let's talk about that for a second.

6  Application comes in to OBN, right?  And the first place it

7  goes to is those background service people, the customer

8  service people, as you call them; is that right?

9  A.   I'm trying to go to the correct snapshots in time.  But,

10  yes, they're going to handle it very quickly.

11  Q.   Okay.  And they do a review of the form, right?

12  A.   Should, yes.

13  Q.   All right.  And you'd agree with me, right?  Like, no

14  matter what the actual resources are that, in June through

15  December of 2020 and January through June of 2021 -- okay? --

16  it's OBN's responsibility, your charge, is to vet applicants,

17  right?

18  A.   Yes.

19  Q.   All right.  And so when it comes in to these customer

20  service people, they're the front lines to conduct the initial

21  screening of the applicant, right?

22  A.   That's a bit of a mischaracterization.  And if I --

23  Q.   Yeah, of course.

24  A.   So we've traditionally registered people since 1975, as

25  best I can tell.  I obviously wasn't working for OBN in '75.

1    But the registration system was never designed to detect fraud

2    on the front end.  I think that's the important thing to keep

3    in mind.  That system was designed -- like, we've had doctors

4    we've made cases on, criminal cases and administrative cases,

5    but we've never had a doctor that wasn't actually a doctor.

6         That system was never set up to detect fraud on the front

7    end, nor were those personnel trained to detect fraud on the

8    front end.  And that's part of this evolutionary process, and

9    that's why we've got new things in place -- supplemental

10   packet, face-to-face interviews with agents, all of these

11   things.  We've never dealt with people that wanted a

12   registration that were committing a fraud on the front end

13   before.

14   Q.   All right.  So back to my question.  The application comes

15   in, and it goes to the customer service people at registration,

16   right?  Their job is to review the application, right?

17   A.   Yes.

18   Q.   All right.  They're looking for certain things, whether or

19   not it comports, that they've answered the questions properly,

20   those kind of things, right?

21   A.   Uh-huh.

22   Q.   And in a perfect system, what happens is that those

23   registration people, they refer it to an agent, a law

24   enforcement officer, to conduct an inspection of the facility,

25   right?

1   A.   No.  They're referred to do a triple-eye background check

2   on the applicants.

3   Q.   Okay.  And then an agent goes out -- and this is happening

4   every day in September of 2020 and October of 2020 and November

5   of 2020, all the way to June, your agents -- Martinez, Paulk,

6   Chaffin, Peterson, they're all going out, and they're filing

7   all these reports.  "Drove by 44 Smith Street today, active

8   grow, recommend denial," right?

9   A.   At times, yes.

10  Q.   You've seen those reports, right?

11  A.   That's part of the workload they had, yes.

12  Q.   Right.  Meaning, their job.  Look, you are literally

13  giving out -- and let me call them "registrations."  But you're

14  giving a license to distribute controlled substances, right?

15  A.   Not to a grow.

16  Q.   What's that?

17  A.   A grow has to get -- has a license to manufacture.

18  Q.   You're giving out -- you're allowing people to handle

19  controlled substances, right?

20  A.   Correct.

21  Q.   All right.  And before you give someone that privilege --

22  not a right, right?  It's OBN's responsibility to investigate

23  the applicant, right?

24  A.   To a degree, yes.

25  Q.   Well, is it -- why isn't it to a full degree?  Meaning, if

1  someone wants to possess, manufacture, distribute a controlled
2  substance, don't you think there should be a full vetting of
3  that person?
4  A.   I think when somebody gets a driver's license, they're
5  required to follow the laws of the rules of the road.  That
6  doesn't mean that somebody has to ride with them all of the
7  time to do that.  There's spot-checks and things like that.
8  Maybe not a perfect reference, but one we've used before to try
9  to explain that point.  We can't check every one, but we can go
10  back and check anyone at any time.  We checked as much as we
11  could at the time or, if there was some reason to believe there
12  was something else going on, to try to dig deeper.
13       And the criminal cases --
14  Q.   And so handling marijuana, distributing marijuana, to you,
15  is the equivalent of a driver's license?
16  A.   No, sir.
17  Q.   Well, you just made the analogy.
18  A.   No, I made the analogy talking about inspecting
19  everything.  There is a requirement that goes with that license
20  to drive that you will follow the rules of the road.  There is
21  an expectation and a requirement that goes along with an OBN
22  registration that you will follow the state laws and the
23  administrative code that are associated to that registration.
24  Q.   Okay.  So it wouldn't have been best practice to go out
25  and interview applicants and inspect their facilities?  That

CRAIG WILLIAMS - CROSS-EXAMINATION BY MR. GOLDSTEIN          280

1   wouldn't be best practice?

