# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. CR-24-146-R |
| v. | ) | |
| | ) | |
| MATTHEW ALAN STACY, | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

## MATTHEW A. STACY'S PROPOSED FINDINGS
## OF FACT AND CONCLUSIONS OF LAW

**/s/ Robert M. Goldstein**
Robert M. Goldstein
*Admitted pro hac vice*
GOLDSTEIN LAW FIRM
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
Telephone: (617) 742-9015
Email: rmg@goldstein-lawfirm.com

*Attorney for Matthew A. Stacy*

**/s/ Josh Welch**
Josh Welch, OBA #17214
Joey Degiusti, OBA #33734
Allison B. Christian, OBA #34326
DEGIUSTI & WELCH PLLC
3721 N. Classen Blvd
Oklahoma City, OK 73118
Telephone: 405.778.3098
Email: josh@dwlegal.law
Email: joey@dwlegal.law

*Attorneys for Matthew A. Stacy*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................ 1

I.    June 2018: Oklahoma Citizens Legalize Medical Marijuana ..................... 4

II.    The Federal Appropriations Act And Rider ................................. 5

III.    The Two-Entity Corporate Structure: How It Worked ............................. 7

IV.    Mr. Stacy Openly Disclosed The Details Of His Legal Practice, Including During The Very First Inquiry By OBN ................................ 9

V.    Cochran Was Wrong: There Was No Statute, Rule Or Regulation That Prohibited Mr. Stacy's Practice ..................................... 15

VI.    Mr. Stacy Could Have Lawfully Persisted In Refusing To Comply With Cochran's Interpretation Of The Registration Process .................. 21

VII.    Mr. Stacy Immediately And Permanently Changed His Practice ........... 22

VIII.    From June 2020 To July 2021, OBN Consistently Treated Growth Before Registration As An Administrative, Not Criminal, Matter ................................................................ 32

IX.    Mr. Stacy Did Not Tell A Single Client It Was Legal To Grow Or Sell Marijuana Before OBN Registration. He Provided Legal Advice To Clients Regarding Potential Consequences Of Contemplated Action, Which Is Expressly Authorized By Law ............. 44

X.    OBN Formed A New "Understanding" And Altered Its Approach To Growth Before Registration, Without Any Public Notice Or Warning ................................................................. 52

XI.    Mr. Stacy Did Not File Any False Applications ........................................... 53

XII.    Mr. Stacy Had The Consent Of Local Residents ....................................... 67

XIII.    Mr. Stacy Did Not Instruct Any Client To Lie To Any Bank ................... 74

i

**XIV.   Mr. Stacy Never Intentionally Or Knowingly Rented His Property For The Purpose Of Unlawful Marijuana Activity** ............ 76

**XV.   OBN Is To Blame: OBN Was Ill-Prepared And Under-Resourced, And It Failed Miserably At Implementing The New Medical Marijuana Laws** ........................................................................... 79

**CONCLUSION** ............................................................................................ 85

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220 (N.D. Tex. 2019) ........................ 16

*Green Sol. Retail, Inc. v. United States*, 855 F.3d 1111 (10th Cir. 2017) ......................... 5

*Kropp Forge Co. v. Sec'y of Lab.*, 657 F.2d 119 (7th Cir. 1981) .................................... 16

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) ................. 6

*Office of Pers. Mgmt v. Richmond*, 496 U.S. 414 (1990) ............................................... 1, 5

*United States v. Bally*, No. 17-CR-20135, 2017 WL 5625896 (E.D. Mich. Nov. 22, 2017*)* ........................................................................................................................... 6

*United States v. Bilodeau*, 24 F.4th 705 (1st Cir. 2022) ................................................. 5, 6

*United States v. Blomquist*, 361 F. Supp. 3d 744 (W.D. Mich. 2019) .............................. 6

*United States v. Jackson*, 388 F. Supp. 3d 505 (E.D. Pa. 2019) .................................... 5, 7

*United States v. Kleinman*, 880 F.3d 1020 (9th Cir. 2017) ............................................... 7

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ............................................ 5, 6

*United States v. Nichols*, 184 F.3d 1169 (10th Cir. 1999) ............................................... 21

*United States v. Samp*, No. 16-CR-20263, 2017 WL 1164453 (E.D. Mich. Mar. 29, 2017) ..................................................................................................................... 6, 7

*United States v. Silkeutsabay*, 678 F. App'x 608 (9th Cir. 2017) (unpublished) .............. 6

*United States v. Sirois*, 119 F.4th 143 (1st Cir. 2024) .................................................. 6, 7

**State Cases**

*C.M. Keys Commission Co. v. Miller*, 59 Okl. 42, 157 P. 1029 (1916) ........................... 19

*Cahill v. Waugh*, 1986 OK CIV APP 4, 722 P.2d 721 ................................................... 19

*Ghoussoub v. Yammine*, 2022 OK 64, 518 P.3d 110 (Okla. 2022)................................... 17

*Gorton v. Doty*, 57 Idaho 792, 69 P.2d 136 (1937)..................................................... 19

*Hall v. Globe Life & Acc. Ins. Co.*, 1999 OK 89, 998 P.2d 603 (Okla. 1999)................. 17

*U.S. Bank, N.A. ex rel. Credit Suisse First Bos. Heat 2005-4 v. Alexander*, 2012
OK 43, 280 P.3d 936 (Okla. 2012) ...................................................................... 19

**Statutes and Rules**

U.S. Const. art. I, § 9, cl. 7........................................................................................ 5

Consolidated and Further Continuing Appropriations Act, 2015, Pub. L. 113-235,
Div. B, § 538, 128 Stat. 2130, 2217 (Dec. 16, 2014) ........................................... 5

18 O.S. § 2001(14)................................................................................................... 56

18 O.S. § 2001(15)................................................................................................... 56

18 O.S. § 2001(16)................................................................................................... 57

18 O.S. § 2001(17)................................................................................................... 57

63 O.S. § 2-101(2)................................................................................................... 18

63 O.S. § 2-101(40)................................................................................................. 17

63 O.S. § 2-101(46)................................................................................................. 15

63 O.S. § 2-302 .............................................................................................. *passim*

63 O.S. § 2-302(A)................................................................................................... 17

63 O.S. § 2-302(H)................................................................................................... 17

63 O.S. § 2-302(H)(1).............................................................................................. 17

63 O.S. § 2-302(H)(3).............................................................................................. 11

63 O.S. § 2-408 ....................................................................................................... 33

63 O.S. § 2-509B..................................................................................................... 33

63 O.S. §§ 420 – 426 .......................................................................................... 4

63 O.S. § 420(C) (effective Aug. 4, 2018).......................................................... 4

63 O.S. § 422(A) ............................................................................................... 79

63 O.S. § 422(B) (effective Aug. 4, 2018)................................................... 15, 79

63 O.S. § 422(B) (effective Nov. 1, 2021)......................................................... 16

63 O.S. § 422(D) ............................................................................................... 16

63 O.S. §§ 427.1 – 427.23 .................................................................................. 4

63 O.S. § 427.14(E)(12) ............................................................................... 16, 44

63 O.S. § 427.2(46) ........................................................................................... 56

63 O.S. § 427.3.................................................................................................... 4

63 O.S. § 427.3(A) (effective Aug. 30, 2019)..................................................... 4

OAC 475:1-1-2 (Emergency action, effective Aug. 10, 2023). ....................... 18

Rule 1.2 of the Oklahoma Rules of Professional Conduct........................... 21, 45

Rule 1.2(d), Oklahoma Rules of Professional Conduct ............................... 21, 45

Rule 1.2, Oklahoma Rules of Professional Conduct, Comment 9 ...............45, 50

Rule 1.2, Oklahoma Rules of Professional Conduct, Comment 12 ............21, 22

## Other Authorities

State Question 788, Initiative Petition 412.......................................................... 4

HB 2612 (2019) ................................................................................................... 4

SB 1543, § 8 (2022) ............................................................................................ 4

Black's Law Dictionary 9th ed. 2009 ............................................................... 19

# INTRODUCTION

This case raises a profoundly important constitutional issue. Mr. Stacy, a duly licensed attorney, has been charged with federal marijuana offenses based solely and exclusively upon his role as an attorney. Mr. Stacy did not own or operate any marijuana facilities, have any interest in any marijuana facility, or personally participate in any marijuana business or activity. He stands charged with federal offenses solely because of his practice as an attorney, in the confines of a state statutory system that expressly legalized medical marijuana, but at the mercy of a state regulatory apparatus that failed miserably at implementing newly enacted medical marijuana laws.

Congress has clearly expressed its intent here. A rider to the Federal Appropriations Act prohibits the government from expending any funds on a federal marijuana prosecution against a citizen, like Mr. Stacy, who has complied with governing state law. The Court has a constitutional duty to ensure the government does not spend funds in a manner prohibited by Congress. The Appropriations Clause was enacted to "assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Office of Pers. Mgmt v. Richmond*, 496 U.S. 414, 428 (1990).

As set forth herein, the evidence presented to the Court demonstrated that Mr. Stacy at all times complied with state law. He did not file any false applications, he never knowingly or intentionally leased his property for the purpose of tenants engaging in unlawful marijuana activity, he never instructed any clients to lie to a bank, and the local residents at all times consented to participating in the marijuana business ventures.

1

He likewise never instructed any client that growing or selling marijuana before OBN registration was lawful, but instead always provided his honest legal opinion regarding likely consequences of contemplated conduct, which was expressly authorized by the Oklahoma Rules of Professional Conduct and deeply grounded in precisely how OBN treated growth before registration at the relevant time. Finally, when he received notice on June 30, 2021, that OBN had officially rejected his approach to the registration process, Mr. Stacy immediately changed his practice, in a responsible and professional manner, notwithstanding the fact that the Oklahoma Rules of Professional Conduct expressly authorized him to engage in continued disobedience of Cochran's interpretation of the relevant statutes.

As such, for all of the reasons set forth herein, the defense respectfully submits the Court must enjoin the instant prosecution. Mr. Stacy at all times reasonably believed his conduct complied with state law governing medical marijuana, and/or at all times he acted in substantial and/or strict compliance with the medical marijuana statutory framework.

2

## PROPOSED FINDINGS OF FACT
## <u>AND CONCLUSIONS OF LAW</u>

Now comes the Defendant, Matthew Stacy, by and through undersigned counsel, pursuant to the Court's Order of January 29, 2025, and hereby respectfully submits the following proposed findings of fact and conclusions of law.

In support hereof, Mr. Stacy relies upon the evidence admitted (documentary and testimonial) during the hearings convened on January 28 and 29, 2025, the pleadings (and exhibits thereto) filed in support of Mr. Stacy's Motion to Enjoin (*see* Documents 67, 99, 133, 150 and 151), as well as the following three additional exhibits offered for the Court's consideration: (1) email and letter sent by Russ Cochran on May 20, 2021, explaining Cochran's position on the legal structure employed by the Stacy Legal Group, inadvertently omitted from Mr. Stacy's exhibits (offered here as Exhibit 156), (2) audio recording of OBN Agent Peterson explaining the July 2021 policy shift at OBN, which was the subject of testimony during the hearing (offered here as Exhibit 157), and (3) internal Stacy Legal Group records evidencing the filing date of an OBN application that was the subject of testimony during the hearing (offered here as Exhibit 158).[1]

---

[1] Defense exhibits are identified herein as "Exhibit __," and government exhibits are identified as "Govt. Exhibit__."

I.      **June 2018: Oklahoma Citizens Legalize Medical Marijuana.**

1.      On June 26, 2018, Oklahoma citizens approved State Question 788 (SQ 788), Initiative Petition 412, and thus legalized medical marijuana in Oklahoma.[2]  Tr. at 8.

2.      SQ 788 became effective one month following the certification of its passage and was codified at 63 O.S. §§ 420 – 426.

3.      According to § 420(C) (effective Aug. 4, 2018), "[a] regulatory office shall be established under the Oklahoma State Department of Health which will receive applications for medical license recipients, dispensaries, growers, and packagers within sixty (60) days of the passage of this initiative."

4.      In 2019, the Oklahoma Legislature passed HB 2612, which created a new body of law, the Oklahoma Medical Marijuana and Patient Protection Act (OMMPPA), codified and amended at 63 O.S. §§ 427.1 – 427.23.

5.      With the enactment of HB 2612 in 2019, the Oklahoma Medical Marijuana Authority ("OMMA") was created as a division within the Oklahoma State Department of Health (OSDH).  *See* 63 O.S. § 427.3(A) (effective Aug. 30, 2019); Tr. at 8.

6.      With the approval of SB 1543, § 8 (2022), amending OMMPPA at 63 O.S. § 427.3, OMMA became an independent, stand-alone agency as the state's medical marijuana regulatory body, effective November 1, 2022.

_____

[2] https://www.sos.ok.gov/documents/questions/788.pdf.  Currently, the medical use of cannabis has been legalized in 40 states and the District of Columbia.

4

II.     **The Federal Appropriations Act And Rider.**

7.     The operative rider to the Federal Appropriations Act prohibits the

Department of Justice ("DOJ") from expending funds made available by the Act to

"prevent [Oklahoma] from implementing [its] own laws that authorize the use,

distribution, possession, or cultivation of medical marijuana."  Consolidated and Further

Continuing Appropriations Act, 2015, Pub. L. 113-235, Div. B, § 538, 128 Stat. 2130,

2217 (Dec. 16, 2014).

8.     The Court has a constitutional duty to ensure the government does not

spend funds in a manner prohibited by Congress.

9.     U.S. Const. art. I, § 9, cl. 7 provides: "No Money shall be drawn from the

Treasury, but in Consequence of Appropriations made by Law."

10.     As the Supreme Court has observed, the Appropriations Clause was

enacted to "assure that public funds will be spent according to the letter of the difficult

judgments reached by Congress as to the common good and not according to the

individual favor of Government agents."  *Office of Pers. Mgmt v. Richmond*, 496 U.S.

414, 428 (1990).

11.     As set forth in detail in Mr. Stacy's prior pleadings, incorporated and relied

upon herein, the appropriations rider prohibits the DOJ from prosecuting Mr. Stacy under

the federal Controlled Substances Act for actions taken in compliance with Oklahoma

medical marijuana laws.  *See Green Sol. Retail, Inc. v. United States*, 855 F.3d 1111,

1114 (10th Cir. 2017); *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016); *United

States v. Bilodeau*, 24 F.4th 705, 713 (1st Cir. 2022); *United States v. Jackson*, 388 F.

5

Supp. 3d 505, 512 (E.D. Pa. 2019); *United States v. Blomquist*, 361 F. Supp. 3d 744, 747

(W.D. Mich. 2019); *United States v. Bally*, No. 17-CR-20135, 2017 WL 5625896, at *5

(E.D. Mich. Nov. 22, 2017); *United States v. Samp*, No. 16-CR-20263, 2017 WL

1164453, at *2 (E.D. Mich. Mar. 29, 2017).

12.    For more than eight years after the Ninth Circuit decided *United States v.

McIntosh*, 833 F.3d 1163 (9th Cir. 2016), Congress has employed the same language in

the rider. "Congress is presumed to be aware of an administrative or judicial

interpretation of a statute and to adopt that interpretation when it re-enacts a statute

without change." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353,

382, n.66 (1982).

13.    The defense respectfully submits the Court must enjoin the expenditure of

any funds on the instant prosecution if it concludes Mr. Stacy reasonably believed his

conduct complied with state law governing medical marijuana. *See Bilodeau*, 24 F.4th at

713 (referring to "reasonable effort"); *United States v. Silkeutsabay*, 678 F. App'x 608,

610 (9th Cir. 2017) (unpublished) (holding that evidentiary hearing was required where

"reasonable reading" of state caselaw may have supported defense argument).

14.    The alternative "strict compliance" standard adopted by the Ninth Circuit is

unsupported by the language of the appropriations rider and insufficiently protective of

citizens given the significant "potential for technical noncompliance." *Bilodeau*, 24 F.4th

at 713.