2   A.   In a perfect world, absolutely, every one.

3   Q.   Okay.  All right.  And so sometimes your agents did go out

4   and inspect the facilities, right?

5   A.   Yes.

6   Q.   And very often, they found marijuana, right?

7   A.   They did occasionally, yes.

8   Q.   Right.  And they didn't arrest anyone, right?

9   A.   Yes.

10  Q.   I'm going to show you what's going to be marked as Defense

11  Exhibit A for ID.  Okay?

12       So King Happy Farms, starting on the left.  Okay.  That's

13  the one we've been talking about.  It's -- search warrant is

14  executed on June 4th of 2020.  Do you see that, sir?

15  A.   Yes, sir.

16  Q.   All right.  That's consistent with the documents that

17  we've just gone through, right?

18  A.   Yes.

19  Q.   And then an OBN registration was issued July 14th, right?

20  A.   We saw that, whatever the date was on that registration.

21  Q.   Yeah, yeah, yeah.  You saw that, right?  Okay.  And Ping

22  Two, you were involved in that as well, right?

23  A.   I don't know that I was personally involved in it.

24  Q.   No?  This is Ping Two.  That's you, right?  Or no?  Is

25  that you or not?

1  A.    No.  I'm not Justin Williams; I'm Craig Williams.

2  Q.    No.  Okay.  All right.  But they got their OBN as well,

3  right?

4  A.    Yeah, you showed the registration for that consistently.

5  Q.    Yeah.  All right.  So when the agents go out -- you

6  testified that sometimes you may tell them it's fine, even

7  though it might be some kind of undercover operation, right?

8  Remember that testimony on direct?

9  A.    Yes, sir.

10  Q.    All right.  And you said it might -- you know, it might be

11  part of some sophisticated investigation that you're

12  conducting, right?

13  A.    Sometimes I wouldn't say "sophisticated," but it may be

14  part of an investigation.

15  Q.    I mean, when you tell someone that it's fine to grow

16  marijuana, and they then grow the marijuana --

17  A.    They would be immediately followed up on.  It would be a

18  part of an ongoing right then.

19  Q.    No, I understand that.  But I guess what I'm lost at is

20  someone's growing marijuana without a registration.  Your agent

21  goes and tells them, "It's fine."  You can grow marijuana

22  without registration.  You know, how is that some -- part of

23  some undercover operation when you're telling the people it's

24  okay to grow?

25  A.    You can tell somebody that there's an administrative

1  violation.  I don't have the authority to tell somebody to

2  break state law or federal law.  The agents that I supervise

3  don't have the authority to tell somebody to break state law or

4  federal law.

5  Q.   But they did.  They did tell them that.  They told them it

6  was okay to grow.

7  A.   In the excerpt that you presented, I heard something that

8  sounded similar to that, yes.

9  Q.   And there are other examples that we've introduced into

10 evidence of the same exact thing.

11 A.   Again, I will go back to I'm familiar with what the law

12 says, and I'm familiar with other conversations with

13 Mr. Cochran and Mr. Stacy.

14         MR. GOLDSTEIN:  May I have a moment, Your Honor?

15         THE COURT:  Sure.

16         MR. GOLDSTEIN:  Nothing further, Your Honor.

17         THE COURT:  Anything further?

18         MR. COFFEY:  Just a few questions, Your Honor.

19                      REDIRECT EXAMINATION

20 BY MR. COFFEY:

21 Q.   Mr. Goldstein asked you about what these licenses cost.

22 Do you recall?

23 A.   At the time, an OMMA license cost $2,500.  And I say "at

24 the time"; when it first started, when 788 first passed.  And

25 an OBN registration was $500.

1   Q.    So about 3,000 total to get set up?

2   A.    Correct.

3   Q.    Okay.  So Mr. Goldstein also beat you up a little bit

4   about why you guys didn't execute more search warrants; is that

5   fair?