15.    The First Circuit recently applied a "substantial compliance" standard in

considering a motion to enjoin under the appropriations rider. *United States v. Sirois*,

119 F.4th 143, 152 (1st Cir. 2024).  The court was not called upon to decide the appropriate standard in that case because the parties agreed on the standard, and the decision therefore does not weigh against application of the reasonableness standard advanced here by Mr. Stacy.

16.    Nonetheless, even should the Court apply a "strict compliance" or "substantial compliance" standard here, the evidence admitted in this matter necessitates enjoinment of this prosecution.

17.    Finally, whether or not any part of the government prosecution can proceed, the rider prohibits spending even a dime of congressionally appropriated funds for state-compliant conduct.  The government is not permitted to "bootstrap" expenditure of funds for state-compliant conduct to any conduct the Court arguably concludes was not compliant with state law.  *See United States v. Kleinman*, 880 F.3d 1020, 1028 (9th Cir. 2017); *Jackson*, 388 F. Supp. 3d at 515; *Samp*, 2017 WL 1164453, at *1.

**III.    The Two-Entity Corporate Structure: How It Worked.**

18.    Mr. Stacy represented individuals and corporate entities seeking to lawfully participate in Oklahoma's medical marijuana industry.

19.    Prior to July 1, 2021, Mr. Stacy and his law firm, the Stacy Legal Group, employed a two-entity corporate structure for clients seeking a state license to participate in the medical marijuana industry.

20.    First, the Stacy Legal Group created a limited liability company ("license holding company") for the purpose of applying for a license with OMMA and, later,

registration with the Oklahoma Bureau of Narcotics and Dangerous Drugs Control ("OBN").

21.     The members of that license holding entity often included an Oklahoma resident ("local resident") and one or more out-of-state residents.

22.     The corporate documents specified that the local resident was the 75% owner of the license holding entity.  The out-of-state resident or residents would fulfill the remaining 25% ownership interest.

23.     Second, the Stacy Legal Group created a different limited liability company ("operating company") to manage the grow operation.

24.     The local resident would not be a member of the operating company.

25.     Third, the Stacy Legal Group drafted a management agreement, which set out the rights, duties and obligations of each corporate entity.  The management agreement specified, *inter alia*, that the operating company (a) received a management fee of 100% of sales revenue and (b) paid a set figure to the license holding company over the two year term of the management agreement.  *See* Exhibit 53 (Management Agreement at Exhibit A).

26.     Typically, the local resident would be compensated on a per annum basis for the value of his or her contribution to the license holding entity, *i.e.*, serving as the local resident.  These funds came from the corporate entities, not Mr. Stacy.

IV.    **Mr. Stacy Openly Disclosed The Details of His Legal Practice, Including During The Very First Inquiry By OBN.**

A.  <u>March 1, 2021: Agents Visit The Carrillos and Mr. Stacy Readily Explains His Practice</u>.

27.    On March 1, 2021, numerous agents from OBN visited Helen Carrillo at her house.  Her husband, Rafael, was present at that time. Tr. at 170; Govt. Exhibit 20.

28.    Rafael Carrillo eventually put Mr. Stacy on speakerphone.  Tr. at 400; Govt. Exhibit 20.

29.    Mr. Stacy explained his legal practice to the OBN agents, including Agent Martinez, at that time.  Tr. at 401-02; Govt. Exhibit 20.

30.    Amongst other things, Mr. Stacy explained the two-entity corporate structure, the use of a management company, the fact that the local resident (Helen Carrillo) did not participate in the marijuana grows, the local resident did not receive any distribution of profits, and Helen Carrillo was paid $5,000 for serving as the local resident.  Tr. at 401-02; Govt. Exhibit 20.

31.    Agent Martinez asked Mr. Stacy if he would explain his legal practice to OBN's General Counsel Russell Cochran and/or share his agreements with Cochran.  Tr. 402-03; Govt. Exhibit 20.

32.    Mr. Stacy readily agreed to do so, and further explained he had already been in touch with Cochran.  Tr. at 403; Govt. Exhibit 20.

33.    Mr. Stacy also informed Agent Martinez that he had previously shared the details of his practice, including the two-entity corporate agreements, with OMMA, and that OMMA had vetted and approved them.  Tr. 403; Govt. Exhibit 20.

9

B.  <u>May 2021: Mr. Stacy Engages In A Series Of Meetings And Emails With Cochran.</u>

34.    On May 11, 2021, Mr. Stacy met with Cochran to discuss the particulars of his legal practice, including the business structure he utilized as part of the application process.  Tr. 207-08.

35.    On that same date, Mr. Stacy sent a follow-up email to Cochran setting out his position that the corporate structure he utilized in his law practice was appropriate and lawful.  Tr. 218; Exhibit 53.  Mr. Stacy attached to his email "the standard management agreement" he used in his legal practice.  Exhibit 53; Tr. at 219.  In the email, Mr. Stacy explained, *inter alia*, the following, using Helen Carrillo "as the representative local resident":

- Two companies are formed: (1) a "license company" that is usually 75% Helen Carrillo and 25% one or more owners of the operating company, and (2) an operating company ("manager") that is 100% owned by the management team.

- These two companies enter into a management agreement, an example of which was attached to the email, pursuant to which the license company hires the operating company to manage all operations.

- "This is akin to any type of standard management agreement common in non-cannabis businesses," for example a standard brand name restaurant where patrons often see the words "Operated by XYZ management LLC." "The rights to operate flagship brand are often 'owned' by an investor and they hire a management company to 'operate' in exchange for some type of return."

- The management agreement "goes even further to comport with proper disclosure in that we do not allow Helen Carrillo to receive a [percentage] of the operations of the manager. Her compensation is a set amount i.e. $5,000 or $15,000 in the example document. It is a true bonafide exchange of value for services or rights."

10

- Mr. Stacy proceeded to set out the definition of "owner" and some other relevant legal terms.

- Mr. Stacy concluded that a "valid question" existed as to whether the manager should register with OBN, and noted that he believed the manager fell within the exception of 63 O.S. §2-302(H)(3).

- Mr. Stacy also raised the prospect of amending OBN rules.

36.     In another follow-up email on the same day, May 11, 2021, Mr. Stacy wrote the following to Cochran:

> I should probably clarify in light of our earlier conversation that a strawman has no definition in Oklahoma law that I can find however the term generally requires fraud or an intent to deceive.  That isn't the case here. We have actual contractual agreements between the parties and the Manager is often represented as a 25% holder on the license. They just have a contractual arrangement to allocate responsibilities and revenue in a different way through the management agreement. Additionally, ownership of the marijuana always remains with the License company. Hope that is persuasive.

Exhibit 66.

37.     Cochran reviewed the management agreement and made some cursory notes in the margins of the agreement.  Exhibit 53.

38.     On May 20, 2021, Cochran emailed Mr. Stacy a letter setting out his initial response.  *See* Exhibit 156 attached hereto.  Cochran wrote that it was his "opinion that the business structure you propose does not provide for the minimum level of control or oversight that an OBN registration requires."  *Id*.  Cochran asserted that the operating company in Mr. Stacy's corporate structure needed to maintain an OBN registration, and he did not agree that the operating company fit within the exception set out in 2-302(H)(3) (the "common carrier" exception).  *Id*.

11

39.     Mr. Stacy and Cochran had a second meeting on May 21, 2021.

40.     On May 26, 2021, Cochran emailed Mr. Stacy a letter dated May 25, 2021.

The letter provided:

>    This letter is a follow up to my letter of May 20, 2021, and our
>    meetings on May 11th and May 21st.  Based on OBN's position that I
>    explained in my original letter to you, you proposed an alternative
>    for me to consider. In that proposal, you suggested that the 25%
>    owner of the OMMA 'license holding company' (or licensee) could
>    go forward with the OBN registration application, either alone or
>    with the other members of the 'operating company' (or operator)
>    splitting the 25% ownership of the license holding company.
>    Regrettably, I cannot agree to your proposal.
>
>    In your business structure, an LLC holds the OMMA license. OBN's
>    position is that all owners of the licensee will be included in the
>    OBN registration. I cannot allow the 25% owner(s) of the licensee to
>    become the registrant without the 75% owner. Furthermore, I
>    maintain that OBN cannot knowingly register a licensee to
>    manufacture or dispense marijuana when that company is not
>    engaged in, and has no control over the operations that produce or
>    dispense the controlled drug. I also maintain that the operator should
>    have an OBN registration, and will have to have one to conduct their
>    business in Oklahoma.
>
>    Your clients have the right to appeal their registration denial to an
>    administrative hearing. I can discuss the logistics of that with you.

Exhibit 101.

41.     On May 27, 2021, Mr. Stacy emailed Cochran advising that he had

discussed with OBN's Director, Donald Anderson, "the importance of having a joint

meeting early next week regarding this matter before it enters the administrative hearing

process."  Exhibit 87.  Mr. Stacy further requested "that any denial decision and

communication to the registrants [be] delayed until after that meeting as our ability to

have informal meetings with full candor is challenged under the administrative process."

Exhibit 87.  Finally, Mr. Stacy advised that he believed the parties "still have a path" to

"clean[] up" the ownership disclosure issue that would "avoid unnecessary litigation and

an excessive administrative burden on the bureau."  Exhibit 87.

      C.  <u>The June 3, 2021 Meeting: Mr. Stacy And His Civil Counsel Meet With Cochran And Other OBN Stakeholders</u>.

42.     A penultimate meeting was held on June 3, 2021, and it was recorded by

Mr. Stacy.  Exhibit 112.

43.     The defense respectfully urges the Court to listen to this recording.[3]

44.     It documents, in detail, Mr. Stacy's good faith and honest disagreement

with how OBN was interpreting the registration process and relevant statutes, as well as

OBN's consideration of the matter.  Exhibit 112.

45.     The following persons attended the meeting: Mr. Stacy, Seth Day (Mr.

Stacy's civil litigation attorney), OBN Chief Agent Craig Williams, OBN Public

Information Officer Mark Woodward, OBN Deputy Director Mel Woodrow, and

Cochran.  Exhibit 112; Tr. 208.

46.     Mr. Stacy explained at length the two-entity corporate structure, maintained

that it complied with all applicable statutes, insisted that it qualified for registration by

OBN, repeatedly offered various potential solutions to resolve any OBN concerns, and

answered any questions asked of him.  Exhibit 112; Tr. 217.

---

[3] If it would assist the Court the defense will finalize and provide a transcript of this meeting to the Court.

47.     It bears noting here that, as McGuire testified, Mr. Stacy was not the only professional insisting that OBN did not properly understand the legal landscape.  Tr. at 340.  When asked why OBN amended their applications and added new affirmations in 2022 and 2023, McGuire testified:

> Because we *consistently* had attorneys trying to find loopholes and trying to argue that we did not understand our own laws and everything and that they were allowed to provide false information, they were allowed to have these third-party unregistered individuals. So we had to make it very clear and in black and white in writing that this is not allowed and they affirm that they are not one of these kind of loopholes that people were trying to create.

Tr. at 340 (emphasis added).

48.     During the June 3rd meeting, the parties also discussed the possibility of agreeing to a process whereby a declaratory judgment action would be instituted so the parties could obtain a judicial ruling construing the relevant statutes.  Exhibit 112; Tr. 217.  Cochran said he anticipated that is where the parties might ultimately land, that a foundational record might first need be established (and perhaps some testimony), and he would think further about that issue.  Exhibit 112.

49.     On June 30, 2021, Cochran sent an email with a letter attached, in which OBN denied a list of applications.  Exhibit 105.  The cover email stated: "Please find the attached letter with the businesses that we have officially denied."  Exhibit 105.  It went on to advise that, "[a]s we have discussed already, they are being denied because of the business structure."  Exhibit 105.

50.     While the government elicited testimony from Cochran that Mr. Stacy erroneously described Cochran's June 30, 2021, communication as the "official" denial,

14

*see* Tr. at 211-12, that is the exact language Cochran used in his email to Mr. Stacy on June 30, 2021, and is fully consistent with the parties discussion of that issue on June 3rd. Exhibits 105, 112 (audio recording); *see also* Tr. at 331-32.

V.     **Cochran Was Wrong: There Was No Statute, Rule Or Regulation That Prohibited Mr. Stacy's Practice.**

51.     Mr. Stacy's legal practice of utilizing a license holding company and an operating company clearly fit within the statutory scheme as it existed during the relevant time period (2018 to July 2021).

52.     No Oklahoma statute, rule or regulation prohibited the ownership structure utilized by Mr. Stacy's legal group.

53.     There was no statutory definition of "straw person" until May 15, 2024.  63 O.S. §2-101(46); *see also* Tr. at 313 (McGuire conceding there was no legislative definition of "straw owner" from 2018 to 2022).

A.     The Oklahoma Medical Marijuana Patient Protection Act.

54.     At all relevant times, the Department of Health was required by statute to "approve all applications" of "applying entities" that showed "all members, managers, and board members [we]re Oklahoma residents[,]" or that the "percentage ownership" of any non-Oklahoma resident(s) was 25% or less, in addition to satisfying other criteria not relevant here.  63 O.S. §422(B) (Aug. 4, 2018).

55.     The OMMPPA did not condition the growing or even selling of marijuana upon an OBN registration being obtained.

56.     Instead, the statute required that applicants "submit" a registration with OBN, 63 O.S. §427.14(E)(12), and it provided that any "licensed grower" could grow an unlimited amount of marijuana, 63 O.S. §422(D).

57.     It was not until after the events at issue in this case that the legislature amended the OMMPPA to require disclosure of "all ownership interests ***in the commercial grower operation***," a requirement that did not exist during the relevant time period.  63 O.S. §422(B) (as amended, effective Nov. 1, 2021) (emphasis added).

58.     This subsequent amendment undercuts the argument, essential to the government's prosecution of this case, that any such disclosure was impliedly required by the pre-existing version of the statute.  *See Kropp Forge Co. v. Sec'y of Lab.*, 657 F.2d 119, 123 (7th Cir. 1981) (noting that subsequent amendment to explicitly include requirements relied upon by agency constituted an "acknowledg[ement] that these elements were not previously included in the standard"); *Exxon Mobil Corp. v. Mnuchin*, 430 F. Supp. 3d 220, 233 (N.D. Tex. 2019) (citing precedent for considering "agency's decision to later clarify the language at issue to be at least some support that the language lacked clarity at the time of an alleged violation" (citation omitted)).

B.     63 O.S. §2-302.

59.     The government relies upon 63 O.S. §2-302 as the statute that prohibited Mr. Stacy's practice.

60.     First, this older, more general statutory provision did not override the clear language of the newly enacted OMMPPA.

61.    Oklahoma law expressly permitted Mr. Stacy to rely upon the more specific

and recent enactment set forth in the OMMPPA.  *See, e.g.*, *Hall v. Globe Life & Acc. Ins.*

*Co.*, 1999 OK 89, ¶ 5, 998 P.2d 603, 605 (Okla. 1999) ("Where a matter is addressed by

two statutes—one specific and the other general—the specific statute, which clearly

includes the matter in controversy and prescribes a different rule, governs over the

general statute") (citation omitted); *Ghoussoub v. Yammine*, 2022 OK 64, ¶ 25, 518 P.3d

110, 116 n.14 (Okla. 2022) ("More recently enacted legislation controls over earlier

provisions") (citation omitted).

62.    Second, 63 O.S. §2-302 expressly permitted, not prohibited, the practice

employed by Mr. Stacy.

63.    63 O.S. §2-302(A) provides that "[e]very person who manufactures,

distributes, [or] dispenses . . . any controlled dangerous substance . . . shall obtain a

registration issued by the Director of the Oklahoma State Bureau of Narcotics and

Dangerous Drugs Control…."

64.    Exceptions to this general registration requirement are set forth in 63 O.S.

§2-302(H), which expressly provides that certain persons "shall not be required to

register" with the Director of the OBN.

65.    One such "person" that is <u>not</u> required to register with OBN is "[a]n agent,

or an employee thereof, of any registered manufacturer, distributor [or] dispenser. . . if

such agent is acting in the usual course of such agent's or employee's business or

employment[.]"  63 O.S. §2-302(H)(1).