6   A.    That's fair.

7   Q.    Okay.  Let me -- why didn't you guys just like -- I don't

8   know -- call the National Guard and have them help you?

9   A.    Well, there's an interesting reason on that.  We have

10  utilized the National Guard on two occasions.

11  Q.    Okay.  Why not utilize them on every occasion?

12  A.    We used counterdrug analysts.  But in conversation with

13  our counterdrug counterparts, we found out that Mr. Stacy was a

14  lieutenant colonel in the National Guard, served at the Joint

15  Operation Center where any of those requests would have gone

16  through.  Had we requested National Guard air assets, had we

17  requested National Guard assets to help with eradications, it

18  would have gone through and provided a significant operational

19  security issue for us.

20  Q.    Basically, it was tough for you because your ultimate

21  target has a security clearance, doesn't he?

22  A.    Yes, sir.

23  Q.    You also were asked about whether some difficulties with

24  the budget and OBN were communicated to Mr. Stacy, and you said

25  something about the Health Department.  And Mr. Goldstein kind

CRAIG WILLIAMS - REDIRECT EXAMINATION BY MR. COFFEY        284

1  of cut you off, and I wanted to give you the opportunity.  Why
2  does it matter what the Health Department was doing at the time
3  with the budget and Mr. Stacy?
4  A.   Early on, there's an evolutionary process.  OMMA was
5  initially not a standalone state agency.  OMMA was placed under
6  the Health Department, under the direction of the Health
7  Department as a division of the Health Department.
8       I believe it was two to four days after the search warrant
9  at Stratford Mr. Stacy signed a contract to work for the Health
10 Department for the interim director.  I believe he's the
11 interim.  It may have been full-time.  Frye was the gentlemen's
12 name.  To do four things:  To help evaluate structure of the
13 Health Department, to help evaluate the personnel of the Health
14 Department, to implement the approved changes at the Health
15 Department and to -- and I'm not getting a direct quote, but
16 this is the gist of it.  The fourth component was to not
17 interfere with OMMA or to not have anything to do with OMMA.
18 Q.   What do you mean his contract was to not do anything with
19 OMMA?
20 A.   It's wording in it that he wasn't supposed to be
21 consulting on the OMMA.
22 Q.   Okay.  But he could go set up marijuana licenses, even
23 though he has this State contract?
24 A.   He's got a State contract with the Health Department, who
25 sets up and supervises the Oklahoma Medical Marijuana

1  Authority, yes, sir.

2  Q.   Okay.  So, you know, putting that to the side, Mr. Stacy

3  would have been aware -- would he not have? -- based on this

4  position with the Health Department about the problems OBN was

5  facing?

6          MR. GOLDSTEIN:  Well, I object.  He can't testify as

7  to what Mr. Stacy may have been aware to at some time unless he

8  had a conversation with him.

9          THE COURT:  Ask your next question.  That's

10  irrelevant, really.

11  Q.   (BY MR. COFFEY) Agent, would OBN and the Health Department

12  at least have been talking about the difficulties OBN was

13  facing?

14  A.   Absolutely.

15  Q.   All right.  Defendant's exhibit marked for identification,

16  that long chart that Mr. Goldstein just put up?

17  A.   Yes, sir.

18  Q.   Do you remember what the date was that it started on?

19  A.   I don't.

20          MR. GOLDSTEIN:  June 4th, 2020.

21          MR. COFFEY:  Okay.

22  Q.   (BY MR. COFFEY) All the dates after it postdated -- excuse

23  me.  All the dates after June 4th postdated your conversation

24  with Matt Stacy, right?

25  A.   Yes.

CRAIG WILLIAMS - REDIRECT EXAMINATION BY MR. COFFEY          286

1  Q.   The grow -- the call that you took with Mr. Stacy at the
2  Stratford grow, correct?
3  A.   Yes, sir.
4  Q.   In which you told him that it was criminal to grow without
5  a marijuana registration?
6  A.   Yes.
7  Q.   And apparently, Mr. Stacy talked to Mr. Paulk.  Do you
8  have any information about that?
9  A.   I don't know the specifics on that.
10 Q.   Do we have any idea whether Matt Stacy's actually
11 listening to that recording live?
12 A.   I do not.
13 Q.   Okay.  Well, here's my question:  Following that June 4th,
14 2020 call, when the chief agent in charge of OBN tells him that
15 it is criminal to grow without a registration, does he ever try
16 to reach back out to you and say, "Whoa, wait a minute.  I'm
17 hearing something from your agents on the field that this is
18 administrative."  Do you ever get contact by Mr. Stacy?
19 A.   I don't recall any direct contact with Mr. Stacy.
20 Q.   He never reached out, did he?
21 A.   No, I don't know the conversations that he had with Russ.
22 We referred most of our conversation to general counsel, Russ
23 Cochran.
24 Q.   But fair enough, if Mr. Cochran had just testified and
25 conversations like that had taken place, Mr. Stacy probably

1  would have asked him about that?