66.    The definition of "person" includes a corporation.  63 O.S. §2-101(40).

17

67.     "Agent" was defined by statute as, *inter alia*, "an authorized person who acts on behalf of" a registrant, "but does not include a common or contract carrier, public warehouser or employee thereof, or a person required to register under the Uniform Controlled Dangerous Substances Act …."  63 O.S. §2-101(2).

68.     The management agreements utilized by Mr. Stacy in his legal practice created a structure whereby the operating company was "an authorized person" who acted "on behalf of" the registered manufacturer, distributor or dispenser (*i.e.*, the license holding company).  Exhibit 53.

69.     The management agreement specifies, *inter alia*, that the licensing company "agrees Manager is acting as a management services company and therefore grants Manager the right to sell Marijuana and Marijuana Product ***on behalf of*** Company to the extent the transaction is conducted lawfully and dutifully recorded in accordance with Oklahoma law."  Exhibit 53 (Management Services Agreement at ¶2) (emphasis added).

70.     Pursuant to the two-entity corporate structure Mr. Stacy employed in his law practice, the operating company clearly satisfied this definition of "agent," as that term was defined during the relevant time period.

71.     In 2023, the definition of "agent" was changed in the Oklahoma Administrative Code to add the following limitation on the definition of "agent": "the term 'agent' does not include contractors, subcontractors, or their employees."  OAC 475:1-1-2 (Emergency action, effective Aug. 10, 2023).

18

72.    This amendment confirms that the term "agent" previously included contractors, subcontractors or their employees.  In other words, the operating companies utilized by Mr. Stacy in his legal practice squarely fit within the definition of "agent," at least until August 2023, when the definition was modified within the Oklahoma Administrative Code.[4]

73.    "Agent" is defined in Oklahoma case law as "[o]ne who is authorized to act for or in place of another; a representative."  *U.S. Bank, N.A. ex rel. Credit Suisse First Bos. Heat 2005-4 v. Alexander*, 2012 OK 43, 280 P.3d 936, 942 n.12 (quoting Black's Law Dictionary 9th ed. 2009).

74.    Moreover, the "status of agency and of independent contractor are not mutually exclusive.  By definition an independent contractor is an agent in the broad sense of that term in that he undertakes, at the request of another, to do something for the other."  *Cahill v. Waugh*, 1986 OK CIV APP 4, ¶ 10, 722 P.2d 721, 724, citing *C.M. Keys Commission Co. v. Miller,* 59 Okl. 42, 157 P. 1029 (1916); *Gorton v. Doty,* 57 Idaho 792, 69 P.2d 136 (1937).  The management agreement's identification of the

---

[4] It does <u>not</u> appear that 63 O.S. §2-101, which sets out the statutory definition of "agent," was amended. "Agent" is still defined in that statute as follow: "'Agent' means a peace officer appointed by and who acts on behalf of the Director of the Oklahoma State Bureau of Narcotics and Dangerous Drugs Control or an authorized person who acts on behalf of or at the direction of a person who manufactures, distributes, dispenses, prescribes, administers or uses for scientific purposes controlled dangerous substances but does not include a common or contract carrier, public warehouser or employee thereof, or a person required to register under the Uniform Controlled Dangerous Substances Act…." 63 O.S. §2-101.

operating company as an independent contractor is therefore inconsequential for purposes of analyzing §2-302(H)(1).

75.    Jessica McGuire testified there have been no substantive changes to 63 O.S. §2-302, "the law governing the registration requirements," between 2018 and 2023.  Tr. at 294.

76.    As noted, there has been a "substantive change" to the definition of "agent," which is a critical term within §2-302.

77.    Moreover, a Westlaw search reveals there have been 28 deletions and 30 additions to 63 O.S. §2-302, when comparing the statutory version in effect on October 31, 2018, to the version in effect from November 21, 2021 to October 31, 2023.

78.    McGuire is not qualified—by education, training or experience—to interpret any statute for the Court.  *See, e.g.*, Tr. at 334 (when asked if she could list a single canon of statutory construction, McGuire responded, "I mean, not off the top of my head"); Tr. at 337 (Court sustaining objection).

79.    McGuire's discussion of §2-302(H) was incomplete and inaccurate.  Tr. at 295.  Her testimony that §2-302(H) applies "mostly" to "employees of registrants or people who are allowed to lawfully possess the CDS as part of their jobs," Tr. at 295, ignores the explicit statutory exception for "agent" set forth in §2-302(H)(1).

80.    McGuire's testimony that "anyone under Section H, basically the extent of their authority, is [ ] to lawfully possess and nothing else," Tr. at 297, contradicts the plain language of §2-302(H)(1) and should be rejected in total.

81.     The government's suggestion that the "agent" exception set forth in §2-302(H)(1) permits only the possession (and not the manufacture) of controlled substances is also contrary to the plain language of the statute.

82.     The statute very clearly states that an "agent" is "not required to register…."  That the statute also says that an agent "may lawfully possess" controlled dangerous substances does not limit, narrow or qualify the preceding words.  *See, e.g., United States v. Nichols*, 184 F.3d 1169, 1171 (10th Cir. 1999) ("[W]here a statute is clear on its face, we give its words literal effect.").

## VI.     Mr. Stacy Could Have Lawfully Persisted In Refusing To Comply With Cochran's Interpretation Of The Registration Process.

83.     Mr. Stacy at all times believed his legal practice fully comported with the state statutory scheme and at all times endeavored to comply with the law, as clearly demonstrated by Exhibit 112 (June 3, 2021, audio recording).

84.     There is not a single piece of evidence to the contrary.  In fact, Agent Peterson, the case agent for the Oklahoma state prosecution of Mr. Stacy, could not identify a single email, text, diary entry, computer entry, or other document wherein Mr. Stacy evidenced knowledge that his business structure violated any state law.  Tr. at 64.

85.     Rule 1.2 of the Oklahoma Rules of Professional Conduct provides, in pertinent part, that a lawyer "may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law."  Rule 1.2(d), ORPC.

86.     Comment 12 to Rule 1.2 provides that this "last clause of paragraph (d) recognizes that determining the validity or interpretation of a statute or regulation may

21

require a course of action involving *disobedience* of the statute or regulation *or of the interpretation placed upon it by governmental authorities*."  Comment 12, Rule 1.2, ORPC (emphasis added).

87.     This Comment explicitly permits an attorney to engage in a "course of action involving disobedience . . . of the interpretation [of a statute or regulation] placed upon it by governmental authorities."  Comment 12, Rule 1.2, ORPC.

88.     There was no binding judicial decision endorsing or affirming Cochran's interpretation of the statutes relating to medical marijuana.

89.     As late as February 2022, a lawyer with OBN told Mr. Stacy there was a lot of "confusion surrounding medical marijuana laws" and OBN was therefore "making sure" at that time that all of their positions were in writing.  Exhibit 154; Tr. at 332-33.

90.     It would have been entirely appropriate for Mr. Stacy to persist in a course of action involving disobedience or disagreement with Cochran's interpretation of the laws governing the registration process.

91.     Nevertheless, as detailed below, Mr. Stacy immediately changed his practice after receiving Cochran's letter of June 30, 2021.

**VII.     Mr. Stacy Immediately And Permanently Changed His Practice.**

92.     On July 1, 2021, Mr. Stacy changed his legal practice.  Tr. at 90.

93.     Jessica Goure confirmed this was a "period of big change" and a "changing point" at the Stacy Legal Group.  Tr. at 91, 92.

94.     Mr. Stacy issued a clear directive to all employees: the Stacy Legal Group would no longer utilize, or even provide the name of, a non-active local resident, and all

22

existing local residents needed to be removed from issued licenses and registrations.  Tr. at 91-92.

95.    There was a "clear change in direction" and employees were tasked with notifying clients regarding that change.  Tr. at 92; 139-40 (Goure confirming on cross-examination there was a "concerted" effort to remove local residents from licenses and registrations).

96.    These changes included a directive that all clients would need to find new, active local residents for all matters, and all clients were required to attest that they had secured a local resident who was going to be active in the business.  Tr. 155.

97.    The changes were made at Mr. Stacy's direction.  Tr. 94.

98.    The changes were permanent.  Agent Peterson testified that, despite all of the evidence he has reviewed and seized in this matter, he was not aware of Mr. Stacy telling a single client, after June 30, 2021, that it was permissible to use a nonactive, local resident to obtain OBN registration.  Tr. 64-65.

99.    This undeniable fact—that the Stacy Legal Group immediately changed its practice after receiving the "official denial" of OBN—is categorically demonstrated by voluminous contemporaneous documents admitted as exhibits during the hearing, and the testimony of Jessica Goure.

100.    The government position—set out in its pre-hearing pleadings—that Mr. Stacy did not change his practice, *see* Doc. 87 at 31-32, which the government wrongly theorized was because Mr. Stacy was fueled by monetary greed to violate the law, *id*. at 32, n.10, has been categorically refuted.

23

101.    On July 1, 2021, Mr. Stacy sent an email to his clients stating, "please be made aware that my office received a letter on June 30th, 2021, from the [OBN] that your business registration has been denied or they intend to deny it.  You do not have a current license."  Tr. 90; Exhibit 22.

102.    On July 2, 2021, Mr. Stacy sent a longer, follow-up email.  Exhibit 23.

103.    In the July 2, 2021, email, Mr. Stacy notified his clients, *inter alia*, that (1) their applications were denied on June 30, 2021, (2) OBN denied the application "because of the underlying business structure," (3) that his "efforts were unfortunately unsuccessful in changing the decision of OBN," (4) that, as his "law firm advised initially, until you or your company is licensed by both OBN and OMMA it is illegal to operate in the medical marijuana business," and (5) we "must reiterate that you must not possess any cannabis plants, plant material, or derivative product unless and until you have a valid and approved OBN registration."  Exhibit 23.

104.    On July 6, 2021, internal emails were circulated within the Stacy Legal Group regarding Mr. Stacy's direction to "put together a spreadsheet of all our clients contact information….We have to send out all the clients new regulations for OBN and there is paperwork that has to be sent with it, this process has to be done in the next 60 days[,] so the faster we can g[e]t the spreadsheet done the better."  Exhibit 4; Tr. at 93.

105.    It was a "chaotic" time in the office and employees were doing their "level best" to implement the changes directed by Mr. Stacy.  Tr. at 94.

106.    Mr. Stacy began to immediately schedule meetings with his clients to inform them of the change and tell them that they needed to secure their own local, active resident, if they wanted to continue to pursue OBN registration.  Tr. 94; Exhibit 27.

107.    As part of the change in practice, Mr. Stacy directed that new forms be provided to clients.  Tr. at 99.

108.    Mr. Stacy had clients sign addendums to their original contracts.  Exhibit 27.  The Addendum provided, *inter alia*, that (a) "OBN is now objecting to the use of a two-company structure involving a non-active Oklahoma resident," (b) "[t]o meet the new requirements, you will likely need to form a single business entity that includes the Oklahoma partner/partners that comprise a minimum 75% of your operation and meet the residential requirements," (c) "that as of June 30th, 2021, the two-company structure with a non-active Oklahoma resident partner is specifically being rejected by OBN," (d) that the client "must provide the name and application information to [Stacy Legal Group] for [the] company's Oklahoma resident partner within three (3) days" of their meeting with Mr. Stacy, (e) that the "law firm previously advised that until you or your company is licensed by both OBN and OMMA you cannot operate a medical marijuana business in the State of Oklahoma," (f) the client "must obtain [] a valid OMMA license and [] a valid/approved OBN registration prior to possessing any cannabis plants, plant material, or derivative product, and (g) that "until [the client is] fully licensed with both [] OMMA and [] OBN that possession of any plants, plant material, or cannabis derivative product is illegal under Oklahoma law."  Exhibit 27.

109.    Mr. Stacy had his clients review and initial this Addendum after each operative paragraph.  Exhibit 27.

110.    Barbara Miuccio is one of many clients who initialed and signed the Addendum, explicitly affirming Mr. Stacy previously informed her that she could not operate a medical marijuana business in Oklahoma until the company was issued both an OMMA license and OBN registration.  Exhibit 27.

111.    As part of his effort to inform and educate clients regarding OBN's new policy, Mr. Stacy created a new form titled "OBNDD Attestation Requirements." Exhibit 31; Tr. at 99.  This form provided as follows:

> Please be advised that every partner will need to be able to answer the following questions if asked: **1. If OMMA or OBNDD asked you to shut down the business due to diversion (illegal activity) what steps would you take? 2. Are you going to be an active participant engaged in the business[,] not merely a license holder?**  We have been advised by the Oklahoma Bureau of Narcotics and Dangerous Drugs that will not allow a member of a company to be registered with their agency unless that member is actively involved in the company.  Active has not been legally defined by OBNDD but generally, active means you are involved in company operations and can be held accountable for any failure of the company to properly follow the law.  By signing below, you acknowledge that you are willingly entering this partnership and understand the requirements to be involved in this business.

Exhibit 31 (emphasis in original).

112.    This form was "consistent with how Mr. Stacy changed his practice after June 30th," 2021.  Tr. at 99-100.

113.    Going forward, when an email was sent to clients alerting them that their OBN application had been submitted, the email included the following notice:

> Your Paper license for your Medical Marijuana Grow has arrived in the office.  Please be advised that our office has submitted an OBNDD application on behalf of you and your company.  OBNDD provides a number for your account once it has been submitted.  This does NOT mean that your OBN license is approved.  Our office will provide you and your company a paper copy of the certificate, once you are fully approved.  Until that time, <u>possession of any plants, plant material or cannabis derivative product is **illegal** under Oklahoma law</u>.  Currently, you are **<u>NOT</u>** Fully Licensed.

Exhibit 12 (emphasis in original); *see also* Tr. at 102 (Goure testifying regarding this process).

114.    Likewise, when an email was sent to clients notifying them that their new local resident was approved, it included the following notice:

> We received approval of the new local partner from the OMMA….We are re-submitting with the OBN for your company's OBN license. OBN provides a number for your account once it has been submitted.  This does NOT mean that your OBN license is approved.  Our office will provide your company a paper copy of the certificate, once you are fully approved.  Until that time, <u>possession of any plants, plant material or cannabis derivative product is **illegal** under Oklahoma law</u>.  Currently, you are **<u>NOT</u>** Fully Licensed.  Please be advised that the local resident will need to be able to answer the following questions if asked: **1. If OMMA or OBNDD asked you to shut down the business due to diversion (illegal activity) what steps would you be able to take? 2. Are you going to be an active participant engaged in the business, not merely a license holder?** We have been advised by the Oklahoma Bureau of Narcotics and Dangerous Drugs that they will not allow a member of a company to be registered with their agency unless that member is actively involved in the company…operations and can be held accountable for any failure of the company to properly follow the law.

Exhibit 25 (emphasis in original); *see also* Tr. at 101-102 (Goure testifying regarding this process).

115.    As part of the change in his practice, Mr. Stacy terminated clients that he no longer wanted to represent, *see* Tr. at 98, surrendered licenses and registrations on behalf of clients, and did not seek renewal of licenses and registrations.  *See, e.g*., Exhibits 9, 16 (surrendering OMMA licenses); Exhibit 34 (surrendering OMMA license); Tr. at 98-99.

116.    The summer of 2021 was consumed with the process of trying to implement the changes as directed by Mr. Stacy.  Tr. at 92-93.

117.    There was "an urgency in the office that summer . . . [t]o try and get every local resident [the office had] provided off the license." Tr. at 103; *id*. (noting that directive came from Mr. Stacy).

118.    Employee meetings were still being held in late August 2021, to address and implement needed changes.  *See* Exhibits 9, 10, 13.

119.    For example, on August 24, 2021, Jessica Goure instructed another employee, Siyan Liu Baker, that she was "tagging" her for all Kylie Kennedy matters, and she needed Ms. Liu Baker to "contact the client and let them know they need to schedule a meeting with matt, (kind of like we are with Helen)[,] he will go over everything and all the changes in the law with them."  Exhibit 13; Tr. at 103-05 (Goure testifying regarding this exhibit).