2  A.   Yes.  And I was present in one conversation -- I don't

3  remember the date -- where -- a meeting with Mr. Cochran and

4  Mr. Stacy.

5  Q.   Oh.  When was that meeting, roughly?

6  A.   I don't know the date on that meeting.  I think it was

7  around May of '21, but I'm not certain.

8  Q.   Did you find out recently that it was recorded?

9  A.   I did.

10 Q.   Was that a surprise to you?

11 A.   It was.

12 Q.   Did Mr. Stacy or Mr. Day ever ask for your consent before

13 they recorded that meeting?

14 A.   No.

15 Q.   Have you ever been recorded surreptitiously in a meeting

16 without your, you know, consent or knowledge?

17 A.   I'm sure I have, but that's the one that stands out most

18 right now.

19          MR. COFFEY:  Pass the witness.

20          THE COURT:  Further questions, Mr. Goldstein?

21          MR. GOLDSTEIN:  No, Your Honor.  Thank you.

22          THE COURT:  You may step down.  You're excused.

23          THE WITNESS:  Thank you, sir.

24          THE COURT:  Mr. Coffey, what's the status of your

25 defense?

1          MR. COFFEY:  We've got Jessica McGuire from OBN, who

2    is ready to go, Your Honor.

3          THE COURT:  And what is she going to -- who is this?

4    Jessica, what is she going to testify to?

5          MR. COFFEY:  She's a records custodian, Your Honor.

6    So given that there is an identified dispute about whether

7    there's false information on these registrations, we were going

8    to show them to her and have her walk through the registrations

9    and why they're false.  Unless, of course, Mr. Stacy wants to

10   concede they're false.

11         MR. GOLDSTEIN:  They're not false.

12         THE COURT:  How long will she be?

13         MR. COFFEY:  Forty-five minutes.

14         THE COURT:  Okay.  And, then, what's your other

15   witness?

16         MR. COFFEY:  Alicia Martinez.

17         THE COURT:  And what is her testimony?

18         MR. COFFEY:  She was present at the interview of the

19   Carrillos and had a phone conversation with Mr. Stacy that day

20   in which Mr. Stacy described his ownership structure.

21         THE COURT:  Okay.  All right.  Let's go ahead and

22   recess until nine o'clock in the morning.

23       Let me ask:  What is the status of the State case?

24   Mr. Goldstein, you can fill me in on that.

25         MR. GOLDSTEIN:  Yeah, so the case -- the State case

1    is scheduled for trial in September.  It's really following

2    along this case, Your Honor.  And so it was put on the trial

3    docket for September, right?  Yeah, September.

4            THE COURT:  Are you handling that case also?

5            MR. GOLDSTEIN:  I think I will be handling that case,

6    yes.

7            THE COURT:  All right.  Anything else?

8            MR. COFFEY:  No, Your Honor.

9            THE COURT:  All right.  Court will be in recess.

10       (COURT ADJOURNED FOR THE EVENING RECESS.  FOR FURTHER

11    PROCEEDINGS, SEE VOLUME II.)

12                    CERTIFICATE OF OFFICIAL REPORTER

13       I, Tracy Thompson, Federal Official Realtime Court

14    Reporter in and for the United States District Court for the

15    Western District of Oklahoma, do hereby certify that pursuant

16    to Section 753, Title 28, United States Code that the foregoing

17    is a true and correct transcript of the stenographically

18    reported proceedings held in the above-entitled matter and that

19    the transcript page format is in conformance with the

20    regulations of the Judicial Conference of the United States.

21

22                    Dated this 5th day of February 2025.

23                    /S/ Tracy Thompson

24                    -------------------------------
                       Tracy Thompson, RDR, CRR
25                    Federal Official Court Reporter