120.    This exhibit represented "another example of directions from Mr. Stacy that nonactive, local residents could no longer be utilized and they needed to be removed from all pending applications or licenses."  Tr. at 105.

121.    Ms. Goure also contacted Ms. Kennedy directly, asking her to come to the office for a meeting with Mr. Stacy to discuss the changes.  Tr. at 131.

28

122.    On August 26, 2021, Joshua Huckleberry, a lawyer employed at the Stacy Legal Group, was directed to contact all Bay Tran clients for a meeting to change the local resident.  Exhibits 9 and 10; Tr. at 97.

123.    Bay Tran was Mr. Huckleberry's mother-in-law, Tr. 97, and Mr. Huckleberry was responsible for all clients that had listed Bay Tran as a local resident, Tr. at 106-07.

124.    On August 30, 2021, there was another staff meeting "to walk through [the] Helen list."  Exhibit 11.

125.    The efforts to implement the changes to the practice continued throughout the fall of 2021.

126.    For example, on September 16, 2021, Mr. Huckleberry entered a notation in the Stacy Legal Group internal collaboration system (a platform called "Asana") regarding a "master list" for Bay Tran matters.  Mr. Huckleberry noted that he would be "updating this [list] daily as we get more new LOR's [Local Residents]."  Exhibit 14.

127.    Sometimes delays in implementing the changes were beyond Mr. Stacy's control.  For example, on July 19, 2021, another Stacy Legal Group employee, Leanna Bertram, emailed her "sincerest apologies for the delay" in putting together the spreadsheet of client contact, explaining she "had a very close death in the family at the end of last week so it has surely put [her] behind."  Exhibit 4 (at page 4).

128.    There were innocent mistakes made along the way as the Stacy Law Group worked "feverishly" to implement the changes to its practice, Tr. at 108-09, but the

29

evidence irrefutably demonstrated that the Stacy Legal Group in fact changed its practices after June 30, 2021.

129.    In its pre-hearing pleading, the government asserted that in December 2021, Mr. Stacy was still submitting applications with Bay Tran as a local resident, ostensibly as evidence that Mr. Stacy did not change his practice.  *See* Doc. 87 at 32.

130.    Exhibits 46 and 48 demonstrate that Bay Tran still being listed as the local resident in December 2021 was an innocent mistake, something that "fell through the cracks."

131.    Mr. Huckleberry left the employ of the Stacy Legal Group in December 2021.  Exhibit 20.  That month, Ms. Liu Baker sent Ms. Goure a note in Asana that Bay Tran was "still on the license" for BuBu Jing Xin and "they need new" local resident.  Tr. at 106; Exhibit 46.

132.    As demonstrated in Exhibit 46, and through the testimony of Jessica Goure, Mr. Huckleberry had been assigned to remove Bay Tran from the BuBu Jing Xin license, in accordance with the change of practice implemented after June 30, 2021.  Exhibit 46; Tr. at 106.

133.    In March, 2022, Jessica Goure entered a note in Asana that the BuBu Jing Xin Grow matter had been assigned to Mr. Huckleberry, and it "looks like one that fe[l]l through the cracks after he left."   Exhibit 46; Tr. at 106.

134.    Exhibit 48 is another Asana entry on the subject of BuBu Jing Xin Grow.  It is marked as a "HIGH PRIORITY."  In that entry, dated March 28, 2022, Jessica Goure

alerted Ms. Liu Baker that they "need to get them to get us their NEW LOR and update this ASAP!" Exhibit 48 (emphasis in original).

135.    Mr. Huckleberry proved to be unreliable and he was not diligent in following through with his assignments and tasks, as a general matter. Tr. at 107-108.

136.    When an employee is tasked with something through the Asana platform the system does not automatically provide updates to other employees. Tr. at 108. One would have to go back into the system and search for that particular task to learn whether or not the task had been completed. *Id*.

137.    Stacy Legal Group had hundreds of clients, and it was a hectic time at the Stacy Legal Group, from July 2021, "all the way through to 2022." Tr. at 108.

138.    The employees were "working feverishly to try and get the local residents that had been on licenses and registrations off of licenses and registrations." Tr. at 108-09.

139.    BuBu Jing Xin and any other grow facility cited by the government wherein a non-active local resident remained on a license, registration or renewal form was the product of an innocent mistake, and certainly not an intentional act by Mr. Stacy. Tr. at 109.

140.    The defense admitted other documents to illustrate the obvious fact that innocent mistakes can occur when operating a busy law practice.

141.    For example, on March 29, 2021, Ms. Goure emailed Jessica McGuire at OBN to report that when she "was doing an OBNDD application it autocorrected to Matt

Stacy and [she] needed to update that but its (sic) now asking for a name change document…." Exhibit 1; Tr. at 111-12.

142.    On October 29, 2021, Ms. Goure emailed Jessica McGuire to report that she "accidentally" put one client "as 100% which is not correct," that she "tried to go back to the owner's information" but it was not "there yet," and noted she did not know how to fix the problem. Exhibit 18; Tr. at 112.

143.    As Ms. Goure confirmed, these are example of "accidents or mistakes" that can happen at a busy law firm and/or when interacting with an agency. Tr. at 112.

## VIII.    From June 2020 To July 2021, OBN Consistently Treated Growth Before Registration As An Administrative, Not Criminal, Matter.

A.    June and July 2020: King Happy Farms and Ping Two.

144.    On June 4, 2020, OBN agents executed a search warrant at King Happy Farms and seized 14,776 marijuana plants. Exhibit 54.

145.    On that same date, Mr. Stacy applied for an OBN registration on behalf of King Happy Farms. Exhibit 55.

146.    On July 14, 2020, OBN granted King Happy Farms an OBN registration. Exhibit 56.

147.    Not a single person was arrested or charged with a single criminal offense as a result of the warrant execution at King Happy Farms. Tr. at 229.

148.    Any and all testimony that OBN agents believed there was human trafficking at that location, or other untoward criminal behavior, is completely irrelevant, especially given the failure to take any law enforcement action.

149.    On July 1, 2020, OBN agents conducted an administrative inspection of the Ping Two LLC facility.  Exhibit 59.

150.    The facility was "actively cultivating marijuana" and the owner told agents it "took her seven months to grow the plants…."  Exhibit 59.

151.    The operator of the facility identified Mr. Stacy as her attorney and Agent Williams spoke with Mr. Stacy during the inspection.  Exhibit 59.

152.    The report prepared by the agents listed an administrative violation of growing marijuana before OBN registration.  This is the only report admitted into evidence that also listed criminal violations for illegal cultivation of marijuana, and specifically listed 63 OS §§ 2-509B and 2-408.  *Id.*

153.    This report was not provided to Mr. Stacy or to Ping Two LLC.

154.    Seven days later, on July 8, 2020, OBN granted a registration to Ping Two LLC.  Exhibit 73.

155.    As detailed below, from this point forward, OBN consistently treated the growth of marijuana after OMMA licensing and before OBN registration as an administrative, not criminal, matter.  *See generally* Exhibits 52, 62, 63, 67, 70, 71, 78, 84-86, 92, 94, 99, 108, 120, 121, 123, 151-53, and 155.

B.    Golden Tree

156.    On September 21, 2020, OBN Agent Justin Williams conducted an inspection of the Golden Tree facility.  Tr. at 26-28; Exhibit 52 (spreadsheet identifying Golden Tree's address); Exhibit 92.

157.    The facility did not have an OBN registration on that date.  Tr. at 27-28; Exhibit 92.

158.    OBN Agent Williams observed a greenhouse "full" of "bushy" marijuana plants that were approximately 5 to 6 feet tall.  Tr. at 27; Exhibit 92.

159.    OBN took no law enforcement action.  *Id*.

C.    Ying Liu Green

160.    On October 1, 2020, Agent Martinez inspected the Ying Liu Green facility. Tr. 382; Exhibit 78.

161.    Ying Liu Green did not have an OBN registration.  Tr. 383; Exhibit 78.

162.    Agent Martinez noted in her report that, "[i]n terms of administrative violations, it's unknown if Ying Liu Green is currently growing marijuana but there's no fencing."  Tr. 383; Exhibit 78.

163.    On November 5, 2020, Agent Martinez returned to Ying Liu Green for another inspection.  Tr. 384; Exhibit 155.

164.    The facility still had not obtained an OBN registration.  Tr. 385.

165.    Agent Martinez observed marijuana plants at the facility.  Tr. 385; Exhibit 155.  A representative of the business discussed his growing practices with Agent Martinez.  Tr. 385; Exhibit 155.

166.    Agent Martinez took photographs of the plants, but took no law enforcement action and did not seize any marijuana plants.  Tr. 386; Exhibit 155.

167.    The next day, November 6, 2020, OBN issued an order to show cause and notice of hearing to Ying Liu Green, officially notifying the business it could be

34

penalized $2,000 and refused an OBN registration if an administrative violation was proven. Tr. 387; Exhibit 108. The notice referenced a statute making it a crime to grow wild plants, but did not cite statutes applicable to unlawful possession or distribution of marijuana. Tr. 428; Exhibit 108.

168. On February 23, 2021, Agent Martinez inspected the Ying Liu Green facility for a third time. Tr. 395; Exhibit 94.

169. Ying Liu Green still did not have an OBN registration.

170. There were marijuana plants at the facility. Tr. 395-96; Exhibit 94.

171. During that inspection, Agent Martinez spoke directly with Mr. Stacy on the telephone. Tr. 395; Exhibit 94.

172. During the call, which was recorded by Agent Martinez, Mr. Stacy repeatedly asked Agent Martinez if she had any concerns regarding the Ying Liu Green facility. *See, e.g.*, Tr. at 395-97; Exhibit 94. In response to these questions, Agent Martinez referenced the absence of self-closing, self-locking doors and/or insufficient fencing. Tr. 396; Exhibit 94. Agent Martinez never mentioned the growth of marijuana plants as a concern. Exhibit 94.

173. Instead, it was Mr. Stacy who first asked how many marijuana plants were present on site. Mr. Stacy told Agent Martinez the facility reported to OMMA one thousand plants in the prior month. Tr. 397; Exhibit 94. Agent Martinez responded that the plant count was a lot higher than one thousand at the time of her inspection. Tr. 398; Exhibit 94.

174.    Agent Martinez never said anything to Mr. Stacy in this conversation that she had any concerns about the facility growing marijuana prior to OBN registration, and never said anything to suggest it was unlawful for the facility to be growing marijuana prior to obtaining OBN registration.  Tr. 399; Exhibit 94.

175.    It should be emphasized that, as referenced above, Ying Liu Green routinely filed reports with OMMA fully disclosing that it was operational and growing marijuana without an OBN registration.

176.    For example, in April 2021, Ying Liu Green filed a report with OMMA disclosing there were 3,000 immature plants and 3,000 mature plants at the facility. Exhibit 86; Tr. 392-93.

177.    Similar reports were filed in May and June 2021 reporting the number of plants at the facility.  Exhibits 84-85; Tr. 393-94.

178.    Ying Liu Green did not possess an OBN registration during any of these months.

179.    These reports were made available to OBN.  *See, e.g.*, Tr. at 30-32; Exhibit 121.

180.    OBN took no law enforcement action.

D.      Chow King

181.    On October 15, 2020, OBN agents (including Agent Peterson, Agent Paulk, and Agent Martinez) inspected the Chow King facility.  Tr. at 13-15; Exhibit 125.

182.    On that date, Chow King possessed an OMMA license but did not have an OBN registration.  Tr. at 13-15; Exhibit 125.

183.    Chow King was actively growing marijuana.  Tr. at 17; Exhibit 125.

184.    At some point during the inspection, Mr. Stacy joined the conversation by telephone.  Tr. at 17; Exhibit 99.

185.    While speaking directly to Mr. Stacy and a person at the facility, in reference to the growth of marijuana before OBN registration, Agent Paulk stated: "It's activity before a license, but that's an admin thing. That's fine."  Tr. 17; Exhibit 99.

186.    One minute after Agent Paulk made that statement, he consulted with Agent Martinez about the timing of a re-inspection, ultimately telling the business, "My boss [Agent Martinez] is saying two weeks."  Tr. 380; Exhibit 99.

187.    OBN agents did not make any arrests, seize any marijuana plants, obtain any search warrants, or initiate any criminal charges.  Tr. at 17-18; Exhibit 125.  Instead, Agent Martinez prepared a report which identified growth before OBN registration as an administrative matter.  Exhibit 125.

188.    In an internal report dated October 16, 2020, Agent Martinez recommended denial of registration for Chow King.  The basis for denial, however, was not growth before registration.  It was "[g]rowing without proper security measures." Exhibit 123; Tr. 120.

189.    OBN never communicated this recommendation of denial to Chow King or Mr. Stacy.  The Stacy Legal Group did not learn that Chow King's OBN application had been denied until July 23, 2021, when a client called OBN and was "told they were denied for growing without a security system."  Exhibit 7; Tr. at 118.

190.    In December 2020, Mr. Stacy filed a report with OMMA disclosing that Chow King was operational and possessed 1,310 marijuana plants at the facility.  Tr. 375-377; Exhibit 151.

191.    Chow King did not possess an OBN registration at that time. *See*, *e.g*. Exhibit 52 (Cochran spreadsheet showing Chow King did not have license in December 2020).

192.    Chow King filed similar reports in other months, including February 2021 (reporting 1,450 marijuana plants) and March 2021 (reporting 1,450 marijuana plants). Exhibits 152, 153.

193.    In these reports, filed by Mr. Stacy and Gold Star Compliance on behalf of Chow King, the business clearly and fully disclosed to OMMA that it was operational and growing marijuana at a time when it did not possess an OBN registration.  Tr. at 375-378.

194.    Again, these reports were made available to OBN.  *See, e.g*., Tr. at 30-32; Exhibit 121.

195.    OBN took no law enforcement action.

E.    Nana Zhang

196.    On October 27, 2020, Agent Martinez conducted an inspection of a facility called Nana Zhang.  Tr. at 27-28; Exhibit 121.

197.    Prior to conducting an inspection on that date, Agent Martinez had obtained a copy of a report filed with OMMA by Mr. Stacy on behalf of his client, Nana Zhang,

wherein Nana Zhang disclosed that it was operational and growing marijuana before any OBN registration.  Tr. at 30-32; Exhibit 121.

198.   During the October 27, 2020, inspection, Agent Martinez personally observed that Nana Zhang was manufacturing marijuana before OBN registration. Tr. at 29-30; Exhibit 121.

199.   OBN agents did not make any arrests, seize any marijuana plants, or take any other law enforcement action.  Tr. 32; Exhibit 121.

200.   Instead, an internal report was filed by Agent Martinez noting that Nana Zhang was operational and growing marijuana before OBN registration.  Exhibit 121.

201.   Yet again, the report characterized the growth of marijuana before OBN registration as an "Administrative Violation[]."  Tr. 28-29; Exhibit 121.

F.     Lama Green LLC

202.   On December 16, 2020, OBN agents conducted an inspection of Lama Green LLC.  Tr. at 32; Exhibit 70.

203.   Lama Green was a client of Mr. Stacy.  Tr. at 33.  The operator tried to call Mr. Stacy while the agents were on site.  *Id;* Exhibit 70.

204.   Once again, OBN agents observed marijuana growth and activity at a facility that did not yet have an OBN registration.  Tr. at 32-34; Exhibit 70.

205.   The facility operator reported that the plants were two months old.  Tr. at 33; Exhibit 70.

206.   Agents were told that the facility had 20 greenhouses, 10 of which were actively growing marijuana.  Tr. at 34; Exhibit 70.

207.    There were approximately 2,000 marijuana plants at the facility on the date of the inspection. Tr. at 34; Exhibit 70.

208.    No law enforcement action was taken.  OBN agents did not make any arrests, seize any marijuana plants, or obtain any search warrants.  Tr. at 33-34; Exhibit 70.

209.    Agents filed an internal report noting that Lama Green was growing marijuana before OBN registration.

210.    Yet again, Agent Martinez cited growth before OBN registration as an "administrative," not criminal, matter.  Tr. at 33; Exhibit 70.

G.    Jeff BC Properties

211.    In January 2021, OBN Agents Peterson and Martinez inspected a facility called Jeff BC Properties.  Tr. at 34-35; Exhibit 67.

212.    The facility did not have an OBN registration. Tr. at 35; Exhibit 67.

213.    Yet again, another internal report was prepared noting that the facility was engaged in growth of marijuana before OBN registration, and it yet again referenced it as an administrative matter.  Tr. at 35; Exhibit 67.

214.    Yet again, OBN agents took no law enforcement action.  Tr. 35; Exhibit 67.

H.    AI 2020

215.    On February 23, 2021, OBN inspected a facility named AI 2020.  Tr. at 36; Exhibit 71.

216.    The facility did not have an OBN registration on that date.  Tr. at 36; Exhibit 71.

40

217.    Yet again, OBN agents observed the growth of marijuana before OBN registration.  Tr. at 36; Exhibit 71.

218.    Yet again, OBN agents took no law enforcement action and seized no plants. Tr. at 36; Exhibit 71.

219.    Agents once again prepared a report noting growth before OBN registration and yet again cited it as an administrative matter. Tr. at 36; Exhibit 71.

I.    Daphne Green

220.    On February 23, 2021, OBN agents, including Agent Peterson and Agent Paulk, inspected the Daphne Green facility.  Tr. at 36-37; Exhibit 62.

221.    Yet again, OBN agents observed growth of marijuana at a facility without an OBN registration.  Tr. at 36-37; Exhibit 62.

222.    There were approximately 400 marijuana plants.  Tr. 36-37; Exhibit 62.

223.    The agents told the persons at the facility they would not "touch" any of the plants.  Agent Paulk said, "Not going to take, destroy, not going to touch. All we want to do is look."  Tr. at 37; Exhibit 106 (audio recording of inspection).

224.    Yet again, OBN agents took no law enforcement action, but instead filed another report noting growth before OBN registration and referring to it as an administrative matter.  Exhibit 62.

J.    Earth Angel

225.    On February 23, 2021, OBN agents conducted an inspection of Earth Angel.

41

226.   There were approximately 300 marijuana plants on the premises.  Tr. at 19-25; Exhibit 63 (report); Exhibit 120 (audio recording).

227.   Jeremy Grable, one of Earth Angel's owners, informed OBN agents that he had been growing marijuana for three months.  Tr. at 19-20; Exhibit 120.

228.   Earth Angel did not have an OBN registration.  Tr. at 20; Exhibit 63.

229.   OBN agents took no law enforcement or administrative action.  Tr. at 20-21; Exhibits 63, 120.

230.   Mr. Grable told the officers Mr. Stacy was his attorney, he had invested heavily because he did not want to have to "look over shoulders," and specifically requested that they inform him if there was anything non-compliant about his operation. Tr. at 24; Exhibit 120.

231.   Agents told Mr. Grable they would "point out anything that's not compliant," "[t]hat way, everything is above board," and explicitly told him they would give him all the guidance he would need.  Tr. at 22-23; Exhibit 120.

232.   Agents even told Mr. Grable they would not fine him, but instead would tell him what needs to be fixed and come back for a re-inspection in 30 days.  Tr. at 22; Exhibit 120.

233.   Not a single agent told Mr. Grable that it was improper, much less criminal, to grow marijuana before OBN registration.  Tr. at 23-24; Exhibit 120.

234.   Agent Peterson conceded he could not cite a single thing that either he or any other agent did on that date to discourage Mr. Grable from growing marijuana before OBN registration.  Tr. at 25.

42

K. <u>Russ Cochran Spreadsheet of Pending Applications</u>

235.    On May 7, 2021, Russ Cochran forwarded a spreadsheet to Shannon Tarpley, which contained a list of pending OBN applications.  Exhibit 52.  The spreadsheet was prepared at Cochran's request.  *Id.*

236.    The spreadsheet set out two different categories of applications: (a) one group (highlighted in yellow) that "Agent Martinez told us she was recommending denial," and (b) a second group (highlighted in green) that "are applications that have Helen Carrillo listed as an owner that Agent Martinez advised us she was awaiting word from Legal on how we would proceed on those…".  Exhibit 52.

237.    All of the entities detailed above in Sections VIII(B)-(J) were listed in this spreadsheet.  Not a single one of them had yet been denied an OBN registration, notwithstanding their clear, obvious, and entirely open growth of marijuana prior to registration.

238.    AI 2020 LLC, Golden Tree LLC, Ying Liu Green LLC, Chow King LLC, Jeff BC Properties LLC, Lama Green LLC and Nana Zhang LLC were amongst the entities highlighted in yellow.  *Id.*

239.    Earth Angel LLC and Daphne Green LLC were highlighted in green.  *Id.* As such, as late as May 7, 2021, OBN legal had not yet even taken a position as to whether or not these facilities should be granted an OBN registration, despite the fact that OBN had actual knowledge that both facilities were growing marijuana prior to registration.

240.    In the face of all of this uncontroverted evidence of OBN treating growth as an administrative matter after June 4, 2020, the government reliance on conversations that allegedly occurred on June 4, 2020, between Mr. Stacy and OBN personnel is entirely unpersuasive.  By word and conduct, OBN consistently told Mr. Stacy from that date forward that growth before OBN registration was an administrative, not criminal, matter.

241.    Indeed, OBN's consistent treatment of growth before registration as an administrative matter is consistent with provisions of the OMMPPA detailed earlier—*i.e.*, the statute did not condition growth on obtaining an OBN registration but instead only required that applicants "submit" a registration with OBN.  63 O.S. §427.14(E)(12).

## IX.    Mr. Stacy Did Not Tell A Single Client It Was Legal To Grow Or Sell Marijuana Before OBN Registration. He Provided Legal Advice To Clients Regarding Potential Consequences Of Contemplated Action, Which Is Expressly Authorized By Law.

242.    Mr. Stacy was at all relevant times a duly licensed attorney authorized to practice law in the State of Oklahoma.

243.    Mr. Stacy never instructed a single client that it was legal to grow or sell marijuana before OBN registration.

244.    To the contrary, Mr. Stacy provided legal advice to clients regarding potential consequences of contemplated actions, and that legal advice was fully consistent with OBN's treatment of growth before registration to that point in time.

245.    The Oklahoma Rules of Professional Conduct expressly authorize an attorney to provide legal advice regarding potential consequences of contemplated

actions, and providing legal opinions regarding potential consequences does not make the lawyer a part of the conduct or legally responsible for it.

246.    Rule 1.2 of the Oklahoma Rules of Professional Conduct provides, in pertinent part, that a "lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, *but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.*"  Rule 1.2(d), ORPC (emphasis added).

247.    Comment 9 to Rule 1.2 provides the following:

> Paragraph (d) prohibits a lawyer from knowingly counseling or assisting a client to commit a crime or fraud. ***This prohibition, however, does not preclude the lawyer from giving an honest opinion about the actual consequences that appear likely to result from a client's conduct. Nor does the fact that a client uses advice in a course of action that is criminal or fraudulent of itself make a lawyer a party to the course of action. There is a critical distinction between presenting an analysis of legal aspects of questionable conduct and recommending the means by which a crime or fraud might be committed with impunity.***"

Rule 1.2, ORPC, Comment 9 (emphasis added).

248.    Exhibit 60 is a text string between Mr. Stacy and a then-existing client, James Chen.

249.    In this text string, in February and April 2021, Mr. Stacy and Mr. Chen engaged in text messages wherein they discuss the potential penalty for growing or selling marijuana before OBN registration.

250.    On February 1, 2021, Mr. Chen and Mr. Stacy discussed via text that another grow facility had been visited by OBN agents, and Mr. Stacy told Mr. Chen that

the other facility was still waiting for OBN registration.  Exhibit 60 at p. 25-26.  Mr.

Chen then asked if his facility, Okmulgee Green, was also still waiting for an OBN

registration, and asked at the same time "Can not grow in the meantime?"  Exhibit 60 at

25.

251.    Mr. Stacy responded: "Same but you can grow. It is just an admin penalty."

Exhibit 60 at 25. Mr. Chen then asked "What kind of penalty?"  *Id*.  Mr. Stacy responded

"$2000."  *Id*. at 24.

252.    Mr. Stacy never told or instructed Mr. Chen in the foregoing text exchange

that it was legal to grow marijuana before OBN registration.  If an act is legal, then there

is no penalty associated with the act.  Mr. Stacy explicitly told Mr. Chen there was a

penalty associated with the contemplated conduct, which necessarily means the conduct

is not lawful.

253.    Moreover, Mr. Stacy's opinion as to the potential consequence of growing

before an OBN license was fully consistent with how OBN was treating growth before

OBN registration at that time, as detailed extensively, *supra,* in Section VIII.

254.    Later, on the same date, February 1, 2021, Mr. Chen texted: "Maximum

penalty is $2000, no jail time?"  *Id*. at 23.  Four minutes later, Mr. Stacy responded:

"Correct. I don't know when it will be approved as I talk to them weekly about it."  *Id*. at

23.

255.    It is not entirely clear whether or not the "correct" refers to the question

about "maximum penalty, no jail time."  In any event, as detailed *supra*, any such legal

opinion as to the potential consequence of growth before OBN registration was fully

consistent with how OBN was treating growth before registration at that time. Moreover, whether or not Mr. Stacy was correct in his opinion as to the likely penalty associated with the contemplated conduct, the provision of that legal opinion is expressly authorized by the Oklahoma Rules of Professional Conduct.

256.    At no time during that February 1, 2021, text exchange, did Mr. Stacy tell Mr. Chen it was lawful to grow marijuana before OBN registration. At all times, he provided a legal opinion as to the potential consequences of contemplated action.

257.    On April 15, 2021, Mr. Chen sent the following text to Mr. Stacy: "Can we sell without the narcotic license." Exhibit 60 at 19. Mr. Stacy responded with a single word: "no." *Id.*

258.    Mr. Stacy then followed up the "no" with the following text: "Technically, but I can help you with that," *id.* at 19, which the text chain later reveals was a reference to the Gold Star Compliance company, *see id.* at 12, 16-18. Mr. Chen responded: "I might need your help to sell in a month or so. Narcotic license no end in sight. Also what about the management agreement?" *Id.*

259.    It should be noted that Mr. Stacy made the same statement directly to OBN in an email dated February 7, 2021. Exhibit 32 ("Clients are very concerned about not having these licenses available to display and they *technically* cannot sell without the OBNDD granted") (emphasis added); *see also* Tr. at 115.

260.    In any event, during that April 15, 2021, text exchange, Mr. Stacy never instructed Mr. Chen it was lawful to sell marijuana before OBN registration, and he never instructed Mr. Chen to sell before OBN registration.

47

261.    Additionally, there is no evidence Mr. Stacy took any action whatsoever to help, assist or facilitate a single sale by Mr. Chen.

262.    This text exchange is not evidence of Mr. Stacy's non-compliance with any state statute.

263.    Six days later, on April 21, 2021, there was another discussion wherein Mr. Chen asked Mr. Stacy if other than the Metrc system there is anything else he should watch out for.  *Id*. at 17-18.  Mr. Stacy noted that the Metrc system "is the main thing right now" and asked Mr. Chen if Gold Star Compliance had reached out to him yet.  *Id*. at 17.  Mr. Stacy explained that Gold Star Compliance could handle all of their Metrc compliance, including training employees on how to tag and account for plants.  *Id*. at 16. Mr. Chen said it was worth having a conversation with Gold Star Compliance.  *Id*.

264.    Four days later, on April 25, 2021, Mr. Chen sent the following text: "You said earlier that you could help us sell. Can you explain how?"  *Id*. at 16.

265.    Mr. Stacy never responded to that text.  *Id.*

266.    The next day, April 26, 2021, Mr. Chen sent a text asking about a prior comment that there was a pending investigation into Chinese owned companies.  *Id*. at 16.

267.    Mr. Stacy responded.  *Id*.  He told Mr. Chen he would have Gold Star Compliance call him.  *Id*.  He explained it was "very easy" for OBN to discern which companies were owned by Chinese nationals "because 25% of the company is owned by one of the Chinese owners."  *Id*.  Mr. Chen responded, "selling without narcotics license is easy?," *id*. at 15, which was a mistaken understanding of Mr. Stacy's text that it was

"very easy" for OBN to discern which companies were owned by Chinese nationals.  Mr. Stacy cleared up the confusion, responding, "No. Easy for OBN to know if they are Chinese owned." *Id*. at 15.

268.    On April 27, 2021, there was another discussion about growing marijuana without an OBN license.  At 5:35 p.m., Mr. Chen sent the following text: "What's the worst penalty for growing without a license?" *Id*. at 13.  Mr. Stacy responded: "It can be up to $2000 per plant." *Id*.  Once again, as detailed *supra*, this legal opinion regarding the potential consequence was fully consistent with OBN's treatment of growth before OBN registration.

269.    Mr. Chen later asked: "So there is a big risk for us to grow right now." *Id*.  Mr. Stacy responded: "Big risk to sell lower risk to grow." *Id*.

270.    Once again, this text represents a lawyer providing legal advice to a client regarding the potential consequences of engaging in potential conduct.

271.    Mr. Chen then texted: "$2000 per plant, what about jail time?" *Id*.  A blank text next appears in the string.  *Id*.

272.    Mr. Chen then texted: "My wife was asking me what's the worst penalty. The deleted text was directed to her. I told her the case in Guthrie, if they have cash, they could be charged with money laundering." *Id*. at 12.  Mr. Stacy responded: "Possibly. I'm getting details on the case there, but you have to be very careful who you sell to[]." *Id*.  Mr. Stacy then texted: "My compliance company can really help you guys stay out of trouble." *Id*.  There is then a discussion wherein Mr. Stacy asked if Mr. Chen's facility is

"fully complaint," listing items such as eight foot fencing, alarm system, and cameras.
*Id*.

273.    At no point during any part of the foregoing text exchange did Mr. Stacy

instruct Mr. Chen to grow or sell marijuana without an OBN registration, and at no point

did Mr. Stacy instruct Mr. Chen that it was lawful to grow or sell marijuana without an

OBN registration.

274.    To the contrary, Mr. Stacy provided an "honest opinion" that an

administrative fine of $2000.00, rather than jail time, was "likely to result" from a

client's growth of marijuana before OBN registration, as expressly authorized by Rule

1.2, Comment 9.

275.    As detailed extensively *supra*, *see* Section VIII, this "honest opinion" was

both reasonable and *deeply* grounded in information received from, and instructions

directly provided by, OBN, and it was fully consistent with the manner in which OBN

treated the growth of marijuana before OBN registration for the prior nine months.

276.    Indeed, by way of example, but detailed more extensively *supra*, on

October 15, 2020, Agent Paulk directly instructed Mr. Stacy that growth before OBN

registration was "fine" and that it was an "admin thing."  *See*, *e.g.*, Tr. at 16-17; Exhibit

99.  On November 6, 2020, OBN served an order to show cause upon Ying Liu Green,

which explicitly referenced a potential fine of $2,000.00 for any violation.  Exhibit 108.

On June 4, 2020, OBN agents seized in excess of 14,000 plants from King Happy Farms,

which had been operating without an OBN registration—not a single person was arrested,

and King Happy Farms was actually granted an OBN registration several weeks later.

Exhibits 54-56.  On February 23, 2021, OBN visited two clients of Mr. Stacy, Earth Angel and Daphne Green, observed marijuana activity at both locations, and took no law enforcement action.  On February 23, 2021, Agent Martinez spoke on the telephone with Mr. Stacy while inspecting another facility (Ying Liu Green) that not only had marijuana plants present but Mr. Stacy had previously filed reports with OMMA disclosing the facility was operational (and discussed that fact with Agent Martinez), and Agent Martinez expressed no concerns, reservations or issues with the marijuana activity occurring before registration at that facility.  Certainly, these events, amongst the many others detailed *supra*, reasonably informed Mr. Stacy's legal advice to his client, James Chen, regarding the potential consequences of activity before OBN registration.

277.    Indeed, the government position that it was Mr. Stacy, through texts of this nature or otherwise, who unlawfully encouraged growth before registration is incredulous given the events of the preceding year.  It was OBN (and every facet of that organization), not Mr. Stacy, that encouraged growth before registration, and strongly so, by words and conduct: (a) through its agents, during inspection visits and telephone conversations, (b) through its registration department, by granting registrations to facilities that had openly grown before registration, including King Happy Farms and Ping Two, and (c) through its legal department, by taking no action to deny licenses and providing zero direction or guidance, despite repeated inquiries month after month after month, even when there was open and obvious growth at the facilities and self-reporting to OMMA.

278.    In any event, a lawyer giving his legal opinion about the potential consequences of contemplated conduct does not violate any law, much less constitute evidence of Mr. Stacy being "non-compliant" with any rule, regulation or statute regarding medical marijuana in Oklahoma.

279.    Mr. Stacy never instructed Mr. Chen, or any other client, it was legal to grow or sell marijuana before OBN registration.  In fact, Jessica Goure testified (on cross-examination) to the contrary: Mr. Stacy directed his employees to inform clients that they could not operate without an OBN registration.  Tr. at 145-46.

280.    Finally, at no time did Mr. Stacy ever tell a client it could grow or sell without an OMMA license.  Tr. 65.

### X.    OBN Formed A New "Understanding" And Altered Its Approach To Growth Before Registration, Without Any Public Notice Or Warning.

281.    In July 2021, there was a shift in OBN's approach to the growth of marijuana after OMMA licensure but before OBN registration.

282.    The defense played a recording of Agent Peterson explaining that policy shift, and the change of understanding, that occurred at OBN in July 2021.

283.    A clip from that recording is being filed with this pleading and offered to the Court as Exhibit 157.

284.    The recording captured a conversation between Agent Peterson and a lawyer for a potential witness (during a witness interview).

285.    The following persons were present in the room with Agent Peterson: Travis White and Josh McGoldrick, General Counsel and Deputy General Counsel for

52

OBN at the time of the interview, and Dane Towery, a Deputy Attorney General handling the state prosecution of Mr. Stacy.

286.    At one point during the recorded conversation, the lawyer told Agent Peterson that agents took no law enforcement action against another client of his, in December 2020, even though that client was growing marijuana without an OBN registration.  The lawyer then asked Agent Peterson a direct, and simple, question: why was no action taken then if the client was growing marijuana without an OBN registration.

287.    Agent Peterson clearly explained that OBN originally treated growth before OBN registration as an administrative matter, but "[t]he stand began to alter and change" in July 2021, after they got Travis White "on board" at OBN.  Tr. 41-42; Exhibit 157.

288.    It was then, and only then, that OBN "[s]tarted understanding" that it was illegal to grow marijuana between OMMA licensure and OBN registration.  Tr. 43; Exhibit 157.

289.    As noted, OBN's General Counsel (Travis White) and Deputy General Counsel (Josh McGoldrick) were present and participating in the discussion, as was the Deputy Attorney General (Dane Towery) prosecuting Mr. Stacy in state court.

290.    OBN did not provide any notice to Mr. Stacy or the general public regarding that shift in policy, Tr. at 43-44, and there is no evidence it sought an opinion from the Attorney General.

### XI.    Mr. Stacy Did Not File Any False Applications.

291.    OBN changed its application over time.

292.    An early version of the application form requested, *inter alia*, "business name" and "physical business address."  Exhibit 110.

293.    A second variation of the OBN application requested, *inter alia*, "applicant details," including "name," "business name," "physical business address," and "owner details."  Exhibit 107.

294.    A third variation of the OBN application requested, *inter alia*, "business registration details," "representative" information, "business name," "business physical address," "contact person" information, "business owner details," including "percent owned" and "owner details," including name, date of birth, address, and driver license information.  Exhibit 95.

295.    There were no false answers provided by Mr. Stacy as to any of these questions.

A.  Ownership Interest In Applicant Companies.

296.    The local residents listed on the subject applications as 75% owners were in fact 75% owners of the entity listed on the application.

297.    For example, McGuire testified that Helen Carrillo was listed on the Levi Green LLC application as the 75% owner.  Tr. at 305.  This application was identified as an exhibit by both parties.  Exhibit 79; Govt. Exhibit 2.

298.    There is nothing false about that information.

299.    Pursuant to the official corporate documentation, Helen Carrillo was, *de facto* and *de jure*, the 75% owner of Levi Green LLC.

54

300.  McGuire was asked directly if she was aware that statement was "literally true."  Tr. at 348.  McGuire testified she was "not aware of that."  Tr. at 348.

301.  McGuire was then asked if she possessed any evidence demonstrating that the statement was not literally true.  Tr. at 348.  McGuire testified "I wouldn't have that information."  Tr. at 349.

302.  McGuire also testified regarding Government Exhibit 6, an application for an entity called H Green OK LLC, wherein Kylie Kennedy is listed as 75% owner of the entity.

303.  There is nothing false about this application.  The corporate documentation did in fact identify Kylie Kennedy as 75% owner of this entity.

304.  McGuire's testimony that the local residents listed on the applications "were not actual owners in these grows," Tr. at 311, is irrelevant.

305.  The application forms did **not** ask for or request ownership interest in "grows."  Government Exhibit 6.  The application forms requested ownership information for the listed applicant entities, and the applications accurately listed that ownership information.

306.  There was no statute, rule or regulation dictating or demanding that a 75% owner of a Limited Liability Company receive 75% of the profits, contribute 75% of the capital, suffer 75% of the losses, or have any minimum control over or be active in the day-to-day activities of the business.

307.  Limited Liability Companies are legally allowed to set up their ownership, control, and responsibilities in any form they desire.

308.    63 O.S. §427.2(46) provides, in pertinent part, that "[o]wner means, except where the context otherwise requires, a direct beneficial owner including, but not limited to, all persons or entities as follows . . . (d) all *members* that own *an interest* in a *limited liability company* . . .." 63 O.S. §427.2(46) (emphasis added).

309.    The Oklahoma Limited Liability Company Act defines "member," "membership interest," and "interest" as these terms exist relative to Limited Liability Companies. 18 O.S. §2001.

310.    18 O.S. §2001 defines "member" as follows:

> a person with an ownership interest in a limited liability company, with the rights and obligations specified under the Oklahoma Limited Liability Company Act….

18 O.S. §2001(14).

311.    18 O.S. §2001 defines "membership interest" or "interest" as follows:

> a member's rights in the limited liability company, collectively, including the member's share of the profits and losses of the limited liability company, the right to receive distributions of the limited liability company's assets and capital interest, any right to vote or participate in management, and such other rights accorded to members under the articles of organization, operating agreement, or the Oklahoma Limited Liability Company Act….

18 O.S. §2001(15).

312.    As the foregoing makes clear, none of these operative statutes mandate or require that a member of an LLC receive some minimum amount of profits or losses, that a member receive distributions, or that a member have any right to vote or participate in management or the day-to-day activities of a Limited Liability Company.

56

313.    18 O.S. §2001 explicitly provides that a membership interest or interest may include certain matters.  The list is illustrative, not mandatory.

314.    Per 18 O.S. §2001, if a membership agreement dictates that certain members have no rights to profits or losses, or no right to participate in management or day-to-day activities, that is entirely permissible and lawful.

315.    Indeed, 18 O.S. §2001(16) explicitly defines "operating agreement" as "*any* agreement of the members, including a sole member, as to the affairs of a limited liability company and the conduct of its business including the agreement as amended or restated," regardless of whether that agreement is called an operating agreement, "whether oral, in a record, implied or in any combination thereof."  18 O.S. §2001(17) (emphasis added).

316.    There simply were no minimum, mandatory statutory or regulatory requirements to satisfy the definition of "ownership."

317.    The OBN and OMMA applications were truthful in every respect regarding the ownership details.  There was nothing false about the names of the applicant entity, the address of the applicant entity, the dates of birth for the applicants, the driver license information, or the ownership of the applicant entity.

318.    Agent Peterson recommended the same ownership structure to Lara Seuss.

319.    On December 14, 2021, Agent Peterson visited Ms. Seuss at her home. Tr. at 44-45; Exhibit 49.

320.    During the interview, Ms. Seuss repeatedly told Agent Peterson she only had a two percent profit interest in Earth Angel, and that Ms. Miuccio and Mr. Grable were the majority owners of the entity.  Tr. at 47-48; Exhibit 49.

321.    Agent Peterson told Ms. Seuss that she could be listed as the 75% owner on the OBN application materials and it did not matter how they split up – internally – the ownership percentages.  Tr. at 49-50; Exhibit 49.

322.    On January 3, 2022, just a few weeks later, Earth Angel's application for OBN registration was allowed.  Exhibit 28.

B.    <u>Placing Mr. Stacy's Email and Telephone Number In Business Owner Section Does Not Constitute A False Application</u>.

323.    Mr. Stacy and/or employees of the Stacy Legal Group sometimes placed Mr. Stacy's email address (matt@stacylegalgroup.com) and/or his telephone number within the section of the application asking for the "business," "owner" or "applicant" details.  *See*, *e.g*., Tr. at 305-09; Exhibit 89; Exhibit 95.

324.    This did not render the applications false.

325.    Lawyers acting on behalf of clients as the point of contact with government officials is entirely customary in the legal profession and business community.

326.    The applications did not explicitly or implicitly prohibit this customary practice.

327.    The application forms did not contain any instructions, general or specific, and they did not expressly prohibit a lawyer from placing his email address or telephone

number in the owner, business or applicant section.  *See, e.g.,* Exhibits 79, 89, 95, 107, 110.

328.    OBN created the application forms and dictated the contents of the application forms and any associated instructions.

329.    OBN could have expressly prohibited this activity, but it never did.

330.    Jessica McGuire, OBN's Manager of Professional Regulation Services, could not identify any statute, rule or regulation expressly prohibiting a business from using its attorney's contact information in an OBN application.  Tr. 314-15.

331.    McGuire never told Mr. Stacy that he could not or should not list his contact information in the business, owner, or applicant section of the OBN application, and she was not aware of anyone else from OBN discussing the issue with Mr. Stacy.  Tr. 319-20.

332.    Nobody at OBN ever suggested to Mr. Stacy that the use of his email or telephone number in this manner was problematic, much less "false" or "fraudulent."

333.    McGuire testified regarding Government Exhibit 4.  McGuire testified that the email address is "supposed to belong" to the registrant.  Tr. at 309.  Nowhere in the application does it require or even suggest that the email address must belong to the registrant, rather than the attorney for the registrant.  Govt. Exhibit 4.

334.    Indeed, in that section of that application, it states: "Email Address (To be used for official OBN Business only)."  Govt. Exhibit 4.  This language—"[t]o be used for official OBN Business only"—strongly suggests it was entirely appropriate for an applicant to designate the attorney they hired for the specific purpose of conducting its

OBN business, as contrasted with a personal or professional email address used for myriad purposes.

335.    OBN's position that an application is "false" because it lists Mr. Stacy's email address or phone number under the business owner details is a recent contrivance.

336.    Indeed, McGuire testified she would never knowingly approve a false or fraudulent application, but she conceded she approved applications wherein Mr. Stacy's email address and telephone numbers were listed in the section calling for the business owner details.  Tr. at 315-19.

337.    OBN had actual knowledge of Mr. Stacy's telephone number and email address, and they knowingly approved applications containing this information.  Tr. at 315-19.

338.    The email address "matt@stacylegalgroup.com" is self-authenticating and obvious.

339.    Not only is the email address self-authenticating and obvious, McGuire and her team routinely emailed with Mr. Stacy and his employees, and those emails included both Mr. Stacy's email address and the telephone number that appeared on the applications.  *See, e.g.*, Tr. at 315-17, 319; Exhibits 15, 17, 19, 24, and 42.

340.    There were also emails between Jessica Goure and Jessica McGuire (and others at OBN) explicitly on the subject matter of Mr. Stacy's email address.  For example, on July 9, 2021, Goure emailed McGuire and others at OBN to advise that the Stacy Legal Group "have tried sending a forgot password email to Matt's email about 5 times now since yesterday and he is not getting any emails…".  Exhibit 6.  This email,

amongst many others, would have explicitly alerted McGuire to Mr. Stacy's email address.

341.    Finally, the applications listed the same email address and telephone number for both the 75% owner and the 25% owner.  Govt. Exhibit 2 at 18, 20; Tr. at 307-08.

342.    This represented a clear and obvious disclosure to OBN that both applicants had designated their attorney as the point of contact for official OBN business.

343.    Mr. Stacy certainly did not take any action to conceal or obfuscate the fact that he was placing his email address and telephone number in the business owner section of the application.

344.    McGuire has been identified as an "expert" by the government.  *See* Dkt. Entry 174.  McGuire has a PhD from Claremont Graduate University.   Dkt. Entry 174-1 (McGuire Resume attached to expert disclosure). She (and her team) clearly knew the email address and phone number listed in the business owner section belonged to Mr. Stacy.

345.    McGuire's testimony that she did not know it was Mr. Stacy's contact information lacks any credibility.  Tr. at 317 (testifying she did not know the address "off the top of my head" and "even had to look it up the other day to see if it was dot net or dot com or what").

346.    The government suggestion that "if something had gone wrong" at the applicant facility McGuire would not have been able to contact either owner is inaccurate.  Tr. at 308.  McGuire could send an email to or telephone their designated

contact.  She could also mail a letter to their business or residential address, both of which were accurately disclosed to OBN.  And, of course, she could always send an agent to the business facility.

347.    There was also good reason to use Mr. Stacy's email address and phone number.

348.    Some clients did not use or check email, some clients would not return telephone calls, some clients were "very difficult" to contact, and some clients did not speak English.  *See, e.g.*, Tr. at 121, 129; Exhibit 45 (Goure directing Huckleberry to meet with client, noting that the client "do[es] not check emails").

349.    There were specific instances where clients did not receive materials sent by OBN.  *See, e.g.*, Exhibit 44 (November 3, 2021, email wherein Jessica Goure notified Jessica McGuire and Gretchen Hall that some clients had not received paperwork sent out by OBN).

350.    In fact, in February 2022, Mr. Stacy had a lengthy email exchange with Gretchen Hall and Jessica McGuire at OBN regarding requests for information that were physically mailed to clients by OBN.  Exhibit 24.  Mr. Stacy requested a list of clients that were sent the requests for additional information, noting there were "many scenarios" his office needed to "eliminate," including clients who may have moved, clients who use postal boxes, or clients who may have a home address out of state.  *Id.* Jessica McGuire responded that business owners were "the ones responsible to make sure they have received and returned any information," and that they listed their home addresses on their application, which was "certified" as being correct on the application.

*Id*. Mr. Stacy advised that the reason he said clients might have moved "is that several of the applications were submitted over 6 months ago. It was accurate at the time of submission but has been pending for quite a while. I just want to make sure they received the letter since it had a 30 day return window." *Id*. Mr. Stacy asked if there was a reason the letter was not sent to his office, considering he is listed as the point of contact for each company. *Id*. Jessica McGuire advised that it was not sent to Mr. Stacy's office because he is "not the registrant," that "[r]egistrants are the ones that are subject to [OBN] regulations," that OBN "correspond[s] with the registrant," and noted that Mr. Stacy is "only the representative that is allowed access to submit applications, renewals, and changes on their behalf." *Id*.

351.    McGuire testified that OBN stopped approving Stacy Legal Group applications in July 2021 because they learned he was putting his phone number and email in the business owner section. Tr. at 341. This testimony was not accurate.

352.    OBN denied Stacy Legal Group applications on June 30, 2021, because of the underlying business structure, as Cochran explained in his email and letter to Mr. Stacy on that date.

353.    When asked on re-cross examination about the testimony that the applications were denied in July 2021 because of the email address and telephone number issue, McGuire testified "I didn't testify to why they were denied." Tr. at 348. McGuire then conceded they were denied because of the business structure. Tr. at 348.

C.  OBN Documents Submitted To The Court Contain Certifications That Were
    Not On Original Applications As Submitted By The Stacy Legal Group.

354.    Several applications admitted into evidence by the government (and by the
state in the prior state proceeding) contain an attestation/certification on the right side of
certain pages of the application.  *See, e.g.*, Government Exhibit 2 at 17, 20; Exhibit 93 at
5; Exhibit 95 at 5.

355.    These certifications were <u>not</u> on the original applications as submitted by
the Stacy Legal Group.  In other words, the applications as presented to this Court (and
the state court) have been altered by OBN after they were submitted by the Stacy Legal
Group.

356.    As McGuire testified in the state court proceeding, and reaffirmed before
this Court, that attestation/certification language was not added to the application until
"after July of 2021 at some point. I don't remember the exact date. Fall of 2021."  Tr. at
326.

357.    McGuire conceded that the application identified as Government Exhibit 2,
which was filed by the Stacy Legal Group in December 2020, was altered by OBN after
its submission by the Stacy Legal Group.  *See, e.g.*, Tr. at 321-22 ("This one you're
showing right now, this exact one right here, did not have that."); Tr. at 347 (McGuire
answering Court's question, affirming that the certification on Govt. Exhibit 2 was not on
the application as actually filed by the Stacy Legal Group).

358. McGuire adamantly (and wrongly) insisted, however, that the application identified as Government Exhibit 6, had the attestation language when filed by the Stacy Legal Group. *See* Govt. Exhibit 6 at 2, 9, 11 and 13.

359. McGuire testified without qualification that the attestation language "absolutely was on Government Exhibit 6 application … original application. It was on this one." Tr. at 323.

360. McGuire was later asked a very clear question and gave her response:

Q. So to be very clear, because I want your testimony to be very clear, you are saying, under oath, that [Government] Exhibit 6, okay, had that certification language on it and there's no doubt in your mind that that certification language was on this application?

A. It's on that particular one, yes.

Tr. at 325.

361. McGuire went so far as to testify that Government Exhibit 6 was submitted to OBN on July 3, 2021, Tr. at 324

362. McGuire's testimony is wholly inaccurate.

363. The application identified as Government Exhibit 6 was filed with OBN on June 6, 2021.

364. That fact is demonstrated by two independent sources.

365. First, attached hereto as Exhibit 158 are internal Stacy Legal Group records demonstrating that the application identified as Government Exhibit 6 was filed on June 6, 2021. Exhibit 158 (the reference number matches the number on Government Exhibit 6).

366.    Second, the government showed McGuire a spreadsheet during her testimony, which the government filed as an exhibit to its proposed findings of fact and conclusions of law.  Document 202-1.  That spreadsheet identifies Government Exhibit 6, the H Green LLC application, and confirms that it was filed on June 6, 2021.[5]

367.    McGuire's testimony that Government Exhibit 6 was filed on July 3, 2021, is likewise refuted by various other facts: (a) July 3, 2021, was a Saturday, and applications were not filed on Saturday, particularly the day before the July 4th holiday, (b) OBN switched to a new platform at the beginning of July 2021, as McGuire acknowledged, Tr. at 325, and (c) applications filed in June 2021 were not processed until after OBN switched to the new system in July 2021, as McGuire acknowledged, Tr. at 325-26.

368.    The July 3, 2021, date relied on by McGuire is simply the date that OBN switched over to a new registration platform, and hence that document's "creation" date is July 3, 2021.  *See, e.g.*, Exhibits 5, 6 and 37.  That is why this application, like others, bears the date of July 3, 2021.  *See, e.g.*, Exhibit 95 (application for Yizhi Green LLC bearing date of July 3, 2021).

369.    The defense admitted copious evidence of this platform changeover, including emails demonstrating that the Stacy Legal Group could not even access OBN's platform in early July 2021.  *See, e.g.*, Exhibits 5, 6, 37, 51.

---

[5] The defense did not have a copy of this spreadsheet until it was filed by the government as an exhibit to its pleading.

370.    For example, on July 9, 2021, Jessica Goure emailed OBN to complain that the Stacy Legal Group could not access their account after the changeover to the new system, despite following the instructions provided by OBN.  Exhibit 6.

371.    McGuire eventually conceded she did not know the date that the application identified as Government Exhibit 6 was filed with OBN.  Tr. at 326.

372.    On redirect examination, McGuire began to equivocate regarding her testimony as to Government Exhibit 6, testifying that the attestation question "was answered by the applicant at some point no matter when they submitted their application to us."  Tr. at 339-40.

373.    This testimony was likewise inaccurate.  Once an application was submitted to OBN, the Stacy Legal Group had no ability to go back into the system and alter, adjust or modify that part of the application.

## XII.    Mr. Stacy Had The Consent Of Local Residents.

374.    Helen Carrillo attended a meeting at Stacy Legal Group in the summer of 2020 after her husband's friend asked whether Ms. Carrillo would serve as a local resident for the friend's marijuana grow.  Tr. at 158.  Helen's husband Rafael Carrillo also attended the meeting.  Tr. at 158.

375.    At the meeting, Mr. Stacy answered Helen Carrillo's questions, and she consented to being the local resident.  Tr. at 159-60.

376.    After that time, Rafael Carrillo was in regular contact with Mr. Stacy via text message, sometimes using Helen Carrillo's phone with her permission and in her presence.  Tr. at 161; Exhibits, 82, 109, 118.

377.   Helen and Rafael Carrillo fully consented to Helen being used on additional applications by Mr. Stacy.  Tr. at 165-66.

378.   The Carrillos regularly and repeatedly inquired with Mr. Stacy regarding additional opportunities for Helen to serve as a local resident on marijuana licensure applications.  Tr. at 162-64.

379.   Helen Carrillo would receive $5,000 for the first year of an entity's operation, and then another $5,000 if the company's license was renewed for a second year.  Tr. at 163.

380.   As the text messages admitted as exhibits and Rafael Carrillo's testimony clearly demonstrate, the Stacy Legal Group was not required to send contracts ("docusigns") to Helen Carrillo before the Stacy Legal Group was authorized to utilize Helen Carrillo on a license application.  Tr. at 164.

381.   For example, on July 15, 2020, Mr. Stacy texted, "We are behind.  I will give [Rafael Carrillo] a list."  Tr. at 165; Exhibit 82.

382.   The Carrillos understood this to mean that Mr. Stacy had placed Helen Carrillo on an application without a pre-existing contract in place.  Tr. at 165.  The Carrillos were fine with that.  Tr. at 165.

383.   The text chain between Mr. Stacy and Helen Carrillo contains additional similar examples.  Exhibit 82.

384.   On March 1, 2021, OBN agents, including Agent Martinez, went to the Carrillos' home and informed them that Helen had been listed on 64 applications.  Tr. at 172.

385.    Just before that visit, on February 22, 2021, Mr. Stacy engaged in a series of texts with Helen Carrillo (though it was likely Rafael Carrillo doing the typing for his wife, Helen).  Those text exchanges clearly demonstrated that Mr. Stacy and the Carrillos needed to get "aligned" regarding the number of applications naming Helen Carrillo as a local resident.  Tr. at 173.

386.    On February 22, 2021, at 10:04 a.m., Helen Carrillo texted the following: "Good Morning Mr. Stacy, its Helen again lol [laugh out loud]. I'm just checking in to see if you have a date for pick up that way I can schedule at your convenience."  Exhibit 82.  After plans were made for a visit on a following Thursday, Mr. Stacy texted: "See you then. Can you tell me how much I have paid you so far? I am just keeping it for internal records."  Exhibit 82.  Helen Carrillo then texted that she had "11 DocuSign emails" from Mr. Stacy's office and asked if "that match[es] your records."  Exhibit 82. Mr. Stacy responded: "I'll check," and noted that he just wanted to check with Ms. Carrillo "to make sure we are aligned."  Exhibit 82.  Helen Carrillo then texted (still on February 22, 2021): "Oh makes sense. I'm not sure I have every document signed for contracts you paid us on. I just signed the ones your office emailed me."  Exhibit 82.

387.    On March 4, 2021, Helen and Rafael Carrillo met with Mr. Stacy at his office.  Tr. at 172.  Rafael Carrillo had thought the number of applications naming his wife was lower than agents disclosed on March 1st, so Mr. Stacy, Rafael and Helen went through the number of applications to get "aligned" on the number of applications and an accounting of payments, as they had discussed even before agents visited their home on March 1, 2021.  Tr. at 172.

388.    Rafael Carrillo was not upset about the applications that the Carrillos had not yet been paid for because Mr. Stacy was "usually pretty good" about making payment.  Tr. at 182-83.

389.    At the March 4, 2021 meeting, Mr. Stacy answered all the Carrillos' questions, and the Carrillos again provided consent for Mr. Stacy to use Helen Carrillo's name on applications moving forward, without any prior approval.  Tr. at 174.

390.    Mr. Stacy could use Helen Carrillo's name, and Mr. Stacy and the Carrillos would catch up later and align on the number of applications.  Tr. at 174.

391.    In short, both before and after March 4, 2021, Mr. Stacy at all times had the consent of Helen Carrillo to place her name on applications for medical marijuana licensure.

392.    The opportunity to be paid $5,000.00 per entity, per year, served as the obvious motive for the Carrillos to provide blanket consent to Mr. Stacy.

393.    Another local resident, Kylie Kennedy, likewise provided Mr. Stacy consent to be utilized as a local resident on medical marijuana applications.

394.    As Jessica Goure testified, Kylie Kennedy came to Mr. Stacy's office and consented to serving as a local resident for companies seeking marijuana licensure.  Tr. at 131-34, 151, 154.

395.    Kylie Kennedy came to the office with an individual named Jeff Chen.  Tr. at 132; Exhibit 88.

396.    Ms. Goure testified on direct examination that her best memory is that Ms. Kennedy came to the office with another woman named Krystal Blevins.  Tr. at 132-33.

70

397.    On cross-examination by government counsel, Ms. Goure testified: "I remember two women coming into the law firm with Jeff Chen. I believe it was Krystal and Kylie. And then they were put on licenses and had a meeting with Matt." Tr. at 151.

398.    Ms. Goure's testimony is corroborated by Mr. Stacy's professional calendar, which references a meeting on January 5, 2021, wherein Jeff Chen is bringing a local resident to his office.  Exhibit 29.

399.    Ms. Goure's testimony is also corroborated by her text message exchange with Jeff Chen and her email exchange with Ms. Kennedy.  In particular, on February 12, 2021, at 11:28 a.m., Ms. Goure texted Jeff Chen to advise that the "drivers license picture" for Ms. Kennedy "is not in the correct format," and asked Mr. Chen to have Ms. Kennedy email a picture of the front and back of her license to Ms. Goure at Jessica@stacylegalgroup.com.  Exhibit 144; Tr. at 133-34.

400.    At 12:37 p.m., Mr. Chen texted photographs of the front and back of Ms. Kennedy's license to Ms. Goure.  Exhibit 144.  Ms. Goure responded that she needed the photographs emailed to her by Ms. Kennedy.  Exhibit 144; Tr. at 133-34.

401.    At 1:58 p.m., Mr. Chen texted Ms. Goure that "[s]he already email to u." Exhibit 144.  Ms. Goure responded "Yep I got it."  Exhibit 144.

402.    In fact, on February 12, 2021, at 12:39 p.m., Ms. Kennedy had emailed a photograph of the front and back of her license to Ms. Goure.  Exhibit 149; *see also* Tr. 134.  The email was sent from the following address: kkennedy2212@icloud.com. Exhibit 149.

71

403.    Mr. Goure's testimony is also corroborated by an email she sent to Ms. Kennedy on August 31, 2021.  Exhibit 88.  In that email, Ms. Goure wrote that we "have been trying to get in contact with you," and that "Matt needs to have a meeting with you about a few changes made…"  Exhibit 88.  Ms. Goure confirmed in that email that Ms. Kennedy "came to our office to be put on a medical marijuana license with Jeff" and they needed her to come to the office to "sign some paperwork" and have "a brief meeting" with Mr. Stacy.  Exhibit 88.

404.    CX Green LLC was an entity formed for a client named Crystal Huynh. Exhibit 138.

405.    At the hearing in this matter, the government asserted that Ms. Huynh testified during the state proceedings that the "Stacy Legal Group put her name on the original license without her permission."  Tr. at 150-51.

406.    Ms. Huynh testified in the state court proceeding that she willingly consented to taking part in the marijuana grow and provided consent to do so during a meeting with Mr. Stacy.  State Transcript, Volume II, at 429-33, 435-37.

407.    Ms. Huynh also affirmed her voluntary participation in the marijuana business when she was interviewed by Agent Peterson on April 21, 2022.  Exhibit 138.

408.    On that date, Agent Peterson traveled to Ms. Huynh's residence and knocked on her door.  Exhibit 138.

409.    During that interview, Ms. Huynh told Agent Peterson that Mr. Stacy helped her set up a marijuana grow in late 2018, she sold the grow to a Chinese male, Mr.

Stacy did the paperwork for the sale, and, importantly, she told Agent Peterson "she had too much money in the grow and could not afford to keep growing."  Exhibit 138.

410.    While Ms. Huynh told Agent Peterson on that date that she could not recall the name of the Asian male to whom she sold the business, and told Agent Peterson she did not know a person named Guanrong Yang, *see* Exhibit 138, when she testified during the state proceedings Ms. Huynh identified Mr. Yang from a photograph as the person with whom she was in the marijuana business (though she knew him as "Ty").  State Transcript, Volume V, at 921, 930.

411.    There was an honest mistake made at the Stacy Legal Group in early 2021 when employees renewed Ms. Huynh's license.

412.    As Jessica Goure testified, there was discussion in the office that Guanrong Yang was purchasing the CX Green license from Ms. Huynh.  Tr. at 110-11; *see also* Exhibit 142 (internal Stacy Legal Group Asana entries noting that Guan Green would be taking over CX Green license and Ms. Huynh would be removed from license); Exhibit 145 (April 15, 2021, email noting that Jessica Goure needed to update the proof of residency for CX Green "before we can transfer it to the Guan Green info").

413.    Ms. Goure testified that she submitted the renewal license for CX Green because she "was under the impression it was getting purchased" by Mr. Yang.  Tr. at 111; *see also* Exhibit 142 at p.2 (February 18, 2021, Asana entry that the transfer of the license to Guan Green "WILL HAVE TO BE DONE AFTER THE RENEWAL IS APPROVED") (emphasis in original).

414.    The license was not renewed in any attempt to "do it behind Crystal Huynh's back or anything like that…".  Tr. at 111.

415.    This was simply "[a]nother one of the mistakes that can happen in a busy law office."  Tr. at 111.

416.    The license was surrendered when the Stacy Legal Group learned of the mistake.  Exhibit 146-148 (documenting surrender of CX Green license); Tr. at 110.

417.    On cross-examination, when Ms. Goure was asked to put in her "own words" what she remembered about this matter, she confirmed that it was her understanding that Ms. Huynh did not want her license any longer, Mr. Yang was going to purchase Ms. Huynh's license, and the intention was to remove Ms. Huynh's name from the license after it was renewed.  Tr. at 150.

418.    Carman Osborne (Ms. Goure's friend), Zac Staton (Ms. Goure's brother-in-law), and Annette Yarger (Ms. Goure's sister-in-law) all provided consent to be used as local residents on applications.  Tr. at 140-41.

### XIII.    Mr. Stacy Did Not Instruct Any Client To Lie To Any Bank.

419.    In its pre-hearing pleading, the government alleged that Mr. Stacy instructed a client, Barbara Miuccio, to lie to the bank about being in the marijuana business.  Doc. 87 at 9, 27.

420.    Mr. Stacy did not instruct Ms. Miuccio, or any other client, to lie to any bank.

421.    Exhibit 35 is an email from Barbara Miuccio.  It clearly demonstrates that the bank was notified that her business was in the cannabis business.

422.    Ms. Miuccio forwarded an email from the bank to Jessica Goure, asking "Stacy" if he could help her with the email.  Exhibit 35.

423.    The email from the bank unequivocally demonstrated the bank was on actual notice that Earth Angel was in the marijuana business.  Amongst other things, the email requested details about which of the entities was "the grow," and it requested a copy of various items including the "OBN License" and the "OMMA License."  Exhibit 35; *see also* Tr. at 122-23.

424.    The original email to Ms. Miuccio from the bank explicitly thanked her for "contacting First Enterprise Bank ***regarding a Grow Account***."  Exhibit 35 at p.3 (emphasis added).

425.    The attachment to the email explicitly advised that, amongst the materials required for all applications, were the "OMMA License" and "OBND license."  Exhibit 35 (attachment entitled "Keeping it Simple").

426.    Ms. Miuccio's testimony in the state proceeding that Mr. Stacy told her to lie to the bank is not accurate.  Ms. Miuccio is an extremely biased witness against Mr. Stacy, generated in large part by Agent Peterson falsely claiming to her that Mr. Stacy was responsible for the delay in her licensing and all of her financial strain, when it was Agent Peterson and OBN that was responsible for the delay and financial strain.  Tr. at 53-58.  As Agent Peterson conceded, he went so far as to tell Ms. Miuccio she should sue Mr. Stacy.  Tr. at 58.

427.    Finally, even assuming *arguendo* Mr. Stacy told Ms. Miuccio, or any other client, to not disclose the fact they were in the cannabis business, the government has not

cited a single state statute that would have been violated by any such legal advice. For this reason as well, the government cannot rely upon this conduct as a "non-compliant" predicate for a federal prosecution.

## XIV.   Mr. Stacy Never Intentionally Or Knowingly Rented His Property For The Purpose Of Unlawful Marijuana Activity.

428.    Mr. Stacy leasing his property to individuals engaged in the medical marijuana business, even to those acting in violation of medical marijuana statutes, does not violate any state statute. As such, this conduct cannot form the basis of a federal prosecution.

429.    Nonetheless, the evidence demonstrates that Mr. Stacy did not knowingly or intentionally lease his property to anyone for the purpose of engaging in unlawful drug activity.

430.    Admitted as Exhibit 113 is the lease for the property identified in Count II, located at 1383 S. State Highway 76, Blanchard, Oklahoma. The lease is executed by and between the Stacy Property Group, LLC and X Fortune Inc., Xiandan Yu, RuWen Zhu, and Zhongming Yu. Exhibit 113.

431.    The lease agreement expressly provides that Mr. Stacy's tenants will comply with "all applicable state and local laws and regulations from any governmental authority with jurisdiction over Tenant's use, including but not limited to Oklahoma medical marijuana law." Exhibit 113.

432.    Admitted as Exhibit 114 is an amendment to that lease, dated March 30, 2021.

433.    Admitted as Exhibit 122 is a recording of Mr. Stacy and his tenants.

434.    The recording is self-authenticating as to proof it is a conversation between Mr. Stacy and his tenants.  To wit, during the recording, the following statements are made: (a) "I'm happy to assist with the city of Blanchard"; and (b) "I am your landlord too."

435.    Mr. Stacy also says that he will reduce the rent by $3,000/month, thus resulting in a monthly lease payment of $14,125.00.  Exhibit 122.  Exhibit 113 shows that the lease amount was originally $17,125.00 per month.  These statements also confirm the recording is between Mr. Stacy and his tenants.

436.    The recording is self-authenticating in terms of the date being sometime during the summer of 2021. During the recording, Mr. Stacy explains in detail the recent change of position taken by OBN, including the following statements: (a) "OBN is no longer going to allow what's called a non-active Oklahoma resident to be on licenses"; (b) "the person on there has to be changed out to someone that's an active part of your business"; (c) "the Oklahoma resident now is required to be an active part of your business"; (d) "on June the 30th of this year, the OBN changed their policy, and they made it where they're no longer going to allow someone who's not a member of your company or an active member of your business to be able to hold that OBN license"; (e) "I can't provide that person anymore as of the June 30th policy change at OBN.  They're very strict on that"; (f) "the OBNDD, they have been very clear that I can't provide that Oklahoma resident to you guys, you have to provide it because it has to be someone that's willing to be held accountable in your company.  I mean, who that person is, that's

a decision you guys make"; (g) "I can't make the introduction anymore they're clear with me I can't participate in that"; (h) "I can't provide the person for you.  I can't even make a suggestion;" and (i) "the way they're interpreting the law, it really needs to be someone from your company, from your side, not someone that came through my law firm." Exhibit 122.

437.    Additionally, statements are made during the recording regarding how long it has been since the lease was executed and/or how many months are left on the lease. For example, during the recording, the following statements are made: (a) "it's been around one year" and (b) "there's another 12, I mean, at least another 12 months, 13 months left on the lease, 14 months left on the lease."  These statements likewise confirm the conversation occurred during the summer of 2021, as the original lease commenced September 16, 2020 and was set to expire on October 16, 2022.  Exhibit 113.

438.    As to the issue of Mr. Stacy never knowingly or intentionally leasing his property for the purpose of unlawful marijuana trafficking, Mr. Stacy explicitly tells his tenants that they cannot possess marijuana without an OBN registration.  To wit, Mr. Stacy tells them, (a) "it's very likely that your OMMA license will be approved, but you won't be able to get an OBN . . . License, which you're required to have both . . . to operate"; (b) "they'll inspect the facility for security cameras, security alarm systems, make sure there's no growing going on"; (c) "They're looking to make sure there's no plants.  They're looking 1), to make sure there's no plants currently growing"; and (d) "they're just looking for a few basic things, most importantly, to make sure there's no illegal growing going on."  Exhibit 122.

439.    Mr. Stacy's clear and direct statements to his tenants, as captured in Exhibit 122, demonstrates that he did not knowingly or intentionally lease his property for the purpose of his tenants engaging in unlawful drug activity.

440.    The grand jury testimony of Ru Wen Zhu, relied upon by the government on this issue, Govt. Exhibit 15, is devoid of factual detail, it is unreliable, and explicitly contradicted by Exhibit 122.

441.    Ru Wen Zhu was asked if Mr. Stacy was aware he was growing marijuana on his land without a marijuana license, and he responded "yes, he knew."  Govt. Exhibit 15 at 10.   There is no further detail provided to support this testimony.   Moreover, this testimony is explicitly contradicted by the recording admitted as Exhibit 122.

## XV.    OBN Is To Blame: OBN Was Ill-Prepared And Under-Resourced, And It Failed Miserably At Implementing The New Medical Marijuana Laws.

442.    From August 2018 to October 2021, 63 O.S. §422(B) mandated that the Department of Health "must approve all applications" that met seven rudimentary qualifications.

443.    There was no limit to the number of licenses to be issued by the Department of Health.  Tr. at 273.

444.    The Department of Health had only two weeks to approve or reject an application.  63 O.S. §422(A).

445.    The application fee was only $2500.00.  63 O.S. §422(A).

446.    All of this contributed to an avalanche of applications to OMMA and OBN. Tr. at 241 (OBN receiving approximately 300 applications per week).

447.    OBN agents conceded the agency was "not equipped" to respond, Tr. at 420, and "[a]bsolutely not prepared for what happened."  Tr. at 273.

448.    OBN had only two customer service representatives in 2018 and it resulted in "a very cursory check."  Tr. 241.

449.    OBN lacked the man power to execute search warrants on grows that it believed were operating unlawfully.  Tr. at 67.  As described by Agent Williams, challenges in executing searches included "significant heat," "manual labor involved in eradication," a lack of "heavy equipment," and a lack of "food for the agents at lunch." Tr. at 245-46.

450.    The problem, in Agent Peterson's words, was "overwhelming."  Tr. at 68.

451.    The result, in Agent Williams' words, was "lax enforcement."  Tr. at 273.

452.    OBN did not timely act on applications.  Mr. Stacy repeatedly sent emails asking for updates on pending applications, some of which had been pending as far back as August 2020.  *See, e.g.*, Exhibits, 3, 15, 19, 21, 32, 33, 42, 50, 52, 76.

453.    This caused chaos and confusion for participants in the industry.

454.    The Stacy Legal Group was getting "daily" inquiries from clients regarding their pending applications, there was a "sense of urgency from the clients," and they were "bothering" and "inundating" Stacy Legal Group with inquiries as to their pending applications.  Tr. at 117-118.  It was a "big problem." Tr. at 119.

455.    Dealing with OBN was a moving target, Tr. at 129, it was "difficult" and challenging, and the Stacy Legal Group could not always get straight answers from them, Tr. at 124.

456.    Jessica Goure testified she would email personnel at OBN, including Jessica McGuire and Gretchen Hall, on a weekly if not daily basis, and she would often come away "frustrated" by her communications with OBN personnel.  Tr. at 124-25.

457.    For example, on October 6, 2020, Jessica Goure emailed Gretchen Hall asking what the Stacy Legal Group should do for clients who needed to renew OBN registrations by October 31, 2020, but were still waiting on their licenses to be approved by OMMA.  Exhibit 47.  As Jessica Goure explained, clients with OBN registrations needed to renew their registrations on or before October 31st of the year.  Tr. at 129-30. Sometimes, the Stacy Legal Group did not receive necessary approvals or materials from OMMA before the October 31st deadline.  *Id*. at 130.  This presented Stacy Legal Group with a "pickle" situation because their clients needed to renew with OBN but they were still waiting for necessary materials from OMMA.  Tr. at 130-31.  Gretchen Hall's responsive email confirms there was no solid process in place at OBN to handle this situation.  Exhibit 47.

458.    OBN's online portal system was "inefficient," "incompetent" and rudimentary.  Tr. at 124-25; *see also* Exhibits 2, 17, 36 (illustrating problems with OBN's online portal).

459.    It did not even allow for the Stacy Legal Group to "halt" applications for clients who had decided to surrender their OMMA licenses.  Exhibit 40.

460.    OBN's online system went through different iterations over time, and there were inevitably problems when they changed platforms.  Tr. at 125-26; Exhibit 5.

461.    OBN changed their online portal system in July 2021.  Exhibit 5; Tr. at 126-27.  It was a hectic time for the Stacy Legal Group and there were problems with OBN's new system.  Exhibit 37; Tr. at 126-27.   Clients were "incessantly" making inquiry of the Stacy Legal Group and Jessica Goure could not get answers from OBN. Tr. at 127.

462.    On July 21, 2021, Jessica Goure emailed Jessica McGuire and Gretchen Hall, imploring that she "really need[ed] someone to reach out to us about our OBN log in," and reporting that she "just received another stack of approvals for OMMA today and can't apply for their OBN's and clients are on us daily about it."  Exhibit 37.

463.    On July 29, 2021, Ms. Liu Baker emailed Jessica McGuire and Gretchen Hall to again note they "still weren't able to see the new applications in the new system under registrations."  Exhibit 38.

464.    The failures of OBN are too extensive to chronicle here.

465.    It was not until February 2022 that OBN began to require applicants to complete an "Affidavit For Oklahoma Resident," attesting to certain facts related to Oklahoma residency and ownership interests, as well as attesting to the fact that applicant was "active in managing the day-to-day operations" or, if not active, agreeing to "provide additional documentation demonstrating proof of ownership to include: operating agreements, financial documents related to my acquisition or investment of business interests, and any further documentation as requested."  Exhibit 76.

466.    This affidavit was still rudimentary and insufficient.

467.    In May 2022, OBN issued a "peer reviewed white paper outlining the challenges in registering marijuana businesses."  Exhibit 74; Exhibit 81.

468.    In or about December 2022 or January 2023, OBN issued a policy statement on granting marijuana growing registrations, "an attempt by OBNDD to outline the application process for growing licenses with clarity and transparency."  Exhibit 74; Tr. at 328-29.

469.    This policy statement represented a radical change in the OBN application process.  The policy outlined a four step process: (1) an applicant for a registration needed to submit an application form, (2) the applicant needed to download and complete a "Supplemental Application Packet," which contained requests for additional information, (3) upon the timely return of the Supplemental Application Packet, OBN would schedule a face-to-face interview with all applicants on the application, and (4) at the completion of the interview, OBN may grant the registration or conduct a further criminal or administrative investigation.  Exhibit 74.

470.    It was not until that time that OBN required an applicant to fill out a comprehensive affidavit, provide articles of incorporation, "operating agreements," "management agreements," a self-inspection assessment, an owner and property information form, an employee identification form, a site plan, and certificates of occupancy.  The affidavit required attestations for various facts, including material facts as to ownership and operation of marijuana grows.  Exhibit 74; Tr. at 330-31.

471.    This change in policy, and application process, represented a step towards a responsible and effective approach to determining whether or not to grant a registration to grow, manufacture or dispense a controlled substance.  Tr. at 329-30.

472.    There was nothing preventing or prohibiting OBN from implementing a similar process from 2018 to 2022, Tr. at 331, it simply failed to do so.

473.    OBN dictated the application process and requirements for the application process, and it was up to OBN to decide what information or materials needed to be submitted with an application.  Tr. at 331.

474.    OBN and other state actors are responsible for the problems that emerged in the medical marijuana industry, not Mr. Stacy.  *See, e.g.,* Tr. at 331; Exhibit 74.

475.    Indeed, there were approximately 8,400 grow operations in Oklahoma, Tr. at 258, but Mr. Stacy submitted only 300 or so applications.  Tr. at 311.  Based on these figures, at most, Mr. Stacy represented less than five percent of all applications, which does not even account for the fact that there necessarily would be far more than 8,400 applications submitted if 8,400 applications were granted (*i.e.*, not every application was granted).

476.    On March 1, 2021, Agent Martinez told Mr. Stacy that it would be "normal course of business" for OBN to interview the local 75% owner of a marijuana grow, and that "of course" they would visit and interview the 75% owner of a marijuana grow.  Yet, OBN did not bother to visit Helen Carrillo until March 1, 2021. Tr. at 405-06.

477.    Had OBN done its job properly, Mr. Stacy would have disclosed the details of his legal practice to OBN at the outset of the process, as he had done with OMMA.

478.    While the government asked Ms. Goure if Mr. Stacy preemptively contacted OBN to ask permission to utilize his corporate structure, *see* Tr. at 147, there was no rule, law or regulation that even suggested, much less required Mr. Stacy to place such a call.  And, of course, agencies do not provide advisory legal opinions to lawyers.

## CONCLUSION

For all of the foregoing reasons, the defense respectfully submits the Court must enjoin the instant prosecution.  Mr. Stacy at all times reasonably believed his conduct complied with state law governing medical marijuana, and/or at all times he acted in substantial and/or strict compliance with the medical marijuana statutory framework.

Respectfully Submitted,
Matthew A. Stacy,
By His Attorney,


**/s/ Robert M. Goldstein**
Robert M. Goldstein
*Admitted pro hac vice*
GOLDSTEIN LAW FIRM
Mass. Bar No. 630584
20 Park Plaza, Suite 1000
Boston, MA 02116
Telephone: (617) 742-9015
Email: rmg@goldstein-lawfirm.com

Respectfully Submitted,
Matthew A. Stacy,
By His Attorneys,

**/s/ Josh Welch**
Josh Welch, OBA #17214
Joey Degiusti, OBA #33734
Allison B. Christian, OBA #34326
DEGIUSTI & WELCH PLLC
3721 N. Classen Blvd
Oklahoma City, OK 73118
Telephone: 405.778.3098
Email: josh@dwlegal.law
Email:  joey@dwlegal.law


Dated February 20, 2025

## **Certificate of Service**

I, Robert M. Goldstein, hereby certify that on this date, February 20, 2025, a copy of the foregoing document has been served via the Electronic Court Filing system on all registered participants, including but not limited to Assistant U.S. Attorneys Nicholas Coffey and Elizabeth Bagwell.

**/s/ Robert M. Goldstein**
Robert M. Goldstein